## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CHEGG, INC.

*Plaintiff*,

v.

GOOGLE LLC and ALPHABET INC.,

*Defendants*.

Case No. 1:25-cv-00543-APM

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................4

I.      GOOGLE'S SEARCH ENGINE ...............................................................................4

II.     CHEGG'S LAWSUIT ..............................................................................................6

ARGUMENT ........................................................................................................................8

I.      CHEGG FAILS TO ADEQUATELY PLEAD ANTITRUST STANDING......................8

II.     CHEGG FAILS TO PLEAD A CLAIM FOR RECIPROCAL DEALING
(COUNTS I-II)......................................................................................................11

      A.     Chegg Fails To Allege A *Per Se* Reciprocal Dealing Claim .................................12

      B.     Chegg Fails To Plausibly Allege A Reciprocal Dealing Claim Under The
Rule Of Reason ....................................................................................................19

      C.     Chegg Lacks Antitrust Standing To Raise A Reciprocal Dealing Claim .............21

III.    CHEGG FAILS TO PLEAD A CLAIM FOR "TORTIOUS CONDUCT"
UNDER THE SHERMAN ACT (COUNT III) .........................................................22

IV.    CHEGG FAILS TO PLEAD UNLAWFUL MONOPOLY MAINTENANCE
(COUNT V) ..........................................................................................................27

      A.     Chegg Lacks Antitrust Standing To Bring An Unlawful Monopoly
Maintenance Claim ..............................................................................................27

      B.     Chegg Has Not Alleged Exclusionary Conduct In The General Search
Services Market ...................................................................................................28

V.     CHEGG FAILS TO PLAUSIBLY PLEAD MONOPOLY LEVERAGING
(COUNT IV) AND ATTEMPTED MONOPOLIZATION OF THE ONLINE
EDUCATIONAL PUBLISHING MARKET (COUNT VI)..............................................30

      A.     There Is No Claim For Monopoly Leveraging Under The Sherman Act .............30

      B.     Chegg Fails To Plausibly Plead Attempted Monopolization.................................30

            1.     Chegg Fails To Plead A Relevant Market .................................................31

            2.     Chegg Fails To Allege The Elements Of Attempted
Monopolization ........................................................................................33

                  a.     Chegg Fails To Allege Anticompetitive Conduct In The
Relevant Market..........................................................................33

                  b.     Chegg Fails To Allege Specific Intent To Monopolize ................34

                  c.     Chegg Fails To Allege Google Has Dangerous Probability
Of Achieving Monopoly Power....................................................35

VI.   CHEGG FAILS TO PLEAD A VIABLE UNJUST ENRICHMENT CLAIM
      (COUNT VII)..................................................................................................37

      A.   California Law Applies To Chegg's Unjust Enrichment Claim...........................37

      B.   Chegg Fails To Allege Facts That Would Support A Quasi-Contractual
           Claim For Restitution..............................................................................39

CONCLUSION...........................................................................................................40

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*,
    62 F.3d 1454 (D.C. Cir. 1995) ................................................................................37

*\*Alaska Airlines, Inc. v. United Airlines, Inc.*,
    948 F.2d 536 (9th Cir. 1991) ............................................................................28, 30

*\*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
    592 F.3d 991 (9th Cir. 2010) ....................................................................10, 29, 34

*\*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
    190 F.3d 1051 (9th Cir. 1999) ......................................................21, 22, 27, 34

*\*Andrx Pharms., Inc. v. Biovail Corp. Int'l*,
    256 F.3d 799 (D.C. Cir. 2001) ..............................................................8, 9, 10

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..............................................................................................4

*Ass'n for Intercollegiate Athletics for Women v. NCAA*,
    735 F.2d 577 (D.C. Cir. 1984)........................................................................30

*Ass'n of Retail Travel Agents, Ltd. v. Air Transp. Ass'n of Am.*,
    635 F. Supp. 534 (D.D.C. 1986) ....................................................................36

*Astiana v. Hain Celestial Grp., Inc.*,
    783 F.3d 753 (9th Cir. 2015) ....................................................................38, 39

*Athos Overseas, Ltd. v. YouTube, Inc.*,
    2022 WL 910272 (S.D. Fla. Mar. 29, 2022)................................................18

*Atl. Richfield Co. v. USA Petrol. Co.*,
    495 U.S. 328 (1990)......................................................................................9, 19

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
    140 F.3d 494 (3d Cir. 1998)........................................................11, 12, 13, 20

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993)............................................................................................24

*Brown Shoe Co. v. U.S.*,
    370 U.S. 294 (1962)............................................................................................15

*Brown v. Brown*,
    524 A.2d 1184 (D.C. 1987) ............................................................................38

*Cal. Crane Sch., Inc. v. Google LLC*,
  2023 WL 2769096 (N.D. Cal. Mar. 31, 2023)................................................28

*Carpenter Tech. Corp. v. Allegheny Techs.*,
  646 F. Supp. 2d 726 (E.D. Pa. 2009) ..........................................................36

*Chicago Ins. Co. v. Paulson & Nace, PLLC*,
  37 F. Supp. 3d 281 (D.D.C. 2014), *aff'd*, 783 F.3d 897 (D.C. Cir. 2015).......................37

*City of Moundridge v. Exxon Mobil Corp*,
  471 F. Supp. 2d 20 (D.D.C. 2007) ..........................................................34, 35

*City of Oakland v. Oakland Raiders*,
  20 F.4th 441 (9th Cir. 2021) ..................................................................10

*Conwood Co., L.P. v. U.S. Tobacco Co.*,
  290 F.3d 768 (6th Cir. 2002) ..................................................................24

*Covad Commc'ns Co. v. Bell Atl. Corp.*,
  398 F.3d 666 (D.C. Cir. 2005) ................................................................24

*Cupp v. Alberto-Culver USA, Inc.*,
  310 F. Supp. 2d 963 (W.D. Tenn. 2004)........................................................32

*Dream Big Media Inc. v. Alphabet Inc.*,
  2022 WL 16579322 (N.D. Cal. Nov. 1, 2022) ...............................................18

*\*Dreamstime.com, LLC v. Google, LLC*,
  2019 WL 341579 (N.D. Cal. Jan. 28, 2019), *aff'd*, 54 F.4th 1130
  (9th Cir. 2022)........................................................................25, 26, 29

*Durell v. Sharp Healthcare*,
  183 Cal. App. 4th 1350 (2010) ................................................................38

*E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.*,
  357 F.3d 1 (1st Cir. 2004)......................................................................26

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992)............................................................................19

*Ekco Grp., Inc. v. Travelers Indem. Co. of Ill.*,
  273 F.3d 409 (1st Cir. 2001)....................................................................23

*Eli Lilly & Co. v. Home Ins. Co.*,
  764 F.2d 876 (D.C. Cir. 1985)..................................................................37

*\*Fotobom Media, Inc. v. Google LLC*,
  719 F. Supp. 3d 33 (D.D.C. 2024)..............................................12, 22, 27, 36

*Fresh Made, Inc. v. Lifeway Foods, Inc.*,
   2002 WL 31246922 (E.D. Pa. Aug. 9, 2002) ................................................. 32

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) ....................................................................... 20

*GEICO v. Fetisoff*,
   958 F.2d 1137 (D.C. Cir. 1992) .................................................................... 37

*Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C.*,
   61 Cal. 4th 988 (2015) ................................................................................. 40

*Ill. Tool Works Inc. v. Independent Ink, Inc.*,
   547 U.S. 28 (2006) ......................................................................... 20, 21, 34

*In re Aluminum Warehousing Antitrust Litig.*,
   833 F.3d 151 (2d Cir. 2016) ................................................................... 11, 22

\**Intergraph Corp. v. Intel Corp.*,
   195 F.3d 1346 (Fed. Cir. 1999) .................................................................... 13

*Iron Vine Sec., LLC v. Cygnacom Sols.*,
   274 A.3d 328 (D.C. 2022) ...................................................................... 38, 39

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984) .................................................................................. 16, 17

*Krukas v. AARP, Inc.*,
   376 F. Supp. 3d 1 (D.D.C. 2019) ................................................................. 39

*L.A. Land Co. v. Brunswick Corp.*,
   6 F.3d 1422 (9th Cir. 1993) ......................................................................... 35

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007) .............................................................................. 12, 13

*Montgomery Cnty. Ass'n of Realtors v. Realty Photo Master Corp.*,
   783 F. Supp. 952 (D. Md. 1992), *aff'd*, 993 F.2d 1538 (4th Cir. 1993),
   *cert. denied*, 510 U.S. 964 (1993) ............................................................... 17

*New York v. Meta Platforms, Inc.*,
   66 F.4th 288 (D.C. Cir. 2023) ...................................................................... 10

*News World Commc'ns, Inc. v. Thompsen*,
   878 A.2d 1218 (D.C. 2005) .......................................................................... 38

*Nordic Bank PLC v. Trend Grp., Ltd.*,
   619 F. Supp. 542 (S.D.N.Y. 1985) ............................................................... 17

*Nurriddin v. Bolden*,
    818 F.3d 751 (D.C. Cir. 2016) ................................................................................4

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018)........................................................................................20

*Peart v. D.C. Hous. Auth.*,
    972 A.2d 810 (D.C. 2009) .............................................................................38

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ......................................................................23

*\*PhantomALERT v. Apple, Inc.*,
    2025 WL 71888 (D.D.C. Jan. 10, 2025)........................15, 16, 21, 27, 28, 32, 34

*Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*,
    886 F.3d 332 (3d Cir. 2018).......................................................................29, 36

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997)..........................................................................16

*Rich & Whillock, Inc. v. Ashton Dev., Inc.*,
    157 Cal. App. 3d 1154 (1984) .......................................................................40

*Russell v. Walmart, Inc.*,
    680 F. Supp. 3d 1130 (N.D. Cal. 2023) .....................................................39, 40

*Rutherford Holdings, LLC v. Plaza Del Rey*,
    223 Cal. App. 4th 221 (2014) ........................................................................38

*Scott v. J.P. Morgan Chase & Co.*,
    296 F. Supp. 3d 98 (D.D.C. 2017) ..................................................................5

*Sidibe v. Sutter Health*,
    4 F. Supp. 3d 1160 (N.D. Cal. 2013) ............................................................21

*Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*,
    947 F. Supp. 2d 88 (D.D.C. 2013) .......................................................14, 31, 33

*Spartan Grain & Mill Co. v. Ayers*,
    581 F.2d 419 (5th Cir. 1978) ........................................................................11

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993)......................................................................................33

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997)..........................................................................................12

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
    373 F.3d 57 (1st Cir. 2004) ................................................................26

*Stutsman v. Kaiser Found. Health Plan of Mid-Atl. States, Inc.*,
    546 A.2d 367 (D.C. 1988) ................................................................37

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006) ................................................................12

*Therapearl, LLC v. Rapid Aid Ltd.*,
    2014 WL 4794905 (D. Md. Sept. 25, 2014) ................................................36

*TKO Energy Servs., LLC v. M-I L.L.C.*,
    539 F. App'x 866 (10th Cir. 2013) ................................................36

*Tremblay v. OpenAI, Inc.*,
    716 F. Supp. 3d 772 (N.D. Cal. 2024) ................................................40

*Tundra, Inc. v. Faire Wholesale, Inc.*,
    2024 WL 589097 (N.D. Cal. Feb. 13, 2024) ................................................31

*United States v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) ................................................................16

*United States v. Google LLC*,
    747 F. Supp. 3d 1 (D.D.C. 2024) ................................................4, 24, 35

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) ................................................................28

*United States v. Microsoft*,
    253 F.3d 34 (D.C. Cir. 2001) ................................11, 12, 14, 16, 26, 28, 29, 35

*United States v. Microsoft Corp.*,
    1998 WL 614485 (D.D.C. Sept. 14, 1998) ................................................30

*Uniwill v. City of Los Angeles*,
    124 Cal. App. 4th 537 (2004) ................................................................40

*Valley Prods. Co. v. Landmark*,
    128 F.3d 398 (6th Cir. 1997) ................................................................11

*Washkoviak v. Student Loan Mktg. Ass'n*,
    900 A.2d 168 (D.C. 2006) ................................................................38

*Wu v. Stomber*,
    750 F.3d 944 (D.C. Cir. 2014) ................................................................39

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C. § 15b ........................................................................................................10

**OTHER AUTHORITIES**

3A Areeda & Turner, *Antitrust Law*, ¶ 782(a) .............................................24

Chegg, Inc., Annual Report (Form 10-K)...................................................7, 9, 26, 32

Danny Sullivan, *A Reintroduction to Google's Featured Snippets*,
    GOOGLE: THE KEYWORD (Jan. 30, 2018),
    https://blog.google/products/search/reintroduction-googles-featured-
    snippets/ ...........................................................................................................5

*Flashcards*, QUIZLET, https://quizlet.com/features/flashcards.......................................32

Gary Myers, *The Restatement's Rejection of the Misappropriation Tort: A Victory
    for the Public Domain*, 47 S.C. L. REV. 673, 679-83 (1996)..............................23

*Get Homework Help with Chegg Study*, CHEGG, https://www.chegg.com/study .........................6

Liz Reid, *Generative AI in Search: Let Google Do the Searching for You*,
    GOOGLE: THE KEYWORD (May 14, 2024),
    https://blog.google/products/search/generative-ai-google-search-may-
    2024/ ...........................................................................................................6

Restatement (Second) of Conflict of Laws § 145 (Am. Law Inst. 1971) ...............................38, 39

Restatement (Third) of Unfair Competition § 38 (Am. Law Inst. 1995).....................................23

Richard A. Posner, *Misappropriation: A Dirge*, 40 HOUS. L. REV. 621, 641 (2003)...................23

## INTRODUCTION

Plaintiff Chegg, Inc., is an online learning company that provides students with homework and test answers in exchange for a monthly subscription fee.  Over the past several years, students have increasingly been looking to generative artificial intelligence tools like ChatGPT, Perplexity, or Gemini, which can just as easily provide quick answers to students' questions—often without a fee.  In the face of this competition, Chegg has experienced declining revenues and subscriber loss.  Instead of competing more effectively, it seeks to blame Google for its business decline.  Chegg's grab bag of obscure legal theories in support of this effort not only are not cognizable under the antitrust laws, but run directly afoul of those laws.

The core of Chegg's case faults Google for introducing generative AI features in its search engine that more efficiently provide users with the information they seek.  As a result, Chegg claims that Google Search now designs its search results page *too* well, thereby helping users realize that they will not find enough useful information on Chegg's website to justify their time to go there and find it.  In Chegg's preferred world, Google Search should be *less* efficient, requiring users to speculatively visit websites like Chegg's, where they can access their desired information—if it is found there at all—only after signing up for expensive, difficult-to-cancel monthly subscriptions.

No antitrust law supports this theory.  Chegg argues that Google has leveraged its alleged monopoly power in General Search Services to coerce Chegg and other online publishers to make their content available to Google, which Chegg claims is used to improve Google's search engine.  This alleged coercion, Chegg claims, violates antitrust law in multiple ways, impacting half a dozen markets spread across multiple different industries.  But Chegg does not claim to compete with Google in its alleged "General Search Services" market, nor does it state any plausible claim

that Google has created or achieved market power in online educational publishing. Those two facts alone are fatal to Chegg's antitrust claims.

Its scattershot claims fail for other reasons too. *First*, Chegg lacks antitrust standing to bring its claims. Across its antitrust claims, Chegg alleges two injuries: lost revenue that Chegg could otherwise have earned from selling or licensing its content to other AI companies and lost subscriptions resulting from fewer visits to Chegg's website. Neither injury is adequately pled. As to the lost revenue from selling or licensing content, Chegg alleges no facts plausibly alleging that there are any companies that would have otherwise paid for that content. And as to lost subscriptions, Chegg fails to plausibly allege that the drop in subscriptions is attributable to anything other than newfound competition resulting from the rise in generative AI.

*Second*, Chegg alleges that Google has engaged in unlawful reciprocal dealing by coercively withholding what the complaint calls "Search Referral Traffic" from Chegg and other publishers unless those publishers provide content in return. Plaintiff's theory of coercion is implausible. Google obtains content from websites for its search index based on publishers' own choices to make such content available. Publishers maintain discretion over which portions of their websites are available to Google and can even opt out of indexing altogether. Those publishers who continue to allow Google to index their sites do so not because of coercion, but because of the free traffic to their websites that indexing provides. In any event, this alleged arrangement does not constitute unlawful reciprocal dealing, which requires a defendant to condition purchases in one market on purchases in another market. Here, there is no plausible allegation of a market for Search Referral Traffic, and Chegg has also not adequately alleged the markets in which Chegg would otherwise sell its content.

*Third*, Chegg alleges that Google's introduction of new search features has unlawfully maintained its monopoly in the General Search Services market.  But Chegg does not plausibly claim to be a participant in the General Search Services market, so it lacks antitrust standing on these claims for that additional reason.  And regardless, Chegg's theory that Google's introduction of new AI-powered search features—which were introduced to make its search engine better for its users—constitute anticompetitive conduct fails as a matter of law.

*Fourth*, Chegg claims that Google is using its aforementioned market power in General Search Services to obtain a monopoly in a purported market for "Online Educational Publishing." That market is not plausibly alleged, but even if it were, Google has not participated—let alone engaged in anticompetitive conduct—in that market merely by providing educational information to search users.

*Fifth*, Chegg alleges that Google has misappropriated content generated by Chegg and other publishers.  But "misappropriation" is a claim that can be asserted only under the law governing intellectual property, and Chegg has chosen not to raise such a claim here.  Even if such a claim existed independent of intellectual property law, it is not a basis for antitrust liability.  And Chegg's independent claim for misappropriation based on an unjust enrichment theory is not supported by any allegations of fraud, mistake, coercion, or request, as the law requires.

For these and other reasons outlined below, Chegg's complaint should be dismissed.

# BACKGROUND[1]

## I.    GOOGLE'S SEARCH ENGINE

Google's search engine uses automated software—referred to as web crawlers—to "crawl the web" and collect information about what pages exist and what they contain. *United States v. Google LLC*, 747 F. Supp. 3d 1, 38 (D.D.C. 2024). Google's crawler is affectionately termed "Googlebot." Compl. ¶ 35. The results of this crawling are then organized into an index, which is searched whenever a user enters a query into the search engine. *Id.* ¶ 34.

Website developers maintain control over what content Google collects for its index through a file called robots.txt, which specifies the parts of a website Googlebot can crawl. Compl. ¶ 36. Using robots.txt, website developers can opt out of Googlebot crawling completely, or they can do so selectively, deciding for themselves which sections of their website can be indexed. *See id.*

When a user enters a query into Google, the search engine runs the query against Google's index. The search results are presented in a results page, which lists the results in the order that Google believes most relevant to the user and may also provide additional content, including advertisements, related searches, and excerpts of relevant webpages. *See* Compl. ¶ 31.

Google's search engine is "widely recognized as the best [search engine] available in the United States." *Google*, 747 F. Supp. 3d at 56. Rather than resting on its laurels, Google has repeatedly sought to introduce enhancements to its search engine to more efficiently provide its users with the information they seek. The features that Chegg protests in its complaint—the Knowledge Panel, Featured Snippets, the People Also Ask panel—are illustrative. The

---

[1] Chegg's factual allegations are taken as true for purposes of this motion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The motion does not, however, accept inferences drawn by Chegg that "are unsupported by the facts set out in the complaint," *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) (citation omitted), or "a legal conclusion couched as a factual allegation," *Iqbal*, 556 U.S. at 678 (citation omitted).

Knowledge Panel presents users with the answer to a simple query, such as the example Chegg provides regarding a search for "Washington's birthday." Compl. ¶ 60. Meanwhile, the Featured Snippets feature—introduced in 2014—provides excerpts from particular search results that Google believes to be especially relevant to a user's search. *Id.* ¶¶ 61-62. Chegg's complaint characterizes these excerpts as "Republishing Content." *Id.* ¶ 134. But Google added this feature with the understanding that Featured Snippets not only provide a better experience to users but also tend to drive traffic to websites whose content is excerpted in a Featured Snippet.[2] Likewise, the People Also Ask panel builds upon the Featured Snippet feature, offering additional Featured Snippets that may be relevant to a user's inquiry based on other, similar searches made by other users. *Id.* ¶ 64. Chegg does not claim that these features were introduced for any reason other than to improve the overall search experience for Google's users.

The rise of generative AI has provided Google with opportunities to improve the search experience for its users. Generative AI—so called because it *generates* natural language in response to a prompt—can allow users to engage in conversation, ask detailed questions, and even produce work product, such as computer code or an essay. *Id.* ¶¶ 79, 85. A fundamental technology underlying text-based generative AI is the large language model or LLM. "An LLM works by predicting words that are likely to follow a given string of text based on the potentially billions of examples used to train it. . . . LLM operators 'train' their models on vast datasets of written material, allowing them to encode patterns and relationships between words and sentences." *Id.* ¶ 85. The complaint refers to the datasets on which LLMs are trained as "GAI

---

[2] Danny Sullivan, *A Reintroduction to Google's Featured Snippets*, GOOGLE: THE KEYWORD (Jan. 30, 2018), https://blog.google/products/search/reintroduction-googles-featured-snippets/. This page is expressly referenced and excerpted in the complaint, *see* Compl. ¶ 61, and therefore may be considered on a motion to dismiss, *see Scott v. J.P. Morgan Chase & Co.*, 296 F. Supp. 3d 98, 105 (D.D.C. 2017).

Training" content.  *Id.* ¶¶ 134, 199.  Chegg also claims that, "once trained," an LLM can use a technique called "retrieval-augmented generation" (RAG) to "connect[] an LLM to external sources of information, such as live search results, to improve the quality of its outputs."  *Id.* ¶ 91.  The complaint refers to these external sources as "RAG Content."  *Id.* ¶ 134.

Among Google's new AI-based features are AI Overviews, which uses generative AI to augment Google Search.  *See id.* ¶¶ 102-06.  With AI Overviews, Google Search can parse more complex questions, providing "both a quick overview of a topic and links to learn more."  Liz Reid, *Generative AI in Search: Let Google Do the Searching for You*, GOOGLE: THE KEYWORD (May 14, 2024), https://blog.google/products/search/generative-ai-google-search-may-2024/.[3]  As with the other search features discussed, Google released AI Overviews with "a focus on sending valuable traffic to publishers and creators," recognizing that "links included in AI Overviews get more clicks than if the page had appeared as a traditional web listing for that query."  *Id.*

## II.    CHEGG'S LAWSUIT

Chegg is an online learning company that primarily provides its users with homework and test answers from its "database of 135 million proprietary question-and-answer solutions."  Compl. ¶ 24.  Chegg's main offering is a subscription-based service called "Chegg Study," *id.* ¶ 19, which Chegg advertises as providing "[h]omework solutions" and "[q]uiz & exam help," *Get Homework Help with Chegg Study*, CHEGG, https://www.chegg.com/study (last visited May 5, 2025) [hereinafter *Chegg Study*].  Subscribers enter their questions into the Chegg Study platform, which then spits out answers drawn from its database.  *See* Compl. ¶ 19.  Chegg alleges that students find their way to Chegg's website from Google Search when seeking a quick answer to coursework or

---

[3] This link is also referenced in the complaint, *see* Compl. ¶ 106 n.46, and therefore may be considered on a motion to dismiss.  *See supra* note 2.

a solution to a problem found in a textbook. *See id.* ¶¶ 38-43. To access Chegg's answers, students must subscribe to Chegg Study. Currently, Chegg charges $15.95 per month for Chegg Study, and $19.95 per month for its Chegg Study Pack, which includes additional features, such as "[e]xpert proofreading" and "[m]ath help." *Chegg Study, supra.*

Chegg has experienced four years of declining revenues. *See* Chegg, Inc., Annual Report (Form 10-K), at 59 (Feb. 24, 2025), [hereinafter Chegg 10-K]. Chegg has also lost 1.5 million subscribers since 2022. *See id.* at 4-5. Its subscriber and revenue declines began before Google's introduction of AI Overviews into its search engine results page.

As Chegg itself has recognized in its public securities filings, the growing popularity of generative AI products like OpenAI's ChatGPT is a threat to its subscription business. Chegg 10-K, *supra*, at 15. Generative AI can provide tailored, conversational responses to a user's inquiry, rather than relying on an aging database of Q&A solutions, as Chegg's services do. Given generative AI's competitive advantage, it is unsurprising that Chegg has seen "students . . . increasingly turning to generative AI for academic support, such as homework and exams," and "see generative AI products like Chat GPT and others as strong alternatives to vertically specialized solutions for education such as Chegg." *Id.* at 15-16. Chegg acknowledges that generative AI caught the company flatfooted: Chegg did not "pivot to AI" until April 2023, *id.* at 14, years after Google and other companies had begun developing AI tools, *see* Compl. ¶¶ 75-80.

Rather than innovating and competing, Chegg has now filed this lawsuit. Chegg blames Google for a variety of conduct and brings seven counts, which allege multiple (defective) theories of antitrust violations across a large range of markets.

At a high level, those claims can be sorted broadly into three categories. The first, which comprises Counts I and II, involve so-called reciprocal dealing, a rarely used theory that is based

here on Chegg's claim that "Google is . . . threatening to withhold . . . Search Referral Traffic" from Chegg and other publishers unless those publishers provide content in return.  *Id.* ¶ 131; *see also id.* ¶¶ 131-42.  The second category, which includes Counts IV through VI, involves Google's alleged use of monopoly power in the General Search Services market to unlawfully maintain its monopoly and to threaten monopolization in other markets.  *See id.* ¶¶ 143-44.  The final category, which comprises Counts III and VII, involves alleged unjust enrichment based on Google's alleged misappropriation of content generated by Chegg and other publishers.  *See id.* ¶¶ 145-48.  For the reasons explained below, Chegg's claims fail.

## ARGUMENT

### I.  CHEGG FAILS TO ADEQUATELY PLEAD ANTITRUST STANDING

Although each of Chegg's antitrust claims fail for various reasons, Counts I through VI can all be rejected because Chegg lacks antitrust standing.  To allege antitrust standing, Chegg must plausibly plead "that the defendant's illegal conduct caused its injury" and that the "injury . . . reflect[s] the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation."  *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 806, 812 (D.C. Cir. 2001).  A competitor "may not claim an injury resulting from competition even when such competition was actually caused by conduct that violates the antitrust laws."  *Id.*  Here, Chegg identifies two supposed injuries: (1) it "was paid less for the sale of Republishing Content, GAI Training Content, and RAG Content than it would have but for Google's conduct," and (2) it "lost revenues as a result of Google diverting traffic from [its] website in the form of lost subscription revenue from users' visits to its site."  Compl. ¶¶ 158, 168, 175, 181, 187, 194.  Neither injury is sufficient to confer antitrust standing.

The first claimed injury is not plausibly alleged because it is unsupported by any factual allegations.  The complaint includes no factual allegations supporting the notion that Google or

anyone else would pay Chegg any particular amount for this content if Google did not already have access to it. And there is ample reason to believe no one would. As Chegg acknowledges, "[a]n LLM works by predicting words that are likely to follow a given string of text based on *the potentially billions* of examples used to train it." Compl. ¶ 85 (emphasis added). In other words, generative AI requires "a massive collection of works" for training. *Id.* ¶ 87. There is little reason to think that Chegg's content has special value as compared to other potential sources of the same information, such as academic articles or similar education resources available on the internet. Indeed, Chegg's own content is derived from such sources. *See* Chegg 10-K, *supra*, at 27 ("[W]e have entered into agreements with textbook publishers that provide access to textbook questions and other content for our Chegg Study subscription service."). To the extent Chegg's purported injury flows from the fact that its content is becoming inessential in an increasingly AI-driven world, that is a "loss[] stemming from continued competition," *Atl. Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 334 (1990), not Google's alleged violations of the antitrust laws.

Chegg's second alleged injury—lost subscription revenues as a result of Google diverting traffic from Chegg's website, Compl. ¶¶ 158, 168, 175, 181, 187, 194—also does not confer antitrust standing. *First*, Chegg fails to plausibly plead that its lost revenues were caused by Google's alleged violations of the antitrust laws, and that the "decline in [Chegg's] business or property [is] not shown to be attributable to other causes." *Andrx Pharms.*, 256 F.3d at 808 (internal quotations and citations omitted). Chegg acknowledges the competitive threat that non-Google generative AI tools like ChatGPT pose to its business model, noting that "students are increasingly turning to generative AI for academic support, such as homework and exams." Chegg 10-K, *supra*, at 42-43. Yet Chegg fails to plead any facts supporting a plausible inference that Chegg's declining web traffic and subscription revenues flow from *Google's* alleged

9

anticompetitive conduct rather than the introduction of these various new sources of competition.[4] Why is any supposed injury to Chegg caused by Google's AI summaries as opposed to the widespread (and often zero-cost) availability of tools like ChatGPT or Copilot? Chegg never says. In addition, "standing may be denied if damages rest[] at bottom on some abstract conception or speculative measure of harm." *Andrx Pharms.*, 256 F.3d at 815 (internal quotation marks omitted). Here, Chegg's alleged injury relies on speculation that consumers would have purchased a Chegg subscription had they visited the website in response to a search query, and that they would have visited Chegg's website in greater numbers if Google had not introduced new search features— both dubious propositions, especially given the students' increased reliance on broadly available free generative AI tools. *See City of Oakland v. Oakland Raiders*, 20 F.4th 441, 459-60 (9th Cir. 2021) (concluding that a plaintiff lacked antitrust standing when it "ha[d] not alleged—and there is no way of knowing—what would have occurred in a more competitive marketplace").

*Second*, even as pleaded, Chegg's alleged lost subscription revenues do not "flow[] from that which makes defendants' acts unlawful," *Andrx Pharms.*, 256 F.3d at 812, because they stem not from any alleged reciprocal dealing, monopolization, or attempted monopolization on Google's part but rather from how Google is designing its search engine to make it better for its users. Chegg's fundamental complaint is that fewer consumers navigate to its website because Google's AI search features provide quick answers that eliminate the need for users to navigate to multiple webpages, including Chegg's. But "product improvement by itself does not violate Section 2, even if it is performed by a monopolist and harms competitors as a result." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 999–1000 (9th Cir. 2010);

---

[4] If Chegg alleges that its injuries stem from Google's introduction of Featured Snippets in 2014, rather than the more recent rise of generative AI, such a claim would be time-barred. *See* 15 U.S.C. § 15b; *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 295 (D.C. Cir. 2023).

*see also United States v. Microsoft*, 253 F.3d 34, 68 (D.C. Cir. 2001) ("[A] monopolist does not violate the Sherman Act simply by developing an attractive product."). The mere allegation that Google's change in business has resulted in "economic injury" to Chegg does not suffice to plead antitrust injury. *See, e.g.*, *Valley Prods. Co. v. Landmark*, 128 F.3d 398, 400, 403-04 (6th Cir. 1997) (affirming dismissal of tying claim predicated on defendants' withdrawing plaintiff's permission to use a valuable trademark).

Because Chegg fails to plead antitrust standing, Counts I through VI should be dismissed. *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157 (2d Cir. 2016) ("[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement we must dismiss it as a matter of law."). Chegg's antitrust claims also fail for lack of antitrust standing for the claim-specific reasons discussed below.

## II.    CHEGG FAILS TO PLEAD A CLAIM FOR RECIPROCAL DEALING (COUNTS I-II)

Chegg has not plausibly alleged that Google engaged in reciprocal dealing (to the extent it is even a viable antitrust theory), either in violation of Section 1 of the Sherman Act (Count I) or Section 2 of the Sherman Act (Count II). "Reciprocal dealing exists where . . . '[o]ne party offers to buy the other party's goods, but only if the second party buys other goods from the first party.' More colloquially, reciprocal dealing exists when one party tells the other: 'I'll buy from you, if you buy from me.'" *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 511 (3d Cir. 1998) (quoting *Spartan Grain & Mill Co. v. Ayers*, 581 F.2d 419, 424 (5th Cir. 1978)).

Courts analyze claims for reciprocal dealing under the same standard as claims for tying— "where a seller conditions the sale of one good (the tying product) on the buyer also purchasing another, separate good (the tied product)." *Brokerage Concepts*, 140 F.3d at 510, 512. And "like tying, not all reciprocal dealing arrangements are anticompetitive," only "'coercive' reciprocal dealing, where a party uses its economic power as a purchaser in one market in order to restrict

competition in another market where it is a seller." *Id.* at 511. As with tying, reciprocal dealing can be evaluated "under both the *per se* and rule of reason tests." *Id.* at 512; *see also Fotobom Media, Inc. v. Google LLC*, 719 F. Supp. 3d 33, 50 (D.D.C. 2024).

The allegation that any such reciprocal agreement exists between Google and Chegg is—to put it plainly—nonsense. Chegg does not and cannot allege that Google has promised to deliver any amount of referral traffic, or indeed any traffic at all, in exchange for Chegg allowing Google to index its site. Indeed, Chegg has not even alleged *that there is an agreement* governing Google's use of content crawled from its site. If any such agreement did exist, Chegg would necessarily be alleging that Google is promising to refer a certain amount of traffic to every website indexed for Google Search—an absurd result. If any such referral traffic flows at all, it is the result of users, not Google, choosing to click on Chegg's site in search results. In addition to the facial absurdity of Chegg's argument, Chegg has not plausibly alleged either the tying product market or the tied product market, and it has also failed to plausibly plead that Google engaged in any coercion, which would be required for a *per se* tying claim. Likewise, any claim for reciprocal dealing under the rule of reason fails, because it does not adequately allege anticompetitive harm in the tied markets.

### A.    Chegg Fails To Allege A *Per Se* Reciprocal Dealing Claim

Courts "presumptively appl[y] rule of reason analysis, under which antitrust plaintiffs must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). *Per se* treatment "is appropriate only after courts have had considerable experience with the type of restraint at issue, and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886-87 (2007). "[W]here the economic impact of certain practices is not immediately obvious," courts decline to adopt a *per se* rule. *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (citation omitted); *see also Microsoft*, 253 F.3d

at 385, 389 (declining to apply *per se* treatment to an alleged tying agreement "involv[ing] software that serves as a platform for third-party applications" because "tying . . . may produce efficiencies," particularly in "pervasively innovative . . . markets").  Plaintiff's allegations fall far short of meeting this high bar.

At the outset, reciprocal dealing itself has only been at issue in a few cases and has not supported a viable antitrust claim this century.  Even if it had, the type of reciprocal dealing that Chegg alleges is plainly not one that "courts have had considerable [or any] experience with." *Leegin*, 551 U.S. at 886.  As noted, courts describe reciprocal dealing as when a buyer conditions its purchase of a product on the seller agreeing to buy a separate product from it—in other words, "I'll buy from you if you buy from me." *Brokerage Concepts*, 140 F.3d at 511.  Here, by contrast, Chegg alleges "[r]eciprocal dealing occurs when a firm with market power *refuses to sell* product X to a customer unless that customer agrees to *sell (or give)* product Y to it."  Compl. ¶ 131 (emphasis added).  Put differently, Chegg claims that reciprocal dealing occurs when a defendant says, "I *won't sell* to you *unless* you sell to me."  But this alleged arrangement does not necessarily present the same economic effects that arise from the classic "I'll buy from you if you buy from me" arrangement. *Brokerage Concepts*, 140 F.3d at 511.  It is far from clear whether coercive reciprocal *selling* (i.e., the arrangement alleged here) has the same consequences as coercive reciprocal *buying* (i.e., typical reciprocal dealing).  Indeed, the only court to address a similar claim has rejected it. *See Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1361-62 (Fed. Cir. 1999) (holding that a seller's conditioning "a continued supply . . . of CPUs and technical information" on the buyer's "relinquishment of . . . technology patents without costs" to the seller did not constitute coercive reciprocal dealing).  At minimum, it is obvious that Plaintiff's novel theory of reciprocal dealing is not one that "courts have had considerable experience with." *Leegin*, 551

13

U.S. at 886.  That is doubly true given that the alleged markets in which this alleged reciprocal dealing has occurred involve cutting-edge technologies that courts are just beginning to consider. *Cf. Microsoft*, 253 F.3d at 92 ("While the paucity of cases examining software bundling suggests a high risk that *per se* analysis may produce inaccurate results, the nature of the platform software market affirmatively suggests that *per se* rules might stunt valuable innovation.").  *Per se* treatment of Plaintiff's reciprocal dealing claim is therefore inappropriate.

In any event, Chegg has not adequately alleged the requisite elements of a *per se* reciprocal dealing claim, which courts borrow from tying cases.  "There are four elements to a *per se* tying violation: (1) the tying and tied goods are two separate products; (2) the defendant has market power in the tying product market; (3) the defendant affords consumers no choice but to purchase the tied product from it; and (4) the tying arrangement forecloses a substantial volume of commerce."  *Microsoft*, 253 F.3d at 85.  Three fundamental flaws doom Chegg's claims.

*First*, Chegg fails to plausibly allege tying and tied product markets and is thus unable to establish the first two elements.   Chegg alleges that the tying product market is "Search Referral Traffic."  Compl. ¶¶ 151, 163.  Yet Chegg fails to allege any facts to support the existence of such a market.  Instead, Chegg merely asserts—without any basis—that "[t]here is a distinct relevant antitrust market for Search Referral Traffic."  *Id.* ¶ 131.  At the pleading stage, the "alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes . . . , and it must be plausible."  *Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*, 947 F. Supp. 2d 88, 103 (D.D.C. 2013).  The "failure to define the market by reference to the reasonable interchangeability—or lack thereof—of services is valid ground for dismissal at the Rule 12(b)(6) stage."  *Sky Angel*, 947 F. Supp. 2d at 103.

The absence of factual allegations supporting this supposed market is unsurprising because a "market" for Search Referral Traffic makes little sense. "[A] market is 'any grouping of sales whose sellers, if unified by a hypothetical cartel or merger, could profitably raise prices significantly above the competitive level.'" *PhantomALERT v. Apple, Inc.*, 2025 WL 71888, at *5 (D.D.C. Jan. 10, 2025) (citation omitted). Here, Chegg alleges that a "market" exists in which Google "sells" Search Referral Traffic to publishers, who "'pay' for search distribution by contributing their websites' contents and associated metadata to the search engines." Compl. ¶ 32. But Google does not sell "Search Referral Traffic" to publishers, obtains no revenue from them for delivering that Traffic, and Chegg does not buy it from Google. Nor can Chegg plead that Google promised Chegg or any other publisher a certain volume of traffic, or indeed, any traffic at all, in exchange for allowing their pages to be indexed by Google. At most, Google "refer[s]" users to web pages chosen by those users that do not block Google from indexing their content, thus generating this so-called "Search Referral Traffic." *Id.* ¶¶ 32-36. This arrangement bears no relationship to the "grouping of sales" that courts typically regard as a market. *PhantomALERT*, 2025 WL 71888, at *5. It beggars belief that every web publisher that fails to opt out of indexing is "paying" for Search Referral Traffic simply by allowing Google to index their websites.

Moreover, it is well established that a market must be defined "by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962). A complaint that "fails to draw the market's boundaries to encompass the product at issue as well as all economic substitutes for the product . . . cannot state a claim for relief." *PhantomALERT*, 2025 WL 71888, at *8 (internal quotations omitted). Chegg acknowledges that web publishers have other ways of obtaining referral traffic, such as "[d]irect navigation" to a publisher's website or "a publisher's

website via links on other publishers' pages or social media" or, indeed, purchasing ads, Compl. ¶ 132, but fails to plausibly allege that these other forms of referral traffic do not compete with Search Referral Traffic. Chegg suggests that these alternatives are "not viable substitutes for Search Referral Traffic" because users "go to search engines when they are specifically looking for information." *Id.* While Chegg may value Search Referral Traffic more highly than other sources of referral traffic, that is certainly not the case for *all* web publishers, such as news outlets or bloggers, and Chegg has not even asserted, let alone plausibly alleged, that it is. "The test for a relevant market is not commodities reasonably interchangeable by a particular plaintiff, but 'commodities reasonably interchangeable by consumers for the same purposes.'" *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)).

Chegg also fails to allege any facts in its 206-paragraph complaint to support its alleged tied product markets of "Republishing Content," "GAI Training Content," and "RAG Content." Compl. ¶ 134. Chegg offers no allegations whatsoever to support the existence of these markets, stating only that "[c]ontent supplied for each of these uses constitutes a separate product sold in a separate relevant product market." *Id.* Those conclusory assertions are insufficient. *See PhantomALERT*, 2025 WL 71888, at *8.

*Second*, even if Chegg had plausibly alleged the existence of the tying and tied markets, it has not adequately pleaded that "the tying and tied goods are two separate products." *Microsoft*, 254 F.3d at 85. "[T]he answer to the question whether one or two products are involved turns . . . on the character of the demand for the two items." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19 (1984). As just discussed, Chegg attempts to allege the tying market of Search Referral Traffic and the tied markets of Republishing Content, GAI Training Content, and RAG

Content.  The complaint includes no allegations that suggest that there are "distinct markets" that are "distinguishable in the eyes of buyers" for publisher content indexed for Google Search in exchange for Search Referral Traffic and publisher content that is republished through snippets, used for GAI training, or repackaged via RAG.  *Id.*  To the contrary, Chegg admits that those markets all involve the exchange of the same purported product—website content that is indexed for Google Search.  *See* Compl. ¶ 138 ("Google's crawler collects Search Index Data from digital publishers . . . . But it uses the same index data for Republishing Content, GAI Training Content, and RAG Content.").  That publisher content serves as "pay[ment]" for Search Referral Traffic in the alleged tied market, *id.* ¶ 32, yet that content is also "sold" as Republishing Content, GAI Training Content, and RAG Content, *id.* ¶ 134.  Thus, what Chegg has really alleged is a single product market, in which publisher content is exchanged.  *See Nordic Bank PLC v. Trend Grp., Ltd.*, 619 F. Supp. 542, 559 (S.D.N.Y. 1985) (holding that two different types of loans allegedly tied together were not separate products because they "involved the same market for credit," even though the loans were for different purposes); *Montgomery Cnty. Ass'n of Realtors v. Realty Photo Master Corp.*, 783 F. Supp. 952, 960-61 (D. Md. 1992), *aff'd*, 993 F.2d 1538 (4th Cir. 1993), *cert. denied*, 510 U.S. 964 (1993).  Because publisher content that is indexed for Google Search is the same content alleged to be used for republishing, GAI training, and RAG, it cannot be true that they also constitute separate products.

*Third*, Chegg fails to adequately allege coercion—that is, that publishers have no choice but to "sell" the tied products to Google, which but for Google's coercion could be sold elsewhere.  Chegg alleges that Google conditions the "sale" of Search Referral Traffic "on Plaintiff giving Google Republishing Content, GAI Training Content, and RAG Content (the Tied Products) for free."  Compl. ¶ 151.  But the complaint makes clear that Google does not require publishers to

"give" Google anything.  Google simply indexes publicly available content, *id.* ¶¶ 34-35, and Chegg acknowledges that publishers are free to block Google from indexing their content if they wish, *id.* ¶ 36.  Google does not charge publishers to index their websites, nor does it pay publishers for indexing access.  Courts have uniformly held that there can be no coercion for "acceptance of a free service" like the one at issue here.  *See Athos Overseas, Ltd. v. YouTube, Inc.*, 2022 WL 910272, at *3 (S.D. Fla. Mar. 29, 2022) ("[A]cceptance of a free service does not constitute an impermissible tie-in."); *Dream Big Media Inc. v. Alphabet Inc.*, 2022 WL 16579322, at *4 (N.D. Cal. Nov. 1, 2022) ("Because they fail to allege they purchased any Google . . . services, [Plaintiffs] fail to allege coercion.").

Chegg suggests that Google nevertheless engages in unlawful reciprocal dealing by "coercing publishers to supply content to be used for other purposes as a condition of being included in its search index *at all*," Compl. ¶ 131 (emphasis added), and that "publishers *must* let Google republish their content through snippets," *id.* ¶ 134 (emphasis added).  But this assertion is flatly contradicted by Chegg's own complaint.  As Chegg admits, publishers can prevent Google from showing snippets of their content by using the "nosnippets" meta-tag, *id.* ¶¶ 71-72—which means that publishers *can* be included in the search index without supplying "Republishing Content."[5]  Chegg alleges that using the "nosnippets" tag "means demotion on the [search results page] or disappearing from Google's organic search results entirely," *id.* ¶ 73, but Chegg's own allegations make clear that those effects do not stem from any coercive conduct by Google, but rather vigorous competition from other web publishers.  Chegg alleges that, if it uses the

---

[5] Despite acknowledging publishers' ability to opt out of snippets, Chegg curiously alleges elsewhere in the complaint that "[t]he only way for digital publishers to opt out completely is to block Google's crawlers, which effectively means forgoing Google Search Referral Traffic." Compl. ¶ 138.  That assertion is false, for the reasons Chegg acknowledges earlier in its complaint. *Id.* ¶¶ 71-72.

"nosnippets" tag, "other digital publishers" will decline to use the "nosnippets" tag to continue being featured in search results, thereby outcompeting Chegg's content on the search results page. *Id.* ¶¶ 139-40. That injury, however, is a "loss[] stemming from continued competition," *Atl. Richfield*, 495 U.S. at 334, not Google's alleged reciprocal dealing (or Google at all).

*Fourth*, Chegg fails to allege that the challenged conduct forecloses "a substantial volume of commerce in the tied market." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462 (1992). Even if Chegg's alleged tied markets existed (and Chegg does not adequately plead they do), Chegg does not even attempt to allege that the purported reciprocal dealing arrangement forecloses a substantial volume of commerce to other buyers or potential buyers in those alleged markets. *See* Compl. ¶¶ 149-70. Chegg makes no allegations that, but for the challenged conduct, this Republishing Content, GAI Training Content, or RAG Content could be sold elsewhere. *See supra* pp. 9. And while Chegg does allege that OpenAI and Perplexity "are paying for at least some publisher content" (namely, content from news publications), Compl. ¶ 84, the complaint is devoid of allegations that these companies—or anyone—has offered to pay for Chegg's content or that anyone would do so absent Google's alleged reciprocal dealing. The closest Chegg comes to alleging the foreclosure of any amount of commerce is a strained assertion that "[e]ducational publishing content with appropriate associated rights can satisfy at least some demand for content in each of these markets." *Id.* ¶ 134. But Chegg offers no factual allegations supporting the existence of such demand—let alone that Google has, through the challenged conduct, foreclosed a *substantial* volume of commerce to other buyers or potential buyers of this content.

### B.    Chegg Fails To Plausibly Allege A Reciprocal Dealing Claim Under The Rule Of Reason

Because Chegg fails to allege a *per se* reciprocal dealing claim, its claim must be analyzed under the rule of reason. That standard requires plaintiffs to plausibly allege that "the challenged

restraint has a substantial anticompetitive effect that harms consumers in the relevant market,"
*Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018). To do so, Chegg must plausibly allege that
the alleged conduct harmed competition in the market for the tied product. *See Brokerage
Concepts*, 140 F.3d at 510, 512 (analyzing reciprocal dealing claim under the same standard as
tying claim). As the Supreme Court has stated, "the justification for the challenge [against ties]
rest[s] on either an assumption or a showing that the defendant's position of power in the market
for the tying product [is] being used to restrain competition *in the market for the tied product*." *Ill.
Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 34 (2006) (emphasis added).

Chegg's complaint does not plausibly state that the challenged conduct harmed competition
in the allegedly tied markets—that is, the purported Republishing Content, GAI Training Content,
and RAG Content markets. Chegg makes no mention of any anticompetitive effects in those
purported markets. Instead, Chegg at most alleges that Google's conduct harmed competition in
the markets for General Search Services by "lower[ing] Google's costs," Compl. ¶¶ 154, 166, and
for Online Educational Publishing by "diverting traffic that would otherwise go to original content
publishers without compensation," *id.* ¶¶ 155, 167. Even if these allegations were plausible—
which they are not, *see supra* Part I—they are irrelevant because they are not about competition
"in the market for the tied product." *Ill. Tool Works*, 547 U.S. at 34; *see also FTC v. Qualcomm
Inc.*, 969 F.3d 974, 993 (9th Cir. 2020) ("[E]ven if [Defendant's] practices are interrelated, actual
or alleged harms to customers and consumers outside the relevant markets are beyond the scope
of antitrust law."). And the complaint is devoid of any allegations (let alone plausible allegations)
of harm to competition in the allegedly tied markets of Republishing Content, GAI Training
Content, and RAG Content. *See* Compl. ¶¶ 149-70.

Moreover, because these markets are not adequately alleged, Chegg fails to plead anticompetitive harm within such markets. *See Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160, 1178 (N.D. Cal. 2013) (holding that a complaint did "not plead facts showing any negative impact on competition in the tied markets" because "Plaintiffs have not defined the relevant markets sufficiently to make such a showing").

### C.     Chegg Lacks Antitrust Standing To Raise A Reciprocal Dealing Claim

Beyond the overarching antitrust standing problem described above, Chegg also specifically lacks antitrust standing to assert this reciprocal dealing claim because the type of injury that the law against reciprocal dealing is intended to prevent is injury in the tied market—here, the supposed markets for Republishing Content, GAI Training Content, and RAG Content. *See Ill. Tool Works*, 547 U.S. at 34. As to Chegg's claim that it was paid less for this content, that claim is unsupported by any factual allegations and therefore not plausibly alleged at all, let alone plausibly alleged to have an impact in the tied market. *See supra* Part I. As to Chegg's claim that it lost subscription revenue because of a purported reduction in Google Search Referral Traffic to its website, that purported injury does not occur in any of the tied markets. That is fatal to Chegg's reciprocal dealing claims: "Antitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained. Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999); *see also, e.g.*, *PhantomALERT*, 2025 WL 71888, at *6 ("Even if all PhantomALERT's assertions were true, it would not have suffered any injury in the smartphone market . . . because PhantomALERT, as an app developer, has suffered no injury in the smartphone market.").

### III.  CHEGG FAILS TO PLEAD A CLAIM FOR "TORTIOUS CONDUCT" UNDER THE SHERMAN ACT (COUNT III)

Count III, which asserts tortious conduct in violation of Section 2 of the Sherman Act, should likewise be dismissed for at least three reasons.

*First*, Chegg lacks antitrust standing.  As with Counts I and II, Chegg identifies its injuries as being paid less for the sale of Republishing Content, GAI Training Content, and RAG Content, and lost subscription revenues from reduced search traffic referrals.  Compl. ¶ 175.  These injuries are not plausibly alleged for the reasons explained.  *See supra* Part I.  Chegg also independently lacks antitrust standing to assert this count because it is not a "participant" in the General Search Services market—the market in which Chegg alleges Google has acquired and maintained a monopoly through tortious conduct.  *See Fotobom*, 719 F. Supp. 3d at 42 (evaluating "whether the plaintiff is a market 'participant'" and "hold[ing] that Plaintiff lacks antitrust standing to pursue claims with respect to the market for general search services"); *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d at 158 (explaining that "[g]enerally, only those that are participants in the defendants' market can be said to have suffered antitrust injury").  Because Chegg does not participate in the General Search Services market, the injuries it alleges plainly were not experienced in that market, or any other market where Google is alleged to be a monopolist.  And, as already explained, it is black-letter law that "parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury."  *Am. Ad Mgmt.*, 190 F.3d at 1057; *see supra* Section II.C.

*Second*, Chegg does not plausibly allege that Google engaged in tortious conduct.  The only tortious conduct Chegg identifies is Google's alleged "misappropriation of Plaintiff's content for AI model training and grounding and republishing."  Compl. ¶ 172.  But Chegg does not explain what the tort of "misappropriation" is or offer any allegations supporting its assertion that

Google has committed this supposed tort. Instead, Chegg simply asserts that Google has "misappropriat[ed]" its content by using it for AI model training, grounding, and republishing. *Id.* ¶ 173. That is insufficient to plausibly allege that Google has committed a tort.

An antitrust claim based on misappropriation is especially inappropriate because the notion of "a residual common law tort of misappropriation" has been disfavored for decades. Restatement (Third) of Unfair Competition § 38 (Am. Law Inst. 1995); *see also Ekco Grp., Inc. v. Travelers Indem. Co. of Ill.*, 273 F.3d 409, 412 (1st Cir. 2001) ("There is no general common law rule against using the ideas, inventions and practices of others, absent deception or wrongful acquisition."); Gary Myers, *The Restatement's Rejection of the Misappropriation Tort: A Victory for the Public Domain*, 47 S.C. L. REV. 673, 679-83 (1996). For good reason: "[T]he potential for interference with the policies underlying the federal intellectual property regime counsels against the recognition of broad and indeterminate rights against misappropriation." Restatement (Third) of Unfair Competition § 38; *see also* Richard A. Posner, *Misappropriation: A Dirge*, 40 HOUS. L. REV. 621, 641 (2003) ("Clarity of analysis would be enhanced if the doctrine and the very word were banished from discussions of intellectual property law."). When no intellectual property regime applies, "[i]t is clear that no general rule of law prohibits the appropriation of a competitor's ideas, innovations, or other intangible assets once they become publicly known." Restatement (Third) of Unfair Competition § 38. Had Chegg brought a claim for misappropriation under the appropriate intellectual property regime—here, copyright law—that claim would undoubtedly fail. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1168 (9th Cir. 2007) (concluding that a plaintiff's copyright claim over thumbnail images would likely fail because "Google has put [the] thumbnail images . . . to a use fundamentally different than the use intended" and, "[i]n doing so, Google has provided a significant benefit to the public").

*Third*, even if Chegg had plausibly alleged misappropriation, it would still not have a viable Section 2 claim.  The Sherman Act does "not create a federal law of unfair competition or 'purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.'" *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993) (citation omitted).  Accordingly, "[i]solated tortious activity alone does not constitute exclusionary conduct for purposes of a § 2 violation, absent a significant and more than a temporary effect on competition, and not merely on a competitor or customer."  *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 783 (6th Cir. 2002); *see also Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 674 (D.C. Cir. 2005) (rejecting claim that false advertising gave rise to a Section 2 violation because plaintiffs failed to allege that the false advertising resulted in "a plausible harm to competition").  Indeed, "[b]usiness torts will be violative of § 2 only in 'rare gross cases.'" *Conwood*, 290 F.3d at 783-84 (quoting 3A Areeda & Turner, Antitrust Law, ¶ 782(a), at 272 (2002)).

This is not a "rare gross case."  Chegg has not plausibly alleged that Google's purported "misappropriation" has harmed competition in any relevant market.  Chegg instead asserts that "Google has willfully acquired and maintained its monopoly in General Search Services" by "systematically and repeatedly misappropriating Plaintiff's content for AI model training and grounding and republishing."  Compl. ¶ 173.  That assertion is implausible.  This Court has extensively analyzed the reasons for Google's success in General Search Services.  *See, e.g.*, *Google*, 747 F. Supp. 3d at 31 ("Google has not achieved market dominance by happenstance. It has hired thousands of highly skilled engineers, innovated consistently, and made shrewd business decisions.").  That success has had nothing to do with AI, and indeed long predates the introduction of the relatively nascent AI features at issue in this case.  *See id.* at 123 ("Currently, AI cannot replace the fundamental building blocks of search, including web crawling, indexing, and

ranking.").  The notion that using Chegg's content for AI model training has anything to do with Google's success is as absurd as it sounds.

The complaint is also devoid of factual allegations suggesting that any competitors of Google have been excluded from the General Search Services market because of the alleged misappropriation.  To be sure, Chegg asserts conclusorily that Google has "rais[ed] the costs of rivals who lack its power to coerce publishers to provide their content for free to develop competing products with comparable features."  Compl. ¶ 11; *see also id.* ¶¶ 51, 144.  But the complaint includes no factual allegations supporting the existence of such raised costs for Google's rivals or even the identity of any rivals whose costs were raised.  Instead, the complaint reflects that Google's competitors in the General Search Services market can and do obtain content used to train AI models for free: The complaint notes that other AI companies do not uniformly pay for the data used to train their models and have entered into only a few licensing deals with a handful of news publishers.  *See id.* ¶ 84 (noting that AI companies are paying only "for *at least some* publisher content" (emphasis added)).  Similarly, the complaint recognizes that some competitors of Google have been sued for relying on content that they did not pay for.  *See id.* ¶ 145 & n.69 (noting claims against OpenAI and Microsoft for failing to compensate the *New York Times* for AI training).  And even if Google's competitors were unable to obtain AI training content for free, Chegg has altogether failed to allege that this lack of access is attributable to any anticompetitive conduct on Google's part.  *See Dreamstime.com, LLC v. Google, LLC*, 2019 WL 341579, at *8 (N.D. Cal. Jan. 28, 2019) (dismissing antitrust claim where plaintiff "ha[d] not met its burden to show that the reason Google's rivals are unable to obtain the same access to licensed photos as Google is because of Google's anticompetitive action"), *aff'd*, 54 F.4th 1130 (9th Cir. 2022).

Chegg's assertion that "Google's tortious conduct" has "restricted output and reduced quality in digital publishing markets, including the Online Educational Publishing market, by diverting traffic that would otherwise go to original content publishers without compensation," Compl. ¶ 174, also does not constitute a plausible harm to competition in a relevant market. Google is not alleged to be a monopolist in the Online Educational Publishing market, and obviously it is not. Chegg itself has publicly acknowledged the existence, in a judicially noticeable document, of several competing "platforms that provide study materials and online instructional systems, such as Course Hero, Quizlet, Khan Academy, and Brainly," undercutting any suggestion that competition in the Online Educational Publishing is wanting. Chegg 10-K, *supra*, at 15. Thus, even assuming that Chegg had plausibly alleged that some of its competitors have been excluded from the Online Educational Publishing market (which it has not, *see infra* pp. 34-35), Google's alleged conduct does not create or maintain any monopoly, and thus does not violate Section 2.

Because Chegg does not explain how the alleged misappropriation has harmed competition among general search engines, it fails to allege any "harm [to] the competitive process" in the asserted market for General Search Services. *Microsoft*, 253 F.3d at 58; *see also Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 69 (1st Cir. 2004) (Boudin, J.) (explaining that "[s]ome antitrust cases are intrinsically hopeless because . . . they merely dress up in antitrust garb what is, at best, a business tort or contract violation"). Even if Chegg or other publishers are hurt in some way, "antitrust claims are concerned not with wrongs directed against the private interest of an individual business but with conduct that stifles competition." *E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.*, 357 F.3d 1, 4 (1st Cir. 2004); *see also Dreamstime.com*, 2019 WL 341579, at *6 (noting that even a "pattern of conduct that appears to be predatory . . . is not in and of itself injurious to competition in the relevant market"). No matter

how severely Chegg claims it is harmed, antitrust liability can be based only on *anticompetitive* conduct, which Chegg has failed to allege here.

## IV.    CHEGG FAILS TO PLEAD UNLAWFUL MONOPOLY MAINTENANCE (COUNT V)

Chegg alleges unlawful monopoly maintenance in the General Search Services market, Compl. ¶¶ 143-44, 185, but this claim fails for two reasons.  *First*, Chegg has not established antitrust standing to assert this claim: Chegg does not plausibly allege that it is a participant in the General Search Services market or that it suffered an antitrust injury in that market.  *Second*, even if Chegg had standing, Chegg does not plausibly allege that Google engaged in any exclusionary or anticompetitive conduct in the General Search Services market.

### A.    Chegg Lacks Antitrust Standing To Bring An Unlawful Monopoly Maintenance Claim

Chegg brings a claim for unlawful monopoly maintenance in the General Search Services market, Compl. ¶¶ 143-44, 185, yet, as discussed, fails to plausibly allege that it is a "participant" in that market, *see supra* p. 22.  Chegg thus lacks standing to assert a claim involving the General Search Services market.  *Fotobom*, 719 F. Supp. 3d at 43.

Instead, Chegg asserts that it was injured by Google leveraging its monopoly in the General Search Services market to obtain benefits on types of content in *other* markets for a reduced price. *See* Compl. ¶¶ 143-44, 186-87 (referencing injury to the Online Educational Publishing market and injury from obtaining Republishing Content, GAI Training Content, and RAG Content).  As already explained, Chegg fails to support this assertion with factual allegations.  *See supra* Part I.

Regardless, Chegg's alleged injury is not in the General Search Services market—the market in which Google is alleged to have unlawfully maintained a monopoly—which defeats antitrust standing.  *PhantomALERT*, 2025 WL 71888, at *6; *Am. Ad Mgmt.*, 190 F.3d at 1057; *see also Fotobom*, 719 F. Supp. 3d at 46 (dismissing claim when "Plaintiff nowhere explains how the

challenged conduct that harms Keyboard+ reduces competition in the market for general search, thereby causing Plaintiff antitrust injury in that market"). While injuries in downstream markets can sometimes support antitrust standing for certain claims (for example, a claim of attempted monopolization *of the downstream markets*), such allegations do not show antitrust injury for a claim for monopoly maintenance in the upstream, allegedly monopolized market. *See Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 547 (9th Cir. 1991) ("[A] plaintiff cannot establish a violation of Section 2 without proving that the defendant used its monopoly power in one market to obtain, or attempt to attain, a monopoly in the downstream, or leveraged, market.").

Because there "is a mismatch between the market allegedly controlled by [Google] and the market where [Chegg] is allegedly injured," Chegg has failed to allege an antitrust injury. *PhantomALERT*, 2025 WL 71888, at *6; *Cal. Crane Sch., Inc. v. Google LLC*, 2023 WL 2769096, at *3 (N.D. Cal. Mar. 31, 2023) (dismissing due to "mismatch" where plaintiff alleged injury in the "search advertising market," but alleged anticompetitive conduct in the "search market").

## B.    Chegg Has Not Alleged Exclusionary Conduct In The General Search Services Market

Even if Chegg had antitrust standing to bring a monopoly maintenance claim with respect to the General Search Services market, it has failed to plausibly allege "exclusionary conduct 'as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Microsoft*, 253 F.3d at 58 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)).

Chegg provides no plausible allegations that Google's conduct has caused or will cause anticompetitive harm to the General Search Services market. First, Chegg's allegations amount to an argument that Google Search has become too efficient, thereby leading to fewer visits to Chegg's website. As discussed, however, "[p]roduct improvement[s]" are not anticompetitive as

a matter of law. *Allied Orthopedic*, 592 F.3d at 999. Chegg also alleges that Google uses its monopoly power in the General Search Services market to obtain "GAI Training Content and RAG Content for free," which "effectively lowers Google's costs." Compl. ¶¶ 153-54. But a firm's efforts to lower its costs—even a supposed monopolist—does not violate the antitrust laws. *See, e.g.*, *Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 886 F.3d 332, 340 (3d Cir. 2018) ("Uber's ability to operate at a lower cost is not anticompetitive. Running a business with greater economic efficiency is to be encouraged, because that often translates to enhanced competition among market players, better products, and lower prices for consumers."). Regardless, the complaint includes no factual allegations suggesting that Google's rivals in the General Search Services market are unable to obtain free content to train their generative AI services or that any inability to access AI training data is attributable to anticompetitive conduct. *See Dreamstime.com*, 2019 WL 341579, at *8. Chegg's complaint acknowledges that other companies have accessed free content to train AI models, and it is implausible to think that other competitors in the General Search Services market or other firms with generative AI offerings could not do the same. *See supra* p. 25.

Nor does the Complaint allege that Google's conduct harms consumers in the General Search Services market. That allegation, too, would be implausible, given that Chegg's own complaint acknowledges that the challenged search features *benefit* Google's General Search Services consumers. *See, e.g.*, Compl. ¶ 144 (referring to Google AI Overviews "as a source of quick and easy information"). Thus, the challenged conduct is not exclusionary as a matter of law. *See Allied Orthopedic*, 592 F.3d at 999; *Microsoft*, 253 F.3d at 68.

## V.    CHEGG FAILS TO PLAUSIBLY PLEAD MONOPOLY LEVERAGING (COUNT IV) AND ATTEMPTED MONOPOLIZATION OF THE ONLINE EDUCATIONAL PUBLISHING MARKET (COUNT VI)

### A.    There Is No Claim For Monopoly Leveraging Under The Sherman Act

In Count IV, Chegg alleges that Google "unlawfully leveraged its monopoly power in General Search Services into other markets, including the Online Educational Publishing market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2." Compl. ¶ 179.  But no independent claim for "leveraging" exists under Section 2 of the Sherman Act.

Courts, including in this District, have consistently concluded that "leveraging" does not, by itself, constitute a separate viable claim under Section 2 of the Sherman Act.  *E.g.*, *United States v. Microsoft Corp.*, 1998 WL 614485, at *27 (D.D.C. Sept. 14, 1998) (granting summary judgment and noting that courts and commentators "have rejected the [leveraging] theory outright, as contrary to both economic theory and the Sherman Act's plain language"); *Alaska Airlines*, 948 F.2d at 547 (rejecting the "monopoly leveraging doctrine as an independent theory of liability under Section 2").[6]  Chegg's monopoly leveraging claim is, therefore, legally baseless and should be dismissed.  To the extent that Chegg invokes "leveraging" as exclusionary conduct to support an attempted monopolization claim, that claim also fails, because Chegg has failed to plausibly plead the markets in which any such "leveraging" has occurred and it has otherwise failed to allege the elements of an attempted monopolization claim.

### B.    Chegg Fails To Plausibly Plead Attempted Monopolization

Chegg's attempted monopolization claim—Count VI, which alleges that Google has used a monopoly in General Search Services to "creat[e] monopolies in digital publishing markets,

---

[6] The D.C. Circuit has not decided whether leveraging may constitute a distinct Section 2 claim but has noted the "substantial academic criticism cast upon the leveraging concept."  *Ass'n for Intercollegiate Athletics for Women v. NCAA*, 735 F.2d 577, 586 n.14 (D.C. Cir. 1984).

including in the Online Educational Publishing market," Compl. ¶ 192—is implausible.    At bottom, this claim rests on the assertion that Google has developed features that make Google Search more effective and efficient all to position itself as a monopolist in the Online Educational Publishing market.  Chegg cannot plead its way into court on such a farfetched theory.  But even accepting these fanciful allegations as true, Chegg's claims fail on their own terms.  Chegg has failed to allege a relevant market that Google has attempted to monopolize or that Chegg has suffered an injury in that market sufficient to confer antitrust standing.  And even setting aside those fatal flaws, Chegg fails to plead the elements of an attempted monopolization claim.

### 1.    Chegg Fails To Plead A Relevant Market

Chegg offers nothing close to the factual allegations required to define the purported market of "Online Educational Publishing."  Chegg asserts that, within the "field" of "publishers of nonfiction topical, historical, or reference information, such as science, medical, educational, or business reporting, guidance, or opinion . . . there exists a distinct market for educational publishing of the kind produced by Chegg."  Compl. ¶ 52.  Chegg dedicates only a single sentence to attempt to allege the boundaries of this proposed market: "Other forms of online informational content such as that conveyed by popular interest, news, or other nonfiction publishers *cannot substitute* for educational publishing content, because they fail to combine key attributes that student consumers require, such as curation, verification, authority, and pedagogical focus."  *Id.* (emphasis added).  Because these allegations are too vague to determine the proposed market's boundaries and fail "to define the market by reference to the reasonable interchangeability—or lack thereof—of" the products at issue, its claims must be dismissed.  *Sky Angel*, 947 F. Supp. 2d at 103.

*First*, Chegg's allegations are hopelessly vague.  The terms Chegg uses—like "key attributes," "curation," "verification," and "pedagogical focus," Compl. ¶ 52—"are so generic as to render implausible" any claim that relies on this "relevant market definition."  *Tundra, Inc. v.*

*Faire Wholesale, Inc.*, 2024 WL 589097, at *1 (N.D. Cal. Feb. 13, 2024) (dismissing case where relevant market definition turned on terms like "local," "new," and "emerging"); *Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963, 970 (W.D. Tenn. 2004) (finding "fatally vague" a proposed market of "exclusive salon hair care products"). Chegg offers no meaningful guidance—let alone facts—to distinguish between so-called "educational publishing" and other "online information content" that supposedly lacks "key attributes that student consumers require," or any further details on what constitutes "verification," "curation," "authority," or "pedagogical focus." Compl. ¶ 52.

*Second*, even if those terms were not fatally vague, Chegg's definition also fails to plausibly allege a reasonable lack of interchangeability, as the other forms of content that Chegg tries to argue are not substitutable—similarly vaguely defined as "popular interest, news, or other nonfiction publishers," Compl. ¶ 51—do not all plausibly lack traits like "verification," "curation," or "authority." *See PhantomALERT*, 2025 WL 71888, at *8 (dismissing where plaintiff failed to "draw the market's boundaries to encompass the product at issue as well as all economic substitutes for the product"). In public filings, Chegg has pointed to "platforms that provide study materials and online instructional systems, such as Course Hero, Quizlet, Khan Academy, and Brainly," as its chief competitors. Chegg 10-K, *supra*, at 15. It is not clear whether those acknowledged competitors would fall within the Online Educational Publishing market as Chegg has defined it—Quizlet, for example, relies heavily on user-created flashcards, which do not appear to be "verified," "curated," or based on any kind of "authority." *See Flashcards*, Quizlet, https://quizlet.com/features/flashcards (last visited May 5, 2025).

*Third*, Chegg does not allege any facts at all demonstrating that this Online Educational Publishing market is, in fact, a distinct market from overall digital publishing or nonfiction publishing. *See, e.g.*, *Fresh Made, Inc. v. Lifeway Foods, Inc.*, 2002 WL 31246922, at *5 (E.D.

Pa. Aug. 9, 2002) (dismissing when plaintiff did not "allege facts establishing that the market for specialty Russian dairy products, such as kefir, is distinct from the market for yogurt, other drinkable yogurt products, or from other dairy products in general").  Chegg's own allegations suggest that these other types of online publishing *are* interchangeable.  As the examples Chegg itself has provided show, the Google Search features that form the basis of Chegg's claim—such as Featured Snippets or AI Overviews—cite to a variety of online publications, not just so-called "educational publishing content."  *See, e.g.*, Compl. ¶¶ 63 (citing Wikipedia), 64 (citing news sources), 111-12 (noting "links . . . provided to other sources from which the AI Overview is also derived").  Chegg has therefore failed to "define the market by reference to the reasonable interchangeability" or raise any plausible allegations that such a market exists.  *Sky Angel*, 947 F. Supp. 2d at 103.

### 2. Chegg Fails To Allege The Elements Of Attempted Monopolization

To establish a Sction 2 violation for attempted monopolization, "a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).  Chegg fails to plead each of these elements.

### a. Chegg Fails To Allege Anticompetitive Conduct In The Relevant Market

Chegg's claim for anticompetitive conduct in the purported Online Educational Publishing market is predicated on its claim for reciprocal dealing.  *See* Compl. ¶ 141 ("By using reciprocal dealing to get free Republishing Content, GAI Training Content, and RAG Content, Google restricts competition in downstream digital publishing markets, including the Online Educational Publishing market, where it competes against other web publishers like Chegg.").  As explained, however, Chegg's claim of anticompetitive conduct resulting from any alleged reciprocal dealing

fails, because Chegg's allegations allege only that Google has harmed competition in the alleged markets for General Search Services and Online Educational Publishing. Those purported markets are irrelevant, because they are not the "market[s] for the tied product." *Ill. Tool Works*, 547 U.S. at 34—that is, the purported markets Republishing Content, GAI Training Content, and RAG Content. *See supra* Section II.B.

Moreover, Chegg claims that, because of Google's enhanced search features, users no longer "click through to . . . publishers' original content." Compl. ¶ 141. Again, these features constitute "[p]roduct improvement[s]," which are not, as a legal matter, anticompetitive. *Allied Orthopedic*, 592 F.3d at 999. In any event, the lost clicks that publishers allegedly experience do not occur in the Online Educational Publishing market. Instead, by Chegg's own admission, those reduced clicks occur in an alleged market for Search Referral Traffic. Compl. ¶ 131. As noted, "[a]ntitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained." *Am. Ad Mgmt.*, 190 F.3d at 1057; *see also PhantomALERT*, 2025 WL 71888, at *6. Because those alleged harms do not impact competition in the Online Educational Publishing market that Google is supposedly attempting to monopolize, they cannot support a claim for attempted monopolization.

### b.    Chegg Fails To Allege Specific Intent To Monopolize

"Specific intent to engage in predatory or anticompetitive conduct" is also "a required element of attempted monopolization." *City of Moundridge v. Exxon Mobil Corp*, 471 F. Supp. 2d 20, 42 (D.D.C. 2007). "In determining whether the plaintiff satisfies the specific intent to monopolize element, a court can infer intent from conduct that has no legitimate business justification but to destroy or damage competition." *Id.* at 42-43. "If plaintiff['s] claim is not supported by a factual assertion, however, specific intent is not sufficiently pled." *Id.* at 43.

Chegg has failed to plausibly allege such specific intent here. None of its factual allegations show conduct that has "no legitimate business justification but to destroy or damage competition" in the alleged Online Educational Publishing market. *Id.* Far from it: All that Chegg's allegations suggest is that Google intended to improve its offerings in the General Search Services market by providing more useful responses to users' search queries. *See, e.g.*, Compl. ¶¶ 60-65, 110-11.

      **c.**      **Chegg Fails To Allege Google Has Dangerous Probability Of Achieving Monopoly Power**

Finally, Chegg has failed to plausibly allege a dangerous probability of Google achieving monopoly power in the alleged Online Educational Publishing market. *First*, establishing a "dangerous probability of success" requires a plaintiff to show, as a threshold matter, that the relevant market "can be monopolized." *Microsoft*, 253 F.3d at 81. This requires, first, plausibly defining the relevant market, which Chegg has failed to do, *see supra* Section V.B.1, and second, showing that "substantial barriers to entry protect that market," *Microsoft*, 253 F.3d at 81. Entry barriers are "additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants," or "factors in the market that deter entry while permitting incumbent firms to earn monopoly returns." *L.A. Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1427-28 (9th Cir. 1993); *see also Google*, 747 F. Supp. 3d at 107 ("Entry barriers are factors 'that prevent new rivals from timely responding to an increase in price above the competitive level.'").

Chegg has alleged nothing of the sort here. The word "barrier" appears in the complaint only with reference to the "search market." Compl. ¶ 51. Chegg offers no allegations whatsoever specific to barriers in the Online Education Publishing market. It is simply implausible that this market has any "substantial barriers to entry." *Microsoft*, 253 F.3d at 81. As the allegations and common knowledge indicate, essentially anyone can start a website or app and display textual

content.  *See Phila. Taxi Ass'n*, 886 F.3d at 342 (dismissing complaint and noting that "[e]asy entry—particularly historical evidence of entry—is even more significant in the attempt case than in monopolization cases generally"); *TKO Energy Servs., LLC v. M-I L.L.C.*, 539 F. App'x 866, 872 (10th Cir. 2013) (affirming dismissal where plaintiff did "not plead . . . what substantial entry barriers exist").

    *Second*, Chegg has also failed to allege any facts to show that Google has a dangerous probability of monopolizing the alleged market.  *See Ass'n of Retail Travel Agents, Ltd. v. Air Transp. Ass'n of Am.*, 635 F. Supp. 534, 538 (D.D.C. 1986) (dismissing for failure to allege a "dangerous probability of success").  Chegg must support the "dangerous probability" element by alleging facts related to, for example, the defendant's "actual or probable market power," *id.* "market share, or the ability to affect competition," *Carpenter Tech. Corp. v. Allegheny Techs.*, 646 F. Supp. 2d 726, 735 (E.D. Pa. 2009).  "The D.C. Circuit has not established a minimum market share percentage from which courts may infer a dangerous probability, but it has observed that 'a share of 30% or less presumptively *disproves* requisite power.'" *Fotobom*, 719 F. Supp. 3d at 52.

    Here, Chegg makes no allegations about Google's share in the alleged Online Educational Publishing market.  That omission defeats any claim that Google has a dangerous probability of monopolization.  *See Therapearl, LLC v. Rapid Aid Ltd.*, 2014 WL 4794905, at *8 n.10 (D. Md. Sept. 25, 2014) (dismissing an attempted monopolization claim when a plaintiff made "no allegation as to [the defendant's] market share in the market").

    Further, Chegg fails to allege that Google participates in the alleged Online Education Publishing market at all.  Chegg alleges only that Google has implemented various search features that publish content to the search results page.  *See, e.g.*, Compl. ¶¶ 1, 56, 119.  But these allegations alone do not make it a participant in Chegg's purported Online Educational Publishing

market.  Chegg purports to define the Online Educational Publishing market as online publications with "key attributes" like "verification," "curation," "authority," or "pedagogical focus."  Compl. ¶ 52.  Yet, Chegg offers no allegations that Google Search features possess these attributes.

## VI.    CHEGG FAILS TO PLEAD A VIABLE UNJUST ENRICHMENT CLAIM (COUNT VII)

Like its antitrust claims, Chegg's unjust enrichment claim fails.  Under the law of the relevant forum—California, where both parties are based, *see* Compl. ¶¶ 18, 21-22—Chegg has alleged no facts to support an unjust enrichment claim.

### A.    California Law Applies To Chegg's Unjust Enrichment Claim

Where a federal court exercises supplemental jurisdiction, "it applies the forum state's choice of law rules."  *A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1463 (D.C. Cir. 1995).  Under District of Columbia law, this Court must "'first determine whether there is a conflict' between D.C. and [California] law in the case."  *Chicago Ins. Co. v. Paulson & Nace, PLLC*, 37 F. Supp. 3d 281, 290 (D.D.C. 2014) (quoting *Eli Lilly & Co. v. Home Ins. Co.*, 764 F.2d 876, 882 (D.C. Cir. 1985)), *aff'd*, 783 F.3d 897 (D.C. Cir. 2015).  If there is a conflict, the court must then determine which jurisdiction "has the 'more substantial interest' in having its law applied."  *GEICO v. Fetisoff*, 958 F.2d 1137, 1141 (D.C. Cir. 1992) (quoting *Eli Lilly & Co.*, 764 F.2d at 882).

To start, there is a conflict here because the District of Columbia recognizes a standalone cause of action for unjust enrichment while California does not.  *See Stutsman v. Kaiser Found. Health Plan of Mid-Atl. States, Inc.*, 546 A.2d 367, 372 (D.C. 1988) (recognizing a "clear conflict" because the District of Columbia provided a cause of action for loss of consortium due to negligence while Virginia did not).  Under D.C. law, plaintiffs have a cause of action for unjust enrichment whenever (1) they "conferred a benefit on the defendant; (2) the defendant retains the

benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222-23 (D.C. 2005).

By contrast, "in California, there is not a standalone cause of action for 'unjust enrichment.'" *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (quoting *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1370 (2010)). California instead treats unjust enrichment claims as a narrower "quasi-contract claim seeking restitution." *Id.* (quoting *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221 (2014)). A plaintiff may recover on such a quasi-contract theory only if they can show that the "defendant has been unjustly conferred a benefit 'through mistake, fraud, coercion, or request.'" *Id.* (citation omitted). Under D.C. law, plaintiffs may bring unjust enrichment claims without having to allege mistake, fraud, coercion, or request. Under that forum's approach, "[o]rdinarily . . . a 'promise to pay will be implied in law when one party renders valuable services that the other party knowingly and voluntarily accepts.'" *Peart v. D.C. Hous. Auth.*, 972 A.2d 810, 814 (D.C. 2009) (quoting *Brown v. Brown*, 524 A.2d 1184, 1186 (D.C. 1987)).

Next, California has a more substantial interest in applying its laws. D.C. courts look to four factors in determining which jurisdiction's interest controls: (1) "the place where the injury occurred," (2) "the place where the conduct causing the injury occurred," (3) "the domicile, residence, nationality, place of incorporation and place of business of the parties," and (4) "the place where the relationship is centered." *Washkoviak v. Student Loan Mktg. Ass'n*, 900 A.2d 168, 180 (D.C. 2006) (citing Restatement (Second) of Conflict of Laws § 145 (Am. Law Inst. 1971)).

Here, all four factors establish California's more significant interest. *First*, "[p]ecuniary harm to a plaintiff 'will normally be felt most severely at the plaintiff's headquarters or principal place of business.'" *Iron Vine Sec., LLC v. Cygnacom Sols.*, 274 A.3d 328, 349 (D.C. 2022)

(quoting Restatement (Second) Conflict of Laws § 145, cmt. f).  Here, that is California.  Compl. ¶ 18.  *Second*, Google is also headquartered in and has its principal place of business in California, *id.* ¶ 21, so California is the place "where the conduct causing the [alleged] injury occurred," *Wu v. Stomber*, 750 F.3d 944, 949 (D.C. Cir. 2014).  *Third*, with regard to a "tort caus[ing] primarily a 'financial injury'" like the one alleged here, the "plaintiff's principal place of business is the 'most important contact for determining the state of the applicable law.'"  *Iron Vine Sec.*, 274 A.3d at 349 (quoting Restatement (Second) Conflict of Laws § 145).  Fourth, California is the "center[]" of the "relationship" between the California-based parties.  *See Krukas v. AARP, Inc.*, 376 F. Supp. 3d 1, 31 (D.D.C. 2019) (finding that "plaintiff's relationship with the defendants is centered" in the location where "defendants have their primary place of business and where they make their policies and practices").

### B.    Chegg Fails To Allege Facts That Would Support A Quasi-Contractual Claim For Restitution

To state a quasi-contractual claim under California law, Chegg must allege that Google was "*unjustly* conferred a benefit 'through mistake, fraud, coercion, or request.'"  *Russell v. Walmart, Inc.*, 680 F. Supp. 3d 1130, 1133 (N.D. Cal. 2023) (quoting *Astiana*, 783 F.3d at 762).  It is not enough that Defendants may have "realized a gain at [Plaintiff]'s expense."  *Russell*, 680 F. Supp. 3d at 1133.  But a gain at Plaintiff's expense is all that Count VII of the Complaint alleges.  Compl. ¶ 203 ("Google's enrichment has come at Plaintiff's expense"); *see id.* ¶¶ 201-02, 205-06.

Chegg does not allege any mistake or fraud.  In fact, Chegg alleges that Google's Terms of Service and Privacy Policy clearly indicated that "[Google] was using content it crawls from the web to train the models that it uses to generate AI Overviews" and that this included Chegg's works.  Compl. ¶¶ 115-16.  And Chegg concedes that it retained the option of whether to permit Google to index its content.  Compl. ¶ 73.  Chegg therefore fails to allege the kind of "direct

request" that would support an unjust enrichment claim. *Russell*, 680 F. Supp. 3d at 1133-34 (invoking absence of "direct request" by defendant and plaintiff's exercise of choice as bases for dismissing unjust enrichment claim); *see also Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C.*, 61 Cal. 4th 988, 1000 (2015) ("When a person acts simply as she would have done in any event, out of duty or self-interest, she cannot equitably claim compensation from anyone who merely happens to benefit as a result.").

At most, Chegg alleges that, by leveraging its monopoly power, Google "coerce[d]" and "forced" it to accede to the purported "misappropriation of [its] content." Compl. ¶¶ 1, 9. But calling Google's conduct "coercion" does not make it so. To state a viable claim for "restitution due to economic duress" under California law, Chegg must identify a "wrongful act" taken by Google and plausibly allege that "a reasonably prudent person subject to such an act may have no reasonable alternative but to succumb when the only other alternative is bankruptcy or financial ruin." *Uniwill v. City of Los Angeles*, 124 Cal. App. 4th 537, 545 (2004) (quoting *Rich & Whillock, Inc. v. Ashton Dev., Inc.*, 157 Cal. App. 3d 1154, 1156-57 (1984)). Chegg does not come close to clearing that high bar. Nowhere does Chegg allege it had no feasible economic alternative other than acquiescing to the purported misappropriation of its content. Because Chegg does not allege the requisite "qualifying conduct" on Google's part, its unjust enrichment claim fails as a matter of law. *See Tremblay v. OpenAI, Inc.*, 716 F. Supp. 3d 772, 782-83 (N.D. Cal. 2024) (dismissing unjust enrichment claim for "OpenAI's use of [plaintiff's] copyrighted books to train ChatGPT" for want of allegations of "fraud, mistake, coercion, or request").

## CONCLUSION

For the reasons above, Google's motion to dismiss should be granted.

Dated: May 5, 2025                           Respectfully submitted,

By: _/s/ Sonal N. Mehta_
Sonal N. Mehta*
Chris Johnstone*
WILMER CUTLER PICKERING HALE
AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA  94306
Telephone: (650) 858-6000
Facsimile: (650) 858-6100
sonal.mehta@wilmerhale.com
chris.johnstone@wilmerhale.com
*Admitted Pro Hac Vice*

David Gringer (Bar No. 1001200)
WILMER CUTLER PICKERING HALE
AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888
david.gringer@wilmerhale.com

*Counsel for Defendants Google LLC &
Alphabet Inc.*