# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CHEGG, INC.,
3990 Freedom Circle
Santa Clara, California 95054

*Plaintiff*,

v.

GOOGLE LLC,
1600 Amphitheatre Parkway
Mountain View, CA 94043

and

ALPHABET INC.,
1600 Amphitheatre Parkway
Mountain View, CA 94043

*Defendants*.

Civil Action No. 1:25-cv-00543 (APM)

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

**TABLE OF CONTENTS**

I.     NATURE OF THE ACTION .................................................................................... 1

II.    JURISDICTION AND VENUE ............................................................................. 4

III.   THE PARTIES ........................................................................................................ 5

IV.    FACTUAL ALLEGATIONS ................................................................................. 6

    A.     Chegg's Investment in High-Quality and Trustworthy Content ............................ 6

    B.     Distribution of Publisher Content Through Search ................................................. 9

        1.     The Content Distribution Relationship Between General Search
             Services and Publishers ......................................................................... 9

        2.     The Importance to Chegg of Its Content Distribution
             Relationship with Google ...................................................................... 12

    C.     Google's Search Monopoly ................................................................................... 16

    D.     Google's Forced Entry into Digital Publishing Markets ....................................... 17

        1.     The Online Educational Publishing Market ............................................ 18

        2.     Google's Transformation from a Search Engine to Web
             Publisher ................................................................................................ 20

            a)     Phase I: Google republishes other digital publishers'
                   content on its SERP ..................................................................... 21

            b)     Phase II: Google develops GAI, uses GAI to rewrite
                   other publishers' content, then publishes that derivative
                   content on its SERP. .................................................................... 29

    E.     How Google's GAI Products Work ........................................................................ 34

            a)     Bard .............................................................................................. 36

            b)     Gemini ........................................................................................... 37

            c)     Search Generative Experience ...................................................... 42

            d)     AI Overviews ................................................................................ 44

    F.     Google's Unauthorized Use of Publisher Content for AI Training ....................... 49

i

G.     The Fundamental Threat Google Poses to Online Publishing ............................... 52

H.     The Unlawfulness of Google's Misappropriation of Digital Publishers' Content ...................................................................................................... 57

     1.     Reciprocal Dealing ...................................................................... 57

     2.     Monopoly Maintenance ............................................................. 62

     3.     Unjust Enrichment..................................................................... 65

COUNT I: Reciprocal Dealing in Violation of Section 1 of the Sherman Act............................ 68

COUNT II: Reciprocal Dealing in Violation of Section 2 of the Sherman Act.......................... 70

COUNT III: Unlawful Monopoly Leveraging in Violation of Section 2 of the Sherman Act..................................................................................................................... 72

COUNT IV: Unlawful Monopolization in Violation of Section 2 of the Sherman Act ............... 73

COUNT V: Unlawful Attempted Monopolization in Violation of Section 2 of the Sherman Act.................................................................................................................... 74

COUNT VI: Common Law Unjust Enrichment.......................................................................... 75

Plaintiff Chegg, Inc. ("Chegg"), by its attorneys Susman Godfrey L.L.P., for its amended complaint against Defendants Google LLC and Alphabet Inc. (together, "Google"), alleges as follows:

## I.    NATURE OF THE ACTION

1.    This action challenges Google's abuse of its adjudicated monopoly in General Search Services to coerce online publishers like Chegg to supply content that Google republishes without permission in AI-generated answers that unfairly compete for the attention of users on the Internet in violation of the Antitrust laws of the United States. This conduct threatens to further entrench Google's generative search monopoly and to expand it into online publishing, restricting competition in those markets and reducing the production of original content for consumers.

2.    This conduct is especially threatening to online educational publishers like Chegg, and to the millions of students who rely on them for accurate study materials to help attain their educational goals. Over more than a decade, Chegg has invested heavily in creating affordable online learning solutions to enhance and supplement the student educational experience. Chegg provides on-demand online learning support on a monthly subscription basis. Over the years, Chegg has created and maintained a vast, high-quality learning bank of over 135 million questions and answers across at least 26 disciplines, such as biology, finance, economics, engineering, algebra, calculus, physics, and chemistry. This content, along with Chegg's other learning tools, has long made it a top destination for students.

3.    Chegg funds its investments in its content primarily through user subscriptions. Significant numbers of those subscribers discover Chegg by searching on Google for answers to questions that arise in the course of their studies. Chegg thus depends on referrals from Google's monopoly search engine for a large portion of the revenue that it devotes to producing original online content.

4.    Accordingly, Chegg not only allows Google to crawl its website to index its contents to generate such referrals, but actively pushes that content out to Google's search index for that sole and limited purpose. This exchange of access for traffic is the fundamental bargain that has long supported the production of content for the open commercial Web.

5.    But in recent years, Google has begun to tie its participation in this bargain to another transaction to which Chegg and other publishers do not willingly consent. As a condition of indexing publisher content for search, Google now requires publishers to also supply that content for other uses that cannibalize or preempt search referrals.

6.    These uses include prompting generative artificial intelligence ("GAI") programs running "large language models" ("LLMs") to summarize publisher content that is responsive to user search requests in "AI Overviews" that appear ahead of search results on Google's search engine results page ("SERP"). They also include training the LLMs that Google uses to generate AI Overviews, as well as excerpting key portions of publisher content in "Featured Snippets," including in a format called "Questions and Answers," that appear prominently on Google's SERP.

7.    Because AI Overviews and Featured Snippets often provide the answers to questions posed by search users, and because the answers are featured advantageously on Google's SERP, they generate lower click-through rates to the original sources from which Google generates the answers, if Google provides links to those sources at all. Google's foray into digital publishing is designed to make Google a destination, rather than a search origination point to other websites.

8.    But for the exercise of its monopoly power to tie crawling for these substitutive purposes to crawling for search and high placement on the SERP, Google would pay publishers like Chegg separately for the right to republish and train LLMs with their content. If it did not, publishers would limit or block Google from crawling their web sites for any purpose.

9. Because Google does exercise such monopoly power, Chegg and other publishers are forced to acquiesce to this misappropriation of their content. Moreover, even if Google did provide a way to separately opt out of republishing in AI Overviews and Featured Snippets, publishers would be deterred from doing so by the presentation of those features in a way that deprecates search results.

10. Google's use of its monopoly power to coerce publishers to supply content for other, often competing purposes as a condition of receiving search referrals from Google at all amounts to a form of unlawful reciprocal dealing that harms competition in violation of the Sherman Act. In many circumstances, it also constitutes common-law unjust enrichment.

11. Google's reciprocal dealing reduces publishing output by depriving publishers of the revenues that, in a market that Google had not unlawfully monopolized, they would otherwise earn by either licensing their content for those uses or selling advertising to serve the traffic that those uses commandeer. These uses also unlawfully maintain Google's General Search Services monopoly by raising the costs of rivals who lack its power to coerce publishers to provide their content for free to develop competing products with comparable features.

12. Chegg is particularly affected by Google's coercive practices. The breadth, depth, quality, and volume of Chegg's educational content are the culmination of years of Chegg's investment in human talent, technology, and infrastructure, and the resulting content holds enormous value for use in artificial intelligence applications. Its trustworthy, informative content is exceptionally valuable to Google for generating AI Overviews and Featured Snippets, and especially subject to diversion of traffic by the answers those features provide.

13. Google's conduct is already eroding incentives for Chegg and other publishers to produce such valuable and useful content. If not abated, this trajectory threatens to leave the public

with an increasingly unrecognizable Internet experience, in which users never leave Google's walled garden and receive only synthetic, error-ridden answers in response to their queries—a once robust but now hollowed-out information ecosystem of little use and unworthy of trust.

14.     The law does not permit Google's systematic anti-competitive conduct. By this action, Chegg seeks to hold Google responsible for the millions of dollars of harm it is causing and illicit profits it is reaping by misappropriating Chegg's unique and valuable works and protect the public's continued access to high-quality and trustworthy online information.

## II.     JURISDICTION AND VENUE

15.     The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), 1338(a), and 1367, as well as 15 U.S.C. § 15, because this action arises under the laws of the United States, specifically the Sherman Act of 1890, 15 U.S.C. § 1, et seq. and the Clayton Act, 15 U.S.C. §§ 12-27.

16.     Jurisdiction over Google is also proper because it is registered to do business in the District of Columbia and has purposely availed itself of the privilege of conducting business in the District of Columbia. A substantial portion of Google's monopoly maintenance conduct alleged herein occurred in the District of Columbia, including through the employment of engineering and technology personnel for purposes of GAI development and marketing, as well as through the distribution and sale of Google's republishing and GAI products and services to District of Columbia residents. Furthermore, Google maintains large offices in the District of Columbia.

17.     Venue is proper pursuant to Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15, 22) because Google or its agents who participated in its unlawful conduct reside or may be found in this District. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Chegg's claims occurred in this District, including Google's monopoly

maintenance activities and the sales of Google's GAI products based on the commercial exploitation of Chegg's content within this District.

## III.    THE PARTIES

18.    Plaintiff Chegg, Inc. is a Delaware corporation with its headquarters and principal place of business at 3990 Freedom Circle, Santa Clara, California 95054. Chegg is an innovative, publicly held education technology company that has put students' needs first since its founding in 2005. Chegg strives to make academic support affordable and accessible to students of all economic means. To that end, it offers students on-demand, low-cost, high-quality educational support to supplement and complement traditional, in-classroom learning.

19.    Chegg supports students with tools designed to help them learn course materials, succeed in their classes, save money on required materials, and realize the value of the courses for which they pay. Because Chegg's products are available anytime online, Chegg's products also assist students when they are in a remote environment or are otherwise unable to easily access traditional educational resources. One of its products, Chegg Study, does so by providing students with learning tools and resources that include a remarkable bank of 135 million-plus question-and-answer solutions to help students better understand the concepts being taught in their coursework and apply those principles in other contexts.

20.    Chegg's solutions to student questions as well as original, step-by-step solutions to textbook questions walk students through the process of solving problems incrementally, through structured analysis or the "worked example" model. Chegg Study teaches students how to solve not only the questions specifically posed, but also the approach to solving other problems of the same type and to develop problem-solving skills. A student accessing Chegg's solutions learns by using them, just as a student learns when a teacher or tutor guides the student through the steps of

solving a problem. As discussed at www.chegg.com/about/, at a time when classes and homework have gone digital, Chegg provides the kind of learning assistance that students need and value.

21.    Defendant Google LLC is a limited liability company organized and existing under the laws of the State of Delaware and headquartered in Mountain View, California. Google is owned by Alphabet Inc., a publicly traded company incorporated and existing under the laws of the State of Delaware and headquartered in Mountain View, California.

22.    Defendant Alphabet Inc. is a publicly traded company incorporated and existing under the laws of the State of Delaware and headquartered in Mountain View, California. Alphabet Inc. was created as a holding company for Google in late 2015, and Alphabet controls Google's day-to-day operations. Virtually all of Alphabet Inc.'s revenue comes from Google LLC. Since December 2019, Alphabet and Google have had the same Chief Executive Officer. As a result of Alphabet Inc.'s operational control, Google LLC is Alphabet Inc.'s alter ego.

## IV.    FACTUAL ALLEGATIONS

### A.    Chegg's Investment in High-Quality and Trustworthy Content

23.    Tutors were once reserved for only the most affluent or connected students, but Chegg seeks to change all that by democratizing learning and learning outcomes by providing affordable personalized and individualized academic help for each student, no matter their socioeconomic means. Chegg is the leading direct-to-student connected learning platform, which is on-demand, adaptive, and backed up by a network of expert human help. Chegg knows the subjects and topics that students need to learn and how students prefer to learn, drawing on its question-and-answer database, billions of monthly data interaction points, and more than a decade of user insights research. Chegg marshals these insights to improve the student learning experience by providing personalized guidance to subscribers, such as suggesting additional prompts, learning tools, or assessment opportunities based on the questions that student asks and the content they

review on Chegg's site. Chegg's services are particularly important in an era of self-directed learning for college students, who value on-demand access to learning and study tools.

24.    To help students learn more at a lower cost, Chegg offers different subscription-based services, including Chegg Study, Chegg Writing, and Chegg Math among others. Chegg Study, in particular, provides personalized step-by-step learning support, backed by over 150,000 subject-matter experts over time who have contributed to an unparalleled database of 135 million proprietary question-and-answer solutions (and counting).



25.    Chegg's digital content is its most valuable product, which it continues to generate for its satisfied customers and prospective subscribers. In 2024, 90% of Chegg Study and Chegg Study Pack subscribers said that "Chegg helps them learn their coursework" and that "Chegg helps them better understand the concepts they are studying in school." 91% said that they "get better grades when they use Chegg to understand coursework"; 90% said that they "work more efficiently when they use Chegg to understand their coursework"; 91% said that "Chegg helps them figure it

out if they get stuck or have a question when their instructor is not available"; and 85% said that "Chegg helps build confidence before an exam."

26.     Chegg invests enormous resources to deliver high-quality educational content through its subscription services. In the twelve years since Chegg began amassing its study bank of over 135 million Q&A solutions, Chegg has invested hundreds of millions of dollars in the vast human capital and technological capabilities necessary to create, maintain, and expand its extensive educational offerings.

27.     In recent years, Chegg has developed and integrated new AI-enhanced tools into its individualized student learning experience to continue to provide specialized educational products that improve student competency and learning outcomes. Chegg's remarkable trove of Q&A solutions—content designed for learning—provides an invaluable source of thorough, accurate content for Chegg's AI-enhanced learning tools. Even as Chegg has integrated AI into its learning platform, it has maintained its high standards of quality, with a proprietary content workflow designed to ensure Chegg remains a helpful and trustworthy destination for educational content. Chegg is now at the forefront of efforts to use AI to generate accurate and helpful specialized educational content for students.

28.     Chegg has built its business and reputation on its commitment to providing millions of student subscribers with accurate, in-depth educational content delivered by experts and technological tools they can trust. While Chegg continues to serve millions of subscribers annually and generated over $617 million in revenue in 2024, its business model is challenged by the appropriation of content that Chegg makes available to Google for search indexing and which Google utilizes for separate purposes that unfairly compete with Chegg in the market for online

educational publishing while at the same time reinforcing Google's adjudicated monopoly in General Search Services.[1]

B.    Distribution of Publisher Content Through Search

29.    Internet search puts libraries of information and content in our pockets and on our desktops. Indeed, there is now so much information available that we seldom ask, "Does the answer to my question exist?" but rather, "Where can I find it?" We turn to search engines— usually Google—to direct us to where on the Internet the answers can be found. It is impossible to overstate the importance of general search engines to the digital information ecosystem, both in terms of helping users find content and in terms of helping digital publishers—like Chegg—reach audiences. As a result, Chegg's business model, like that of almost all other digital publishers, depends on search services for distribution.

**1.    *The Content Distribution Relationship Between General Search Services and Publishers***

30.    The role of a search engine is to take in a user's search query and return search results that require users to travel to other webpages to explore information responsive to that query. A search result is thus an informational product that connects users to external webpages containing information or content relevant to their queries. Put differently, a search engine is an ***intermediary*** between users seeking information and web publishers, who provide that information. Their purpose is not to serve content, but to connect users to where that content resides online. That is why Google early on defined its search role in this way: "We may be the only people in the world who can say our goal is to have people leave our website as quickly as possible."[2]

---

[1] Plaintiff uses the term "General Search Services" consistent with the Court's defined market in *U.S. v Google*. *See U.S. v. Google LLC*, 2024 WL 3647498, at *68-71 (D.D.C. Aug. 5, 2024).

[2] Google, *Ten Things We Know To Be True*, https://about.google/intl/ALL_in/philosophy/ ("We first wrote these '10 things' when Google was just a few years old.") (last accessed Feb. 21, 2025).

31.     In performing its intermediary role, a search engine engages in economic transactions with each of three constituencies: users, advertisers, and web publishers. With **users**, search engines provide search results in exchange for users' attention to the results delivered on the SERP in response to queries. With **advertisers**, search engines monetize this attention by charging for ads that appear on the SERP alongside or among the search results.

32.     User attention is also an input that search engines use to serve their third class of customers: **web publishers**. Users seeking answers to their search queries click on search results to visit a web publisher's site. The search engine thus converts user attention to search referral traffic, which it "sells" to the publisher ("Search Referral Traffic"). This form of "search distribution" is the single-most important way web publishers reach users. Publishers "pay" for search distribution by contributing their websites' contents and associated metadata to the search engines, so that the search engine can use that content to generate search results. For the purposes of this Complaint, we will refer to data contributed by a web publisher to a search engine for search purposes as "Search Index Data."

33.     The graphic below, as illustrated by the Helena World Chronicle in its class action antitrust complaint against Google,[3] demonstrates the traditional relationship search engines have with each of the three classes of customers and the *quid pro quo* that takes place with respect to providing General Search Services.

---

[3] *See Helena World Chronicle, LLC, et al. v. Google LLC, et al.*, Case No. 1:23-cv-03677-APM, Dkt. No. 27 at 27 (Am. Compl. ¶ 40) (D.D.C. May 13, 2024).



34.    Search engines store Search Index Data from web publishers in a "search index," which is a database containing copies of that content along with pointers to the location of that content on the web. Search engines generate search results using algorithms to parse the content in their indexes and find which content is most relevant to users' queries. The quality of a search engine's results depends on (1) the scope of its search index and (2) the quality of its relevance algorithms.

35.    With respect to Google, publishers contribute Search Index Data to Google's search index in two ways. The first is permitting Google to use its "Googlebot" web crawler to crawl and index the publishers' sites. A web crawler is a software program that systematically visits websites and collects information about their contents, such as the titles, headings, pages contents, images, links, and keywords. Googlebot follows the links on each website to discover new pages and add them to Google's search index.

36.     Publishers can block their content from Googlebot through a file on their websites called robots.txt. This file specifies which pages or sections of the website specific web crawlers can access. By editing their robots.txt file, publishers can opt out of Google's search distribution and prevent their websites from appearing in Google's search results. When publishers do not block Googlebot in their robots.txt files, Google includes their content in its search index.

37.     The second way publishers contribute Search Index Data to Google is by "pushing" data directly to its index. They do so through APIs and other tools that Google makes available to certain publishers. The benefit of pushing content directly to Google's search index rather than waiting to be crawled is that doing so ensures the index has a website's freshest content. That freshness is especially important for publishers seeking to attract users searching for breaking stories or for timely answers to questions relating to current educational coursework.

38.     Google claims that publishers who contribute high-quality content to its Search Index are rewarded with search traffic. Google's "Search Essentials" provides publishers with best practices for helping their web-based content "perform well on Google Search."[4] Those best practices include creating "helpful, reliable, people-first content" that demonstrates a depth of knowledge, helps people learn about a topic, and is useful to a specific audience.[5] This is precisely the type of content published by Chegg.

### 2.     *The Importance to Chegg of Its Content Distribution Relationship with Google*

39.     Success for a digital publisher like Chegg requires that it generate revenue from subscription-based online content sufficient to fund continued broad content creation. Chegg

---

[4] Google, *Google Search Essentials* (last updated Feb. 4, 2025),
https://developers.google.com/search/docs/essentials (last accessed June 9, 2025).
[5] Google, *Creating helpful, reliable, people-based content* (last updated Feb. 4, 2025),
https://developers.google.com/search/docs/fundamentals/creating-helpful-content (last accessed June 9, 2025).

receives revenue from subscriptions only when users visit its site and learns what Chegg's subscriptions have to offer. As shown in the graphic below, Chegg's business depends on users finding it through search, which in turn depends on Chegg continually generating helpful content and providing Google with access to that content for search indexing purposes.



40.    Importantly, Chegg cannot replace search traffic with traffic from other sources. Search traffic is "intentional," meaning it comes from users who are actively seeking out specific information like help with coursework or guidance on specific problems that appear in textbooks. If a search engine stops sending search traffic to Chegg's site, then that traffic is lost to Chegg—there is no way to make it up with traffic from other sources, such as social media.

41.    Chegg, like other publishers, permits Google to access its content and include it in Google's search index to generate traffic to Chegg's website via search results. Chegg contributes Search Index Data to Google in both ways described above. It permits Google to use its "Googlebot" web crawler to crawl and index vast swaths of the content on its site. It also pushes the data directly to Google's index through the regular automated submission of RSS web feed

files multiple times each day. Chegg is compelled to take affirmative steps to push its content to Google's index because of Google's search monopoly and the harm that would result to Chegg's search performance on Google if it did not take these steps. Chegg does not take the same steps to push its content to other search engines that do not wield monopoly power in search. Inherent in this value exchange with Google is the expectation that Google's SERPs will direct users to Chegg's site. When users click on a search result to visit Chegg's site, Chegg can monetize that traffic.

42.     Google understands, recognizes, and encourages this "fundamental fair exchange between Google and the web."[6] In Google's words: "Google crawls, indexes and links to websites in search results, and each search result includes a short preview of what to expect at the site. Websites gain free traffic from users interested in what they have to offer, and each user visit is an opportunity to build a long-term relationship and monetize through advertising or subscriptions."[7] Through this process, Google supposedly supports "a healthy ecosystem of fresh and useful content . . . by sending visitors to websites small and large through our search results."[8] Google has repeatedly reinforced this message over the years, telling the public that it "will continue to prioritize approaches that send valuable traffic and support a healthy, open web."[9]

43.     For example, a Google user entering a query for help understanding the solution to a business operations management question regarding evaluation of stakeholder satisfaction may see among the search results a link to Chegg's Q&A solution to a similar question posed by a Chegg subscriber, because that webpage is included in Google's search index:

---

[6] Google, *Setting the record straight on news* (June 26, 2020), https://blog.google/outreach-initiatives/google-news-initiative/setting-record-straight-news (last accessed June 9, 2025).
[7] *Id.*
[8] Google, *Our Approach to Search*, https://www.google.com/intl/en_us/search/howsearchworks/our-approach/ (last accessed June 9, 2025).
[9] Alphabet Q2 2023 Earnings Call (July 25, 2023), https://abc.xyz/2023-q2-earnings-call/ (last accessed June 9, 2025).



44.      The revenue that Chegg receives by reason of user traffic to its website enables Chegg to make the continuous and significant investments described above in order to produce comprehensive, accurate, and reliable content.

45.      Because Chegg aims to provide its audiences with the best content on the educational topics they cover, and because users know and trust Chegg's brand, user traffic to its website from search engines has been robust. As a result, subscription revenue tied to traffic volume and search has been sufficient to achieve and maintain profitability. In short, Chegg's digital approach has been successful. The company has remained profitable and continues to generate high-quality content for students at great scale.

46.      Chegg's hard-won success, however, is at risk if consumers no longer need to visit Chegg's online properties to obtain the benefits of its high-quality content because they can get it—or an apparent facsimile—directly on Google's SERP.

C.     Google's Search Monopoly

47.     Google's search engine business generates annual revenue of nearly $200 billion and, by any metric, it possesses monopoly power in the search engine market. In a landmark decision last year in *United States v. Google*[410] (the "Government Search Case"), the United States District Court for the District of Columbia found that Google illegally maintained its monopoly power in that market. The court held that:

> (1) there are relevant product markets for general search services and general search text ads; (2) Google has monopoly power in those markets; (3) Google's distribution agreements are exclusive and have anticompetitive effects; and (4) Google has not offered valid procompetitive justifications for those agreements.[11]

48.     Specifically, Google's anticompetitive agreements were "search distribution contracts with two major browser developers (Apple and Mozilla); all major OEMs of Android devices (Samsung, Motorola, and Sony); and the major wireless carriers (AT&T, Verizon, and T-Mobile) in the United States."[12] These distribution agreements were critical to Google's continued monopoly power in search, as evidenced by the fact that "[i]n 2021, Google paid out a total of $26.3 billion in revenue share under these contracts … almost four times more than all other search-related costs combined."[13] Google would not have been willing to pay such sums for search distribution if they were not key to maintaining its search monopoly.

49.     Thanks to its anticompetitive search distribution conduct, Google maintains monopoly power with extremely high market share in General Search Services. As the district court explained:

> Plaintiffs easily have demonstrated that Google possesses a dominant market share. Measured by query volume, Google enjoys

---

[10] *United States v. Google*, Case No. 20-cv-03010-APM, Dkt. No. 1033, 2024 WL 3647498 (D.D.C. Aug. 5, 2024).
[11] *Id.* at *4.
[12] *Id.* at *50.
[13] *Id.*

an 89.2% share of the market for general search services, which increases to 94.9% on mobile devices. This overwhelms Bing's share of 5.5% on all queries and 1.3% on mobile, as well as Yahoo's and DDG's shares, which are under 3% regardless of device type.[14]

50.     Google's monopoly power, in turn, has allowed it to extract monopoly rents. Again, the court explained: "Google has exercised its monopoly power by charging supracompetitive prices for general search text ads. That conduct has allowed Google to earn monopoly profits."[15]

D.     <u>Google's Forced Entry into Digital Publishing Markets</u>

51.     Charging supracompetitive prices for search ads is not the only way Google reaps enormous profits from its search monopoly. Google has also developed a playbook whereby it exploits its dominance in search to coerce firms operating in adjacent markets to supply it with content. Google then uses that content both (1) to maintain its search monopoly and (2) to compete against the firms that supplied the content to monopolize the digital publishing market.[16]

52.     Google is a monopsonist in the input market for publisher content used for search results (the "Input Market"). Monopsony power, or buying power, is the mirror image of monopoly power. A monopsonist is a buyer with sufficient market power to control prices in an input market. Put simply, Google's search monopoly gives it control over online distribution in search results for digital publishers. Google uses that buying power to force digital publishers to give up access to their content without monetary compensation. Google then itself acts as a publisher, either by republishing portions of other digital publishers' content or by using GAI to summarize the content. The end result is that users increasingly consume other web publishers' content on Google's SERP, either in abridged or derivative form, which starves those publishers of traffic and revenue.

---

[14] *Id.* at *76.

[15] *Id.* at *4.

[16] Chegg uses the term "Online Educational Publishing" and "Digital Educational Publishing" interchangeably.

53.     This strategy of embrace, absorb, and extinguish does two things. First, it raises further barriers to entry for potential search market entrants, who must then replicate the full stack of Google services to effectively compete. Second, it also ultimately restricts output in the digital publishing market where Google competes against web publishers.

### 1.     *The Online Educational Publishing Market*

54.     The field of digital publishing consists of websites and apps on which publishers display textual content. Of particular interest to providers and consumers of General Search Services are publishers of nonfiction topical, historical, or reference information, such as science, medical, educational, or business reporting, guidance, or opinion. Within this field, there exists a distinct market for educational publishing of the kind produced by Chegg ("Online Educational Publishing"). Other forms of online informational content such as that conveyed by popular interest, news, or other nonfiction publishers cannot substitute for educational publishing content, because they fail to combine key attributes that student consumers require, such as curation, verification, authority, and pedagogical focus. The relevant geographic market for Online Educational Publishing content is the United States.

55.     In the earlier days of the Internet, digital publishing consisted primarily of websites and apps dedicated to publishing original content. Many such publishers had started out as traditional newspaper or magazine publishers, while others began as "web-native" publications with no offline footprint. Their common characteristic was that they generated original digital content by investing in writers, content creators, and editors. Chegg belongs to this category of digital publishers.

56.     Educational publishing refers to the market for the production and dissemination of educational materials such as textbooks, workbooks, digital resources, and learning aids. Publishers in this market play a crucial role in shaping the academic landscape by providing

educators and students with high-quality content to supplement learning. Educational publishers develop materials that cater to learners and enhance the learning experience across various educational settings.

57.    Online Educational Publishing is recognized as a distinct market within the broader educational publishing market. Participants in Online Educational Publishing include both long-established educational publishers who began as print publishers and now offer online content (such as McGraw Hill) and technology companies whose content offerings have always been hosted online (such as Khan Academy, Course Hero, Quizlet, and Brainly). More recently, companies offering generative AI products have begun to compete in the educational publishing market, in many instances by republishing content created by original education publishers without permission. As Chegg explained in its September 30, 2024 10-Q, its competitors include Google, OpenAI, Microsoft, Meta, and Anthropic, even though these companies are not exclusively focused on education and learning. Google's expansion of AI Overviews, which includes questions and solutions for education, keeps users on Google's search results page versus leading them onto Chegg's site.[17]

58.    In addition to selling content to end consumers of the content, Online Educational Publishing is a critical input to search. Online Educational Publishing content is used by search engines such as Google to populate and enhance, through short previews of the content, search results.

59.    Market analysts recognize Online Educational Publishing as a distinct market. For example, J.P. Morgan issues monthly reports analyzing "Online Education" as a market, of which Chegg is a featured participant.

---

[17] Chegg September 30, 2024 Form 10-Q.

60.    Online Educational Publishing is functionally distinct from other forms of online publishing. The primary purpose of Online Educational Publishing is pedagogical: to deliver information necessary for learning. Online Educational Publishing content is designed primarily for structured learning, skill acquisition, or study. The content is intended for repeated use over time and is periodically updated.

61.    The format in which educational content is delivered by online educational publishers can vary but may involve online educational platforms, electronic textbooks, platform-based advanced interactive digital textbooks, or learning management systems. This differs from other types of online publishing, such as news, which do not employ the same types of tools for content delivery.

62.    Online Educational Publishing is targeted to learners seeking to supplement or obtain assistance with coursework, obtain academic support, or access learning products and services.

### 2.    *Google's Transformation from a Search Engine to Web Publisher*

63.    At least by the early 2010s, Google decided to enter digital publishing by distributing content directly on its SERP. But it did not start hiring writers and editors. It did not even license content from third parties to republish. Instead, Google began repurposing the content that digital publishers had created by investing in human talent, technology, and infrastructure. Google crawled publishers' content for Google's search index by displaying that content and its derivatives on its SERP without permission.

64.    In the digital publishing context, Google's appropriation of publisher content occurred in two phases. During Phase I, Google displayed increasingly detailed excerpts ("snippets") of other digital publishers' content. Now, with the development of sophisticated GAI technologies, Google has entered Phase II, in which it uses other digital publishers' content to train

and prompt GAI models to generate content that competes with that same publisher content for attention on Google's SERP.

65.    Google's shift to Phase II fundamentally alters the terms in the Input Market. Google now uses the inputs (educational content) not only to populate search results, but also as an input for Google to directly compete with online educational publishers in the relevant output market for Online Educational Publishing (through Google's AI Overviews). Google's use of online educational content to compete directly with publishers, without compensation to those publishers, constitutes an underpayment to those online educational publishers in the Input Market for search.

a)    *Phase I: Google republishes other digital publishers' content on its SERP.*

66.    Phase I of Google's digital publishing strategy can be called the "republishing phase." Google simply began republishing portions of others' digital content on its general search and other pages. Over time, this republishing got more extensive, blatant, and egregious.

67.    Google's republishing started with its news search service, Google News, which it has offered since 2002. Google News is a form of specialized search, which is distinct from its general search service. Google introduced the beta version of Google News in September 2002, and it launched the product officially in January 2006. Users access Google News through a unique URL, news.google.com, or by clicking a tab at the top of Google's general search page. Unlike Google's general search SERP, the Google News SERPs exclusively link to news content.

68.    Initially, Google News provided news search results which were distinct from publishing in that their purpose was to guide users to sites containing news content, not for the users to consume the content directly on the SERP. Over time, however, Google began to transition

its Google News SERPs away from displaying news search results towards actually publishing news content.

69.    Google began by posting headlines, images, and short snippets from news articles on Google News. By 2005, publishers started to complain that Google was simply republishing their content. For example, Agence France Presse ("AFP") sued Google alleging that this display of its content constituted copyright infringement. The case settled and Google ultimately agreed to begin licensing that content for a time beginning in 2007.

70.    By May 2012, Google began to port its Google News content to its general search SERP. In that month, Google introduced the "Knowledge Panel" to its SERP. The panel contained rich-text answers to different types of user queries. Google designed the Knowledge Panel to obviate the need for users to leave the SERP page and click Google's search result links to obtain answers to their questions. For example, if a user searched for "Washington's birthday," the Knowledge Panel might simply say "February 22" with a link to a webpage containing that fact.

71.    In response to news- and information-related search queries, Google's Knowledge Panels began to include lengthy snippets of journalistic or informational articles or other webpages, often with accompanying photos. The presentation of such content in Knowledge Panels was similar to the content that appeared on Google News SERPs. Observers began to refer to these snippets on Google's SERP as "Featured Snippets," and Google adopted this title as their official designation as early as 2014. The Knowledge Panels containing Featured Snippets are often labelled "Top Stories." In a 2018 blog post, Google provided the following example of an informational Featured Snippet generated in response to the informational search query "Why is the sky blue?"

# What is a featured snippet?

Let's start with a look at a featured snippet, in this case, one that appears for a search on "Why is the sky blue?"



We call these featured snippets because unlike our regular web listings, the page's description—what we call a "snippet"—comes first. With featured snippets, we reverse the usual format. We're featuring the snippet, hence the "featured snippet" name. We also generate featured snippets in a different way from our regular snippets, so that they're easier to read.

72.    The appearance of Featured Snippets within the Top Stories panels on Google's SERP reduced search traffic to publishers. By publishing other publishers' content directly on the SERP, Google disincentivized users from having to click through to a publisher's website to find the relevant content. While in some cases, users want more information than is available in a Featured Snippet and may click through, in many cases they are satisfied with the content that Google has excerpted and thus stay on Google's SERP. In fact, by 2019, data indicated that less than 50% of Google searches resulted in a click-through to the original source, making Google

more of a walled garden than a traffic director.[18] Digital publishers thus began to complain again about Google's expanding misuse of their content.[19]

73.    In 2015, Google introduced another publishing element to its SERP called "People Also Ask." The People Also Ask panel contains a list of questions about a user's search topic, with drop-downs containing Featured Snippets chosen by Google to answer those specific questions. Below is an example of a People Also Ask feature and several of its Featured Snippets:



74.    The Featured Snippets in Google's People Also Ask feature are even more diversionary than those shown elsewhere on Google's SERP because they are tailored to the questions chosen by Google. While a Featured Snippet in a "Top Stories" panel (the label often

---

[18] Fishkin, R., *Less than half of Google searches now result in a click*, SPARKTORO (Aug. 13, 2019), https://sparktoro.com/blog/less-than-half-of-google-searches-now-result-in-a-click/.

[19] *See, e.g.*, Essers, L., *German publishers start legal action against Google over news snippets*, PCWORLD (June 18, 2014), https://www.pcworld.com/article/439881/german-publishers-start-legal-action-against-google-over-news-snippets.html.

applied to a Knowledge Panel containing journalistic content) will often include general summaries of an article's content, a user may nevertheless click through to the underlying story to answer more detailed questions. But with the People Also Ask panel, Google pulls out the specific part of an article that is relevant to answering a particular question, discouraging users from navigating away from Google's SERP to the pages containing the underlying content. The screenshot below shows a snippet displayed on the SERP in response to a user's click on one of the People Also Ask questions.



75.     Whereas before a user might click through for additional information on Google's previous CEOs, in the example above, Google has attempted to answer all related questions on the SERP page itself, obviating the need to click through.

76.    Google targets Online Educational Publishing content specifically in a Featured Snippet format called "Questions and Answers." In the examples below, questions and answers excerpted from Chegg and a competitor appear above organic search results for those same sources. When present, the Questions and Answers box substantially reduces the number of click-throughs to the top search results.





77.     Google refers to Featured Snippets, Top Stories, and People Also Ask as "search features." But they are separate and distinct products from search results. This is Google acting as an answer engine—not a search engine. They constitute a form of publishing because they display informational and other content to be consumed ***directly on the SERP*** rather than sending users to third-party websites. Though Google's publishing elements contain links to the underlying articles, the click-through rate on those links is extremely low. A study by Rand Fishkin, based on clickstream data from Datos, found that nearly 60% of visits to Google SERPs result in ***no clicks***.[20] The reason for these "zero-click" searches is that users can consume enough republished content directly on Google's SERP to obviate any need to click through to the original publishers' pages.

---

[20] Goodwin, D., *Nearly 60% of Google searches end without a click in 2024*, SEARCHENGINELAND (July 2, 2024), https://searchengineland.com/google-search-zero-click-study-2024-443869; *see also* Sullivan, L., *Nearly Two-Thirds Of Clicks On Google Search Remain Within Its Ecosystem*, MEDIAPOST (July 5, 2024), https://www.mediapost.com/publications/article/397414/nearly-two-thirds-of-google-searches-stay-within-i.html.

78.     Google has thus been republishing digital publishers' content in publishing elements on its SERP for more than a decade. Republication in itself is not necessarily a problem— authorized republication of other creators' content is a common business model. Reuters, for example, has built a business around generating news content and licensing it to third parties for republishing. The non-profit Associated Press has a similar model.

79.     The problem is that the creators whose content Google republishes are not willing suppliers. Google forces them to supply digital content for republishing as a condition of obtaining Search Referral Traffic, of which Google is the monopolist supplier to end users (and is the monopsony buyer for publishers).

80.     Google sources the content it uses to populate its publishing elements from the data that it crawls for its search index. In other words, Google repurposes the Search Index Data digital publishers provide it as republishing content.

81.     Until 2019, the only way for digital publishers to prevent Google from republishing their content was to prevent Google from indexing their content for search at all by blocking Googlebot in robots.txt. Then, in response to the passage of the EU Copyright Directive that year, Google introduced the "nosnippets" meta-tag to allow publishers to direct that snippets of their content not be shown on Google's SERP.

82.     However, while setting the "nosnippets" tag would prevent site content from being republished as Featured Snippets, it would also prevent snippets from being shown as previews in search results. This and the preeminent placement of Featured Snippets ahead of search results on the SERP meant that publishers who used the nosnippets tag to stop Google from republishing their content experienced an even greater reduction in search referrals than they did by allowing republication.

83.     The decision to opt out of republishing by disallowing snippets or withholding Search Index Data is a Hobson's choice. Virtually no digital publishers can afford to take such drastic action, because withholding data from Google's search index means demotion on the SERP or disappearing from Google's organic search results entirely, and as outlined above, appearing prominently in Google's SERP is an essential means of generating traffic and revenue for digital publishers.

        **b)**     ***Phase II: Google develops GAI, uses GAI to rewrite other publishers' content, then publishes that derivative content on its SERP.***

84.     Phase II of Google's strategy to dominate online publishing centers around GAI. Google has seized on recent developments in that field to take its misappropriation and republication of online publishers' content to the next level, further imperiling their ability to survive. Once again, Google's actions are possible only because of its entrenched monopoly in General Search Services.

85.     Google has long developed artificial intelligence for search and other purposes. In 2011, Google launched Google Brain to capitalize on machine learning research and Google's enormous computing power.[21] In January 2014, Google purchased London-based AI company DeepMind for more than $500 million.[22]

86.     Around 2018, Google developed DeepRank, which was based on a second-generation deep learning model called BERT. According to Dr. Eric Lehman, formerly a Distinguished Software Engineer at Google, BERT was a "transformational" technology, that "radically increased the ability of deep learning systems to understand language."[23] At that point,

---

[21] Wikipedia, *Google Brain*, https://en.wikipedia.org/wiki/Google_Brain (last accessed Feb. 21, 2025).
[22] Shu, C., *Google Acquires Artificial Intelligence Startup DeepMind For More Than $500M*, TECHCRUNCH (Jan. 26, 2014), https://techcrunch.com/2014/01/26/google-deepmind/.
[23] *U.S. v. Google*, Tr. Trans. (Lehman) 1843:11-1846:22.

it became clear that Google was "looking at a change that would kind of knock all the pieces off the board of search probably at some point within the next few years."[24]

87.     Dr. Lehman and others were aware that the development of a similar technology outside of Google could have profound implications. As Dr. Lehman wrote concerning BERT in 2018, "One consideration is that such a deep ML [machine learning] system could well be developed outside of Google—at Microsoft, Baidu, Yandex, Amazon, Apple, or even a startup… The risk that Google could … be beaten in relevance by another company is highlighted by a startling conclusion from BERT: Huge amounts of user feedback can be largely replaced by unsupervised learning from raw text. That could have heavy implications for Google."[25]

88.     In 2021, Google completed a third generational LLM—a powerful neural network trained on vast amounts of text capable of generating human-like responses—called T5 (later, MUM). This system "achieved essentially human-level performance."[26]

89.     In late 2022, a newer company, OpenAI, announced a chat-based AI product called "ChatGPT," which could engage in natural conversations, answer questions, and even assist with tasks like coding and creative writing. The AI technology underlying ChatGPT is also an LLM.

90.     ChatGPT quickly captured the public's imagination and sparked a frenzy among tech giants to develop their own LLMs and LLM-based products. In the "exuberance of someone who has like 3 percent share that maybe I'll have 3.5% share," Microsoft CEO Satya Nadella predicted that ChatGPT would "make Google dance."[27]

91.     And dance Google did. Google recognized the disruptive threat posed by OpenAI and other LLM providers and accelerated its own efforts to catch up. Those efforts led to Google

---

[24] *Id.* at 1910:3-22.
[25] *Id.* at 1922:22-1923:12.
[26] *Id.* at 1915:17-20.
[27] *U.S. v. Google*, Tr. Trans. (Nadella) 3532:5-11.

releasing two LLM-based products over the course of the next year. The first was "Bard," now known as "Gemini," which is a standalone, LLM-based chat product similar to ChatGPT. The second Google LLM-based product was "Search Generative Experience" or "SGE," now known as "AI Overviews," which Google deploys directly on its SERP.

92.    Both Bard/Gemini and SGE/AI Overviews constitute forms of digital publishing. Google trained the models underlying those products on digital publishers' content and uses that content as inputs to prompt outputs from those products as well, which means that Google once again is using digital publishers' own content to compete against them.

93.    By 2023, Google had tacitly recognized that the "fundamental fair exchange" that had previously sustained the web would require a rethink for the AI era. As Google acknowledged, "existing web publisher controls were developed before new AI and research use cases," and "a vibrant content ecosystem" demands that "web publishers hav[e] choice and control over their content, and opportunities to derive value from participating in the web ecosystem."[28] Despite this acknowledgment, Google proceeded to deprive Chegg (and countless other publishers) of choice and control over its content, by conditioning Chegg's appearance in search results on Chegg permitting Google to use its content to feed Google Search's artificial intelligence features. This coercive "deal"—the opposite of choice and control—was made possible only by Google's overwhelming monopoly power in search. Google itself recognized the coercive nature of this deal, explaining in internal documents publicly produced in the Government Search Case that it "is considered a forced choice" for publishers.[29] Put simply, Google's monopoly power in search

---

[28] Google, *A principled approach to evolving choice and control for web content* (July 6, 2023), https://blog.google/technology/ai/ai-web-publisher-controls-sign-up (last accessed June 9, 2025).
[29] PXR0026 at -303-304, *U.S. v. Google* (Remedies Hearing Exhibits).

gives it monopsony power in the Input Market for publishing content that drives search results—content which Google secures at below competitive rates.

94.     In the Government Search Case, Google competitor Microsoft predicted that LLMs would complete a merging between search and digital publishing in which Google would dominate:

> Q:    And is there any expectation, at least in the foreseeable future, that these LLMs, these ChatGPT products, are going to replace Internet search?
>
> A:     . . . I believe the search category by itself will fundamentally change, because there's a new way to think about answering questions using LLMs versus sort of just giving you the 10 blue links . . . .[30]

95.     However, one crucial difference has emerged between Google and products on the competitive fringe that seek to merge search results into AI-generated answers in this way: the non-monopolists are paying for at least some publisher content. Both OpenAI and newcomer Perplexity have announced licensing deals in which they pay some publishers for this use.[31] Google, by contrast, through the exercise of its monopoly power in General Search Services, avoids this cost of acquiring publisher content and gains an unfair commercial advantage over new entrants in order to extend and entrench Google's General Search Services monopoly in the potentially competitive new age of AI-assisted search.

96.     For example, during the remedies phase of the Government Search Case, Open AI's Head of Product for Chat GPT testified that Open AI lacks the "leverage" that Google has "over

---

[30] *U.S. v. Google*, Tr. Trans. (Nadella) at 3529:10-17.
[31] Harmon, G., *OpenAI, Perlexity secure more publisher licensing deals*, EMARKETER (Dec. 5, 2024), https://www.emarketer.com/content/openai--perplexity-secure-more-publisher-licensing-deals.

the ecosystem because we provide less traffic" to publishers.[32] This restricts OpenAI's ability to effectively compete with Google.

97.     The value of Chegg's content for republishing and for use in training and grounding LLMs (like the Gemini technology that powers Google's AI Overviews embedded in Google's General Search Services) is concrete, not hypothetical. Chegg has already executed two content licensing deals with two of the top ten technology companies in the world, generating $4 million of revenue in Quarter 1 of 2025 alone with an additional $7 million in revenue expected in Quarter 2 of 2025. These deals are just the tip of the iceberg: they represent less than 5 percent of Chegg's content library and are non-exclusive, allowing Chegg the opportunity to license the content to other companies. Chegg is in discussions with other companies to expand its licensing efforts even further.

98.     There are numerous other real-world examples confirming the monetary value of online publishing content for republishing and for training and grounding LLMs, including, in particular, Online Educational Publishing content. For example, online educational publisher Wiley has reached content licensing deals for its online offerings with Perplexity, Amazon Web Services, Potato, and other undisclosed large technology companies.[33] Online news publishers have entered into a host of content licensing agreements with LLM companies.[34] And the New

---

[32] *U.S. v. Google*, Remedies Hr'g Tr. (Turley) 461:20-462:5.

[33] John Wiley & Sons, Inc., Wiley and Perplexity Announce New AI Search Partnership (May 8, 2025), https://newsroom.wiley.com/press-releases/press-release-details/2025/Wiley-and-Perplexity-Announce-New-AI-Search-Partnership/default.aspx (last accessed June 9, 2025); John Wiley & Sons, Inc., *Wiley Announces Collaboration With Amazon Web Services (AWS) to Integrate Scientific Content Into Life Sciences AI Agents* (May 5, 2025), https://newsroom.wiley.com/press-releases/press-release-details/2025/Wiley-Announces-Collaboration-With-Amazon-Web-Services-AWS-to-Integrate-Scientific-Content-Into-Life-Sciences-AI-Agents/default.aspx (last accessed June 9, 2025); Milliot, J., *Wiley Creates AI Partnership Program*, PUBLISHERS WEEKLY (Oct. 17, 2024), https://www.publishersweekly.com/pw/by-topic/industry-news/industry-deals/article/96248-wiley-creates-ai-partnership-program.html (last accessed June 9, 2025); Milliot, J., *Wiley Wraps Up Divesture Program, Looks at AI Opportunities*, PUBLISHERS WEEKLY (Sept. 5, 2024), https://www.publishersweekly.com/pw/by-topic/industry-news/industry-deals/article/96248-wiley-creates-ai-partnership-program.html (last accessed June 9, 2025).

[34] For example, OpenAI entered into licensing agreements with Axel Springer, the Associated Press, Conde Nast, News Corp, The Atlantic, Vox Media, and Dotdash Meredith; Perplexity entered into licensing agreements with

York Times recently entered into a licensing agreement with Amazon permitting Amazon to use the Times's material to train Amazon's proprietary AI models.[35]

  E.  <u>How Google's GAI Products Work</u>

  99.  The LLMs at the heart of Google's GAI products are called "generative" AI because they are capable of generating content, such as text, images, audio, or other data, rather than simply analyzing existing data. An LLM works by predicting words that are likely to follow a given string of text based on the potentially billions of examples used to train it. They use algorithms to weigh the relevance of different parts of the input data when generating text. LLM operators "train" their models on vast datasets of written material, allowing them to encode patterns and relationships between words and sentences.

  100.  Once trained, LLMs can generate human-like text by taking a seed input (*e.g.*, a question or prompt) and iteratively predicting the most likely next word based on the patterns it has learned. Through this process, LLMs can generate answers to questions about information that is included in their training data. They are also capable of taking documents as input, then summarizing or answering questions about those documents. The quality of the output depends on the size of the model, the diversity of training data, and the specific architecture and training techniques used.

  101.  To develop its LLMs, Google must first select a training dataset (i.e., a massive collection of works) upon which to train the models. On information and belief, Google included

---

Time, Der Spiegel, The Los Angeles Times, Fortune, Entrepreneur, The Texas Tribune, and Automattic; and Prorata.ai entered into licensing agreements McClatchy, MIT Technology Review, Lee Enterprises, The Financial Times, Fortune, Axel Springer, and The Atlantic. *See U.S. v. Google*, Case No. 20-cv-03010 (D.D.C.), Dkt. 1327 at 13-14.

[35] Grynbaum, M. & Metz, C., *The Times and Amazon Announce an A.I. Licensing Deal*, N.Y. TIMES (May 29, 2025), https://www.nytimes.com/2025/05/29/business/media/new-york-times-amazon-ai-licensing.html (last accessed June 9, 2025).

millions of Chegg's proprietary Q&As and homework solutions in the training datasets for its models, including by scraping works from Chegg's website.

102.    Next comes model training, which means the process of encoding the information from the training corpus that they use to make predictions as numbers called "parameters." Training involves storing encoded copies of the training works in computer memory, repeatedly passing them through the model with words masked out, and adjusting the parameters to minimize the difference between the masked-out words and the words that the model predicts to fill them in.

103.    After being trained on a general corpus, models may be further subject to "fine-tuning" by, for example, performing additional rounds of training using specific types of works to better mimic their content or style, or providing them with human feedback to reinforce desired or suppress undesired behaviors.

104.    Models trained in this way are known to exhibit a behavior called "memorization."[36] That is, given the right prompt, they will repeat large portions of many materials they were trained on. This phenomenon shows that LLM parameters encode retrievable copies of many of those training works.

105.    In addition to "memorization," once trained, LLMs may also be deployed in conjunction with a technique called "retrieval-augmented generation" ("RAG"). RAG, also known as "grounding," refers to a technique or process that involves connecting an LLM to external sources of information, such as live search results, to improve the quality of its outputs. Using this method, Google's GAI products: (1) receive a prompt from a user, such as a question; (2) obtain and copy content from its search index relating to the prompt; (3) combine the original prompt

---

[36] Van den Burg, G., *et al.*, *On Memorization in Probabilistic Deep Generative Models*, NEURIPS (2021), https://proceedings.neurips.cc/paper/2021/file/eae15aabaa768ae4a5993a8a4f4fa6e4-Paper.pdf.

with the retrieved copied content in order to provide additional context; and (4) provide the combined data to an LLM, which generates a natural-language response.

106.    In simpler terms, RAG consists of finding relevant content online ("retrieval") and paraphrasing that content using GAI ("generation"). Google then publishes the "new" derivative content to the user, sometimes in boxes on its SERP. But while Google's RAG-generated content may appear on its SERP, it should not be confused with a search result, because the intent is not for users to navigate to the original sources of the information. Rather, like all publications, the intent is simply for users to consume the content where it is displayed.

### a)    *Bard*

107.    In February 2023, Google unveiled "Bard," its response to ChatGPT. Bard is an advanced chatbot that responds, in a human-like manner, to user questions and prompts. According to Google, "Bard seeks to combine the breadth of the world's knowledge with the power, intelligence and creativity of our large language models" and "draws on information from the web to provide fresh, high-quality responses."[37] Google released Bard publicly on May 10, 2023. That same month, Bard's website had 142.6 million visits.[38]

108.    Bard was originally powered by an LLM known as Language Model for Dialogue Applications ("LaMDA"). In May 2023, Google unveiled a new LLM called PaLM 2, which uses nearly five times the amount of text data for training—over 3.6 trillion tokens.[39] PaLM 2 was then thought to be the most powerful LLM in existence.

---

[37] Pichai, S., *An important next step on our AI journey*, GOOGLE (Feb. 6, 2023), https://blog.google/technology/ai/bard-google-ai-search-updates/.
[38] Carr, D., *As ChatGPT Growth Flattened in May, Google Bard Rose 187%*, SIMILARWEB (June 5, 2023), https://www.similarweb.com/blog/insights/ai-news/chatgpt-bard/.
[39] Elias, J., *Google's newest A.I. model uses nearly five times more text data for training than its predecessor*, CNBC (May 16, 2023), https://www.cnbc.com/2023/05/16/googles-palm-2-uses-nearly-five-times-more-text-data-than-predecessor.html.

b)    *__Gemini__*

109.    On December 6, 2023, Google announced Gemini, a multimodal AI system that Google called "its most capable and general model yet," able to "generalize and seamlessly understand, operate across and combine different types of information including text, code, audio, image and video."[40] Google also announced that Gemini would be used to power Bard, marking "the biggest upgrade to Bard since it launched."[41]

110.    Google continued to rapidly develop and expand Gemini in 2024. On February 8, Google announced that the Bard chatbot product would be rebranded as "Gemini" to reflect Gemini's status as "our most capable family of models."[42] Google on the same day unveiled Gemini Advanced, which was powered by Gemini Ultra 1.0, Google's "largest and most capable state-of-the-art AI model."[43] Google promoted Gemini Advanced as "far more capable at highly complex tasks like coding, logical reasoning, following nuanced instructions and collaborating on creative projects."[44] Google has since updated the model powering Gemini Advanced to Gemini 1.5 Pro.[45] On December 11, 2024, Google released Gemini 2.0, which it billed as its "most capable model yet."[46]

111.    Outside observers specifically cited Google's monopoly in search as contributing to Gemini's superiority to ChatGPT, in terms of the former's ability to integrate information from the live web into outputs. One article explained that, while many websites blocked OpenAI's web

---

[40] Pichai, S. & Hassabis, D., *Introducing Gemini: our largest and most capable AI model*, GOOGLE (Dec. 6, 2023), https://blog.google/technology/ai/google-gemini-ai/#introducing-gemini.
[41] *Id.*
[42] Hsiao, S., *Bard becomes Gemini: Try Ultra 1.0 and a new mobile app today*, GOOGLE (Feb. 8, 2024), https://blog.google/products/gemini/bard-gemini-advanced-app/.
[43] *Id.*
[44] *Id.*
[45] Gemini Advanced landing page, https://gemini.google/advanced/ (last accessed Feb. 21, 2025).
[46] Pichai, S., Hassabis, D., & Kavukcuoglu, K., *Introducing Gemini 2.0: our new AI model for the agentic era*, GOOGLE (Dec. 11, 2024), https://blog.google/technology/google-deepmind/google-gemini-ai-update-december-2024/#ceo-message.

crawlers, Google's web crawlers remain largely free to index the web, "likely due to its position as the most popular search engine."[47] Another article similarly explained how "Gemini proves to be slightly more adept than ChatGPT when it comes to online searching and integrating the information it finds into its responses," including because of Google's superior access to the web "from day one."[48] Gemini thus relies on and benefits from Google's monopoly in the General Search Services market.

112.    Google has also incorporated Gemini into Chrome's omnibox (i.e., the address bar), providing users with quick and easy access to the chatbot.[49] One article described this change as "the first step towards AI Search."[50]

113.    Gemini resembles OpenAI's ChatGPT. It contains a box at the bottom of the screen that invites users to input "prompts." Gemini then generates textual or image-based responses that appear directly below the user's prompt. When a user inputs a prompt, Gemini generates content summarizing relevant information. For example, the below screenshot shows that in response to a February 2025 prompt, "Tell me about the history of baseball," Gemini generated a 353-word response summarizing baseball's history:

---

[47] Edwards, B., *Google debuts more powerful "Ultra 1.0" AI model in rebranded "Gemini" chatbot*, ARSTECHNICA (Feb. 8, 2024), https://arstechnica.com/information-technology/2024/02/google-debuts-more-powerful-ultra-1-0-ai-model-in-rebranded-gemini-chatbot/.

[48] Marr, B., *AI Showdown: ChatGPT Vs. Google's Gemini – Which Reigns Supreme?*, FORBES (Feb. 13, 2024), https://www.forbes.com/sites/bernardmarr/2024/02/13/ai-showdown-chatgpt-vs-googles-gemini--which-reigns-supreme/?sh=e97597d60724.

[49] Chen, J., *Chrome's New Built-In AI Is the Biggest Update to the Browser in Over 15 Years*, INVERSE (May 1, 2024), https://www.inverse.com/tech/google-chrome-gemini-ai-browser.

[50] *Id.*

Tell me about the history of baseball

 The history of baseball is rich and complex, with roots that stretch back centuries. Here's a breakdown of key aspects:

**Early Origins:**

- **Ancient Roots:**
  - Games involving bats and balls have existed in various forms throughout history.
  - Games similar to baseball can be traced to earlier games like rounders and cricket in England.

- **19th Century Development:**
  - In the early 19th century, variations of these games were played in the United States.
  - The New York Knickerbockers, formed in 1845, played a crucial role in standardizing the rules of baseball.
  - Alexander Joy Cartwright is credited with codifying many of the rules that shaped modern baseball.

**Growth and Popularization:**

- **Mid-19th Century:**
  - Baseball's popularity surged in the mid-1800s, especially in urban areas.
  - The National Association of Base Ball Players (NABBP) was formed, establishing organized play.

- **The Civil War:**
  - The Civil War helped spread baseball's popularity as soldiers from different regions played the game.

- **Professional Leagues:**
  - The first professional baseball teams emerged in the late 1860s.
  - The National League was founded in 1876, marking a significant step in the development of professional baseball.
  - The American League was founded in 1901, and shortly there after, the world series began.

**Key Developments:**

- **The Color Line:**
  - For much of its history, baseball was segregated.
  - Jackie Robinson's breaking of the color barrier in 1947 was a landmark moment in sports and American history.
- **The 20th Century:**
  - Baseball became known as "America's pastime," with iconic figures like Babe Ruth, Lou Gehrig, and Joe DiMaggio.
  - The sport has faced challenges, including scandals and labor disputes, but has maintained its popularity.
- **The Negro Leagues:**
  - It is very important to remember the Negro Leagues, that produced some of the best baseball players in history. Due to segregation, these players were unable to play in the Major Leagues until Jackie Robinson broke the color barrier.

**Modern Baseball:**

- Baseball continues to evolve, with changes in rules, technology, and player development.
- It remains a popular sport in the United States and has gained international recognition.

I hope this overview of baseball's history is helpful.



114. Gemini thus generates and publishes "original" content in response to certain prompts. Notably, this example contains zero links to third-party content.

115. Google has specifically designed Gemini to generate educational content. Users may be presented with a series of prompts encouraging them to explore different ways they can use Gemini, including a "Give me study tips" prompt, as shown below. When a user clicks on the "study tips" prompt, Gemini describes various learning-related offerings, such as "explaining complex concepts . . . to help you grasp the material," "generating practice questions," "flashcard

creation," and "personalized learning" in which a user can share their "struggle with a certain type of problem" and Gemini "can work through examples together" with that user.



**2. Study Organization and Planning:**

- **Creating Study Schedules:** While I can't directly manage your calendar, I can help you create a realistic study schedule by breaking down your study material into smaller, manageable chunks and allocating time for each.

- **Generating Practice Questions:** I can create practice questions based on the material you're studying, helping you test your understanding and identify areas where you need to focus more. You can ask for specific types of questions (multiple choice, short answer, etc.).

- **Flashcard Creation:** I can help you create flashcards by suggesting key terms and definitions or even generating questions and answers.

- **Personalized Learning:** While I don't "learn" in the same way humans do, you can tailor your interactions with me to focus on your specific weaknesses. If you know you struggle with a certain type of problem, we can work through examples together.

**Example Interactions:**

- "Explain the concept of supply and demand in simple terms."

- "Summarize the key arguments in this article about climate change."

- "Give me some practice questions on the American Revolution."

- "Create flashcards for the key terms in cell biology."

- "Help me brainstorm ideas for an essay on the impact of social media."

**Important Note:** I am a tool to *assist* you in studying, not to *replace* active learning strategies. The best way to learn is by actively engaging with the material, thinking critically, and practicing. Use me to enhance your study process, not as a shortcut. Also, always double-check information with reliable sources.



Gemini can make mistakes, so double-check it

  **c)**  <u>***Search Generative Experience***</u>

116. In May 2023, Google unveiled its Search Generative Experience ("SGE") (later rebranded as "AI Overviews") product, which integrates generative artificial intelligence into Google's search functionality.[51] Google's announcement promised that "we're taking more of the work out of searching, so you'll be able to understand a topic faster, uncover new viewpoints and insights, and get things done more easily."[52]

---

[51] Reid, E., *Supercharging Search with generative AI*, Google (May 10, 2023), https://blog.google/products/search/generative-ai-search/.

[52] *Id.*

117.    SGE is designed to "show an AI-powered snapshot" in response to user queries, "help[ing] people quickly get an overview on a topic."[53] While the results of an SGE search will include links to content on the web, the interface is designed to keep users within SGE, as opposed to exploring the web. SGE invites users "to ask follow-up questions" and provides specific suggestions for such follow-up questions. Clicking them "takes you to a new conversational mode, where you can ask Google more about the topic you're exploring."[54] Google also promises that context is "carried over from question to question; to help you more naturally continue your exploration."[55] All the while, users remain within Google's SGE system, where Google will continue displaying Search ads, giving advertisers "the opportunity to reach potential customers along their search journeys."[56] Google specifically touts SGE's impact on online shopping, promising that SGE will deliver "product descriptions that include relevant, up-to-date reviews, ratings, prices and product images."[57]

118.    Initially, SGE was released in an experimental phase. To access it, most users needed to opt in through the "Search Labs" portion of their Google Account, as shown in the below image:

 SGE, generative AI in Search

Supercharge your search to find what you're looking for in faster, easier ways. Get AI-powered overviews to quickly get the gist of a topic and easily follow up. Let AI do the heavy lifting for you.

When turned on, SGE may appear when you search 

---

[53] *Id.*
[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] *Id.*

119.    In March 2024, Google began testing SGE on users who did not opt-in. This limited rollout impacted "a subset of queries, on a small percentage of search traffic in the U.S, beginning with queries for which Google "thinks generative AI can be especially helpful."[58] Outside commentators at the time predicted that Google might launch SGE for all users that May during its annual I/O developer conference.[59]

d)    *AI Overviews*

120.    They were right. On May 14, 2024, in connection with its annual I/O develop conference, Google announced the roll-out of SGE, rebranded as "AI Overviews," to everyone in the United States, with additional countries to follow shortly thereafter. This launch immediately provided AI Overviews to "hundreds of millions of users," with Google expecting to reach "over a billion people by the end of the year."[60] A Google blog post summarizing these developments touted how "Now, with generative AI, Search can do more than you ever imagined. So you can ask whatever's on your mind or whatever you need to get done — from researching to planning to brainstorming — and Google will take care of the legwork."[61] As one example, "with just one search, you'll be able to ask something like 'find the best yoga or pilates studios in Boston and show me details on their intro offers, and walking time from Beacon Hill,'" without having to navigate to any actual website.[62]

121.    Google's AI Overviews rely on a "new Gemini model customized for Google Search," which "brings together Gemini's advanced capabilities — including multi-step reasoning,

---

[58] Schwartz, B., *Google starts testing AI overviews from SGE in main Google search interface*, SEARCHENGINELAND (Mar. 22, 2024), https://searchengineland.com/google-starts-testing-ai-overviews-from-sge-in-main-google-search-interface-438680.

[59] Schwartz, B., *Google still has not announced a launch date for SGE*, SEARCHENGINELAND (Mar. 28, 2024), https://searchengineland.com/google-still-has-not-announced-a-launch-date-for-sge-438862.

[60] Reid, L., *Generative AI in Search: Let Google do the searching for you*, GOOGLE (May 14, 2024), https://blog.google/products/search/generative-ai-google-search-may-2024/.

[61] *Id.*

[62] *Id.*

planning and multimodality — with our best-in-class Search systems."[63] By August 15, 2024, Google made AI Overviews available for all users in the United States, even those who are not signed in to Google accounts.[64]

122.    In March 2025, Google announced that it had expanded AI Overviews and introduced a new, experimental "AI Mode."[65] Google began to show AI Overviews in response to user search queries even more often, and the overviews went even further in answering user queries and reducing user incentives to click through to publishers' websites.

123.    In May 2025, Google announced that it was making AI Mode available to all U.S. users, regardless of whether they are signed in to Google. Google's CEO described the change as a "total reimagining of search."[66]

124.    The resulting product all but completes Google's evolution from a "search engine" to an "answer engine" that publishes answers to user's queries. Its formerly symbiotic and complementary relationship with publishers has now become overwhelmingly parasitic and competitive. The top of the SERP no longer presents the most relevant links to publishers that have allowed Google to crawl and copy the contents of their sites in exchange for Search Referral Traffic. Instead, pride of place goes to a machine-made essay consisting of multiple paragraphs purporting to provide the information that a user is searching for generated by an AI model from the very same publisher content that the user otherwise might have visited to learn the answer.

125.    Google's transition from a search engine to an answer engine is reflected in Google's own internal documents, made public in the Government Search Case. One email shows

---

[63] *Id.*

[64] Schwartz, B., *Google AI Overviews now show for signed-out users in the US*, SEARCHENGINELAND (Aug. 15, 2024), https://searchengineland.com/google-ai-overviews-now-show-for-signed-out-users-in-the-us-445232.

[65] Google, *Expanding AI Overviews and introducing AI Mode* (Mar. 5, 2025), https://blog.google/products/search/ai-mode-search/ (June 9, 2025).

[66] Google, *Google I/O 2025: From research to reality* (May 20, 2025), https://blog.google/technology/ai/io-2025-keynote (last accessed June 9, 2025).

a Google product manager imagining Google's CEO in 2035 reflecting on the past decade and remarking, "We thought we were in the finding business. Little did we know, we were also in the corpus business."[67] Indeed, Google admits in AI Overviews that Google's GAI products, such as Featured Snippets, "are designed to answer a search query directly in the search results, without needing to click through to a website"—a stark departure from Google's founding principle.



126.    Google also promotes the benefits of AI Overviews as helping users "sav[e] time" by "deliver[ing] a fast and easy way to access relevant information at a glance" by "allowing them to grasp complex subjects without needing to click through multiple websites to find the answer." In other words—Google's goal is for users not to leave the Google search ecosystem by exploring organic search results because it provides "key information directly on the search results page."

---

[67] PXR0105 at -304, *U.S. v. Google* (Remedies Hearing Exhibits).



127.    In the example below, Google's AI Overview paraphrases the first search result from Chegg's website without providing any link to that source in the AI Overview panel. Only by scrolling down the SERP past the AI Overview and clicking on the Chegg website result would a user find the original source that Google mined from its search index to generate its answer.





128.    While inconspicuous links are provided to other sources from which the AI

Overview is also derived, a user who is satisfied with the answer will have little reason to click

them. Even one who does will first be presented with snippets from the source webpages on

Google's SERP. Only by drilling down with still more clicks will the user navigate to an original

source. And even when AI Overviews provide links, they do not always provide attribution to the

sources from which Google derived the content. This cannibalization of user attention, of click-

through rates, and of search referrals breaks the fundamental bargain that sustains the Internet.

129.    Google's AI Overviews compete in the Online Educational Publishing market.

Instead of responding to a user's informational query by directing the user to Chegg or another

education publisher's website, Google serves the user educational content directly, in an AI

Overview based on content lifted from online educational publishers, including Chegg. One study

found that for education queries, AI overview coverage was near-complete as of May 2025.[68]

---

[68] BrightEdge, *AI Overview: A Year in Review* (May 14, 2025), https://videos.brightedge.com/assets/SGE-Guide/BrightEdge%20Report%20-%20AIO%20Overviews%20One%20Year%20Review%20Research%20Paper%20and%20Deep%20Dive%20.pdf (last accessed June 9, 2025).

130. Google itself recognizes that AI Overviews compete in the Online Educational Publishing market. Google has positioned AI Overviews as part of its "family of models and capabilities fine-tuned for learning"[69] and highlighted how AI Overviews "make back to school season easier" by helping users "understand topics faster" "whether you're studying math or art history, English or biology."[70]

131. Google has also demonstrated its intent to compete for customers in the Online Educational Publishing market. For example, Google's former General Manager for Gemini testified in the Government Search Case that Google was specifically concerned about Google Search losing queries related to homework help to LLMs.[71] Recently, Google rolled out AI Overviews to teens,[72] an indication that Google views students as a target demographic for AI Overviews.

132. More generally, Google claims that "making knowledge accessible to everyone" is its "highest priority" and acknowledges that "[p]eople come to Google Search every day to learn."[73] In a study published in May 2025, content marketing platform Semrush found that nearly 90% of the queries that trigger an AI Overview are informational.[74]

F.    Google's Unauthorized Use of Publisher Content for AI Training

133. Google's abuse of its General Search Services monopoly to suborn publisher content for its own purposes is not limited to forcing publishers to acquiesce to the republication

---

[69] Google, *Learn in newer, deeper ways with Gemini* (May 20, 2025), https://blog.google/outreach-initiatives/education/google-gemini-learnlm-update (last accessed June 9, 2025).

[70] Google, *Make back to school season easier with these AI features* (Sept. 3, 2024), https://blog.google/outreach-initiatives/education/google-ai-features-students-educators-2024 (last accessed June 9, 2025).

[71] *U.S. v. Google*, Remedies Hr'g Tr. (Hsiao) 648:2-16, 657:17-22.

[72] Google, *Expanding AI Overviews and introducing AI Mode* (Mar. 5, 2025), https://blog.google/products/search/ai-mode-search (last accessed June 9, 2025).

[73] Google, *Learn in newer, deeper ways with Gemini* (May 20, 2025), https://blog.google/outreach-initiatives/education/google-gemini-learnlm-update/ (accessed June 4, 2025).

[74] *Semrush AI Overviews Study: What 2025 SEO Data Tells Us About Google's Search Shift*, SEMRUSH BLOG (May 4, 2025), https://www.semrush.com/blog/semrush-ai-overviews-study (last accessed June 9, 2025).

in AI Overviews of works that they are compelled to allow to be indexed in exchange for Search Referral Traffic. As noted, Google also uses that same content without permission to train the AI models that it uses to generate those AI Overviews.

134.    Google has been intentionally vague in identifying the precise data sets used to train the LLMs underlying Gemini and AI Overviews.[75]

135.    Google's Terms of Service indicate that it uses all the information that it collects for search indexing, including Chegg's data, to train its LLMs. On July 1, 2023, Google updated its privacy policy to expressly state that it was using content it crawls from the web to train the models that it uses to generate AI Overviews that compete with that same content for attention on the web:

### publicly accessible sources

For example, we may collect information that's publicly available online or from other public sources to help train Google's ~~language~~AI models and build products and features like Google Translate, Bard, and Cloud AI capabilities. Or, if your business's information appears on a website, we may index and display it on Google services.

136.    In response to media inquiries, Google made clear that this change in language did not reflect a change in its practices, but was merely meant to clarify what it had been doing all along:

> "Our privacy policy has long been transparent that Google uses publicly available information from the open web to train language models for services like Google Translate," said Google

---

[75] Wiggers, K., *Google's Gemini isn't the generative AI model we expected*, TECHCRUNCH (Dec. 6, 2023), https://techcrunch.com/2023/12/06/googles-gemini-isnt-the-generative-ai-model-we-expected/ ("Google repeatedly refused to answer questions from reporters about how it collected Gemini's training data, where the training data came from and whether any of it was licensed from a third party.").

spokesperson Christa Muldoon to The Verge. "This latest update simply clarifies that newer services like Bard are also included."[76]

137.    In September 2023, Google purported to respond to publishers' concerns over the use of their search content for AI-training purposes. Google announced a tool called "Google-Extended," which effectively amounted to a tag publishers could implement in robots.txt.[77] Google claimed that by implementing the Google-Extended control, publishers could choose whether their content could be used to "help improve Bard and Vertex AI generative APIs, including future generations of models that power these products."[78] But Google later clarified that this control prevented content indexed for search only from being used to improve models, not from being used to train them in the first place, or to generate the RAG answers that the models produce.[79]

138.    Documents made public in connection with the Government Search Case show that in April 2024, Google considered how granular it would make publishers' ability to opt out of Google using their content for SGE training and grounding. Google drew a "hard red line" at permitting publishers to opt out of their data being used for grounding.[80] Why? Google recognized that grounding was "evolving into a space for monetization."[81] Google ultimately chose to give publishers no new options beyond the Google-Extended control. Tellingly, Google sought to avoid drawing attention to the ways in which it was using publisher content by recommending that Search "silently updat[e]" with "no public announcement" and not "get into the details" of training

---

[76] Weatherbed, J., *Google confirms it's training Bard on scraped web data, too*, THE VERGE (July 5, 2023), https://www.theverge.com/2023/7/5/23784257/google-ai-bard-privacy-policy-train-web-scraping.

[77] Romain, D., *An update on web publisher controls*, GOOGLE (Sep. 28, 2023), https://blog.google/technology/ai/an-update-on-web-publisher-controls/. *See also* Roth, E., *Google adds a switch for publishers to opt out of becoming AI training data*, THE VERGE (Sep. 28, 2023), https://www.theverge.com/2023/9/28/23894779/google-ai-extended-training-data-toggle-bard-vertex.

[78] Romain, D., *An update on web publisher controls*, GOOGLE (Sep. 28, 2023), https://blog.google/technology/ai/an-update-on-web-publisher-controls/.

[79] Monti, R., *Google Clarifies the "Google-Extended" Crawler Documentation*, SEARCH ENGINE JOURNAL (Feb. 9, 2024), https://www.searchenginejournal.com/google-clarifies-the-google-extended-crawler-documentation/507645/.

[80] PXR0026 at -286, *U.S. v. Google* (Remedies Hearing Exhibits).

[81] *Id.* at -290.

its models.[82] Google wanted to protect, and continue to add to, the golden corpus that it had obtained from publishers. Google also confirmed in the Government Search Case that even if publishers opt out of AI training through the Google-Extended program, Google *Search* still trains its AI models on the publishers' content. The Google-Extended Program does not apply to Google Search or AI Overviews. Even when publishers have chosen to opt out of training Google's AI products through Google-Extended, Google still trains its search-specific AI products, including AI Overviews, on their content.

G.    The Fundamental Threat Google Poses to Online Publishing

139.    Traffic generated by search results is critical for Chegg's business model. In 2024, for example, search engine referrals made up 71% of Chegg Study traffic and 60% of Chegg Study acquisitions (new subscriptions to Chegg's Study service) in the United States. The vast majority of Chegg's Search Referral Traffic is generated through Google's SERP. Google's misappropriation of Chegg's content to train and ground its AI models, and the way that misappropriation allows Google to publish its own content—which in turn diminishes traffic to Chegg's and other publishers' sites—threatens the very core of Chegg's business.

140.    It is reasonably foreseeable that Google's forced entry into the digital publishing output market will result in less traffic to other digital publishers, less revenue to the digital publishers that actually generate their own content, and, as a result, less digital publishing content for consumers. As explained by analysts from S&P Global: "The rollout of AI Overviews could reduce traffic to [] websites if Google's AI engine provides an overview that fully covers the

---

[82] *Id.*

searched topic and therefore negates the need for the consumer to directly access the data on the publisher's website."[83]

141.    AI Overviews are "designed to streamline information retrieval, allowing users to quickly understand complex topics without navigating away from their initial search query."[84] Aptly summarized by a CNN reporter, "users will soon no longer have to click on the links displayed in search results to find the information they are seeking."[85]

142.    Google itself admits that GAI-generated content cannibalizes publishers' search referral revenue because it diverts users' attention from the search results on the SERP. In a July 2023 presentation called "Generative Information Retrieval," Marc Najork, Distinguished Research Scientist at Google DeepMind, describing the "[e]ffects of Generative AI on web and search ecosystems," acknowledged: "Direct answers reduce search referral traffic."[86] He identified this reduction as "[m]ostly affecting informational queries."[87] "Direct answers" to such queries, he confirmed, "reduce referrals to content providers hurting their ability to monetize" and "[p]ressure" publishers to "develop alternative revenue streams."[88]

143.    A February 2024 study conducted by Gartner, Inc., a research and consulting company, found that by 2026, traditional search engine volume will drop 25%.[89] And a March

---

[83] S&P Global, *Credit FAQ: U.S. Digital Publishers have Cause For Concern Over Google's AI Overviews* (May 23, 2024), https://www.spglobal.com/ratings/en/research/articles/240523-credit-faq-u-s-digital-publishers-have-cause-for-concern-over-google-s-ai-overviews-13118837.

[84] Mendes, L., *Google AI Overviews: Everything You Need to Know (and Think About)*, ROCKCONTENT (May 21, 2024), https://rockcontent.com/blog/google-ai-overviews/.

[85] Darcy, O., *News publishers sound alarm on Google's new AI-infused search, warn of 'catastrophic' impacts*, CNN (May 15, 2024), https://www.cnn.com/2024/05/15/media/google-gemini-ai-search-news-outlet-impact/index.html?utm_medium=email&utm_source=rasa_io&utm_campaign=newsletter.

[86] Marc Najork, *Generative Information Retrieval*, ACM DIGITAL LIBRARY (July 24, 2023), https://dl.acm.org/doi/abs/10.1145/3539618.3591871.

[87] *Id.*

[88] *Id.*

[89] Gartner, *Gartner Predicts Search Engine Volume Will Drop 25% by 2026, Due to AI Chatbots and Other Virtual Agents* (Feb. 19, 2024), https://www.gartner.com/en/newsroom/press-releases/2024-02-19-gartner-predicts-search-engine-volume-will-drop-25-percent-by-2026-due-to-ai-chatbots-and-other-virtual-agents#.

2024 study conducted by Raptive, a company that provides services to online content creators, concluded that SGE, when fully rolled out, could result "in a substantial loss of advertising revenue for publishers," with declines in search traffic ranging from 20% to 60%.[90]

144.    These pronouncements are consistent with research on the effect of Google's "answer box"—a Featured Snippet precursor to AI Overviews—on Search Referral Traffic. A 2017 study analyzing two million answer box snippets found that they cause a significant drop in the click-through rate to websites appearing in regular, "organic" search results.[91]

145.    Outside observers have recognized the risks posed by GAI-assisted search to content creators like Chegg, focusing on how it diminishes user traffic to websites. For example, an article addressing generative search warned that "[i]f you implement a new way that impacts the traffic coming to the site, it has dire consequences for the performance of a business entirely."[92] "[B]rands risk losses of 20% to 36% of total organic traffic."[93]

146.    Google's misconduct has and will continue to divert user traffic away from Chegg's website, thereby reducing Chegg's subscription revenue associated with website visits. If individuals can obtain Chegg's highly valuable content directly through use of Google's products, without having to navigate to Chegg's website, a substantial percentage of them will not visit that site. Google also wielded and will continue to wield its monopoly to coerce Chegg into permitting Google to republish Chegg's content in AI Overviews, and to use Chegg's content for training and

---

[90] Agius, N., *Google SGE could cost publishers $2 billion in ad revenue*, SEARCHENGINELAND (Mar. 14, 2024), https://searchengineland.com/googles-sge-publishers-ad-revenue-438411.

[91] *See* Soulo, T., *Ahrefs' Study of 2 Million Featured Snippets: 10 Important Takeaways*, AHREFS BLOG (May 30, 2017), https://ahrefs.com/blog/featured-snippets-study/; *see also* Schwartz, B., *Another study shows how featured snippets steal significant traffic from the top organic results*, SEARCHENGINELAND (May 30, 2017), https://searchengineland.com/another-featured-snippet-study-shows-steal-significanttraffic-first-organic-result- 275967 (summarizing Ahrefs' study).

[92] Ostwal, T., *Google's Gen-AI Search Is Powering 84% of Queries, Study Finds*, ADWEEK (Jan. 18, 2024), https://www.adweek.com/media/googles-gen-ai-search-is-powering-84-of-queries-study-finds/ (addressing Google's generative AI search feature).

[93] *Id.*

grounding its AI models. Google's conditioning of search traffic on the use of Chegg's content for republishing, training, and grounding, deprived Chegg of the opportunity to make meaningful choices about how its content would be used. Chegg's only option was to opt out entirely, which would mean complete elimination from the SERP. But that would be devastating for Chegg, which generates of the bulk of its revenue from search referrals that it converts into subscriptions.

147.    Since making AI Overviews broadly available to search users, Google has significantly increased its "coverage" of questions that are answered on Chegg's website. Coverage refers to Google's use of AI Overviews to respond to queries of the sort posed by Chegg users and which typically return Chegg links in the organic search results on Google's SERP. Coverage measures how often Google generates an AI Overview in response to queries involving a given set of keywords within a specified time frame. As Google has increased its coverage of these types of queries, Chegg has experienced declines in click-through rates to its website. Google's increasing coverage generates less traffic and fewer opportunities for Chegg to convert site visits into paid subscriptions.

148.    Google's rollout of AI Overviews has also increased the prevalence of "zero-click" searches on Google, impacting traffic to Chegg's and other publishers' websites. For example, comparing clickstream data for October 2024 versus October 2023 for the U.S. shows that among search terms relevant to Chegg's educational offerings, the percentage of searches where the user does not click through to *any* non-Google site increased by 21% year over year. Another recent study shows that Google's AI Overviews reduce click-through rates for publishers by as much as 34.5% for the top organic search result.[94] Bain and Company concluded that 60% of searches now

---

[94] Search Engine Roundtable, *More Studies Show AI Overviews Harm Google Click Through Rates* (Apr. 23, 2025), https://www.seroundtable.com/ai-overviews-hurt-googleclick-through-rates-39282.html (last accessed June 9, 2025).

terminate without the user clicking through to another website.[95] Tellingly, Google's CEO was unable in a recent interview to identify any public data contradicting the widespread consensus that AI overviews and AI mode send less traffic to publishers than the previous search engine results page.[96]

149.    Siphoning and discouraging user traffic to Chegg's and other publishers' websites in this manner will have profoundly harmful effects on the overall quality and quantity of the information accessible on the Internet. If companies like Google are allowed to continue training LLMs by copying the original content of publishers without permission or payment, and then allowed, again without permission or payment, to use that very content to generate outputs that divert users from original sources, the economic incentives necessary for the creation and publication of high-quality original content will evaporate. Chegg and other publishers will not be able to pay content creators enough to produce quality content because the publishers will not receive a sufficient return on investment. Less content of poorer quality will reduce website traffic, resulting in reduced revenue, and thus less spending on content creation, spawning even less content of even poorer quality and even less revenue, and so on in a downward spiral for content creators and publishers alike.

150.    Caught in such a spiral, both the scale of Chegg's production and publishing of content and the utility of that content for its users would erode as the inevitable result of the reduced investment and shrinking revenue. Shrinking revenue may also force Chegg to reduce or

---

[95] Bain & Company, Consumer reliance on AI search results signals new era of marketing (Feb. 19, 2025), https://www.bain.com/about/media-center/press-releases/20252/consumer-reliance-on-ai-search-results-signals-new-era-of-marketing--bain--company-about-80-of-search-users-rely-on-ai-summaries-at-least-40-of-the-time-on-traditional-search-engines-about-60-of-searches-now-end-without-the-user-progressing-to-a (last accessed June 9, 2025).

[96] Nilay Patel, Decoder, *Google CEO Sundar Pichai on the future of search, AI agents, and selling Chrome* (May 27, 2025), https://www.theverge.com/decoder-podcast-with-nilay-patel/673638/google-ceo-sundar-pichai-interview-ai-search-web-future (last accessed June 9, 2025) (asking whether there is "public data that shows that AI overviews and AI mode actually send more traffic out than the previous search engine results page").

discontinue certain services entirely as, for example, it may no longer make economic sense to provide subscribers with 24/7 on-demand access to subject matter experts.

151.    Google's unlawful conduct has thus put reputable publishers like Chegg in a catch-22. Chegg's millions of carefully researched, expertly written, and thoughtfully curated Q&As and homework solutions have driven its commercial success and allowed it to use the Internet to democratize learning and learning outcomes. But now, with every answer or solution it issues, Chegg provides Google with more training and grounding material for its GAI systems to generate AI Overviews or refine its models, adding fuel to a fire that challenges Chegg's business model, the viability of many other online publishers, and the public's access to high-quality content across the Internet. Google's unlawful conduct cannot be permitted to continue.

H.    The Unlawfulness of Google's Misappropriation of Digital Publishers' Content

1.    *Reciprocal Dealing*

152.    By coercing publishers to supply content to be used for other purposes as a condition of being included in its search index at all, Google is engaged in an unlawful course of reciprocal dealing. Reciprocal dealing occurs when a firm with market power refuses to sell product X to a customer unless that customer agrees to sell (or give) product Y to it. In this case, the product Google is selling to (and threatening to withhold from) digital publishers is Search Referral Traffic. There is a distinct relevant antitrust market for Search Referral Traffic.

153.    Other forms of referral traffic or online distribution are not viable substitutes for Search Referral Traffic. Direct navigation requires the user to know both a publisher's specific URL and that the publisher offers relevant content. And while users may navigate to a publisher's website via links on other publishers' pages or social media, those pages do not deliver the same type of traffic that search provides. While users may happen to see links on other publishers' sites

or in social media posts, they go to search engines when they are specifically looking for information. Digital publishers cannot replicate that intentional search traffic through other means.

154.    As discussed above, the market for Search Referral Traffic is just one component of the cluster of interrelated markets that comprise the overarching market for General Search Services that Google monopolizes. In the same way Google delivers search results to users and search ad impressions to advertisers, it delivers Search Referral Traffic to digital publishers—and it possesses the same monopoly power over publishers as it does in the General Search Services and general search text advertising markets.

155.    As a condition to selling publishers Search Referral Traffic, Google requires publishers to acquiesce in the use of their content for three purposes that are unrelated to providing search results. First, publishers must let Google republish their content through snippets ("Republishing Content"). Second, publishers must let Google use their content for GAI training ("GAI Training Content"). Third, publishers must let Google use, repackage, and republish their content via RAG ("RAG Content"). Content supplied for each of these uses constitutes a separate product sold in a separate relevant product market: (1) the Republishing Content market; (2) the GAI Training Content market; and (3) the RAG Content market. Educational publishing content with appropriate associated rights can satisfy at least some demand for content in each of these markets. Google uses its Search Referral Traffic monopoly to force digital publishers, including educational publishers, such as Chegg, to supply it in each of those three content markets *free of charge*. No other search engine or generative AI company has sufficient market power or monopoly power to compel this exchange.

156.    The Republishing Content market refers to the exchange of the right to republish certain content.

157.     The GAI Training Content market refers to the exchange of the right to use certain content for GAI Training, as that term is defined above.

158.     The RAG Content market refers to the exchange of the right to use certain content for RAG, as that term is defined above.

159.     Each of these rights associated with content usage has independent value. In some instances, the same content can be republished, used for training, and used for grounding. In other instances, content may only be usable for a subset of these purposes.

160.     Public reporting has described AI content markets as "opaque" because participating companies generally do not disclose the details of their content licensing agreements, but analysts have estimated that the value of the overarching AI content market could grow close to $30 billion by 2034.[97]

161.     Available information shows that participants in the AI content market recognize that republishing, training, and retrieval-augmented generation are separate use cases with independent value. For example, some AI companies have proposed sharing a percentage of revenue with publishers whose answers are cited in response to a user query.[98] This pricing is consistent with republishing and retrieval-augmented generation usage, which lends itself more readily to per-query pricing. In contrast, other deals have involved flat fees for use of content for training.[99]

---

[97] Katie Paul & Anna Tong, *Inside Big Tech's underground race to buy AI training data*, REUTERS (Apr. 5, 2025), https://www.reuters.com/technology/inside-big-techs-underground-race-buy-ai-training-data-2024-04-05 (last accessed June 9, 2025).

[98] Perplexity, *Introducing the Perplexity Publishers' Program* (July 30, 2024), https://www.perplexity.ai/hub/blog/introducing-the-perplexity-publishers-program (last accessed June 9, 2025).

[99] Patterson, J., *AI content licensing lessons from Factiva and TIME*, DIGITAL CONTENT NEXT (Mar. 6, 2025), https://digitalcontentnext.org/blog/2025/03/06/ai-content-licensing-lessons-from-factiva-and-time (last accessed June 9, 2025).

162.    For example, the Washington Post recently announced a partnership with OpenAI, in which "ChatGPT will display summaries, quotes, and links to original reporting from The Post in response to relevant questions."[100] The Post's description of the deal indicates that it agreed to permit OpenAI to use its content for republishing and retrieval-augmented generation. But it says nothing about permitting OpenAI to use the Post's content for training.

163.    The relevant geographic market for each relevant product market is the United States. In the Government Search Case, the district court found, and the parties did not dispute, that the geographic market for General Search Services to be the United States. The relevant geographic market for the specific services that make up General Search Services, including Search Index Data and Search Referral Traffic, is accordingly also the United States. The same holds true for the markets for Republishing Content, GAI Training Content, RAG Content, and Online Educational Publishing.

164.    Google provides a local domain website for users in the United States, delivering search results, which include its AI Overviews and other republishing products, tailored to the users' specific location within the country. Moreover, digital informational publishers (and republishers using digital informational content) target U.S. consumers with digital informational publishing.

165.    Upon information and belief, Google evaluates search market shares on a country-by-country basis, including the United States. These search services, including the component inputs, and digital publishing available outside the United States are not reasonable substitutes for those offered in the United States. A hypothetical monopolist in the United States of any of these

---

[100] Washington Post, *The Washington Post partners with OpenAI on search content* (Apr. 22, 2025), https://www.washingtonpost.com/pr/2025/04/22/washington-post-partners-with-openai-search-content (last accessed June 9, 2025).

products would be able to engage in anticompetitive conduct, including by raising price, reducing output, or maintaining quality below the level that would exist in a competitive market.

166.    Google exercises its coercion through its web crawler and its search index. Google's crawler collects Search Index Data from digital publishers and coerces digital publishers to push their data directly to Google to ensure the newest, freshest content quickly appears in Google's search results. But it uses the same index data for Republishing Content, GAI Training Content, and RAG Content. The only way for digital publishers to opt out completely is to block Google's crawlers, which effectively means forgoing Google Search Referral Traffic. In other words, there is no way for publishers to tell Google, "You may buy my content to generate search results, but you do not have my permission to use my content for other purposes."

167.    Even if Google offered digital publishers the ability to opt-out of Google using their Search Index Data for Republishing Content, GAI Training Content, and/or RAG Content, the coercion would persist so long as Google preferences AI Overviews and Featured Snippets on its SERP. Google's AI Overviews boxes often include source links embedded within them, alongside or below the RAG-generated content. The same is true of Google's Top Stories and People Also Ask features.

168.    The presence of these links and the fact that Google automatically places the elements that feature them at or near the top of the SERP create an impossible dilemma for digital publishers. Even if they could opt out of Google republishing their content, doing so would mean demotion on the SERP and thus less Search Referral Traffic. So long as other digital publishers know that they can artificially elevate their own search results by permitting Google to use their content for Republishing, GAI Training, and RAG, there will be a race-to-the-bottom whereby virtually all publishers opt in, even though the only beneficiary in the end is Google.

169.    By using reciprocal dealing to get free Republishing Content, GAI Training Content, and RAG Content, Google restricts competition in downstream digital publishing markets, including the Online Educational Publishing market, where it competes against other web publishers like Chegg. The more users consume Google's derivative, regurgitated content on its SERP, the less they click through to other publishers' original content. That means less revenue for those original publishers, which in turn undermines their ability to invest in new content. So while Google's reciprocal dealing increases its share of the digital publishing market, it does so at the expense of reducing the output of original content across the entire market.

170.    The effects of the output restriction attributable to Google's reciprocal dealing are difficult to overstate. Not only does it affect billions of dollars of digital publisher investment in content, but it also undermines the public's ability to gain access to original content and information. If allowed to persist, the full extent of the consequences of Google's assault on digital publishing ultimately may be impossible to quantify.

### 2.    *Monopoly Maintenance*

171.    As a supplier of content that is indexed by Google for search, Chegg participates in the Input Market for General Search Services. In this input market, Google accesses Chegg's content through an exchange whereby Chegg permits Google to index its content for the purpose of including Chegg in links published on Google's SERP, which leads to search referral traffic for Chegg—and which Chegg then converts to subscription revenue.

172.    Historically, publishers like Chegg permitted Google to access their content for an access price of zero because the publishers at least received something of value as a result: links to their websites on the SERP that resulted in traffic to their websites. That is, publishers like Chegg allowed Google to access their content for free in exchange for the clicks generated by

prominent placement on Google's SERP.  In this ecosystem, web publishers had (in Google's words) "opportunities to derive value from participating in the web ecosystem."[101]

173.    Google's ability to extract a zero access price—when Google was benefiting tremendously through the receipt of advertising revenue generated as a result of this exchange— already evinced Google's monopsony power in the Input Market. In a competitive input market, there would be no obvious reason for Chegg to agree to permit Google to access its content for a zero price.

174.    Now, Google has ratcheted up the abuse of its monopoly power in search (and monopsony power in the Input Market) by forcing Chegg to allow its content to be used to generate AI Overviews, including through republishing the content itself, using the content to train its models, and using the content for RAG. Google's use of Chegg's content for this purpose is demonstrably harmful to Chegg. Google's AI Overviews *reduce*, rather than increase, click-throughs from search results and thus traffic to Chegg's website. The result is that the exchange between Google and Chegg now results in a suppressed value for Chegg. That is, the value that Chegg expects to receive by granting Google access to its content has gone from barely tolerable to intolerably exploitative. But for Google's ill-gotten monopoly in General Search Services, Google would never be able to coerce this exchange at below competitive levels in the Input Market.

175.    Google's conduct harms competition in the Input Market by pushing the compensation for Chegg below competitive levels, which will suppress the volume of new publisher content in the Input Market. Google's conduct also entrenches its ill-gotten monopoly in General Search Services. Google's ability to access Chegg's content for below-competitive

---

[101] Google, *A principled approach to evolving choice and control for web content* (July 6, 2023), https://blog.google/technology/ai/ai-web-publisher-controls-sign-up (accessed June 9, 2025).

levels puts competitor search platforms, some of whom must pay a significantly higher price for the same content, at a competitive disadvantage. The result is that Google's rivals are further disadvantaged in attempting to compete against Google and Google is thus able to further entrench its general search monopoly. With AI Overviews, Google is also positioning itself to suppress dynamic competition in the next frontier in search powered by generative artificial intelligence.

176.    Google's conduct also harms consumers in the General Search Services market. Google's promise to help users find relevant and reliable information relies on the existence of high-quality websites that provide original and accurate content. By starving those websites of search traffic, Google is eliminating their publishers' ability to earn revenue and causing their demise. If those websites go out of business, fully disappear behind paywalls, or are stripped of the financial incentives to maintain existing content or generate new content, search users will be left without relevant and reliable information to answer their queries. The value to consumers of search is built on the content provided by publishers like Chegg. In the absence of that content, search users will suffer because it will become more difficult, if not impossible, to find relevant and reliable information on the Internet. Google's extraction of monopoly rent in the form of a suppressed access price in the Input Market degrades quality in the General Search Services market.

177.    Put another way, Google's reciprocal dealing practices also further its monopoly maintenance strategy in the General Search Services market in at least two ways. First, Google's extraction of Republishing Content, GAI Training Content, and RAG Content free-of-charge constitutes a form of monopoly rent extraction. It is akin to Google charging supracompetitive

prices for search ads to advertisers.[102] But instead of raising prices as a monopolist, Google is artificially decreasing the prices it would otherwise pay digital publishers for Republishing Content, GAI Training Content, and RAG Content. As discussed above, other republishers and GAI companies who lack monopoly power have been willing to pay for each of those forms of content. Google can refuse to pay because it is a monopolist, and as the D.C. District Court found, Google maintained that monopoly power through illegal search distribution deals. Chegg has thus suffered an antitrust injury as a result of Google's illegal monopoly maintenance in the General Search Services market.

178.    Second, Google's reciprocal dealing itself is another strategy to maintain its primary monopoly in General Search Services. In that market, Google's AI products, including its AI Overviews, will increase user reliance on the search engine as a source of quick and easy information as compared to rivals who cannot exercise monopoly power to obtain source content from publishers for free. Thus, by virtue of its illegally maintained monopoly position over web publishers' Search Referral Traffic, Google will be able to entrench its general search monopoly by maintaining an advantage in obtaining the key inputs of Republishing Content, GAI Training Content, and RAG Content.

### 3.    *Unjust Enrichment*

179.    Google has been unjustly enriched by its uses of Chegg's works.  First, Google has avoided the cost of paying for valuable content that other companies pay for. For example, Chegg has entered into commercial agreements to license, on a non-exclusive basis, a portion of its valuable content portfolio to two major technology companies—deals that generated over $4 million in revenue in just the first quarter of 2025, with an additional $7 million in revenue

---

[102] *United States v. Google*, Case No. 20-cv-03010-APM, Dkt. No. 1033, 2024 WL 3647498, at *126–128 (D.D.C. Aug. 5, 2024).

projected for the second quarter of 2025. Chegg is in talks with other companies to expand its licensing efforts even further. For example, OpenAI has entered into commercial agreements with at least several content owners, including an agreement with Axel Springer ballparked at "tens of millions" of dollars, as well as an agreement with the Associated Press.[103] Relatedly, in response to the New York Times's lawsuit against Microsoft and OpenAI, OpenAI CEO Sam Altman stated publicly that OpenAI wanted to pay the New York Times "a lot of money to display their content."[104] Yet Google is commercially exploiting content—created through years of time, labor, and financial investment—for which it has not paid.

180.    Google has also benefited directly from its wrongful conduct. Google announced the launch of Bard on February 6, 2023.[105] The very next day, the share price of its parent, Alphabet Inc., increased by approximately 4.6%.[106] Though Alphabet's stock price briefly dipped thereafter because Bard shared inaccurate information in a promotional video, after Google announced a revamped AI-powered search engine on May 10, 2023, Alphabet's share price surged even further,

---

[103] Cullen, A. & Davalos, J., *OpenAI to Pay Axel Springer Tens of Millions to Use News Content*, BLOOMBERG (Dec. 1, 2023), https://www.bloomberg.com/news/articles/2023-12-13/openai-axel-springer-ink-deal-to-use-news-content-in-chatgpt; *see also* O'Brien, M., *ChatGPT-maker OpenAI Signs Deal with AP to License News Stories*, AP NEWS (July 13, 2023), https://apnews.com/article/openai-chatgpt-associated-press-ap-f86f84c5bcc2f3b98074b38521f5f75a.

[104] Browne, R. & Sigalos, M., *OpenAI CEO Sam Altman Says ChatGPT Doesn't Need New York Times Data Amid Lawsuit*, CNBC (Jan. 18, 2024), https://www.cnbc.com/2024/01/18/openai-ceo-on-nyt-lawsuit-ai-models-dont-need-publishers-data-.html.

[105] Pichai, S., *An important next step on our AI journey*, GOOGLE (Feb. 6, 2023), https://blog.google/technology/ai/bard-google-ai-search-updates/.

[106] Macrotrends, *Alphabet - 21 Year Stock Price History | GOOGL*, https://www.macrotrends.net/stocks/charts/GOOGL/alphabet/stock-price-history (last accessed Feb. 21, 2025).

rising 8.6% in the two days following that announcement.[107] Google's stock price closed 5% higher after its Gemini announcement.[108]

181.    Google also benefits through the monetization of AI Overviews and products grounded on Google Search. For example, Google's service Vertex AI (which it sells to third parties), offers the option of grounding responses with information from Google Search. Moreover, Google has stated publicly that it is monetizing AI Overviews at the same rate as traditional search results.[109]

182.    The value of Google's models and AI products is directly related to the quality of the works that it acquires to train them and ground their outputs. In this respect, Chegg's content is a "golden corpus" that is particularly valuable to Google. Chegg's content is meticulously researched, carefully written, thoroughly edited, and highly accurate, making it ideal for training and grounding the outputs of GAI systems.

183.    The value of Chegg's works for republishing, training, and RAG purposes is made possible only by the enormous investment Chegg puts into them. Chegg content represents the work of thousands of employees and more than 150,000 subject matter experts, the employment of and contracting with whom costs Chegg millions of dollars per year. Google has benefited from over a decade's worth of works produced by these individuals for Chegg. By outright taking that extraordinary volume of content, Google has avoided the enormous costs Chegg expended to

---

[107] Coulter, M. & Bensinger, G., *Alphabet shares dive after Google AI chatbot Bard flubs answer in ad*, REUTERS (Feb. 8, 2023), https://www.reuters.com/technology/google-ai-chatbot-bard-offers-inaccurate-information-company- ad-2023-02-08/; Carson, B., *Google Co-Founders Gain $18 Billion as AI Boost Lifts Stock*, BLOOMBERG (May 12, 2023), https://www.bloomberg.com/news/articles/2023-05-12/google-co-founders-gain-17-billion-as-ai-boost-lifts- stock#xj4y7vzkg.

[108] Capoot, A., *Google shares pop 5% after company announces Gemini AI model*, CNBC (Dec. 7, 2023), https://www.cnbc.com/2023/12/07/google-shares-pop-after-company-announces-gemini-ai-model.html#.

[109] Alphabet, Q1 2025 Earnings Call (Apr. 24, 2025), https://abc.xyz/2025-q1-earnings-call/ (last accessed June 9, 2025).

create that content, ranging into the hundreds of millions of dollars and created billions more in enterprise value at Chegg's expense.

### COUNT I: Reciprocal Dealing in Violation of Section 1 of the Sherman Act

184.    Chegg incorporates by reference and realleges the preceding allegations as though fully set forth herein.

185.    Google engaged in illegal reciprocal dealing in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

186.    Google conditions the sale of Search Referral Traffic (the "Tying Product") to Plaintiff on Plaintiff giving Google Republishing Content, GAI Training Content, and RAG Content (the Tied Products) for free.

187.    In all instances, the Tying and Tied Products are distinct and separate products. They are sold in different markets; serve different functions; have separate demand; have separate customer sets, and are treated by Google and others as separate products.

188.    Google has market power in the General Search Services market, and accordingly also in the Search Referral Traffic market, and has used this market power to condition the sale of the Tying Product to Plaintiff on Plaintiff selling Google the Tied Products for free.

189.    Google's conduct has harmed competition in General Search Services. Forcing digital publishers to provide Republishing Content, GAI Training Content, and RAG Content for free effectively lowers Google's costs. Moreover, Google's underpayments to Chegg reduce the volume of publishing content in the Input Market for General Search Services. GAI search results have already become an important component of SERPs, and Google's conduct serves to maintain its General Search Services monopoly.

190.    Google's conduct has also restricted output and reduced quality in digital publishing markets, including the Online Educational Publishing market, by diverting traffic that would

otherwise go to original content publishers without compensation. As a direct and proximate result, digital publishers have been forced to lay off staff, which has resulted in a reduction in the output and quality of original content.

191.    In addition to harming consumers in the form of decreases in the quality and quantity of Online Educational Publishing material, Google's anticompetitive conduct further harms consumers by decreasing the quality of Google's search product. Starving Chegg and other publishers of search traffic will ultimately leave search users without relevant and reliable information to answer their queries. It will become more difficult, if not impossible, for users to find relevant and reliable information on the Internet over time because publishers like Chegg continually invest in updating and expanding their content.

192.    A substantial amount of interstate commerce for the Tied Products is affected.

193.    Google's anticompetitive reciprocal dealing is per se illegal, or in the alternative illegal under the Rule of Reason or "quick look" analytical framework. There are no legally cognizable procompetitive effects of or justifications for Google tying the sale of Search Referral Traffic to its purchase of the Tied Products, which was not reasonably related to, or reasonably necessary for, any procompetitive objectives. Alternatively, there are no legally cognizable procompetitive effects of or justifications for the reciprocal dealing arrangement that outweigh its substantial anticompetitive effects or that could not be achieved through less restrictive means.

194.    As a result of the foregoing illegal conduct by Google, Plaintiff has been injured in its business and property within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15. Plaintiff was paid less for the sale of Republishing Content, GAI Training Content, and RAG Content than it would have but for Google's conduct. Plaintiff has also lost revenues as a result of

Google diverting traffic from Plaintiff's website in the form of lost subscription revenue from users' visits to its site. Plaintiff is entitled to receive treble damages for its injuries.

195.    Google's anticompetitive reciprocal dealing arrangement is ongoing, and Plaintiff is entitled to injunctive relief and other equitable remedies.

196.    Plaintiff is also entitled to attorneys' fees and costs of suit.

### COUNT II: Reciprocal Dealing in Violation of Section 2 of the Sherman Act

197.    Chegg incorporates by reference and realleges the preceding allegations as though fully set forth herein.

198.    Google engaged in illegal reciprocal dealing in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

199.    Google conditions the sale of Search Referral Traffic (the Tying Product) to Plaintiff on Plaintiff giving Google Republishing Content, GAI Training Content, and RAG Content (the Tied Products) for free.

200.    In all instances, the Tying Product and Tied Products are distinct and separate products. They are sold in different markets; serve different functions; have separate demand; have separate customer sets, and are treated by Google and others as separate products.

201.    Google has monopoly power in the General Search Services market, and accordingly also in the Search Referral Traffic market, and has used this monopoly power to condition the sale of the Tying Product to Plaintiff on Plaintiff selling Google the Tied Products for free.

202.    Through its anticompetitive conduct described herein, namely reciprocal dealing, Google has willfully acquired and maintained its monopoly power in General Search Services in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Forcing digital publishers to provide Republishing Content, GAI Training Content, and RAG Content for free effectively lowers

Google's costs. GAI search results have already become an important component of SERPs, and Google's conduct serves to maintain its General Search Services monopoly.

203.    Google's conduct has also restricted output and reduced quality in digital publishing markets, including the Online Educational Publishing market, by diverting traffic that would otherwise go to original content publishers without compensation. As a direct and proximate result, digital publishers have gone out of business or been forced to lay off staff, which has resulted in a reduction in the output and quality of original content.

204.    In addition to harming consumers in the form of decreases in the quality and quantity of Online Educational Publishing material, Google's anticompetitive conduct further harms consumers by decreasing the quality of Google's search product. Starving Chegg and other publishers of search traffic will ultimately leave search users without relevant and reliable information to answer their queries. It will become more difficult, if not impossible, for users to find relevant and reliable information on the Internet.

205.    As a result of the foregoing illegal conduct by Google, Plaintiff has been injured in its business and property within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15. Plaintiff was paid less for the sale of Republishing Content, GAI Training Content, and RAG Content than it would have but for Google's conduct. Plaintiff has also lost revenues as a result of Google diverting traffic from Plaintiff's website in the form of lost subscription revenue from users' visits to its site. Plaintiff is entitled to receive treble damages for its injuries.

206.    Google's anticompetitive reciprocal dealing arrangement is ongoing, and Plaintiff is entitled to injunctive relief and other equitable remedies.

207.    Plaintiff is also entitled to attorneys' fees and costs of suit.

**COUNT III: Unlawful Monopoly Leveraging in Violation of Section 2 of the Sherman Act**

208.    Chegg incorporates by reference and realleges the preceding allegations as though fully set forth herein.

209.    Google has monopoly power in the General Search Services market. Through its anticompetitive conduct described herein—including forcing Plaintiff to provide content at no cost for AI model training and grounding and republishing—Google has unlawfully leveraged its monopoly power in General Search Services into other markets, including the Online Educational Publishing market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

210.    Google's conduct has restricted output and reduced quality in digital publishing markets, including the Online Educational Publishing market, by diverting traffic that would otherwise go to original content publishers without compensation. As a direct and proximate result, digital publishers have gone out of business or been forced to lay off staff, which has resulted in a reduction in the output and quality of original content.

211.    In addition to harming consumers in the form of decreases in the quality and quantity of Online Educational Publishing material, Google's anticompetitive conduct further harms consumers by decreasing the quality of Google's search product. Starving Chegg and other publishers of search traffic will ultimately leave search users without relevant and reliable information to answer their queries. It will become more difficult, if not impossible, for users to find relevant and reliable information on the Internet.

212.    As a result of the foregoing illegal conduct by Google, Plaintiff has been injured in its business and property within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15. Plaintiff was paid less for the sale of Republishing Content, GAI Training Content, and RAG Content than it would have but for Google's conduct. Plaintiff has also lost revenues as a result of

Google diverting traffic from Plaintiff's website in the form of lost subscription revenue from users' visits to its site. Plaintiff is entitled to receive treble damages for its injuries.

213.    Google's anticompetitive conduct is ongoing, and Plaintiff is entitled to injunctive relief and other equitable remedies.

214.    Plaintiff is also entitled to attorneys' fees and costs of suit.

### **COUNT IV: Unlawful Monopolization in Violation of Section 2 of the Sherman Act**

215.    Chegg incorporates by reference and realleges the preceding allegations as though fully set forth herein.

216.    Google has monopoly power in the General Search Services market. Through its anticompetitive conduct described herein—including forcing Plaintiff to provide content at no cost for AI model training and grounding and republishing—Google has willfully acquired and maintained its monopoly power in General Search Services in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

217.    Google's conduct has also restricted output and reduced quality in digital publishing markets, including the Online Educational Publishing market, by diverting traffic that would otherwise go to original content publishers without compensation. As a direct and proximate result, digital publishers, including Chegg, have been forced to lay off staff. Other digital publishers have gone out of business. This has resulted in a reduction in the output and quality of original content.

218.    In addition to harming consumers in the form of decreases in the quality and quantity of Online Educational Publishing material, Google's anticompetitive conduct further harms consumers by decreasing the quality of Google's search product. Starving Chegg and other publishers of search traffic will ultimately leave search users without relevant and reliable information to answer their queries. It will become more difficult, if not impossible, for users to find relevant and reliable information on the Internet.

219.    As a result of the foregoing illegal conduct by Google, Plaintiff has been injured in its business and property within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15. Plaintiff was paid less for the sale of Republishing Content, GAI Training Content, and RAG Content than it would have but for Google's conduct. Plaintiff has also lost revenues as a result of Google diverting traffic from Plaintiff's website in the form of lost subscription revenue from users' visits to its site. Plaintiff is entitled to receive treble damages for its injuries.

220.    Google's anticompetitive conduct is ongoing, and Plaintiff is entitled to injunctive relief and other equitable remedies.

221.    Plaintiff is also entitled to attorneys' fees and costs of suit.

### COUNT V: Unlawful Attempted Monopolization in Violation of Section 2 of the Sherman Act

222.    Chegg incorporates by reference and realleges the preceding allegations as though fully set forth herein.

223.    Google has monopoly power in the General Search Services market. Through its anticompetitive conduct described herein—including forcing Plaintiff to provide content at no cost for AI model training and grounding and republishing—Google has willfully acquired and maintained its monopoly power in General Search Services in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

224.    Google has also engaged in the above anticompetitive conduct with the specific intent of creating monopolies in digital publishing markets, including in the Online Educational Publishing market.

225.    Google's conduct gives it a dangerous probability of acquiring monopoly power in the Online Educational Publishing market by restricting output and reducing quality of content supplied in that market. It has diverted traffic that would otherwise go to original content publishers

without compensation. As a direct and proximate result, digital publishers have gone out of business or been forced to lay off staff, which has resulted in a reduction in the output and quality of original content.

226.    In addition to harm to consumers in the form of decreases in the quality and quantity of Online Educational Publishing material, Google's anticompetitive conduct further harms consumers by decreasing the quality of Google's search product. Starving Chegg and other publishers of search traffic will ultimately leave search users without relevant and reliable information to answer their queries. It will become more difficult, if not impossible, for users to find relevant and reliable information on the Internet.

227.    As a result of the foregoing illegal conduct by Google, Plaintiff has been injured in its business and property within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15. Plaintiff was paid less for the sale of Republishing Content, GAI Training Content, and RAG Content than it would have but for Google's conduct. Plaintiff has also lost revenues as a result of Google diverting traffic from Plaintiff's website in the form of lost subscription revenue from users' visits to its site. Plaintiff is entitled to receive treble damages for its injuries.

228.    Google's anticompetitive conduct is ongoing, and Plaintiff is entitled to injunctive relief and other equitable remedies.

229.    Plaintiff is also entitled to attorneys' fees and costs of suit.

### COUNT VI: Common Law Unjust Enrichment

230.    Chegg incorporates by reference and realleges the preceding allegations as though fully set forth herein.

231.    The training process for Google's LLMs involves storing encoded copies of the training works in computer memory, repeatedly passing them through the model with words masked out, and adjusting the parameters to minimize the difference between the masked-out

words and the words that the model predicts to fill them in. After being trained on a general corpus, models may be further subject to "fine-tuning" by, for example, performing additional rounds of training using specific types of works to better mimic their content or style, or providing them with human feedback to reinforce desired or suppress undesired behaviors.

232.    On information and belief, at all relevant times, Google included Plaintiff's works within the training corpuses for its LLMs.

233.    Google is liable under common law principles of unjust enrichment for its reliance on Plaintiff's works to train its models.

234.    On information and belief, at all relevant times, Google has been enriched through its reliance on Plaintiff's works for model training. Plaintiff makes enormous investments in human talent, technology, and infrastructure to produce high-quality content. Yet without paying anything to Plaintiff, Google exploited Plaintiff's content for commercial purposes, thereby benefiting from Plaintiff's extensive production efforts.

235.    These Google models (which were developed with Plaintiff's works) now power lucrative user-facing products and features that Google continues to develop—namely, the Gemini chatbot and AI Overviews—which are critical for Google's ongoing success. Google has already begun monetizing these products. For example, Google charges subscription fees to users to access Gemini Advanced. Google also generates advertising revenues through users' engagement with the Gemini chatbot and through Google's SGE search feature. Google's ongoing development of these products are critical to Google's goal of maintaining its dominance in the General Search Services market.

236.    Google's enrichment has come at Plaintiff's expense. Google's conduct diminishes user traffic on Plaintiff's website, which in turn diminishes Plaintiff's revenues. Google's conduct

relatedly diminishes the value of Plaintiff's content. If Google can exploit Plaintiff's content for commercial purposes without paying a dime to Plaintiff, other companies will have less incentive to pay Plaintiff a fair price for that content.

237.    While models may in some instances "memorize" training works by encoding retrievable copies in their parameters, many training works are not memorized in this way. Likewise, while model outputs presented as AI Overviews often may be substantially similar to works on which they are grounded, often they are not. The tuning of models that does not result in the creation of memorized copies of training works in the model parameters and the presentation of model outputs that are not substantially similar to works on which those outputs are grounded are distinct acts of exploitation that are not preempted by the Copyright Act.

238.    Given these circumstances, equity and good conscience require restitution to Plaintiff. Google should be ordered to pay Plaintiff a fair price for using Plaintiff's content to train and ground its models and/or disgorge to Plaintiff the profits that Google earned from its misconduct.

239.    Google's conduct has injured Plaintiff, and Plaintiff is entitled to restitution and/or disgorgement of profits and other remedies provided by law.

## PRAYER FOR RELIEF

WHEREFORE, Chegg demands judgment against Google as follows:

1.    Awarding Chegg compensatory damages, restitution, disgorgement, and any other relief that may be permitted by law or equity;

2.    Permanently enjoining Google from engaging in the unlawful and unfair, conduct alleged herein;

3.   Awarding Chegg costs, expenses, and attorneys' fees as permitted by law; and

4.   Awarding Chegg such other or further relief as the Court may deem just.

## **DEMAND FOR JURY TRIAL**

Chegg hereby demands a jury trial for all claims so triable.

Dated: June 9, 2025

/s/ Davida Brook
Ian Crosby (Bar ID: WA0036)
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
icrosby@susmangodfrey.com

Davida Brook (Bar ID: CA00117)
Halley Josephs (Bar ID: CA00217)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400 Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
dbrook@susmangodfrey.com
hjosephs@susmangodfrey.com

Y. Gloria Park (Bar ID: NY0615)
Thomas Boardman (Bar ID: NY0617)
Betsy Aronson (*application for admission pending*)
SUSMAN GODFREY L.L.P.
One Manhattan West, 50th Floor New York, NY 10001 Telephone: (212) 336-8330
Facsimile: (212) 336-8340
gpark@susmangodfrey.com
tboardman@susmangodfrey.com
baronson@susmangodfrey.com

*Attorneys for Plaintiff Chegg, Inc.*