# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CHEGG, INC.

       *Plaintiff*,

v.

GOOGLE LLC and ALPHABET INC.,

       *Defendants*.

Case No. 1:25-cv-00543-APM

## <u>MEMORANDUM OF POINTS AND AUTHORITIES<br>IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................4

I.      GOOGLE'S SEARCH ENGINE ..............................................................................4

II.     CHEGG'S LAWSUIT ..............................................................................................6

ARGUMENT ........................................................................................................................8

I.      CHEGG FAILS TO PLEAD A VALID CLAIM FOR RECIPROCAL DEALING (COUNTS I-II)................................................................................................................8

     A.    Google's Conduct Constitutes a Lawful Refusal to Deal, Not Reciprocal Dealing........................................................................................................8

     B.    Chegg Fails To Allege A Viable Reciprocal Dealing Claim................................11

          1.    Chegg Fails To Allege *Per Se* Reciprocal Dealing....................................12

              a.    *Per se* treatment is inappropriate .................................................12

              b.    Chegg fails to plausibly allege the tying and tied markets ...........13

              c.    Chegg fails to allege coercion.........................................................19

          2.    Chegg Fails To Plausibly Allege A Reciprocal Dealing Claim Under The Rule Of Reason........................................................................21

     C.    Chegg Lacks Antitrust Standing To Raise A Reciprocal Dealing Claim .............23

II.     CHEGG FAILS TO PLEAD UNLAWFUL MONOPOLY MAINTENANCE (COUNT IV)................................................................................................................26

     A.    Chegg Lacks Antitrust Standing To Bring An Unlawful Monopoly Maintenance Claim ................................................................................26

     B.    Chegg Has Not Alleged Exclusionary Conduct In The GSS Market ...................29

III.    CHEGG FAILS TO PLAUSIBLY PLEAD MONOPOLY LEVERAGING (COUNT III) AND ATTEMPTED MONOPOLIZATION OF THE ONLINE EDUCATIONAL PUBLISHING MARKET (COUNT V)................................................31

     A.    There Is No Claim For Monopoly Leveraging Under The Sherman Act .............31

     B.    Chegg Fails To Plausibly Plead Attempted Monopolization................................32

          1.    Chegg Fails To Plead A Market for Online Educational Publishing.........33

          2.    Chegg Fails To Allege The Elements Of Attempted Monopolization .......................................................................................37

              a.    Chegg Fails To Allege Anticompetitive Conduct In The Relevant Market........................................................................37

i

b.     Chegg Fails To Allege Google's Specific Intent To Monopolize Online Educational Publishing .................................38

c.     Chegg Fails To Allege Google Has Dangerous Probability Of Achieving Monopoly Power in Online Educational Publishing ..................................................................................38

IV.     CHEGG FAILS TO PLEAD A VIABLE UNJUST ENRICHMENT CLAIM (COUNT VI) ....................................................................................41

A.     California Law Applies To Chegg's Unjust Enrichment Claim .........................41

B.     Chegg Fails To Allege Facts That Would Support A Quasi-Contractual Claim For Restitution ........................................................43

V.     AMENDMENT WOULD BE FUTILE ..............................................................44

CONCLUSION ................................................................................................45

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**CASES**

*A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*,
    62 F.3d 1454 (D.C. Cir. 1995) ........................................................................41

*Abbas v. Foreign Pol'y Grp., LLC*,
    783 F.3d 1328 (D.C. Cir. 2015) .....................................................................45

*Acosta Orellana v. CropLife Int'l*,
    711 F. Supp. 2d 81 (D.D.C. 2010) ................................................................30

*Adams v. Pan Am. World Airways, Inc.*,
    828 F.2d 24 (D.C. Cir. 1987) .........................................................................28

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
    948 F.2d 536 (9th Cir. 1991) .........................................................................31

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
    592 F.3d 991 (9th Cir. 2010) ....................................................................29, 37

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
    190 F.3d 1051 (9th Cir. 1999) ..................................................................25, 38

*Andrx Pharms., Inc. v. Biovail Corp. Int'l*,
    256 F.3d 799 (D.C. Cir. 2001) ..................................................................23, 31

*Angel v. Fed. Home Loan Mortg. Corp.*,
    815 F. App'x 566 (D.C. Cir. 2020) ...............................................................45

*Arcell v. Google LLC*,
    744 F. Supp. 3d 924 (N.D. Cal. 2024) ......................................................22, 24

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................4, 28, 30

*Ass'n for Intercollegiate Athletics for Women v. NCAA*,
    735 F.2d 577 (D.C. Cir. 1984) ......................................................................32

*Ass'n of Retail Travel Agents, Ltd. v. Air Transp. Ass'n of Am.*,
    635 F. Supp. 534 (D.D.C. 1986) ...............................................................39, 40

*Astiana v. Hain Celestial Grp., Inc.*,
    783 F.3d 753 (9th Cir. 2015) ....................................................................42, 43

*Athos Overseas, Ltd. v. YouTube, Inc.*,
  2022 WL 910272 (S.D. Fla. Mar. 29, 2022).................................................19

*Atl. Richfield Co. v. USA Petrol. Co.*,
  495 U.S. 328 (1990)........................................................................20

*Belizan v. Hershon*,
  434 F.3d 579 (D.C. Cir. 2006)..............................................................44

*\*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
  140 F.3d 494 (3d Cir. 1998)......................................................8, 11, 12, 21

*\*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962)............................................................15, 16, 18, 31

*Cal. Crane Sch., Inc. v. Google LLC*,
  2023 WL 2769096 (N.D. Cal. Mar. 31, 2023).................................................27

*\*Campfield v. State Farm Mut. Auto. Ins. Co.*,
  532 F.3d 1111 (10th Cir. 2008) ............................................................17

*Carpenter Tech. Corp. v. Allegheny Techs., Inc.*,
  646 F. Supp. 2d 726 (E.D. Pa. 2009) ......................................................40

*Chicago Ins. Co. v. Paulson & Nace, PLLC*,
  37 F. Supp. 3d 281 (D.D.C. 2014), *aff'd*, 783 F.3d 897 (D.C. Cir. 2015)....................41

*City of Moundridge v. Exxon Mobil Corp.*,
  471 F. Supp. 2d 20 (D.D.C. 2007)..........................................................38

*City of Oakland v. Oakland Raiders*,
  20 F.4th 441 (9th Cir. 2021) .............................................................25

*Cupp v. Alberto-Culver USA, Inc.*,
  310 F. Supp. 2d 963 (W.D. Tenn. 2004).................................................33, 34

*Dream Big Media Inc. v. Alphabet Inc.*,
  2022 WL 16579322 (N.D. Cal. Nov. 1, 2022) ...............................................19

*\*Dreamstime.com, LLC v. Google LLC*,
  54 F.4th 1130 (9th Cir. 2022) ............................................................29

*Durell v. Sharp Healthcare*,
  183 Cal. App. 4th 1350 (2010) ...........................................................42

*Eli Lilly & Co. v. Home Ins. Co.*,
  764 F.2d 876 (D.C. Cir. 1985) ...........................................................41

iv

*Firestone v. Firestone*,
  76 F.3d 1205 (D.C. Cir. 1996) ........................................................44

*Flegel v. Christian Hosp., Ne.-Nw.*,
  4 F.3d 682 (8th Cir. 1993) ............................................................15

*\*Fotobom Media, Inc. v. Google LLC*,
  719 F. Supp. 3d 33 (D.D.C. 2024) ....................................11, 25, 26, 27, 38, 40

*Fresh Made, Inc. v. Lifeway Foods, Inc.*,
  2002 WL 31246922 (E.D. Pa. Aug. 9, 2002) ................................36

*FTC v. Facebook, Inc.*,
  560 F. Supp. 3d 1 (D.D.C. 2021) ....................................................11

*FTC v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) ..........................................................22

*GEICO v. Fetisoff*,
  958 F.2d 1137 (D.C. Cir. 1992) ......................................................41

*Ill. Tool Works Inc. v. Independent Ink, Inc.*,
  547 U.S. 28 (2006) ...................................................................21, 22

*In re Google Digital Advert. Antitrust Litig.*,
  721 F. Supp. 3d 230 (S.D.N.Y. 2024) ............................................35

*In the Matter of Diamond Shamrock Corp.*,
  113 F.T.C. 316 (1990) ......................................................................9

*\*Intergraph Corp. v. Intel Corp.*,
  195 F.3d 1346 (Fed. Cir. 1999) ......................................................13

*IQ Dental Supply, Inc. v. Henry Schein, Inc.*,
  924 F.3d 57 (2d Cir. 2019) .............................................................28

*Iron Vine Sec., LLC v. Cygnacom Sols.*,
  274 A.3d 328 (D.C. 2022) ........................................................42, 43

*Johnson v. Comm'n on Presidential Debates*,
  869 F.3d 976 (D.C. Cir. 2017) ........................................................23

*\*Kartell v. Blue Shield of Mass., Inc.*,
  749 F.2d 922 (1st Cir. 1984) ..........................................................24

*Krukas v. AARP, Inc.*,
  376 F. Supp. 3d 1 (D.D.C. 2019) ....................................................43

*L.A. Land Co. v. Brunswick Corp.*,
  6 F.3d 1422 (9th Cir. 1993) ........................................................39

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007).........................................................................12, 13

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,
  924 F.2d 1484 (9th Cir. 1991) .....................................................15

*New York v. Facebook, Inc.*,
  549 F. Supp. 3d 6 (D.D.C. 2021), *aff'd sub nom. New York v.
  Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023)........................10

*News World Commc'ns, Inc. v. Thompsen*,
  878 A.2d 1218 (D.C. 2005) ...........................................................42

*Nurriddin v. Bolden*,
  818 F.3d 751 (D.C. Cir. 2016) .......................................................4

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018)........................................................................21, 22

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
  555 U.S. 438 (2009).........................................................................10, 11

*Peart v. D.C. Hous. Auth.*,
  972 A.2d 810 (D.C. 2009) ..............................................................42

*PhantomALERT v. Apple, Inc.*,
  2025 WL 71888 (D.D.C. Jan. 10, 2025)..................................14, 15, 18, 25, 27, 35, 36, 38

*Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*,
  886 F.3d 332 (3d Cir. 2018)...........................................................29, 39

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997)...........................................................16, 35

*Rich & Whillock, Inc. v. Ashton Dev., Inc.*,
  157 Cal. App. 3d 1154 (1984) .......................................................44

*Russell v. Walmart, Inc.*,
  680 F. Supp. 3d 1130 (N.D. Cal. 2023) .........................................43

*Rutherford Holdings, LLC v. Plaza Del Rey*,
  223 Cal. App. 4th 221 (2014) ........................................................42

*Scott v. J.P. Morgan Chase & Co.*,
  296 F. Supp. 3d 98 (D.D.C. 2017) .................................................6

*SEIU Health & Welfare Fund v. Philip Morris Inc.*,
    249 F.3d 1068 (D.C. Cir. 2001) ...................................................................25

*Sidibe v. Sutter Health*,
    4 F. Supp. 3d 1160 (N.D. Cal. 2013) .........................................................21

*SigmaPharm, Inc. v. Mut. Pharm. Co.*,
    772 F. Supp. 2d 660 (E.D. Pa. 2011), *aff'd*, 454 F. App'x 64
    (3d Cir. 2011) .............................................................................................27

*Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*,
    947 F. Supp. 2d 88 (D.D.C. 2013) ...................................................14, 33, 37

*Spartan Grain & Mill Co. v. Ayers*,
    581 F.2d 419 (5th Cir. 1978) ........................................................................8

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993) ...................................................................................37

*Stallard v. Goldman Sachs Grp., Inc.*,
    2024 WL 4903783 (D.D.C. Nov. 27, 2024) .................................................28

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997) .......................................................................................12

*Stutsman v. Kaiser Found. Health Plan of Mid-Atl. States, Inc.*,
    546 A.2d 367 (D.C. 1988) ..........................................................................41

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006) .......................................................................................12

*Therapearl, LLC v. Rapid Aid Ltd.*,
    2014 WL 4794905 (D. Md. Sept. 25, 2014) ................................................40

*Times-Picayune Pub. Co. v. United States*,
    345 U.S. 594 (1953) ...................................................................................36

*TKO Energy Servs., LLC v. M-I L.L.C.*,
    539 F. App'x 866 (10th Cir. 2013) ..............................................................39

*Tremblay v. OpenAI, Inc.*,
    716 F. Supp. 3d 772 (N.D. Cal. 2024) ........................................................44

*Tundra, Inc. v. Faire Wholesale, Inc.*,
    2024 WL 589097 (N.D. Cal. Feb. 13, 2024) ...............................................33

*United States v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956)....................................................................................16

*United States v. Google LLC*,
    747 F. Supp. 3d 1 (D.D.C. 2024) ................................................................4, 39

*United States v. H & R Block, Inc.*,
    833 F. Supp. 2d 36 (D.D.C. 2011) .....................................................................40

*United States v. Microsoft Corp.*,
    1998 WL 614485 (D.D.C. Sept. 14, 1998) .......................................................31

*\*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) .......................................12, 13, 22, 29, 31, 38, 39

*Uniwill L.P. v. City of Los Angeles*,
    124 Cal. App. 4th 537 (2004) .............................................................................44

*\*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ........................................................................................8, 10

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010) .................................................................................27

*Washkoviak v. Student Loan Mktg. Ass'n*,
    900 A.2d 168 (D.C. 2006) ..................................................................................42

*Wu v. Stomber*,
    750 F.3d 944 (D.C. Cir. 2014) ...........................................................................43

## OTHER AUTHORITIES

Chegg, Inc., Annual Report (Form 10-K) ..............................................................6, 7, 25

*Flashcards*, QUIZLET, https://quizlet.com/features/flashcards ....................................35

*Get Homework Help with Chegg Study*, CHEGG, https://www.chegg.com/study ........6

Liz Reid, *Generative AI in Search: Let Google Do the Searching for You*,
    GOOGLE: THE KEYWORD (May 14, 2024),
    https://blog.google/products/search/generative-ai-google-search-may-
    2024/ .....................................................................................................................6

Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW
    (4th & 5th eds. 2024) ......................................................................9, 22, 30, 31

Restatement (Second) of Conflict of Laws § 145 (Am. Law Inst. 1971) ...............42, 43

U.S. Dept. of Justice & Fed. Trade Comm'n, *Merger Guidelines* § 4.3 (2023)...........16

## INTRODUCTION

Chegg is an online learning company that provides students with homework and test answers for a monthly subscription fee.  However, students are increasingly turning to generative artificial intelligence tools like ChatGPT, which provide quick answers to students' questions—often for free.  In the face of this technological shift, Chegg has experienced declining revenues and subscriber loss.  Instead of adapting, Chegg blames Google's innovation for its decline.  But Chegg's business strategy failures are not cognizable under the antitrust laws.

Even after amending, ostensibly to address defects that Google raised in its initial motion to dismiss, Chegg still faults Google for introducing features in its search engine that more efficiently provide users with the information they seek, including by synthesizing search results with generative AI.  Chegg complains that Google Search designs its search results page *too* well, thereby helping users realize that they will not find enough useful information on Chegg's website to justify their time to go there and find it.  In Chegg's preferred world, Google Search should not innovate and should instead require users to visit websites like Chegg's to access their desired information—if it is found there at all—only after signing up for expensive, difficult-to-cancel monthly subscriptions.

No antitrust law supports this theory.  Chegg argues that Google has leveraged its alleged monopoly power in General Search Services (GSS) to coerce Chegg and other online publishers to make their content available to Google, which Chegg claims is used to improve Google's search engine.  This alleged coercion, Chegg claims, violates antitrust law in multiple ways, impacting half a dozen markets spread across multiple different industries.  But Google is not required to do business with Chegg on Chegg's preferred terms.  And Chegg does not claim to compete with Google in its alleged GSS market, nor does it state any plausible claim that Google has created or

achieved market power in a so-called Online Educational Publishing (OEP) market.  Those facts are fatal to every version of Chegg's antitrust claims.

Even after amendment, its scattershot claims fail for other reasons too.  *First*, Chegg alleges that Google has engaged in "reciprocal dealing" by withholding "Search Referral Traffic" from Chegg and other publishers unless they provide content in return.  But what the Complaint calls "reciprocal dealing" is nothing more than a claim that Google is refusing to deal with Chegg on Chegg's preferred terms.  Chegg does not even try to satisfy the strict legal requirements for bringing such a claim, nor could it.

Even if this were considered a reciprocal dealing claim (it is not), Chegg's claim fails as a matter of law.  To begin, Chegg's theory of coercion is implausible.  Google obtains web content for its search index based on publishers' own choices to make such content available.  Publishers maintain discretion over which portions of their websites are available to Google and can opt out of indexing entirely.  Publishers who allow Google to index their sites do so not because of coercion, but because of the visibility and discoverability benefits indexing provides.

This alleged arrangement is not unlawful reciprocal dealing, which requires a defendant to condition purchases in one market on purchases in another market.  Nor is the alleged arrangement pled to be the cause of any harm to competition, as Chegg does not allege that the purported reciprocal dealing excluded other buyers for its content or prevented publishers from licensing content elsewhere.  Thus, the claim fails as a matter of law.

*Second*, Chegg alleges the existence of an Input Market for GSS in which Google is an alleged monopsonist.  But Chegg fails to plausibly define this market.  Chegg's so-called Input Market involves the exchange of the same content as in its alleged Republishing, GAI Training, and RAG Content markets, and Chegg alleges no facts to explain why they are distinct.  Moreover,

Chegg's claim that Google has monopsony power in the alleged Input Market is unsupported and contradicted by Chegg's allegations that there are numerous other buyers for publisher content. Regardless, Chegg has not plausibly pled that Google's alleged reciprocal dealing harmed competition in the Input Market or in the Republishing, GAI Training, or RAG Content markets.

*Third*, Chegg alleges that Google's introduction of new search features unlawfully maintained its monopoly in the GSS market. But Chegg does not have antitrust standing to bring claims about its alleged GSS market, since it is not a participant in that market. And Chegg's theory that Google's new AI-powered search features are anticompetitive because they make Google's products better would condemn conduct that is encouraged, not prohibited, under the antitrust laws.

*Fourth*, Chegg claims that Google is using its aforementioned market power in GSS to obtain a monopoly in a purported market for "Online Educational Publishing." That market is not plausibly defined, but even if it were, Google has not participated—let alone engaged in anticompetitive conduct—in that market as defined by Chegg merely by providing educational information through Search.

*Fifth*, Chegg alleges that Google has misappropriated content generated by Chegg and other publishers. But "misappropriation" is a claim that can be asserted only under intellectual property law, not antitrust law. And Chegg's claim for misappropriation under an unjust enrichment theory is not supported by any allegations of fraud, mistake, coercion, or request, as the law requires.

Nearly all of these defects were raised in Google's initial motion to dismiss. Chegg chose to respond by amending its complaint to try to cure its obvious deficiencies. Chegg's second bite at the apple fares no better. At this point, it is clear that further attempts to amend will lead to the

same result.  For these and other reasons outlined below, Chegg's Amended Complaint should be
dismissed with prejudice.

## BACKGROUND[1]

### I.    GOOGLE'S SEARCH ENGINE

Google's search engine uses automated software—referred to as web crawlers—to "crawl
the web" and collect information about what pages exist and what they contain.  *United States v.
Google LLC*, 747 F. Supp. 3d 1, 38 (D.D.C. 2024).  The results of this crawling are then organized
into an index, which is searched whenever a user enters a query into the search engine.  Am.
Compl. ¶ 34.

Website developers maintain control over what content Google collects for its index
through a file called robots.txt, which specifies the parts of a website Google can crawl.  *Id.* ¶ 36.
Using robots.txt, website developers can opt out of Google crawling completely, or they can do so
selectively, deciding for themselves which sections of their website can be indexed.  *See id.*

When a user enters a query into Google, the search engine runs the query against Google's
index, and the results are listed in the order that Google believes most relevant to the user.  The
results page may also provide additional content, including advertisements, related searches, and
excerpts of relevant webpages.  *See id.* ¶ 31.

Google's search engine is "widely recognized as the best [search engine] available in the
United States."  *Google*, 747 F. Supp. 3d at 56.  Rather than resting on its laurels, Google has
repeatedly sought to introduce enhancements to its search engine to more efficiently provide its

---

[1]  Chegg's factual allegations are taken as true for purposes of this motion.  *See Ashcroft v. Iqbal*,
556 U.S. 662, 678 (2009).  The motion does not, however, accept inferences drawn by Chegg that
"are unsupported by the facts set out in the complaint," *Nurriddin v. Bolden*, 818 F.3d 751, 756
(D.C. Cir. 2016) (citation omitted), or "a legal conclusion couched as a factual allegation," *Iqbal*,
556 U.S. at 678 (citation omitted).

users with the information they seek.  The features that Chegg protests —the Knowledge Panel, Featured Snippets, the People Also Ask panel—are illustrative.  The Knowledge Panel presents users with the answer to a simple query, such as the example Chegg provides regarding a search for "Washington's birthday."  Am. Compl. ¶ 70.  Meanwhile, the Featured Snippets feature— introduced in 2014—provides excerpts from particular search results that Google believes to be especially relevant to a user's search.  *Id.* ¶¶ 71-72.  Chegg's Amended Complaint characterizes these excerpts as "Republishing Content."  *Id.* ¶ 156.  Likewise, the People Also Ask panel builds upon the Featured Snippet feature, offering additional Featured Snippets that may be relevant to a user's inquiry based on other, similar searches made by other users.  *Id.* ¶ 74.  Chegg does not claim that these features were introduced for any reason other than to improve the overall search experience for Google's users.

The rise of generative AI has provided Google with opportunities to improve the search experience.  Generative AI—so called because it *generates* natural language in response to a prompt—can allow users to engage in conversation, ask detailed questions, and even produce work product, such as computer code or an essay.  Am. Compl. ¶¶ 89, 100.  Generative AI has been incorporated into a variety of products, including, among others, "a chat-based AI product called 'ChatGPT.'" *Id.* ¶ 89.  A fundamental technology underlying text-based generative AI is the large language model or LLM.  The Amended Complaint refers to the datasets on which LLMs are trained as "GAI Training" content.  *Id.* ¶¶ 155, 157.  Chegg also claims that, "once trained," an LLM can use a technique called "retrieval-augmented generation" (RAG) to "connect[] an LLM to external sources of information, such as live search results, to improve the quality of its outputs." *Id.* ¶ 105.  The Amended Complaint refers to these external sources as "RAG Content."  *Id.* ¶ 155.

Among Google's new AI-based features are AI Overviews, which uses generative AI to provide search results. *See* Am. Compl. ¶¶ 102-106. AI Overviews augments Google Search by parsing more complex questions, providing "both a quick overview of a topic and links to learn more." Liz Reid, *Generative AI in Search: Let Google Do the Searching for You*, GOOGLE: THE KEYWORD (May 14, 2024), https://blog.google/products/search/generative-ai-google-search-may-2024/.[2] Google released AI Overviews with "a focus on sending valuable traffic to publishers and creators," recognizing that "links included in AI Overviews get more clicks than if the page had appeared as a traditional web listing for that query." *Id.*

## II.    CHEGG'S LAWSUIT

Chegg primarily provides its users with homework and test answers from its "database of 135 million proprietary question-and-answer solutions." Am. Compl. ¶ 24. Chegg's main offering is called "Chegg Study," *id.* ¶ 19, which Chegg advertises as providing "[h]omework solutions" and "[q]uiz & exam help," *Get Homework Help with Chegg Study*, CHEGG, https://www.chegg.com/study (last visited July 25, 2025) [hereinafter *Chegg Study*]. Subscribers enter their questions into the Chegg Study platform, which then spits out answers. *See* Am. Compl. ¶ 19. To access answers, students must pay either $15.95 per month for Chegg Study or $19.95 per month for its Chegg Study Pack. *Chegg Study*, *supra*.

Chegg has experienced four years of declining revenues. *See* Chegg, Inc., Annual Report (Form 10-K), at 59 (Feb. 24, 2025), [hereinafter Chegg 10-K]. Chegg has also lost 1.5 million subscribers since 2022. *See id.* at 4-5. Its subscriber and revenue declines began before Google's introduction of AI Overviews.

---

[2] This link is referenced in the Amended Complaint, *see* Am. Compl. ¶ 120 n.60, and therefore may be considered on a motion to dismiss. *See Scott v. J.P. Morgan Chase & Co.*, 296 F. Supp. 3d 98, 105 (D.D.C. 2017).

The growing popularity of generative AI chatbots like OpenAI's ChatGPT threatens Chegg's subscription business. Chegg 10-K, *supra*, at 15. Generative AI chatbots can provide tailored, conversational responses based on current sources of information to a user's inquiry, rather than relying on an aging database of Q&A solutions, as Chegg's services do. Given the benefits that AI provides to users, it is unsurprising that Chegg has seen "students . . . increasingly turning to generative AI for academic support, such as homework and exams," and "see generative AI products like Chat GPT and others as strong alternatives to vertically specialized solutions for education such as Chegg." *Id.* at 15-16. Generative AI caught the company flatfooted: by its own admission, Chegg did not "pivot to AI" until April 2023, *id.* at 14, years after companies had begun developing AI tools, *see* Am. Compl. ¶¶ 84-89.

Rather than innovating to improve their products and adapt to advances in technology, Chegg filed this lawsuit. Google moved to dismiss the complaint on May 5, 2025, Dkt. 16, and two weeks later, Chegg notified the Court that it would amend. Dkt. 17. Chegg filed its Amended Complaint on June 9, 2025. Dkt. 18. In the amended pleading, Chegg brings six counts alleging multiple theories of antitrust violations across a large range of markets. All are defective.

At a high level, those claims can be sorted broadly into three categories. The first, comprising Counts I and II, alleges reciprocal dealing, a rarely used theory based here on Chegg's claim that "Google is . . . threatening to withhold . . . Search Referral Traffic" from Chegg and other publishers unless those publishers provide content in return. *Id.* ¶ 152; *see also id.* ¶¶ 152-170. No example of any such threat is given. The second category, which includes Counts III through V, involves Google's alleged use of monopoly power in the GSS market to unlawfully maintain its alleged GSS monopoly and to threaten monopolization in other markets. *See id.* ¶¶ 171-178. The final category is Count VI, which involves alleged unjust enrichment based on

Google's alleged misappropriation of content generated by Chegg and other publishers.  *See id.*
¶¶ 179-183.  For the reasons explained below, each of Chegg's claims fail.

## ARGUMENT

**I.    CHEGG FAILS TO PLEAD A VALID CLAIM FOR RECIPROCAL DEALING (COUNTS I-II)**

Chegg has not plausibly alleged that Google engaged in reciprocal dealing (to the extent it
is even a viable antitrust theory), either in violation of Section 1 of the Sherman Act (Count I) or
Section 2 of the Sherman Act (Count II).  To start, Chegg fails to allege a reciprocal dealing claim
of any kind.  Chegg alleges that Google engaged in conduct that, at its core, is based on a supposed
refusal to deal with Chegg on Chegg's preferred terms.  But that is not prohibited under the antitrust
laws except under narrow circumstances not present here.  Nor do Chegg's allegations constitute
either a *per se* or a rule of reason reciprocal dealing violation.  Chegg has failed to plausibly plead
the tying and tied product markets or that Google engaged in any coercion.  Likewise, any claim
for reciprocal dealing under the rule of reason fails, because it does not adequately allege
anticompetitive harm.  Finally, Chegg lacks antitrust standing to raise this claim, because its
alleged injuries are inadequately pled.

### A.    Google's Conduct Constitutes a Lawful Refusal to Deal, Not Reciprocal Dealing

If it exists as a valid antitrust theory at all, "reciprocal dealing exists where . . . ['o]ne party
offers to buy the other party's goods, but only if the second party buys other goods from the first
party.'  More colloquially, reciprocal dealing exists when one party tells the other: 'I'll buy from
you, if you buy from me.'"  *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 511
(3d Cir. 1998) (quoting *Spartan Grain & Mill Co. v. Ayers*, 581 F.2d 419, 424 (5th Cir. 1978)).
Reciprocal dealing has been at issue only in a few cases, and no appellate decision has recognized
a viable reciprocal dealing claim since the Supreme Court's decision in *Verizon Commc'ns Inc. v.*

*Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004). It is a disfavored theory of liability whose "harms have been exaggerated without adequate appreciation of likely benefits to competition." PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 310c7 (4th & 5th eds. 2024).

Even if it were a viable basis for liability, Chegg has failed to allege a valid reciprocal dealing claim. The allegation that any reciprocal agreement exists between Google and Chegg is nonsense. Chegg does not and cannot allege that Google has promised to deliver any amount of referral traffic, or any traffic at all, in exchange for Chegg allowing Google to index Chegg's site, and Google cannot threaten (and is not alleged to have threatened) to withhold that which it does not deliver, thus there is no reciprocal agreement. *See In the Matter of Diamond Shamrock Corp.*, 113 F.T.C. 316 (1990) ("Coercive reciprocal dealing may violate the law, if there is an actual agreement between the parties to make reciprocal purchases . . . ."). Chegg has not even alleged *that an agreement* governs Google's use of content crawled from Chegg's site. All Chegg alleges is that Google "crawls, indexes and links to websites in its search results" and that "[w]ebsites gain free traffic from users interested in what they have to offer," resulting in a "fundamental fair exchange between Google and the web." Am. Compl. ¶ 42 (citation omitted); *see also id.* ¶ 38. But these allegations merely reflect that there is a mutual benefit to the way search engines work— not that Google has entered into any agreement to provide referral traffic based on its indexing. If any such agreement did exist, Chegg would necessarily be alleging that Google is promising to refer a certain amount of traffic to every website indexed for Google Search—an inference that is so far past plausible that it is laughable. If any such referral traffic flows at all, it is the result of *users* of Google Search, not Google itself, choosing to click on Chegg's site in search results. That

some are doing so less than before is the result of competition and user preference, not anticompetitive conduct by Google.

What Chegg really alleges is that Google refuses to do business with Chegg on Chegg's preferred terms. In Chegg's view, Google must provide Chegg with "Search Referral Traffic" and use Chegg's content only for that purpose, not for republishing, training, and grounding Google's AI models. *See* Am. Compl. ¶ 155. But that is not what the law requires. To the contrary, it is black-letter antitrust law that "businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009).

To be sure, courts have recognized a "narrow-eyed needle" of an exception to this rule when an alleged refusal to deal involves (1) "a preexisting voluntary and presumably profitable course of dealing" that is later terminated; (2) "products that the defendant already sells in the existing market to other similarly situated customers;" and (3) "a willingness to forsake short-term profits to achieve an anti-competitive end." *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 27 (D.D.C. 2021) (citations omitted), *aff'd sub nom. New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023); *see also Trinko*, 540 U.S. at 409.

Nothing in the Amended Complaint suggests that this narrow exception applies here. Most fundamentally, Chegg does not allege that Google terminated any preexisting course of dealing with Chegg. As just explained, there is no agreement under which Google agreed to provide "Search Referral Traffic" to Chegg. And even if there were, Chegg's own Amended Complaint admits that it has allowed—and continues to allow—"Google to access its content and include it in Google's search index" and that, as a result, users of Google Search "generate traffic to Chegg's website via search results." Am. Compl. ¶ 41. In other words, the alleged course of dealing

10

continues to this day. Chegg instead complains that Google has placed a so-called "condition" on the receipt of "Search Referral Traffic"—the use of the content to train Google's AI models. *Id.* ¶ 155. But Google has "no duty to deal under the terms and conditions preferred by [Chegg]." *Pac. Bell*, 555 U.S. at 457. There are also no allegations that Google treats Chegg differently from other publishers or that Google's conduct is "irrational but for its tendency to harm competition." *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 24 (D.D.C. 2021). Chegg's Amended Complaint instead alleges Google uses content voluntarily offered by publishers generally, and that Google's opt out policies apply to all publishers, not just Chegg. *See e.g.*, Am. Compl. ¶ 167. It is also perfectly rational for Google to seek to improve its products using the indexed Search data it has readily available and worked hard to obtain. Chegg cannot seek to impose liability on Google for its refusal to deal on Chegg's preferred terms.

### B.      Chegg Fails To Allege A Viable Reciprocal Dealing Claim

Counts I and II fare no better when assessed under the reciprocal dealing framework. Courts analyze claims for reciprocal dealing under the same standard as claims for tying—"where a seller conditions the sale of one good (the tying product) on the buyer also purchasing another, separate good (the tied product)." *Brokerage Concepts*, 140 F.3d at 510, 512. And "like tying, not all reciprocal dealing arrangements are anticompetitive," only "'coercive' reciprocal dealing, where a party uses its economic power as a purchaser in one market in order to restrict competition in another market where it is a seller." *Id.* at 511. As with tying, reciprocal dealing can be evaluated "under both the *per se* and rule of reason tests." *Id.* at 512; *see also Fotobom Media, Inc. v. Google LLC*, 719 F. Supp. 3d 33, 50 (D.D.C. 2024). Chegg has failed to state a reciprocal dealing claim of any kind.

1.     **Chegg Fails To Allege *Per Se* Reciprocal Dealing**

a.     ***Per se* treatment is inappropriate**

Courts "presumptively appl[y] rule of reason analysis, under which antitrust plaintiffs must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). *Per se* treatment "is appropriate only after courts have had considerable experience with the type of restraint at issue, . . . and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886-87 (2007) (citation omitted). "[W]here the economic impact of certain practices is not immediately obvious," courts decline to adopt a *per se* rule. *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (citation omitted); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 89, 93 (D.C. Cir. 2001).

Plaintiff's allegations—even after amendment—fail to meet this high bar. The type of reciprocal dealing that Chegg alleges is plainly not one that "courts have had considerable [or any] experience with." *Leegin*, 551 U.S. at 886. As noted, courts describe reciprocal dealing as when a buyer conditions its purchase of a product on the seller agreeing to buy a separate product from it—in other words, "I'll buy from you if you buy from me." *Brokerage Concepts*, 140 F.3d at 511. Here, by contrast, Chegg alleges "[r]eciprocal dealing occurs when a firm with market power *refuses to sell* product X to a customer unless that customer agrees to *sell (or give)* product Y to it." Am. Compl. ¶ 152 (emphasis added). Put differently, Chegg claims that reciprocal dealing occurs when a defendant says, "I *won't sell* to you *unless* you sell to me." But this alleged arrangement does not present the same economic effects that arise from the classic "I'll buy from you if you buy from me" arrangement. *Brokerage Concepts*, 140 F.3d at 511. It is far from clear whether coercive reciprocal *selling* (i.e., the arrangement alleged here) has the same consequences as coercive reciprocal *buying* (i.e., typical reciprocal dealing). Indeed, the only court to address a

similar claim has rejected it. *See Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1361-62 (Fed. Cir. 1999) (holding that a seller's conditioning "a continued supply . . . of CPUs and technical information" on the buyer's "relinquishment of . . . technology patents without costs" to the seller did not constitute coercive reciprocal dealing). At minimum, it is obvious that Plaintiff's novel theory of reciprocal dealing is not one that "courts have had considerable experience with." *Leegin*, 551 U.S. at 886. That is doubly true given that the alleged markets in which this alleged reciprocal dealing has occurred involve cutting-edge technologies that courts are just beginning to consider. *Per se* treatment of Plaintiff's reciprocal dealing claim is therefore inappropriate.

In any event, Chegg has not adequately alleged the requisite elements of a *per se* reciprocal dealing claim, which courts borrow from tying cases. "There are four elements to a *per se* tying violation: (1) the tying and tied goods are two separate products; (2) the defendant has market power in the tying product market; (3) the defendant affords consumers no choice but to purchase the tied product from it; and (4) the tying arrangement forecloses a substantial volume of commerce." *Microsoft*, 253 F.3d at 85. Two fundamental flaws—which persist even after amendment—doom Chegg's claims. *First*, Chegg fails to plausibly allege tying and tied product markets and is thus unable to establish the first two elements. *Second*, Chegg fails to allege that Google affords no choice but to provide its content to Google.

### b.    Chegg fails to plausibly allege the tying and tied markets

Chegg alleges that the tying product market is "Search Referral Traffic." Am. Compl. ¶¶ 186, 199. Chegg also alleges the existence of an "Input Market," in which "publisher content used for search results" is an input and Google is an alleged monopsonist. *Id.* ¶¶ 52, 171. Although Chegg's Amended Complaint is muddled on this point (even after Google's first motion to dismiss and Chegg's opportunity to amend), it appears that this so-called Input Market is just a dressed up version of the so-called Republishing Content, GAI Training Content, and RAG Content markets

discussed below. *Compare id.* ¶ 171 (alleging that in the Input Market, Chegg "permits Google to index its content" to "include[e] . . . on Google's SERP" in exchange for "search referral traffic for Chegg"), *with id.* ¶ 32 (alleging that a search engine "sells" publishers "Search Referral Traffic" and publishers "pay" for search distribution with their content).

Yet Chegg fails to allege any facts to support the existence of a "Search Referral Traffic" market or a purported Input Market and does not point to anyone, anywhere ever having conceived of such a market. Instead, Chegg merely asserts that "[t]here is a distinct relevant antitrust market for Search Referral Traffic" and that there is also an "input market for publisher content used for search results." *Id.* ¶¶ 52, 152. At the pleading stage, the "alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes . . . , and it must be plausible." *Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*, 947 F. Supp. 2d 88, 103 (D.D.C. 2013). The "failure to define the market by reference to the reasonable interchangeability—or lack thereof—of services is valid ground for dismissal at the Rule 12(b)(6) stage." *Id.* Chegg never even tries to meet this bedrock requirement.

The ongoing absence of factual allegations supporting these supposed markets is unsurprising because a "market" for "Search Referral Traffic" makes no sense. "[A] market is 'any grouping of sales whose sellers, if unified by a hypothetical cartel or merger, could profitably raise prices significantly above the competitive level.'" *PhantomALERT v. Apple, Inc.*, 2025 WL 71888, at *5 (D.D.C. Jan. 10, 2025) (citation omitted). Here, Chegg alleges that a "market" exists in which Google "sells" "Search Referral Traffic" to publishers, who "'pay' for search distribution by contributing their websites' contents and associated metadata to the search engines." Am. Compl. ¶ 32. But Google does not sell "Search Referral Traffic" to publishers, obtains no revenue from them for delivering that traffic, and Chegg does not buy the traffic from Google. This is no

more a market than receiving phone calls from just the yellow pages would be. *See Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1487, 1489 (9th Cir. 1991) (rejecting on summary judgment an alleged market "comprised of referrals by . . . medical doctors . . . to private medical radiologists" because "nothing in the record suggests that the referrals as such are ever sold"); *Flegel v. Christian Hosp., Ne.-Nw.*, 4 F.3d 682, 690 (8th Cir. 1993) (same). And, as already explained, Chegg has not alleged that Google promised Chegg or any other publisher a certain volume of traffic, or indeed, any traffic at all, in exchange for allowing their pages to be indexed by Google. *See supra* pp. 9-10. At most, Google "refer[s]" users to links in its search results, who then choose to click on those links and generate this so-called "Search Referral Traffic." Am. Compl. ¶¶ 32-36. This arrangement bears no relationship to the "grouping of sales" that courts typically regard as a market. *PhantomALERT*, 2025 WL 71888, at *5. It beggars belief that every web publisher that fails to opt out of indexing is "paying" for "Search Referral Traffic" simply by allowing Google to index their websites. *Id.*

Moreover, a market must be defined "by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). A complaint that "fails to draw the market's boundaries to encompass the product at issue as well as all economic substitutes for the product . . . cannot state a claim for relief." *PhantomALERT*, 2025 WL 71888, at *8 (internal quotations omitted). Chegg acknowledges that web publishers have other ways of obtaining referral traffic, such as "[d]irect navigation" to a publisher's website or "a publisher's website via links on other publishers' pages or social media" or, indeed, purchasing ads, Am. Compl. ¶ 153, but fails to plausibly allege that these other forms of referral traffic do not compete with "Search Referral Traffic." Chegg suggests that these alternatives are "not viable substitutes for Search Referral

Traffic" because users "go to search engines when they are specifically looking for information." *Id.* That conclusory assertion should not be credited. While Chegg may value "Search Referral Traffic" more highly than other sources of referral traffic, that is certainly not true for *all* web publishers, and Chegg has not even asserted, let alone plausibly alleged, that it is. "The test for a relevant market is not commodities reasonably interchangeable by a particular plaintiff, but 'commodities reasonably interchangeable by consumers for the same purposes.'" *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)).

For similar reasons, the existence of an Input Market restricted solely to GSS makes no sense. Chegg alleges that "[i]n this input market, Google accesses Chegg's content through an exchange whereby Chegg permits Google to index its content for the purpose of including Chegg in links published on Google's SERP, which leads to search referral traffic for Chegg." Am. Compl. ¶ 171. But again, Google indexes whatever content is publicly available, *id.* ¶¶ 34-35, and makes that indexed content available to users on its SERP. In addition, unlike in typical input markets like those for labor, *see* U.S. Dept. of Justice & Fed. Trade Comm'n, *Merger Guidelines* § 4.3 (2023), a publisher's choice to make its content available for crawling by Google does not in any way limit its ability to grant—or license—the same content to any number of search engines or distributors, and in fact Chegg's primary business consists of licensing that same content to its customers via subscriptions. Chegg's proposed market definition therefore fails to account for "reasonable interchangeability of use"—that is, the other commercial options available to either Chegg or Google in and beyond the alleged market. This is a fatal defect. *Brown Shoe*, 370 U.S. at 325.

16

Chegg also fails to adequately allege that Google is a monopsonist in any input market. Chegg asserts only that "Google's monopoly power in search gives it monopsony power in the Input Market for publishing content that drives search results," Am. Compl. ¶ 93, but it is not automatically the case that a monopolist in one market downstream is a monopsonist in an upstream input market. In fact, that is typically not the case, as most labor markets make clear. For example, Google certainly competes with a wide range of firms for engineers, even if those firms do not compete in the GSS market. Chegg's Amended Complaint also points to numerous other buyers for its and other publishers' content. *See* Am. Compl. ¶ 97 (describing Chegg's licensing deals), ¶ 98 (describing publishers' licensing agreements with Perplexity, Amazon Web Services, Potato, and other technology companies). Yet Chegg offers no explanation for why these other companies are not "reasonably interchangeable buyers" that should be included in the relevant market. *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1119 (10th Cir. 2008). Chegg does not (and cannot) plead that Google is the only possible buyer for its content, and "[w]hen there are numerous sources of interchangeable demand, the plaintiff cannot circumscribe the market to a few buyers in an effort to manipulate those buyers' market share." *Id.*

As with its inadequately alleged tying markets, Chegg also fails to allege sufficient facts to support its alleged tied product markets of "Republishing Content," "GAI Training Content," and "RAG Content." Am. Compl. ¶ 155. Chegg did not even provide a definition of those invented "markets" in its opening complaint; now, Chegg responds to Google's initial motion to dismiss with perfunctory non-factual allegations about them. Chegg defines these markets as "the exchange of the right" to "republish certain content," "use certain content for GAI Training," and "use certain content for RAG," respectively, *id.* ¶¶ 156-158, and then alleges that each of these

17

rights has "independent value," citing the existence of different pricing structures for use of content for Republishing, RAG, and GAI training, *id.* ¶¶ 159-162.  These allegations are nowhere near sufficient to establish distinct product markets.

After taking the opportunity to amend, Chegg still makes no allegations whatsoever about "the reasonable interchangeability of use or the cross-elasticity of demand," *Brown Shoe*, 370 U.S. at 325, and thus "cannot state a claim for relief," *PhantomALERT*, 2025 WL 71888, at *8.  Chegg also fails to allege facts to support an "understanding of the bounds" of the alleged Republishing Content, GAI Training Content, and RAG Content markets, which is independently fatal.  *Id.*, at *4.  Chegg alleges that "republishing, training, and retrieval-augmented generation are separate use cases with independent value," but alleges no facts distinguishing content suitable for each use case or reasonable substitutes for each.  Am. Compl. ¶¶ 159, 161.  In fact, Chegg's ill-defined Input Market—and arguably, its Online Educational Publishing Market as well[3]—appears to involve the use of the same content as the Republishing Content, GAI Training Content, and RAG Content markets, directly contradicting Chegg's allegations that these markets are distinct.  Chegg concedes that "in some instances, the same content can be republished, used for training, and used for grounding."  *Id.* ¶ 159.  Indeed, as to Google, the publisher content allegedly used for each purpose is the same Search Index Data that Chegg chooses to make generally available on the Web.  *See id.* ¶ 166 ("[Google] uses the same index data for Republishing Content, GAI Training Content, and RAG Content.").

---

[3] As discussed below, this market is so poorly defined that it is impossible to say what it is, but to the extent it includes Chegg's content, it would seem to be the same market.

### c.    Chegg fails to allege coercion

Chegg fails to adequately allege coercion—that is, that publishers have no choice but to "sell" the tied products to Google, which but for Google's coercion could be sold elsewhere. Chegg alleges instead that Google conditions the "sale" of "Search Referral Traffic" "on Plaintiff giving Google Republishing Content, GAI Training Content, and RAG Content (the Tied Products) for free."  Am. Compl. ¶ 186.  But the Amended Complaint makes clear that Google does not require publishers to "give" Google anything.  Google indexes publicly available content, *id.* ¶¶ 34-35, and Chegg admits that publishers may block Google from indexing their content, in part or in whole, if they wish, *id.* ¶ 36.  Google does not charge publishers to index their websites, nor does it pay publishers for indexing access.  Courts have uniformly held that there can be no coercion for "acceptance of a free service" like the one at issue here.  *See Athos Overseas, Ltd. v. YouTube, Inc.*, 2022 WL 910272, at *3 (S.D. Fla. Mar. 29, 2022) ("[A]cceptance of a free service does not constitute an impermissible tie-in."); *Dream Big Media Inc. v. Alphabet Inc.*, 2022 WL 16579322, at *4 (N.D. Cal. Nov. 1, 2022) ("Because they fail to allege they purchased any Google . . . services, [Plaintiffs] fail to allege coercion.").

Chegg suggests that Google "coerc[es] publishers to supply content to be used for other purposes as a condition of being included in its search index *at all*."  Am. Compl. ¶ 152 (emphasis added).  This argument simply repackages Chegg's legally-defective assertion that antitrust law requires Google to deal with Chegg on Chegg's preferred terms.  *See supra* Section I.A.  But beyond that, the assertion that publishers *must* let Google republish their content through snippets in order to be indexed is flatly contradicted by other allegations in Chegg's Amended Complaint. As Chegg admits, publishers can prevent Google from showing snippets of their content by using the "nosnippets" meta-tag, *id.* ¶¶ 81-82—which means that publishers *can* be included in the

search index without supplying "Republishing Content."[4]  It also undermines Chegg's allegation that "Google's monopoly power in search gives it monopsony power in the Input Market for publishing content that drives search results," *id.* ¶ 93, which it allegedly uses "to force digital publishers to give up access to their content without monetary compensation," *id.* ¶ 52.

Perhaps recognizing that publishers plainly are not "forced" to give up their "Republishing Content" for free because they can opt out using the "nosnippets" tag, Chegg alleges that using the "nosnippets" tag "means demotion on the [search results page] or disappearing from Google's organic search results entirely."  *Id.* ¶ 83.  Yet Chegg's own allegations make clear that those effects do not stem from any coercive conduct by Google, but rather vigorous competition from other web publishers.  Chegg alleges that if it uses the "nosnippets" tag, "other digital publishers" will decline to use the "nosnippets" tag to continue being featured in search results, thereby outcompeting Chegg's content on the search results page.  *Id.* ¶¶ 167-168.  That injury, however, is a "loss[] stemming from continued competition," *Atl. Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 334 (1990), not Google's alleged reciprocal dealing (or Google at all).  Chegg also alleges that Google "explain[ed] in internal documents publicly produced in the Government Search Case" that Google's "deal" with publishers "is considered a forced choice." Am. Compl. ¶ 93 (citing PXR0026 at -303-304, *United States v. Google* (Remedies Hearing Exhibits)).  In context, however, this language refers to the fact that some *publishers* perceived there to be such a forced choice. As just explained, however, there is in fact no coercion, because publishers can freely

---

[4] Despite acknowledging publishers' ability to opt out of snippets, Chegg curiously alleges elsewhere in the Amended Complaint that "[t]he only way for digital publishers to opt out completely is to block Google's crawlers, which effectively means forgoing Google Search Referral Traffic." Am. Compl. ¶ 166.  That assertion is false, for the reasons Chegg acknowledges earlier in its Amended Complaint. *Id.* ¶¶ 81-82.  This error persists in Chegg's pleading even after Google pointed it out in its initial motion to dismiss.

choose whether to have their content indexed and/or snippetted.  That Chegg feels competitive pressure from other publishers in making this choice is insufficient to establish the requisite coercion for a reciprocal dealing claim because they still can choose not to provide this content.

### 2.    Chegg Fails To Plausibly Allege A Reciprocal Dealing Claim Under The Rule Of Reason

Because Chegg fails to allege *per se* reciprocal dealing, its claim must be analyzed under the rule of reason.  That standard requires plaintiffs to plausibly allege that "the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market," *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018).  Chegg must therefore plausibly allege that the alleged conduct harmed competition in the market for the tied product.  *See Brokerage Concepts*, 140 F.3d at 510, 512.  As the Supreme Court has stated, "the justification for the challenge [against ties] rest[s] on either an assumption or a showing that the defendant's position of power in the market for the tying product [is] being used to restrain competition *in the market for the tied product*."  *Ill. Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 34 (2006) (emphasis added).

For starters, because the allegedly tied markets—that is, the purported Republishing Content, GAI Training Content, and RAG Content markets—are not adequately alleged, Chegg necessarily fails to plead anticompetitive harm within such markets.  *See Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160, 1178 (N.D. Cal. 2013) (holding that a complaint did "not plead facts showing any negative impact on competition in the tied markets" because "Plaintiffs have not defined the relevant markets sufficiently to make such a showing").

Chegg also fails to sufficiently allege harm to *competition* in any market.  Chegg alleges that Google's conduct has "restricted output and reduced quality" in digital publishing by "diverting traffic" and causing publishers to go out of business or lay off staff.  Am. Compl. ¶¶ 190, 203.  These speculative, "generalized allegations of harm" are "devoid of further factual

enhancement" and insufficient to survive a motion to dismiss. *Arcell v. Google LLC*, 744 F. Supp. 3d 924 (N.D. Cal. 2024). Chegg does not allege specific facts about the quality and output of content it would expect in a competitive market. And even if it had, reduced output alone does not demonstrate harm to competition. "[C]hanges in output are often explained by events completely unrelated to possible predation. For example, changes in technology, consumer taste, or the state of the economy affect overall market demand and thus output." AREEDA & HOVENKAMP, *supra*, ¶ 730. For that reason, Chegg must plausibly allege that this reduction is the result of a less competitive market due to some legally prohibited conduct by Google. *See Am. Express*, 585 U.S. at 548-49. But Chegg makes no nonconclusory allegations that Google's alleged reciprocal dealing excluded competitors from the market or otherwise created monopoly power. Moreover, the alleged harms—that publishers will stop producing "relevant and reliable" information because of being "[s]tarv[ed]" of search traffic, Am. Compl. ¶¶ 191, 204—are entirely speculative. And those harms are, as a logical matter, limited to publishers like Chegg that rely heavily on "Search Referral Traffic." Publishers that rely on other sources of customers, such as "[d]irect navigation" to a publisher's website or "a publisher's website via links on other publishers' pages or social media," *id.* ¶ 153, will not suffer the same harms. The antitrust laws are concerned with harm to the competitive process as a whole; "[h]arm to one or more competitors will not suffice." *Microsoft*, 253 F.3d at 58.

In addition, any alleged harm in the GSS market, Am. Compl. ¶¶ 189, 202, and the OEP market, *id.* ¶¶ 190, 203, are irrelevant because they do not reflect harm to competition in the allegedly tied markets for Republishing, GAI, and RAG content. *Ill. Tool Works*, 547 U.S. at 34; *see also FTC v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020) ("[E]ven if [Defendant's] practices are interrelated, actual or alleged harms to customers and consumers outside the relevant

markets are beyond the scope of antitrust law.").  And to the extent Chegg claims harm to competition in the alleged Republishing, GAI Training, and RAG content markets because it was paid less for content, Chegg has not plausibly alleged that harm was caused by Google's alleged reciprocal dealing, as discussed below.

### C.    Chegg Lacks Antitrust Standing To Raise A Reciprocal Dealing Claim

To allege antitrust standing, Chegg must plausibly plead "that the defendant's illegal conduct caused its injury" and that the "injury . . . reflect[s] the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 806, 812 (D.C. Cir. 2001).  For its reciprocal dealing claim, Chegg identifies two supposed injuries: (1) it "was paid less for the sale of Republishing Content, GAI Training Content, and RAG Content than it would have but for Google's conduct;" and (2) it "lost revenues as a result of Google diverting traffic from [its] website in the form of lost subscription revenue from users' visits to its site."  Am. Compl. ¶¶ 194, 205.  Neither injury is sufficient to confer antitrust standing, because Chegg fails to plausibly allege that Google "violated the antitrust laws," that the violation "had a tendency to injure [Chegg's] business or property," and that the "decline in [Chegg's] business or property [is] not shown to be attributable to other causes." *Andrx Pharms.*, 256 F.3d at 808 (internal quotations and citations omitted); *see also Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976, 982-983 (D.C. Cir. 2017).

Chegg's first claimed injury is insufficient because Chegg has not provided sufficient allegations that the supposed reduction in payments for Chegg's sale of Republishing, GAI Training, and RAG Content was caused by *Google's* so-called reciprocal dealing.  For starters, Google is under no obligation to pay Chegg for its content; again, Google is free to choose the parties with whom it will deal and the terms on which it will deal with them.  *See supra* Section I.A.  Chegg's allegation that Google is a monopsonist does not change that fact.  As discussed,

Chegg has failed to plausibly allege Google's monopsony power in the alleged Input Market.  *See* Am. Compl. ¶¶ 97-98.  And even if Google were a monopsonist, "[a] legitimate buyer is entitled to use its market power to keep prices down."  *Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922, 929 (1st Cir. 1984) (Breyer, J.).  "[E]ven if the buyer has monopoly power, an antitrust court . . . will not interfere with a buyer's (nonpredatory) determination of price." *Id.*  Chegg also has not alleged that Google's alleged reciprocal dealing excluded potential buyers for content or that it prevented publishers from licensing elsewhere as would be necessary for a viable claim. And as to the prices Chegg has received from others, there are only conclusory assertions that Chegg was "paid less . . . than it would have but for Google's conduct," without any allegations regarding how Google's conduct has prevented other buyers from paying more, or how overall market prices for that content would have been higher but for Google's conduct.  Am. Compl. ¶¶ 194, 205.  These "generalized allegations of harms" are insufficient to plead a plausible basis for antitrust standing.  *Arcell*, 744 F. Supp. 3d at 931 (finding no antitrust standing based on an alleged "injury in the form of lost consumer choice, innovation, and search quality" because the complaint failed to "identify what facts would lead to a plausible inference that those choices, innovations, or quality improvements would have emerged absent" Google's conduct).  Chegg's own allegations make clear that robust competition exists for AI training content.  *See e.g.*, Am. Compl. ¶¶ 98-99 (Perplexity, Amazon Web Services, Potato, and "other undisclosed large technology companies"), *id*. ¶ 179 (OpenAI).

Chegg's second alleged injury—lost subscription revenues because of Google diverting traffic from Chegg's website, Am. Compl. ¶¶ 194, 205—also does not confer antitrust standing. Chegg acknowledges the competitive threat that non-Google generative AI chatbots like ChatGPT pose to its business model, noting that "students are increasingly turning to generative AI for

academic support, such as homework and exams." Chegg 10-K, *supra*, at 42-43.  Yet Chegg fails

to plead any facts supporting a plausible inference that Chegg's declining web traffic and

subscription revenues flow from Google's alleged anticompetitive conduct rather than the

introduction of these various new sources of competition or from Chegg's own conceded failure

to invest in AI.  Why is any supposed injury to Chegg caused by Google's AI summaries as

opposed to the widespread (and often zero-cost) availability of tools like ChatGPT or Copilot?

Chegg never says.  In addition, Chegg's alleged injury relies on speculation that consumers would

have purchased a Chegg subscription had they visited its website in response to a search query on

Google Search, and that they would have visited Chegg's website in greater numbers if Google

had not introduced new Search features—both dubious propositions, especially given students'

increased reliance on broadly available free generative AI tools.  *See City of Oakland v. Oakland

Raiders*, 20 F.4th 441, 459-60 (9th Cir. 2021) (finding no antitrust standing when plaintiff "ha[d]

not alleged—and there is no way of knowing—what would have occurred in a more competitive

marketplace"); *SEIU Health & Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068, 1074 (D.C.

Cir. 2001) (finding no antitrust standing grounds when plaintiffs had not "shown that their claimed

economic harms were not caused by other independent factors").

Even if Chegg's claimed injury of lost subscription revenue was plausibly pleaded, it does

not provide Chegg with antitrust standing because that injury was not "suffered . . . in the market

where competition is being restrained." *Fotobom*, 719 F. Supp. 3d at 44 (quoting *Am. Ad Mgmt.,

Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999)); *see also, e.g., PhantomALERT*,

2025 WL 71888, at *6.  Even accepting the inadequately defined tied markets for Republishing,

GAI Training, and RAG Content, Chegg's claim is that it lost subscription revenue because of a

purported reduction in "Search Referral Traffic" to its website—an injury that occurs in the purported market for "Search Referral Traffic," not the allegedly tied markets.

## II.     CHEGG FAILS TO PLEAD UNLAWFUL MONOPOLY MAINTENANCE (COUNT IV)

Chegg's claim for unlawful monopoly maintenance in the GSS market fails for two reasons. *First*, Chegg has not established antitrust standing to assert this claim. Chegg does not plausibly allege that it is a participant in the GSS market or that it suffered an antitrust injury in that market. *Second*, even if Chegg had standing, Chegg does not plausibly allege that Google engaged in any exclusionary or anticompetitive conduct in the GSS market.

### A.     Chegg Lacks Antitrust Standing To Bring An Unlawful Monopoly Maintenance Claim

As with Chegg's reciprocal dealing claim, Chegg lacks antitrust standing to bring a claim for monopoly maintenance in the GSS market. "[T]he antitrust standing inquiry turns on whether the plaintiff is a participant in the relevant market and 'suffered its injury in the market where competition is being restrained.'" *Fotobom*, 719 F. Supp. 3d at 44. Chegg brings a claim for unlawful monopoly maintenance in the GSS market, Am. Compl. ¶¶ 171-178, 216, and therefore must demonstrate that it is a participant and that it suffered antitrust injury in that market caused by the alleged anticompetitive conduct, *Fotobom*, 719 F. Supp. 3d at 42-43. Chegg's allegations do not satisfy these requirements.

*First*, Chegg has not plausibly alleged that it participates in the GSS market. Chegg does not provide search services, so it does not compete with Google, and it does not perform searches so it is not a user either. Instead, Chegg claims to participate by supplying "content that is . . . indexed for search." Am. Compl. ¶ 171. In other words, Chegg does not participate in the market at all—it instead claims to participate as a "supplier" in a different, "input" market that is alleged to be a different market than the GSS market Google is alleged to monopolize.

*Second*, even if Chegg were a participant in the GSS market, it does not plausibly allege that it suffered an antitrust injury *in that market*. *PhantomALERT*, 2025 WL 71888, at *6; *see also Fotobom*, 719 F. Supp. 3d at 46 (dismissing claim when "Plaintiff nowhere explains how the challenged conduct . . . reduces competition in the market for general search, thereby causing Plaintiff antitrust injury in that market"). Chegg instead asserts that Google's conduct "harms competition *in the Input Market* by pushing the compensation for Chegg below competitive levels which will suppress the volume of new publisher content in the Input Market." Am. Compl. ¶ 175 (emphasis added). As explained, Chegg's allegations make clear that this "Input Market" is distinct from the market for GSS. *Id.* Thus, an alleged harm in the Input Market is not, by itself, sufficient for antitrust standing in the GSS market. *SigmaPharm, Inc. v. Mut. Pharm. Co.*, 772 F. Supp. 2d 660, 674 (E.D. Pa. 2011) ("Such injury to an input market would remain too remote from the harms that antitrust law seeks to prevent"), *aff'd*, 454 F. App'x 64 (3d Cir. 2011). That is because "[a] proper antitrust plaintiff is an adversely affected market participant in the *restrained* market"—here, the GSS market. *Id.* at 673. For that reason, a "supplier does not suffer an antitrust injury when competition is reduced in the downstream market in which it sells goods or service." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 102 (3d Cir. 2010). Because there "is a mismatch between the market allegedly controlled by [Google] and the market where [Chegg] is allegedly injured," Chegg has failed to adequately allege an antitrust injury. *PhantomALERT*, 2025 WL 71888, at *6; *Cal. Crane Sch., Inc. v. Google LLC*, 2023 WL 2769096, at *3 (N.D. Cal. Mar. 31, 2023) (dismissing due to "mismatch" where plaintiff alleged injury in the "search advertising market," but alleged anticompetitive conduct in the "search market").

*Finally*, Chegg's own allegations demonstrate that its alleged injuries are improperly indirect and speculative, and that other parties are better situated to pursue alleged anticompetitive

conduct in the GSS market.  Antitrust standing requires "direct and non-speculative damages" to the plaintiff's business as well as "proper-plaintiff status, which ensures that other parties are not better situated to sue."  *See Stallard v. Goldman Sachs Grp., Inc.*, 2024 WL 4903783, at *9 (D.D.C. Nov. 27, 2024); *Adams v. Pan Am. World Airways, Inc.*, 828 F.2d 24, 26 (D.C. Cir. 1987).  To determine whether a party is proper plaintiff, courts consider factors such as the "directness" of the injury, the "existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement," the "speculativeness of the alleged injury," and "the difficulty of identifying damages and apportioning them."  *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 65 (2d Cir. 2019).  Chegg's alleged injury is far too speculative and indirect:  Chegg alleges that "some" "competitor search platforms" "must pay a significantly higher price for the same content," which allegedly helps Google "entrench its general search monopoly."  Am. Compl. ¶¶ 175, 219.  Not only does Chegg fail to plausibly allege that Google's conduct is what prevents its rivals from obtaining the content at the same price, *infra* pp. 29-30, but Chegg's allegations do not identify any rival in the alleged GSS market that has had to "pay a significantly higher price for the same content."  Am. Compl. ¶ 175.  Indeed, Chegg's use of the word "some" implies that there are search competitors that do not, and therefore, Google's ability to obtain certain content for free cannot plausibly be the result of its alleged monopoly position.  *See Iqbal*, 556 U.S. at 681 (rejecting as not plausible allegations that had "more likely" explanations).

Chegg's injury allegations with respect to the separate "Input Market" are also self-contradictory.  Chegg claims that "in a competitive input market, there would be no obvious reason for Chegg to agree to permit Google to access its content for a zero price," Am. Compl. ¶ 173, yet Chegg concedes that publishers receive value from appearing in Google's search results and so

opt in to Search, *id.* ¶ 172, and that publishers permit snippets to be used because it results in greater referral traffic than not doing so, *id.* ¶ 82. That Chegg's competitors might permit Google to use content or snippets in order to increase traffic demonstrates *competition* among online publishers and Google's right to "exercise its own independent discretion as to parties with whom it will deal," not anticompetitive conduct. *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1141 (9th Cir. 2022).

### B.    Chegg Has Not Alleged Exclusionary Conduct In The GSS Market

Even if Chegg had antitrust standing to bring a monopoly maintenance claim with respect to the GSS market, it has failed to plausibly allege "exclusionary conduct as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Microsoft*, 253 F.3d at 58 (internal quotations omitted).

Chegg provides no plausible allegations that Google's conduct was exclusionary as a matter of law. For starters, Chegg's allegations amount to an argument that Google Search has become too efficient, thereby leading to fewer visits to Chegg's website. But "product improvement by itself does not violate Section 2, even if it is performed by a monopolist and harms competitors as a result." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 999-1000 (9th Cir. 2010); *see also Microsoft*, 253 F.3d at 68 ("[A] monopolist does not violate the Sherman Act simply by developing an attractive product.").

Chegg also alleges that Google uses its monopoly power in the GSS market to obtain "GAI Training Content and RAG Content for free," which "effectively lowers Google's costs." Am. Compl. ¶¶ 188-189. But a firm's efforts to lower its costs is "to be encouraged" and does not violate the antitrust laws. *See, e.g.*, *Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 886 F.3d 332, 340 (3d Cir. 2018). Regardless, the Amended Complaint includes no plausible factual allegations indicating that Google's rivals in the GSS market are unable to obtain free content to train their

generative AI services or that any inability to access AI training data is attributable to the alleged anticompetitive conduct. Chegg's allegations do not indicate that Google's actions prevent any GSS rivals from obtaining this content for free, and in fact, Chegg's use of the word "some" implies otherwise. Thus, this allegation contradicts Chegg's theory that Google can obtain such content for free only because of its monopoly in the GSS market. *See Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 109 (D.D.C. 2010) ("[W]here some allegations in the complaint contradict other allegations, the conflicting allegations become 'naked assertions devoid of further factual enhancement . . . [, which therefore] cannot be presumed true.'").

Finally, Chegg claims that Google's conduct "harms consumers by decreasing the quality of Google's search product" through the "[s]tarving Chegg and other publishers of search traffic," which "will ultimately leave search users without relevant and reliable information to answer their queries." Am. Compl. ¶¶ 217-218. Yet, Chegg offers nothing other than speculation to support this sky-is-falling hyperbole. Regardless, the quality of Google Search does not depend solely on the amount of search referral traffic it sends out to other websites. Instead, as is obvious, Google Search's quality depends on its ability to answer user queries. Even at the motion-to-dismiss stage, the Court need not turn a blind eye to "common sense," dooming Chegg's theory. *See Iqbal*, 556 U.S. at 679.

Even if Chegg's speculative assertions on product quality were plausible, they are not, at bottom, anticompetitive. To illustrate this principle, a leading antitrust treatise provides the example of Microsoft developing a new version of Windows that is "particularly buggy and prone to crashes." AREEDA & HOVENKAMP, *supra*, ¶ 651. Even though "consumers as a group would be harmed because they have few good alternatives to Windows," "developing a bad version of Windows is not a monopolistic practice because no one is excluded," even if the practice might

30

"simply impose harm on consumers until Microsoft fixed the problem." *Id.* So too here. Even if Google's conduct harms its search product and that, in turn, causes consumer harm, such conduct would not be a monopolistic practice because no one is excluded from competing with Google as a result. *See id.* Moreover, if, as Chegg contends, Google is worsening the quality of its GSS product, that conduct would enhance, not hurt, the ability of its competitors to compete in that market. As a result, Chegg, which purports to compete with Google in at least some of its contrived markets, would stand to benefit. This is not an injury that the antitrust laws are designed to prevent. *See e.g.*, *Andrx Pharms*, 256 F.3d at 812 ("[A]ntitrust laws 'were enacted for the protection of *competition* not *competitors*.'") (quoting *Brown Shoe*, 370 U.S. at 320); *Microsoft*, 253 F.3d at 58 ("[T]o be condemned as exclusionary, a monopolist's act must have an 'anticompetitive effect.' That is, it must harm the competitive *process* and thereby harm consumers.").

## III. CHEGG FAILS TO PLAUSIBLY PLEAD MONOPOLY LEVERAGING (COUNT III) AND ATTEMPTED MONOPOLIZATION OF THE ONLINE EDUCATIONAL PUBLISHING MARKET (COUNT V)

### A. There Is No Claim For Monopoly Leveraging Under The Sherman Act

In Count III, Chegg alleges that Google "unlawfully leveraged its monopoly power in General Search Services into other markets, including the Online Educational Publishing market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2." Am. Compl. ¶ 209. But no independent claim for "leveraging" exists under Section 2 of the Sherman Act. Courts, including in this District, have consistently concluded that "leveraging" does not, by itself, constitute a separate viable antitrust claim. *E.g.*, *United States v. Microsoft Corp.*, 1998 WL 614485, at *27 (D.D.C. Sept. 14, 1998) (granting summary judgment and noting that courts and commentators "have rejected the [leveraging] theory outright, as contrary to both economic theory and the Sherman Act's plain language"); *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 547 (9th Cir. 1991) (rejecting the "monopoly leveraging doctrine as an independent theory of liability

under Section 2").[5]  Chegg's monopoly leveraging claim is, therefore, legally baseless and should be dismissed.

Chegg claims that Google's alleged leveraging amounts to monopolization of the purported OEP market, but that claim fails for the same reasons as Count V: As explained below, Chegg has failed to plausibly plead the markets in which any such "leveraging" has occurred and it has otherwise failed to allege the elements of an attempted monopolization claim.  *See infra* Section III.B.

### B.    Chegg Fails To Plausibly Plead Attempted Monopolization

Chegg's attempted monopolization claim—Count V, which alleges that Google has used a monopoly in GSS to "creat[e] monopolies in digital publishing markets, including in the Online Educational Publishing market," Am. Compl. ¶ 224—is implausible.  While Chegg styles Google's alleged conduct as one sounding in tying or leveraging, at bottom, Chegg's claim amounts to the assertion that Google has developed features that make Google Search more effective and efficient all to position itself as a monopolist in the OEP market.  This is because the supposed "leveraging" consists of Google making its SERP more attractive to consumers.  That theory does not pass the straight face test, let alone the pleading standard.  But even accepting these fanciful allegations as true, Chegg's claims fail on their own terms.  Despite having and taking a second chance, Chegg has failed to plausibly allege a relevant market that Google has attempted to monopolize or that Chegg has suffered an injury in that market sufficient to confer antitrust standing.  And even setting aside those fatal flaws, Chegg fails to plead the elements of an attempted monopolization claim.

---

[5] The D.C. Circuit has not decided whether leveraging may constitute a distinct Section 2 claim but has noted the "substantial academic criticism cast upon the leveraging concept."  *Ass'n for Intercollegiate Athletics for Women v. NCAA*, 735 F.2d 577, 586 n.14 (D.C. Cir. 1984).

### 1.    Chegg Fails To Plead A Market for Online Educational Publishing

Chegg offers nothing close to the factual allegations required to define the purported market of "OEP." Chegg attempts to define OEP as a subset of two markets: the "field of digital publishing," and the "broader educational publishing market," Am. Compl. ¶¶ 54, 57. Chegg makes three references to the boundaries of this purported market: that "other forms of online informational content" "cannot substitute for educational publishing" because they "fail to combine key attributes that student consumers require" like "curation, verification, authority, and pedagogical focus," *id.* ¶ 54; that OEP is "functionally distinct" based on its "primary purpose" being "pedagogical" and "to deliver information necessary for learning," *id.* ¶ 60; and that that the "format" of OEP "differs from other types of online publishing," *id.* ¶ 61. These allegations are too vague to determine the proposed market's boundaries and fail "to define the market by reference to the reasonable interchangeability—or lack thereof—of" the products at issue, this claim must be dismissed. *Sky Angel*, 947 F. Supp. 2d at 103.

*First*, Chegg's alleged market definition—even after amendment—is hopelessly vague. The terms Chegg uses—like "key attributes," "curation," "verification," "pedagogical," and "pedagogical focus," Am. Compl. ¶¶ 54, 60—"are so generic as to render implausible" any claim that relies on this "relevant market definition." *Tundra, Inc. v. Faire Wholesale, Inc.*, 2024 WL 589097, at *1 (N.D. Cal. Feb. 13, 2024) (dismissing case where relevant market definition turned on terms like "local," "new," and "emerging"); *Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963, 970 (W.D. Tenn. 2004) (finding "fatally vague" a proposed market of "exclusive salon hair care products"). Chegg offers no meaningful guidance—let alone facts—to distinguish between so-called "educational publishing" and other "online informational content" that supposedly lacks "key attributes that student consumers require," or any further details on what constitutes "verification," "curation," "authority," or "pedagogical focus." Am. Compl. ¶ 54.

Chegg's allegations that OEP is distinguished by its "*primary* purpose" being "pedagogical," and it being "designed *primarily*" for things like "structured learning" are also vague, *id.* ¶ 60 (emphases added); those terms would "leave[] the Court at a loss as to what sorts of products to include" in the market. *Cupp*, 310 F. Supp. 2d at 971.

Indeed, it appears that Google itself does not meet that definition to the extent that it can be discerned.  Consider, for example, Chegg's allegation that Google's AI Overviews "compete in the Online Educational Publishing market," because Google has indicated that it can "make back to school season easier" and Google may "view[] students as a target demographic," Am. Compl. ¶¶ 130-131.  Setting aside the bizarreness of carving up Google's search results in the manner Chegg proposes,  common sense tells us that Google's AI Overviews plainly serve many purposes beyond "pedagogical" ones, including serving as an easily accessible synthesis of information for scores of non-student users who might search for "change a tire" or "how do you apply for a loan" or "when is the best time to visit Hawaii."  Chegg's market definition offers no guidance to determine what purpose is "primary," let alone factual allegations that would make plausible an inference that scores of non-pedagogical uses are not primary.

Similarly, Chegg's allegations acknowledge that many types of digital publications seek to convey information, *see id.* ¶ 54 (referencing news, popular interest, and "other nonfiction publishers"), *id.* ¶ 61 (attempting to distinguish "news"), but do not explain why this information cannot constitute the "information necessary for learning" that Chegg asserts distinguishes the alleged OEP market, *id.* ¶ 60.  Indeed, Chegg even cites Wikipedia in its Amended Complaint, *id.* ¶ 85 n.21, and yet its allegations are entirely vague as to whether such an online encyclopedia would fall within this market—such content is "periodically updated" and may be designed for

"learning" and "study," but it would be a practical impossibility to decide whether its "primary" purpose is pedagogical. *See id.* ¶ 60.

Chegg's "format" allegation is also too vague to establish the bounds of the market, as it states only that the formats used by online education publishers "can vary" and "may involve online educational platforms, electronic textbooks . . . or learning management systems." Am. Compl. ¶ 61. Chegg's concession that these formats "*can* vary" and only "*may*" involve specific formats fails to plausibly establish the market's bounds. *See In re Google Digital Advert. Antitrust Litig.*, 721 F. Supp. 3d 230, 254 (S.D.N.Y. 2024) (finding no plausibly alleged market where plaintiff "does not explain what is entailed by the phrase 'component subparts and services'").

*Second*, even if those allegations were not fatally vague, Chegg's definition also fails to plausibly allege a reasonable lack of interchangeability. "When assessing reasonable interchangeability, '[f]actors to be considered include price, use, and qualities.'" *Queen City Pizza*, 124 F.3d at 437. Other forms of content that Chegg tries to argue are not substitutes— described in part as "popular interest, news, or other nonfiction publishers," Am. Compl. ¶ 54— do not all plausibly lack traits like "verification," "curation," or "authority," since many news and nonfiction publishers are verified, curated, and (to many) authoritative. *See PhantomALERT*, 2025 WL 71888, at *8 (dismissing case where plaintiff failed to "draw the market's boundaries to encompass the product at issue as well as all economic substitutes for the product"). Similarly, Chegg offers no explanation for how to distinguish "information necessary for learning," Am. Compl. ¶ 60, from information that other publishers provide. Chegg points to companies such as Course Hero, Quizlet, Khan Academy, and Brainly as OEP participants, *id.* ¶ 57, but it is implausible that all those companies would fall within the alleged OEP market as Chegg has defined it—Quizlet, for example, relies heavily on user-created flashcards, *see Flashcards*,

QUIZLET, https://quizlet.com/features/flashcards (last visited July 25, 2025), which do not appear to be "verified," "curated," or based on any kind of "authority," Am. Compl. ¶ 54.  Similarly, Chegg offers no explanation for why a user-created flashcard company like Quizlet or a "direct-to-student connected learning platform" like Chegg offers, Am. Compl. ¶ 23, are reasonably interchangeable or have cross-elastic demand with products like "electronic textbooks" that Chegg alleges are in this market, *see id.* ¶ 61; *see also Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 612 n.31 (1953) ("[A] relevant market . . . must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn.").  Indeed, Chegg explains that its services involve offering "guidance on specific problems that appear in textbooks," Am. Compl. ¶ 40, but that product plainly cannot be reasonably substituted with an "electronic textbook" itself.  *See PhantomALERT*, 2025 WL 71888, at 5 ("The product market is defined by the good at issue and any other goods that a consumer would sub in if the good at issue were to get more expensive.").

*Third*, Chegg does not allege plausible facts demonstrating that this alleged OEP market is, in fact, distinct from overall digital publishing or educational publishing.  *See, e.g.*, *Fresh Made, Inc. v. Lifeway Foods, Inc.*, 2002 WL 31246922, at *5 (E.D. Pa. Aug. 9, 2002) (dismissing complaint when plaintiff did not "allege facts establishing that the market for specialty Russian dairy products . . . is distinct from the market for yogurt, other drinkable yogurt products, or from other dairy products in general").  Chegg's allegations suggest that other types of online publishing *are* interchangeable.  For example, Chegg claims that the Google Search features at issue in its complaint—such as Featured Snippets or AI Overviews—cite to a variety of online publications, not just so-called "educational publishing content."  *See, e.g.*, Am. Compl. ¶ 73 (citing Wikipedia); *id.* ¶ 74 (citing news sources).  In short, Chegg has failed to "define the market by reference to the

reasonable interchangeability" or raise any plausible allegations that such a market exists. *Sky Angel*, 947 F. Supp. 2d at 103.

### 2.    Chegg Fails To Allege The Elements Of Attempted Monopolization

A Section 2 violation for attempted monopolization requires that a plaintiff prove "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). Chegg fails to plead each of these elements.

### a.    Chegg Fails To Allege Anticompetitive Conduct In The Relevant Market

Chegg's claim for anticompetitive conduct in the purported OEP market is primarily predicated on its claim for reciprocal dealing. *See* Am. Compl. ¶ 169 ("By using reciprocal dealing to get free Republishing Content, GAI Training Content, and RAG Content, Google restricts competition in downstream digital publishing markets, including the Online Educational Publishing market, where it competes against other web publishers like Chegg."). As explained, however, Chegg's claim of anticompetitive conduct resulting from any alleged reciprocal dealing fails, because Chegg does not adequately allege that the purported reciprocal dealing caused harm to competition in the allegedly tied markets by, for example, excluding other buyers for its content or preventing publishers from licensing content. *See supra* Section I.C.

Moreover, Chegg claims that, because of Google's enhanced search features, users no longer "click through to . . . publishers' original content." Am. Compl. ¶ 169. Again, these features constitute "[p]roduct improvement[s]," which are not, as a legal matter, anticompetitive. *Allied Orthopedic*, 592 F.3d at 999. The lost clicks that publishers allegedly experience do not occur in the OEP market, as Chegg concedes, but rather in the so-called "Search Referral Traffic" market. Am. Compl. ¶ 153. As noted, "[a]ntitrust injury requires the plaintiff to have suffered its

injury in the market where competition is being restrained." *Fotobom*, 719 F. Supp. 3d at 44 (quoting *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999)) *see also PhantomALERT*, 2025 WL 71888, at *6. Because those alleged harms do not impact competition in the alleged OEP market that Google is supposedly attempting to monopolize, they cannot support a claim for attempted monopolization.

> **b.    Chegg Fails To Allege Google's Specific Intent To Monopolize Online Educational Publishing**

"Specific intent to engage in predatory or anticompetitive conduct" is also required." *City of Moundridge v. Exxon Mobil Corp.*, 471 F. Supp. 2d 20, 42 (D.D.C. 2007). "If plaintiff['s] claim is not supported by a factual assertion . . . specific intent is not sufficiently pled." *Id.* at 43.

Chegg has again failed to plausibly allege such specific intent. None of its factual allegations show conduct that has "no legitimate business justification but to destroy or damage competition" in the alleged OEP market. *Id.* Far from it: All that Chegg's allegations suggest is that Google intended to improve its offerings by providing more useful responses to users' search queries. *See, e.g.*, Am. Compl. ¶¶ 70-76 (noting, for example, Google's "Knowledge Panel" and snippets that directly respond to searches), *id.* ¶¶ 126-128 (quoting Google as promoting AI Overviews to "deliver[] a fast and easy way to access relevant information").

> **c.    Chegg Fails To Allege Google Has Dangerous Probability Of Achieving Monopoly Power in Online Educational Publishing**

Finally, Chegg has failed to plausibly allege a dangerous probability of Google achieving monopoly power in the alleged OEP market. *First*, establishing a "dangerous probability of success" requires a plaintiff to show, as a threshold matter, that the relevant market "can be monopolized." *Microsoft*, 253 F.3d at 81. This requires, first, plausibly defining the relevant market, which Chegg has failed to do, *see supra* Section III.B.1, and second, showing that "substantial barriers to entry protect that market," *Microsoft*, 253 F.3d at 81. Entry barriers are

"additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants," or "factors in the market that deter entry while permitting incumbent firms to earn monopoly returns." *L.A. Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1427-28 (9th Cir. 1993); *see also Google*, 747 F. Supp. 3d at 107 ("Entry barriers are factors 'that prevent new rivals from timely responding to an increase in price above the competitive level.'").

Chegg has alleged nothing of the sort here. The word "barrier" appears in the complaint only with reference to the "search market." Am. Compl. ¶ 53. Chegg offers no allegations whatsoever specific to barriers in the alleged OEP market. It is simply implausible that this purported market has any "substantial barriers to entry." *Microsoft*, 253 F.3d at 81. As common knowledge indicates, essentially anyone can start a website or app and display textual content. *See Phila. Taxi Ass'n*, 886 F.3d at 342 (dismissing complaint and noting that "[e]asy entry— particularly historical evidence of entry—is even more significant in the attempt case than in monopolization cases generally"); *TKO Energy Servs., LLC v. M-I L.L.C.*, 539 F. App'x 866, 872 (10th Cir. 2013) (affirming dismissal where plaintiff did "not plead . . . what substantial entry barriers exist"). A multitude of firms participate in this market today. *See* Am. Compl. ¶ 57 (including "long-established educational publishers who began as print publishers and now offer online content (such as McGraw Hill) and technology companies whose content offerings have always been hosted online (such as Khan Academy, Course Hero, Quizlet, and Brainly).")); *id.* (listing Google, OpenAI, Microsoft, Meta, and Anthropic as additional participants).

*Second*, Chegg has also failed to allege any facts to show that Google has a dangerous probability of monopolizing the alleged market. *See Ass'n of Retail Travel Agents, Ltd. v. Air Transp. Ass'n of Am.*, 635 F. Supp. 534, 538 (D.D.C. 1986) (dismissing for failure to allege a "dangerous probability of success"). Chegg must support the "dangerous probability" element by

alleging facts related to, for example, the defendant's "actual or probable market power," *id.* "market share, or the ability to affect competition," *Carpenter Tech. Corp. v. Allegheny Techs., Inc.*, 646 F. Supp. 2d 726, 735 (E.D. Pa. 2009). "The D.C. Circuit has not established a minimum market share percentage from which courts may infer a dangerous probability, but it has observed that 'a share of 30% or less presumptively *disproves* requisite power.'" *Fotobom*, 719 F. Supp. 3d at 52. Here, Chegg makes *no* allegations about Google's share in the alleged OEP market. That omission defeats any claim that Google has a dangerous probability of monopolization. *See Therapearl, LLC v. Rapid Aid Ltd.*, 2014 WL 4794905, at *8 n.10 (D. Md. Sept. 25, 2014) (dismissing an attempted monopolization claim when a plaintiff made "no allegation as to [the defendant's] market share in the market").

Moreover, Chegg fails to plausibly allege that Google participates in the alleged OEP market at all. That AI Overviews can serve an educational purpporse does not mean that Google is a participant in OEP because even when companies "compete with each other for the same overall pool of potential customers . . . [,] that fact does not necessarily mean that [those companies] must be viewed as part of the same relevant product market." *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 54-55 (D.D.C. 2011). Chegg conclusorily states that Google's AI Overviews compete in the OEP market, Am. Compl. ¶¶ 129-131, but its factual allegations fall well short of making the assertion plausible. For example, Chegg purports to define the OEP market as online publications with "key attributes" like "verification," "curation," "authority," and "pedagogical focus." *id.* ¶ 54. Yet, Chegg offers no allegations that Google's AI Overviews combine these attributes—by their nature, generative AI programs do not generally possess "verification." *See id.* ¶¶ 99-100. Chegg also points to certain indications that Google's AI Overviews can be used by people interested in "learning," *e.g.*, *id.* ¶¶ 130-132, but as discussed,

Chegg has defined the market to require the "primary purpose" to be "pedagogical," and Chegg

fails to allege that this purpose is "primary" for Google's AI Overviews when compared with its

other purposes.  Common sense and the Court's own familiarity with the industry make clear that

it is not.

## IV.    CHEGG FAILS TO PLEAD A VIABLE UNJUST ENRICHMENT CLAIM (COUNT VI)

Like its antitrust claims, Chegg's unjust enrichment claim fails.  Under the law of the

relevant forum—California, where both parties are based, *see* Am. Compl. ¶¶ 18, 21-22—Chegg

has alleged no facts to support an unjust enrichment claim.

### A.    California Law Applies To Chegg's Unjust Enrichment Claim

Where a federal court exercises supplemental jurisdiction, "it applies the forum state's

choice of law rules."  *A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1463 (D.C.

Cir. 1995).  Under District of Columbia law, this Court must "'first determine whether there is a

conflict' between D.C. and [California] law in the case."  *Chicago Ins. Co. v. Paulson & Nace,

PLLC*, 37 F. Supp. 3d 281, 290 (D.D.C. 2014) (quoting *Eli Lilly & Co. v. Home Ins. Co.*, 764 F.2d

876, 882 (D.C. Cir. 1985)), *aff'd*, 783 F.3d 897 (D.C. Cir. 2015).  If there is a conflict, the court

must then determine which jurisdiction "has the 'more substantial interest' in having its law

applied."  *GEICO v. Fetisoff*, 958 F.2d 1137, 1141 (D.C. Cir. 1992) (quoting *Eli Lilly & Co.*, 764

F.2d at 882).

To start, there is a "clear conflict" here because the District of Columbia recognizes a

standalone cause of action for unjust enrichment while California does not.  *Stutsman v. Kaiser

Found. Health Plan of Mid-Atl. States, Inc.*, 546 A.2d 367, 372 (D.C. 1988).  Under D.C. law,

plaintiffs have a cause of action for unjust enrichment whenever (1) they "conferred a benefit on

the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the

defendant's retention of the benefit is unjust." *News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222-23 (D.C. 2005).

By contrast, "in California, there is not a standalone cause of action for 'unjust enrichment.'" *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (quoting *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1370 (2010)). California instead treats unjust enrichment claims as a narrower "quasi-contract claim seeking restitution." *Id.* (quoting *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221 (2014)). A plaintiff may recover on such a quasi-contract theory only if they can show that the "defendant has been unjustly conferred a benefit 'through mistake, fraud, coercion, or request.'" *Id.* (citation omitted). Under D.C. law, by contrast, plaintiffs may bring unjust enrichment claims without having to allege mistake, fraud, coercion, or request, because "a 'promise to pay will be implied in law when one party renders valuable services that the other party knowingly and voluntarily accepts.'" *Peart v. D.C. Hous. Auth.*, 972 A.2d 810, 814 (D.C. 2009) (citation omitted).

Next, California has a more substantial interest in applying its laws. D.C. courts look to four factors to determine which jurisdiction controls: (1) "the place where the injury occurred," (2) "the place where the conduct causing the injury occurred," (3) "the domicile, residence, nationality, place of incorporation and place of business of the parties," and (4) "the place where the relationship is centered." *Washkoviak v. Student Loan Mktg. Ass'n*, 900 A.2d 168, 180 (D.C. 2006) (citing Restatement (Second) of Conflict of Laws § 145 (Am. Law Inst. 1971)).

Here, all four factors establish California's more significant interest. *First*, "[p]ecuniary harm to a plaintiff 'will normally be felt most severely at the plaintiff's headquarters or principal place of business.'" *Iron Vine Sec., LLC v. Cygnacom Sols.*, 274 A.3d 328, 349 (D.C. 2022) (quoting Restatement (Second) Conflict of Laws § 145, cmt. f). Here, that is California. Am.

Compl. ¶ 18.  *Second*, Google is also headquartered in and has its principal place of business in California, *id.* ¶ 21, so California is the place "where the conduct causing the [alleged] injury occurred," *Wu v. Stomber*, 750 F.3d 944, 949 (D.C. Cir. 2014).  *Third*, with regard to a "tort caus[ing] primarily a 'financial injury'" like the one alleged here, the "plaintiff's principal place of business is the 'most important contact for determining the state of the applicable law.'"  *Iron Vine Sec.*, 274 A.3d at 349 (quoting Restatement (Second) Conflict of Laws § 145, cmt. f).  *Fourth*, California is the "center[]" of the "relationship" between the California-based parties.  *See Krukas v. AARP, Inc.*, 376 F. Supp. 3d 1, 31 (D.D.C. 2019) (finding that "plaintiff's relationship with the defendants is centered" in the location where "defendants have their primary place of business and where they make their policies and practices").

### B.    Chegg Fails To Allege Facts That Would Support A Quasi-Contractual Claim For Restitution

To state a quasi-contractual claim under California law, Chegg must allege that Google was "*unjustly* conferred a benefit 'through mistake, fraud, coercion, or request.'"  *Russell v. Walmart, Inc.*, 680 F. Supp. 3d 1130, 1133 (N.D. Cal. 2023) (quoting *Astiana*, 783 F.3d at 762).  It has not done so.

To start, Chegg does not allege any mistake or fraud.  In fact, Chegg alleges that Google's Terms of Service and Privacy Policy clearly indicated that "[Google] was using content it crawls from the web to train the models that it uses to generate AI Overviews" and that this included Chegg's works.  Am. Compl. ¶ 135.  And Chegg concedes that it retained the option of whether to permit Google to index its content.  *Id.* ¶ 171.  Chegg therefore fails to allege the kind of "direct request" that would support an unjust enrichment claim.  *Russell*, 680 F. Supp. 3d at 1133-34 (invoking absence of "direct request" by defendant and plaintiff's exercise of choice as bases for dismissing unjust enrichment claim).

At most, Chegg alleges that, by leveraging its monopoly power, Google "coerce[d]" and "forced" it to accede to the purported "misappropriation of [its] content."  Am. Compl. ¶¶ 1, 9. But calling Google's conduct "coercion" does not make it so.  To state a viable claim for "restitution due to economic duress" under California law, Chegg must plausibly allege that "a reasonably prudent person subject to such an act may have no reasonable alternative but to succumb when the only other alternative is bankruptcy or financial ruin."  *Uniwill L.P. v. City of Los Angeles*, 124 Cal. App. 4th 537, 545 (2004) (quoting *Rich & Whillock, Inc. v. Ashton Dev., Inc.*, 157 Cal. App. 3d 1154, 1156-57 (1984)).  Chegg does not come close to clearing that high bar.  Nowhere does Chegg allege it had no feasible economic alternative other than acquiescing to the purported misappropriation of its content.  Because Chegg does not allege the requisite "qualifying conduct" on Google's part, its unjust enrichment claim fails as a matter of law.  *See Tremblay v. OpenAI, Inc.*, 716 F. Supp. 3d 772, 782-83 (N.D. Cal. 2024) (dismissing unjust enrichment claim for "OpenAI's use of [plaintiff's] copyrighted books to train ChatGPT" for want of allegations of "fraud, mistake, coercion, or request").

## V.    AMENDMENT WOULD BE FUTILE

Dismissal with prejudice is warranted when, as here, "the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency" in the pleading. *Belizan v. Hershon*, 434 F.3d 579, 583 (D.C. Cir. 2006) (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996)).

Chegg abandoned its original complaint after Google filed a motion to dismiss identifying its numerous legal deficiencies.  Yet rather than addressing those flaws in its Amended Complaint, Chegg recycled the same deficient legal theories and made only minor changes to its factual allegations.  Chegg's Amended Complaint continues to advance a hodgepodge of legal theories that are not cognizable under the antitrust laws.  There are, for instance, no factual allegations

capable of transforming reciprocal dealing into a valid antitrust claim or rewriting Section 2 of the

Sherman Act to permit independent claims of monopoly leveraging.  Because a second Amended

Complaint would "merely spill[] more ink rehashing" these legally deficient theories, dismissal

with prejudice is warranted here.  *Angel v. Fed. Home Loan Mortg. Corp.*, 815 F. App'x 566, 569

(D.C. Cir. 2020); *see Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1340 (D.C. Cir. 2015)

(affirming dismissal with prejudice because plaintiff's claims fail as a matter of law).

## CONCLUSION

For the reasons discussed above, Google's motion to dismiss should be granted.  Because

Chegg amended its response to Google's first motion to dismiss but failed to address the

deficiencies Google set forth, it is clear that further amendment would be futile and dismissal

should be with prejudice.


Dated: July 25, 2025                              Respectfully submitted,

                                                  By:  */s/ Sonal N. Mehta*
                                                  Sonal N. Mehta*
                                                  Chris Johnstone*
                                                  WILMER CUTLER PICKERING HALE
                                                  AND DORR LLP
                                                  2600 El Camino Real, Suite 400
                                                  Palo Alto, CA  94306
                                                  Telephone: (650) 858-6000
                                                  Facsimile: (650) 858-6100
                                                  sonal.mehta@wilmerhale.com
                                                  chris.johnstone@wilmerhale.com
                                                  *Admitted Pro Hac Vice*

                                                  David Gringer (Bar No. 1001200)
                                                  WILMER CUTLER PICKERING HALE
                                                  AND DORR LLP
                                                  7 World Trade Center
                                                  250 Greenwich Street
                                                  New York, NY 10007
                                                  Telephone: (212) 230-8800

Facsimile: (212) 230-8888
david.gringer@wilmerhale.com

*Counsel for Defendants Google LLC &*
*Alphabet Inc.*