**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHEGG, INC., | |
| *Plaintiff,* | |
| v. | Civil Action No. 1:25-cv-00543 (APM) |
| GOOGLE LLC and ALPHABET INC., | |
| *Defendants.* | |

**PLAINTIFF CHEGG, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS CHEGG'S AMENDED COMPLAINT**

**ORAL ARGUMENT REQUESTED**

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................1

SUMMARY OF FACTUAL ALLEGATIONS ..........................................................4

    A.    Chegg's Development of High-Quality Educational Content ....................4

    B.    The "Fundamental Fair Exchange" Between Google and the Web ...............................................................................................................5

    C.    Google Coerces Publishers to Provide Free Content by Exploiting Its Unlawful Monopoly Over Search .........................................5

    D.    Google's Exploitation of Its Monopoly Power in Search Harms Chegg ........................................................................................................8

LEGAL STANDARD.....................................................................................................9

ARGUMENT ................................................................................................................10

    I.    CHEGG ADEQUATELY PLEADS COERCIVE RECIPROCAL DEALING ...........................................................................................10

    A.    The Complaint Alleges Coercive Reciprocal Dealing..............................10

        1.    Chegg's Claims Qualify for Per Se Treatment ..............................14

        2.    Chegg's Allegations Also Satisfy the Rule-of-Reason Standard ........................................................................................15

    B.    Chegg Adequately Alleges the Relevant Markets ....................................16

        1.    Chegg Adequately Alleges a "Tying" Market for Search Referral Traffic .................................................................17

        2.    Chegg Adequately Alleges the Corresponding Input Market ............................................................................................20

        3.    Chegg Adequately Alleges the "Tied" Markets............................22

    C.    Chegg Has Antitrust Standing for Its Coercive Reciprocal Dealing Claims......................................................................................24

        1.    Chegg Is Harmed By Google Underpaying For Chegg's Content ..........................................................................................24

        2.    Chegg Is Harmed By Reduced Search Referral Traffic and Resulting Lost Subscription Revenue ....................................26

|  |  | 3. | Google's Product Improvement Arguments At Most Raise Fact Disputes | 28 |

| | D. | Refusal-To-Deal Doctrine Is Inapplicable | 29 |

II.   CHEGG ADEQUATELY PLEADS UNLAWFUL MONOPOLY MAINTENANCE ....................................................................................31

    A.   The Complaint Alleges the Elements of Monopoly Maintenance ................................................................................31

    B.   Chegg Has Antitrust Standing to Sue for Unlawful Monopoly Maintenance ................................................................................33

        1.   Chegg Adequately Alleges Antitrust Injury as a Supplier of Content for Search and as a Purchaser of Search Referral Traffic ................................................33

        2.   Chegg Also Has Standing Under *McCready* ................................35

        3.   The *Associated General Contractors* Factors Support Standing ................................................................................36

III.   CHEGG ADEQUATELY PLEADS MONOPOLY LEVERAGING ..................37

    A.   Courts in This Circuit Recognize Monopoly Leveraging as a Viable Claim ................................................................................37

    B.   Chegg Adequately Pleads a Market for Online Educational Publishing ................................................................................38

IV.   CHEGG ADEQUATELY PLEADS ATTEMPTED MONOPOLIZATION ....................................................................................40

V.   CHEGG PLEADS A VIABLE UNJUST ENRICHMENT CLAIM ..................43

VI.   DISMISSAL WITH PREJUDICE WOULD BE IMPROPER ..........................45

CONCLUSION ....................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*,
  342 F. Supp. 3d 126 (D.D.C. 2018) ................................................................28, 37

*Adams v. Pan Am. World Airways, Inc.*,
  828 F.2d 24 (D.C. Cir. 1987) ................................................................37

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
  948 F.2d 536 (9th Cir. 1991) ................................................................38

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
  592 F.3d 991 (9th Cir. 2010) ................................................................28

*Am. President Lines, LLC v. Matson, Inc.*,
  633 F. Supp. 3d 209 (D.D.C. 2022) ................................................................17, 40

*Amarel v. Connell*,
  102 F.3d 1494 (9th Cir. 1996), *as amended* (Jan. 15, 1997) ................................................................25

*\*Andrx Pharms., Inc. v. Biovail Corp. Int'l*,
  256 F.3d 799 (D.C. Cir. 2001) ................................................................26, 36

*Apple Inc. v. Pepper*,
  587 U.S. 273 (2019) ................................................................36

*Arcell v. Google LLC*,
  744 F. Supp. 3d 924 (N.D. Cal. 2024) ................................................................20

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985) ................................................................30, 41

*\*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983) ................................................................25, 36

*Athos Overseas, Ltd. v. Youtube, Inc.*,
  2022 WL 910272 (S.D. Fla. Mar. 29, 2022) ................................................................12

*Atlantic Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) ................................................................13

*Banneker Ventures, LLC v. Graham*,
  798 F.3d 1119 (D.C. Cir. 2015) ................................................................9

*Berkey Photo, Inc. v. Eastman Kodak Co.,
    603 F.2d 263 (2d Cir. 1979).........................................................................37

*Betaseed, Inc. v. U & I Inc.,
    681 F.2d 1203 (9th Cir. 1982) ..................................................................14

Blue Shield v. McCready,
    457 U.S. 465 (1982)............................................................................35, 36

Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,
    140 F.3d 494 (3d Cir. 1998)......................................................................14

*Brown Shoe Co. v. United States,
    370 U.S. 294, 325 (1962).................................................................. passim

*Bruton v. Gerber Prods. Co.,
    703 F. App'x 468 (9th Cir. 2017) .........................................................43, 44

Cal. Crane Sch., Inc. v. Google LLC,
    2023 WL 2769096 (N.D. Cal. Mar. 31, 2023)...........................................34

Chase Mfg., Inc. v. Johns Manville Corp.,
    84 F.4th 1157 (10th Cir. 2023) ................................................................29

Cherkin v. PowerSchool Holdings, Inc.,
    2025 WL 844378 (N.D. Cal. Mar. 17, 2025)...........................................44

Chong v. Nestlé Water N.A., Inc.,
    2021 WL 4938128 (9th Cir. Oct. 22, 2021)..............................................44

City of Moundridge, KS v. Exxon Mobil Corp.,
    471 F.Supp.2d 20 (D.D.C. 2007) .........................................................37, 40

City of Oakland v. Oakland Raiders,
    20 F.4th 441 (9th Cir. 2021) ....................................................................27

Concord Assocs., L.P. v. Ent. Props. Tr.,
    817 F.3d 46 (2d Cir. 2016)..........................................................................9

CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.,
    141 F.4th 1075 (9th Cir. 2025) ................................................................43

Cupp v. Alberto-Culver USA, Inc.,
    310 F. Supp. 2d 963 (W.D. Tenn. 2004)...................................................39

Deutsch v. Cook,
    2020 WL 977894 (E.D. Cal. Feb. 28, 2020)............................................44

*Dream Big Media Inc. v. Alphabet Inc.*,
   2022 WL 16579322 (N.D. Cal. Nov. 1, 2022) ....................................................................12

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992)............................................................................................................31

*Epic Games, Inc. v. Apple, Inc.*,
   67 F.4th 946 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 (2024)..................................20

*ESG Cap. Partners, LP v. Stratos*,
   828 F.3d 1023 (9th Cir. 2016) ...........................................................................................44

*Flegel v. Christian Hosp., Ne.-Nw.*,
   4 F.3d 682 (8th Cir. 1993) .................................................................................................20

*Fortner Enterprises, Inc. v. U.S. Steel Corp.*,
   394 U.S. 495 (1969)............................................................................................................15

*\*Fotobom Media, Inc. v. Google LLC*,
   719 F. Supp. 3d 33 (D.D.C. 2024) ............................................................................. *passim*

*\*FTC v. Consol. Foods Corp.*,
   380 U.S. 592 (1965)............................................................................................................10

*FTC v. Facebook, Inc.*,
   560 F. Supp. 3d 1 (D.D.C. 2021) .......................................................................................19

*\*FTC v. Meta Platforms, Inc.*,
   775 F. Supp. 3d 16 (D.D.C. 2024)........................................................................26, 31, 32

*\*FTC v. Staples, Inc.*,
   970 F. Supp. 1066 (D.D.C. 1997) ..............................................................17, 18, 21, 23

*\*FTC v. Sysco Corp.*,
   113 F. Supp. 3d 1 (D.D.C. 2015)..............................................................................16, 18, 39

*FTC v. Tronox Ltd.*,
   332 F. Supp. 3d 187 (D.D.C. 2018) ..................................................................................39

*\*Hartford Cas. Ins. Co. v. J.R. Mktg., LLC*,
   61 Cal. 4th 988 (2015) ......................................................................................................43

*In re Google Digital Advert. Antitrust Litig.*,
   2024 WL 988966 (S.D.N.Y. Mar. 7, 2024) .......................................................................29

*In re Google Digital Advert. Antitrust Litig.*,
   627 F. Supp. 3d 346 (S.D.N.Y. 2022)................................................................................13

*In re High-Tech Emp. Antitrust Litig.*,
  856 F. Supp. 2d 1103 (N.D. Cal. 2012) ....................................................15

*In re Lorazepam & Clorazepate Antitrust Litig.*,
  295 F. Supp. 2d 30 (D.D.C. 2003) ....................................................27, 35

*In re Lorazepam & Clorazepate Antitrust Litig.*,
  467 F. Supp. 2d 74 (D.D.C. 2006) ....................................................18

*In re Mosaic LLM Litig.*,
  2025 WL 2294910 (N.D. Cal. Aug. 8, 2025) ....................................................22

*In re Warfarin Sodium Antitrust Litig.*,
  214 F.3d 395 (3d Cir. 2000) ....................................................35

*Intergraph Corp. v. Intel Corp.*,
  195 F.3d 1346 (Fed. Cir. 1999) ....................................................10

*IQ Dental Supply, Inc. v. Henry Schein, Inc.*,
  924 F.3d 57 (2d Cir. 2019) ....................................................37

*Jamsports & Ent., LLC. v. Paradama Prods., Inc.*,
  2003 WL 1873563 (N.D. Ill. Apr. 15, 2003) ....................................................17

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. 2 (1984) ....................................................10, 14

*Johnson v. Commission on Presidential Debates*,
  869 F.3d 976 (D.C. Cir. 2017) ....................................................26

*Kartell v. Blue Shield of Mass., Inc.*,
  749 F.2d 922 (1st Cir. 1984) ....................................................25

*Kartell v. Blue Shield of Massachusetts, Inc.*,
  582 F. Supp. 734 (D. Mass.) ....................................................25

*Key Enters. of Del., Inc. v. Venice Hosp.*,
  919 F.2d 1550 (11th Cir. 1990), *reh'g granted and opinion vacated on other
  grounds*, 979 F.2d 806 (11th Cir. 1992) ....................................................10

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
  232 F.3d 979 (9th Cir. 2000) ....................................................24

*Kurdistan Victims Fund v. Kurdistan Reg'l Gov't*,
  2025 WL 1360432 (D.D.C. May 9, 2025) ....................................................45

*Le v. Zuffa, LLC*,
  2023 WL 5085064 (D. Nev. Aug. 9, 2023) ....................................................20, 21

*Leeper v. Beltrami*,
    53 Cal. 2d 195 (1959) ................................................................................................44

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,
    924 F.2d 1484 (9th Cir. 1991) .................................................................................20

*New York v. Meta Platforms, Inc.*,
    66 F.4th 288 (D.C. Cir. 2023) .................................................................................30

*Newcal Industries, Inc. v. Ikon Office Solution*,
    513 F.3d 1038 (9th Cir. 2008) .................................................................................16

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018) .................................................................................................32

*Osborn v. Visa Inc.*,
    797 F.3d 1057 (D.C. Cir. 2015) ..............................................................................32

*Palmyra Park Hosp. Inc. v. Phoebe Putney Memorial Hosp.*,
    604 F.3d 1291 (11th Cir. 2010) ...............................................................................36

*PhantomALERT v. Apple, Inc.*,
    762 F. Supp. 3d 8 (D.D.C. 2025) ............................................................................34

*Philadelphia Taxi Association, Inc v. Uber Techs., Inc.*,
    886 F.3d 332 (3d Cir. 2018)...............................................................................33, 42

*Sargent-Welch Sci. Co. v. Ventron Corp.*,
    567 F.2d 701 (7th Cir. 1977), *cert. denied*, 439 U.S. 822 (1978).........................37

*Scott v. J.P. Morgan Chase & Co.*,
    296 F. Supp. 3d 98 (D.D.C. 2017) ............................................................................9

*SEIU Health & Welfare Fund v. Philip Morris Inc.*,
    249 F.3d 1068 (D.C. Cir. 2001) ..............................................................................27

*SigmaPharm, Inc. v. Mutual Pharmaceutical Co.*,
    772 F. Supp. 2d 660 (E.D. Pa.), *aff'd*, 454 F. App'x 64 (3d Cir. 2011) ................34

*Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*,
    947 F. Supp. 2d 88 (D.D.C. 2013) ..........................................................................16

*Spartan Grain & Mill Co. v. Ayers*,
    581 F.2d 419 (5th Cir. 1978) ...................................................................................14

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993)............................................................................................40, 41

*Stallard v. Goldman Sachs Grp., Inc.*,
    2024 WL 4903783 (D.D.C. Nov. 27, 2024) .......................................................37

*Tawfilis v. Allergan, Inc.*,
    157 F. Supp. 3d 853 (C.D. Cal. 2015) ..............................................................29

*Teradata Corp. v. SAP SE*,
    124 F.4th 555 (9th Cir. 2024) .....................................................................14, 15

*\*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001)..............................................................................21

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
    142 F.3d 90 (2d Cir. 1998)................................................................................22

*Tremblay v. OpenAI, Inc.*,
    716 F. Supp. 3d 772 (N.D. Cal. 2024) .........................................................44, 45

*Tundra, Inc. v. Faire Wholesale, Inc.*,
    2024 WL 589097 (N.D. Cal. Feb. 13, 2024) .....................................................39

*United States v. Aetna Inc.*,
    240 F. Supp. 3d 1 (D.D.C. 2017).......................................................................18

*United States v. Apple, Inc.*,
    2025 WL 1829127 (D.N.J. June 30, 2025) ........................................................41

*\*United States v. Bertelsmann SE & Co. KGaA*,
    646 F. Supp. 3d 1 (D.D.C. 2022)...........................................................24, 31, 39

*\*United States v. Google LLC ("Google Search")*,
    747 F. Supp. 3d 1 (D.D.C. 2024)................................................................ *passim*

*\*United States v. Google LLC ("Google Ad Tech")*,
    778 F. Supp. 3d 797 (E.D. Va. 2025) ..................................................17, 29, 30, 31

*United States v. Live Nation Ent., Inc.*,
    2025 WL 835961 (S.D.N.Y. Mar. 14, 2025) ......................................................34

*\*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ..................................................................... *passim*

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004).................................................................................3, 29, 30

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020) ......................................................................13, 29

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
   257 F.3d 256 (2d Cir. 2001)...................................................................38

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
   627 F.3d 85 (3d Cir. 2010)....................................................................34

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
   549 U.S. 312 (2007)..............................................................................31

*Yellow Pages Cost Consultants, Inc. v. GTE Directories Corp.*,
   951 F.2d 1158 (9th Cir. 1991) ..............................................................27

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
   395 U.S. 100 (1969).........................................................................26, 27

**Statutes**

Sherman Act, 15 U.S.C. §§ 1 and 2 ..........................................2, 4, 13, 28

**Rules**

Fed. R. Civ. P. 8(a) ......................................................................................9

Fed. R. Civ. P. 10(c) ....................................................................................9

Fed. R. Civ. P. 12(b)(6)...........................................................................15, 16

Fed. R. Civ. P. 15(a)(2)...............................................................................45

**Treatises**

Areeda *et al.*, Antitrust Law ¶ 338a2 (5th ed. 2022)..................................27

**<u>INTRODUCTION</u>**

Google has broken the fundamental bargain of the internet. Before the advent of AI Overviews, Google and Chegg had a de facto agreement: Chegg permitted Google to access Chegg's content for search indexing purposes, and in exchange, Google displayed links to Chegg's website on the search engine results page ("SERP"). This arrangement drove advertisers to Google and search traffic to Chegg. But now Google's SERP provides Chegg's content directly to users through its "AI Overviews." How did Google manage this? Google took, at no cost, Chegg and other publishers' content and now uses it, in many cases, to compete with those publishers. Google presented web publishers with an ultimatum: either allow us to use your content for republishing, training, and grounding, or disappear from the internet. For publishers—like Chegg—whose business is driven by search referral traffic, there is no meaningful choice, because Google has unlawfully monopolized the search market. The only option is to acquiesce to Google's demand.

This Court has already concluded that Google has engaged in unlawful, anticompetitive conduct to maintain its monopoly in general search services. *See United States v. Google LLC* ("*Google Search*"), 747 F. Supp. 3d 1, 187 (D.D.C. 2024). Google's unlawfully maintained search monopoly gives it enormous power to coerce publisher behavior. The mere threat of being cut off from Google's SERP is existential to publishers. If Google chooses to depress a publisher's search traffic, let alone exclude a publisher from search results altogether, the publisher's sales or prospects for growth could dry up overnight.

Anyone reading the news is aware of the harm that Google's use of publisher content to drive AI Overviews has caused and continues to cause.[1] Left unrestrained, it will swallow the

---

[1] *E.g.*, Will McCurdy, *Google Might Not Believe It, But Its AI Summaries Are Bad News for Publishers*, PCMAG (Aug. 17, 2025); Charlotte Tobitt, *UK and US publishers say Google AI is harming website traffic*, PRESS GAZETTE (Aug. 15, 2025); *AI is killing the web. Can anything save it?*, THE ECONOMIST (July 14, 2025) (quoting publishing CEO Neil Vogel: "We had a very positive

market for content created by web publishers. Why would any consumer navigate to Chegg's website for the answer to a question when Google's AI Overviews has already provided the answer using Chegg's own content? Why would any web publisher invest in developing new content if it will be faced with the Hobson's Choice to either permit Google to use its content for all purposes, or not appear in Google's search results? Google's response to these questions is to distort reality. Google asks the Court to ignore Chegg's well-pleaded allegations describing the emerging markets for licensing of content for republishing, generative AI ("GAI") training, and retrieval-augmented generation. In those markets, law-abiding companies competing with one another seek consent to use publishers' content and pay to use that content. In contrast, Google uses its coercive power, developed through its unlawful monopoly over search, to force publishers to provide this content to Google for all uses for free.

Google's conduct is exactly what the antitrust laws are designed to prevent. Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, forbid monopolists to exploit their market power in one market to stifle competition in another market. Chegg's claims are a straightforward application of this well-established principle of competition law.

Chegg is a direct victim of Google's anticompetitive conduct. In a competitive search market, Chegg could choose not to deal with Google and instead rely on traffic from other search engines. But because of Google's exclusion of rivals from the search market, Chegg has no meaningful alternative. *See Google Search*, 747 F. Supp. 3d at 145. Chegg is thus forced to forgo the compensation it would normally receive for licensing its content for GAI purposes. As a direct

---

relationship with Google for a long time… They broke the deal."); Foo Yun Chee, *Google's AI Overviews hit by EU antitrust complaint from independent publishers*, REUTERS (July 4, 2025); Isabella Simonetti & Katherine Blunt, *News Sites Are Getting Crushed by Google's New AI Tools*, WALL ST. J. (June 10, 2025).

result of Google's exploitation of its unlawful monopoly, Chegg suffers an underpayment for its content. Adding injury to injury, Google then uses the content it obtains from Chegg to power its AI Overviews, which directly competes with Chegg by answering user questions on the SERP rather than referring users to Chegg's website, resulting in the loss of subscriber revenue.

At bottom, Google's conditioning of search referral traffic to publishers on Google's ability to use those publishers' content for its AI models is fundamentally an anticompetitive strategy designed to protect Google's monopoly in search. While Google pays nothing for publishers' content because of its monopoly over search traffic, its competitors must pay to obtain that same content. That is not competition on the merits; it is coercive abuse of monopoly power. At the same time, publishers like Chegg that face the threat of having their content regurgitated by Google's AI Overviews have less reason to invest in their own products and services in the first place. Why invest in continued innovation if the content you develop is going to be taken without compensation and used by Google to compete directly with you? That Google's rivals pay for such access while Google does not both (1) disadvantages Google's competitors in challenging Google's entrenched and unlawful monopoly in search and (2) dampens output of new content to support search and other relevant markets.

Google tries to sidestep the obvious unlawfulness of its conduct by miscasting it as a lawful "refusal to deal" with rivals under *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004), or as innocent "product improvement." Mot. 8-11, 29. But these mischaracterizations are willfully blind to Chegg's allegations. Not to mention reality. Chegg's claims are based on the conditions Google has placed on the parties' dealings, not on an alleged refusal to deal with rivals. Nor is Chegg arguing that Google cannot develop GAI products. Rather, Google has no right to leverage its unlawful monopoly in search to coerce Chegg to provide content

to feed Google's GAI products for no compensation. Google's conduct reflects a drastic departure from the parties' past dealings, enabled only by Google's unlawfully maintained market power. Google's arguments to the contrary fundamentally ignore Chegg's core allegations.

Google encourages the Court to use "common sense and the Court's own familiarity with the industry." Mot. 41. On this point, Chegg agrees with Google. Common sense and the Court's familiarity with search and GAI from *Google Search* should demonstrate that Google cannot escape liability for its conduct as a matter of law. Google's motion ignores controlling pleading standards, improperly challenges the truth of—and often ignores—Chegg's factual allegations, and depends on incorrect legal assertions. When Chegg's allegations are properly considered with all factual allegations accepted as true and reasonable inferences made in Chegg's favor, as is required at the pleading stage, Chegg's Amended Complaint ("Complaint") states plausible claims for violations of the Sherman Act and unjust enrichment. Google's motion should be denied.

<u>SUMMARY OF FACTUAL ALLEGATIONS</u>

A.    <u>Chegg's Development of High-Quality Educational Content</u>

Chegg is the leading direct-to-student connected learning platform. Compl. ¶ 23. In 2024, Chegg served millions of subscribers and generated over $617 million in revenue. *Id.* ¶ 28. By providing on-demand, subscription-based educational resources backed by expert support, Chegg works to democratize the learning process. *Id.* ¶¶ 2, 18-20, 23. *Id.* Chegg subscribers overwhelmingly report that Chegg helps them understand their coursework, build confidence before exams, and improve their grades. *Id.* ¶ 25. Chegg's digital content is its most valuable product. *Id.* Over the years, Chegg has invested enormous resources to create a variety of services, including Chegg Study, which provides personalized step-by step learning support backed by a vast, high-quality bank of over 135 million questions and answers across numerous disciplines. *Id.* ¶¶ 2-3, 24-28, 183.

B.     **The "Fundamental Fair Exchange" Between Google and the Web**

Google understands, recognizes, and encourages a "fundamental fair exchange between Google and the web" in which publishers, including Chegg, allow Google to crawl their websites (or push data directly to Google) so that Google can develop its search index. *Id.* ¶ 42; *see also id.* ¶ 35-37. "In Google's words: Google crawls, indexes and links to websites in search results, and each search result includes a short preview of what to expect at the site. Websites gain free traffic from users interested in what they have to offer, and each user visit is an opportunity to build a long-term relationship and monetize through advertising or subscriptions." *Id.* ¶ 42. Through this process, Google supposedly supports "a healthy ecosystem of fresh and useful content . . . by sending visitors to websites small and large through our search results." *Id*. Google has repeatedly reinforced this message over the years. *Id.* ¶¶ 38, 42.

Google pays zero to access publishers' data, but it benefits tremendously from advertising revenue generated as a result of searches built on that data. *Id.* ¶ 173. In 2021, for example, Google booked $146 billion in advertising revenue. *Google Search*, 747 F. Supp. 3d at 32.

C.     **Google Coerces Publishers to Provide Free Content by Exploiting Its Unlawful Monopoly Over Search**

In *Google Search*, this Court found that Google has monopoly power in the market for general search services and that Google unlawfully maintained that monopoly through anticompetitive conduct. Compl. ¶ 47. As this Court explained,

> Measured by query volume, Google enjoys an 89.2% share of the market for general search services, which increases to 94.9% on mobile devices. This overwhelms Bing's share of 5.5% on all queries and 1.3% on mobile, as well as Yahoo's and DDG's shares, which are under 3% regardless of device type.

*Id.* ¶ 49 (quoting *Google Search*, 747 F. Supp. 3d at 119). Google's monopoly power, in turn, has allowed it to extract monopoly rents "by charging supracompetitive prices for general search text

ads." *Id.* ¶ 50 (quoting *Google Search*, 747 F. Supp. 3d at 32).

In the web's "fundamental fair exchange," Google used Chegg's content as "Search Index Data" and published links to Chegg's website on Google's SERP. *Id.* ¶¶ 32-34, 41-42. Google benefited tremendously from this exchange through the receipt of advertising revenue generated as a result of searches built on publisher data—yet paid nothing to access Chegg's content. *Id.* ¶ 173. Chegg allowed Google to access Chegg's content for "free" because Chegg received something of value: search referral traffic that it could convert into subscriptions. *Id.* ¶ 41. Chegg's business depends on this traffic. *Id.* ¶¶ 39-41, 43-46. Referrals from Google's monopoly search engine generate a large portion of revenue that Chegg, in turn, devotes to producing content. *Id.* ¶¶ 3, 29, 39. In 2024, search engine referrals made up 71% of Chegg Study traffic and 60% of new subscriptions to Chegg Study in the United States. *Id.* ¶ 139. The vast majority of Chegg's Search Referral Traffic is generated through Google's SERP. *Id.*

Google's search monopoly gives it control over online distribution in search results for digital publishers and corresponding monopsony power over the input market for search. *Id.* ¶ 52. Monopsony power, or buying power, is the mirror image of monopoly power. *Id.* A monopsonist is a buyer with sufficient market power to control prices in an input market. *Id.* The zero-access fee that Google historically paid for Chegg's content demonstrates Google's monopsony power in the input market for search. *Id.* ¶ 173. As a monopsonist, Google can control the price for Search Index Data—and it has set those prices to zero. *Id.*

Today, Google continues to pay nothing to access Chegg's content but now uses Chegg's content for additional purposes unrelated to search, including republishing directly on the SERP and for training and grounding Google's AI models. *Id.* ¶¶ 77-80, 133-38. Google thus uses Chegg's content both (1) to maintain its search monopoly and (2) to compete against the firms that

supplied the content. *Id.* ¶ 51. The result heaps injury upon injury: Google underpays Chegg for its content (by providing no compensation to Chegg for the use of its content for republishing, training, and grounding) while also reducing the benefits Chegg used to receive under the parties' "fundamental fair exchange" by reducing or even eliminating click-throughs to Chegg's website from would-be subscribers. *Id.* ¶¶ 139-51.

Google achieves this outcome by leveraging its dominance over search referral traffic. As a condition to providing search traffic to publishers, Google requires publishers to acquiesce in Google's use of their content for three purposes unrelated to providing search results. *Id.* ¶ 155. If Chegg (like other publishers) wants to appear in search results, then Google requires Chegg to permit its content to be used for all purposes. *Id.* ¶ 166. In reality, this is a "forced choice" for Chegg and other publishers. *Id.* ¶ 93. Because of Google's dominance in search, Chegg's exclusion from the SERP would be devastating to Chegg's business. *Id.* ¶¶ 93, 146.

*First*, publishers must let Google republish their content directly on the SERP. *Id.* ¶¶ 66.83, 155. The only way for publishers to prevent Google from republishing their content is to use "nosnippets" meta-tag, which prevents snippets of publisher content from being shown in search results. *Id.* ¶ 81. The result is that publishers who use the nosnippets tag to stop Google from republishing content experience an even greater immediate reduction in search referrals compared to permitting republication. *Id.* ¶ 83. Virtually no digital publishers can afford to disallow snippets, because withholding data from Google's search index means demotion on the SERP or disappearing from Google's organic search results entirely. *Id.*

*Second*, publishers must let Google use their content for training GAI models. *Id.* ¶¶ 91-92, 155. Google has trained the models underlying its GAI products using web publishers' content as *inputs*, and separately also uses that content to prompt *outputs* from those products.

Google is thus using publishers' own content to compete against them.

*Third*, publishers must let Google use, repackage, and republish their content via retrieval-augmented generation ("RAG"), also known as "grounding." *Id.* ¶ 155. RAG involves connecting a large language model to external information to improve the model output quality. In basic terms, RAG consists of finding relevant content ("retrieval") and paraphrasing that content using GAI ("generation"). *Id.* ¶¶ 105-06. RAG content appears on Google's SERP, but its purpose is not to facilitate click-throughs; instead, users consume the content directly on the SERP. *Id.*

The only way for publishers to opt out of these training and grounding uses is to block Google's crawlers, which effectively means forgoing search referral traffic. *Id.* ¶ 165. No other search engine or GAI company has sufficient market power to compel publishers to permit access to their content for these purposes for a zero price. *Id.*

### D.    Google's Exploitation of Its Monopoly Power in Search Harms Chegg

Google's misappropriation of Chegg's content diminishes traffic to Chegg's and other publishers' sites and thus threatens the very core of Chegg's business. Google has acknowledged that "[d]irect answers reduce search referral traffic," that this reduction "mostly affect[s] informational queries," and that "direct answers" "reduce referrals to content providers hurting their ability to monetize." *Id.* ¶ 142. Numerous studies have indicated Google's rollout of AI Overviews will diminish search referral traffic. *See id.* ¶ 143 (predicting "a substantial loss of advertising revenue for publishers," with search traffic declines "ranging from 20% to 60%"); *id.* ¶¶ 144-45 (describing other studies finding GAI-assisted search diminishes click-throughs and organic user traffic to websites). Moreover, common sense tells us that users who can obtain Chegg's valuable content through Google's products have no incentive to separately navigate to Chegg's website and purchase subscriptions. *Id.* ¶ 146.

Google's rollout of AI Overviews has increased the prevalence of "zero-click" searches.

As Google has increased its AI Overviews coverage of the types of questions answered on Chegg's site, Chegg has experienced declines in click-through rates to its website. *Id.* ¶ 147. Google's increasing coverage generates less traffic and fewer opportunities for Chegg to convert site visits into paid subscriptions. Comparing U.S. clickstream data for October 2024 versus October 2023 shows that among search terms relevant to Chegg's educational offerings, the percentage of searches where users do not click through to any non-Google site increased by 21% year over year. *Id.* ¶ 148. Another recent study shows that Google's AI Overviews reduce click-through rates by as much as 34.5% for the top organic search result. *Id.* Bain and Company concluded that 60% of Google searches now terminate without the user clicking through to another website. *Id.*

## LEGAL STANDARD

"At this stage, the court must view the allegations in the light most favorable to Plaintiff and draw all reasonable inferences in its favor." *Fotobom Media, Inc. v. Google LLC*, 719 F. Supp. 3d 33, 52 (D.D.C. 2024).[2] "[T]here is no heightened pleading standard in antitrust cases, and the facts alleged are subject to Federal Rule of Civil Procedure 8(a)'s general requirement of a 'short plain statement' of facts supporting a plausible claim." *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 52 (2d Cir. 2016) (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001)).

---

[2] Google's motion improperly relies on facts outside the Complaint. *See* Mot. 6, 7, 25, 35. In support, Google first incorrectly suggests that any "link" "referenced in the Amended Complaint" is incorporated by reference. *Id.* at 6 n.2. But Rule 10(c) authorizes incorporation only of "written instrument[s]" that are "exhibit[s] to a pleading." Fed. R. Civ. P. 10. Neither requirement is satisfied here. Moreover, the D.C. Circuit has explained that incorporation is inappropriate where, as here, a plaintiff "referred to some of [a document's] recitations to show how it learned some facts in the complaint," but "did not purport to and was not required to adopt the factual contents of the [document] wholesale." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1134 (D.C. Cir. 2015). Google's cited case involved incorporation of agreements whose terms formed the basis of the plaintiff's claim and which were submitted to the court and supported by affidavits attesting to their authenticity. *Scott v. J.P. Morgan Chase & Co.*, 296 F. Supp. 3d 98, 106 (D.D.C. 2017) (cited Mot. 6 n.2). Google also seeks judicial notice (by separate motion) of three documents that are not incorporated into the Complaint. Chegg opposes this request for the reasons stated in its Opposition to that request, filed contemporaneously with this memorandum.

## ARGUMENT

## I.    CHEGG ADEQUATELY PLEADS COERCIVE RECIPROCAL DEALING

### A.    The Complaint Alleges Coercive Reciprocal Dealing

Chegg's coercive reciprocal dealing claims are a straightforward application of the doctrinal framework underpinning tying, exclusive dealing, and monopolization cases. While antitrust law allows firms to obtain monopolies as a reward for innovation, it prohibits firms from using a monopoly in one market to suppress competition in a second market. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 14-15 (1984) (use of market power "to impair competition on the merits in another market" may "harm existing competitors or create barriers to entry of new competitors," and "can increase the social costs of market power by facilitating price discrimination"). For this reason, longstanding Supreme Court precedent condemns "reciprocity" as "one of the congeries of anticompetitive practices at which the antitrust laws are aimed." *FTC v. Consol. Foods Corp.*, 380 U.S. 592, 594 (1965). Unlawful coercive dealing occurs where "one party has sufficient market power to unduly influence a second party to treat the first more favorably than the free market would otherwise dictate, and the second party acts in conformity with the reciprocal arrangement." *Key Enters. of Del., Inc. v. Venice Hosp.*, 919 F.2d 1550, 1562 (11th Cir. 1990), *reh'g granted and opinion vacated on other grounds*, 979 F.2d 806 (11th Cir. 1992) (mem.); *see also Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1361 (Fed. Cir. 1999). That is precisely what Chegg alleges here.

By coercing Chegg to supply content for other uses as a condition of being included in its search index, Google is engaged in an unlawful course of reciprocal dealing. The Complaint describes in detail the relevant product markets and the facts alleging Google's coercion. *See* Compl. ¶¶ 152-70. In summary, Google threatens to withhold search referral traffic from Chegg and other publishers (the "tying" product) unless publishers acquiesce to Google using their

content for three purposes that are unrelated to providing search results: republishing, training, and RAG (the "tied" products). *Id.* ¶¶ 152, 155, 166. Publishers cannot "opt out" of providing their content for these purposes. *Id.* ¶ 166. If Chegg (like other publishers) wants to appear in search results, then Google requires Chegg to permit its content to be used for all purposes. *Id.*

This coercive "deal"—the opposite of choice and control—is made possible only by Google's overwhelming monopoly power in search. Google's conditioning of search traffic on the use of Chegg's content for republishing, training, and grounding deprives Chegg of meaningful choice about how its content is used. Chegg's only option is to opt out from Google entirely, which would mean complete elimination from the SERP and its ability to compete in Online Educational Publishing. *Id.* ¶ 146. Such a result would be devastating for Chegg, which generates the bulk of its revenue from search referrals that it converts into subscriptions. *Id.*

In a competitive input market for search, a search engine's ability to demand that web publishers permit the indexing of its content will be limited because publishers could always choose to forgo indexing by one search engine, so long as the publishers could still appear in the results of other search engines. But these competitive pressures disappear if one search engine achieves monopoly power in general search services. And that is what happened. Google achieved monopoly power and then "thwarted true competition by foreclosing its rivals from the most effective channels of search distribution." *Google Search*, 747 F. Supp. 3d at 145. "The result is that consumer use of rival GSEs has been kept below the critical levels necessary to pose a threat to Google's monopoly." *Id.* The coercion element is further supported by the fact that technology companies who lack Google's search market power but wish to compete in search-adjacent GAI-based offerings have had to pay for publisher content. Compl. ¶ 95 (describing licensing deals by OpenAI and Perplexity "in which they pay some publishers" for content use); *id.* ¶ 97

(describing Chegg's content licensing deals with other technology companies); *id.* ¶ 162 (describing OpenAI's partnership with the *Washington Post*).

In response to Chegg's well-pleaded claim for coercive reciprocal dealing, Google at most raises factual disputes about coercion that cannot be resolved on a motion to dismiss. Google first argues that it has not "promised to deliver" any search referral traffic. Mot. 9. But this simply disputes Chegg's well-pleaded factual allegations, which allege an implicit and longstanding agreement in which publishers permit Google to crawl and index their content in exchange for search referral traffic. *See* Compl. ¶ 38 (Google claims publishers who contribute high quality content are rewarded with search traffic); *id.* ¶ 42 (Google describing "fundamental fair exchange between Google and the web"); *id.* ¶ 93 (Google discussing "web ecosystem"); *id.* ¶ 172 (Chegg would never have granted Google free access to index Chegg's content absent Google's implicit promise to deliver search referral traffic).

Google also misleadingly characterizes search referral traffic as a "free service," and incorrectly claims that Courts have "uniformly held that there can be no coercion for 'acceptance of a free service.'" Mot. 19 (citation omitted). Search referral traffic is not "free." Chegg must provide its content to receive the traffic. Compl. ¶ 166. Google's cited cases were dismissed because the plaintiffs failed to allege coercion, not simply because the product at issue was nominally free. *Athos Overseas, Ltd. v. Youtube, Inc.*, 2022 WL 910272, *3 (S.D. Fla. Mar. 29, 2022) ("Plaintiff was not 'forced' to buy [the allegedly tied product]."); *Dream Big Media Inc. v. Alphabet Inc.*, 2022 WL 16579322, *4 (N.D. Cal. Nov. 1, 2022) ("Plaintiffs do not allege what Google products they were forced to purchase . . . .").

Google's assertion that Chegg could elect not to be indexed and thus avoid having its content used for republishing, training, and grounding reflects a false choice. *See* Mot. 19. If Chegg

refuses to permit Google to use its content for all purposes, Chegg risks never being discovered by consumers and cedes that competitive ground to Chegg's publishing rivals. *See* Compl. ¶ 139 (in 2024, search engine referrals made up 71% of Chegg Study traffic and 60% of new subscriptions to Chegg Study, and the vast majority of this traffic is generated through Google's SERP); *id.* ¶ 83 (explaining that "Google's SERP is an essential means of generating traffic and revenue for digital publishers"); *id.* ¶ 146 ("opt[ing] out entirely" "would be devastating for Chegg"). That Chegg has been forced to deal with Google on penalty of financial harm is evidence of coercion. *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 473 (7th Cir. 2020) (plaintiffs' "ultimate decisions, after much financial pain," to deal with monopolist "d[id] not disprove an illegal tie").

Google's argument that Chegg's injuries are caused by "vigorous competition from other web publishers" fails for similar reasons.[3] Mot. 20. In effect, Google argues that because it has successfully coerced other publishers to accept its onerous terms, Chegg has no claim. That is not the law. Indeed, it is this very agreement that Google has imposed across the publishing industry that forms the "combination … in restraint of trade," the very basis of Chegg's Section 1 claim. 15 U.S.C. § 1. Publishers' forced decision to accede to Google's monopolistic demands is not competition on the merits and is not a voluntary exchange. It has nothing to do with the quality or price of any publisher's content, and everything to do with the scope of Google's unlawful abuse of its monopoly power. That is not competition, it is coercion.

Fundamentally, Google disputes Chegg's factual allegations of coercion. But at this stage, the Court must assume the truth of Chegg's well-pleaded allegations and draw reasonable inferences in Chegg's favor. *See In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346,

---

[3] Google's citation to *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 336 (1990) (cited Mot. 20), is unavailing. That case stands for the ordinary proposition that antitrust injury must be attributable to the defendant's anticompetitive conduct.

369 (S.D.N.Y. 2022) (at motion to dismiss stage, rejecting Google's counterargument that alleged coercion was instead "technological innovation").

### 1.    Chegg's Claims Qualify for Per Se Treatment

Coercive reciprocal dealing claims are analytically similar to tying claims, which have often received per se treatment. *Betaseed, Inc. v. U & I Inc.*, 681 F.2d 1203, 1216-17 (9th Cir. 1982) (concluding that tying and coercive reciprocity both involve using economic power in one market to restrict competition in another market, so both should be subject to per se standard); *see also Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 511 (3d Cir. 1998) (applying tying concepts to coercive reciprocal dealing claim). In a tying claim, a party exploits its market power over a "tying" product to require purchasers to also purchase a "tied" product. *Jefferson Parish*, 466 U.S. at 12; *see also Teradata Corp. v. SAP SE*, 124 F.4th 555, 564–65 (9th Cir. 2024) (tying arrangements allow sellers "to leverage" power in one market "and thereby extend its market power to the tied product market") (cleaned up). Both types of anticompetitive conduct involve a party's leveraging of its market power to force another party to purchase from or sell to it, thus gaining competitive advantage from market power rather than competitive merit. *See Spartan Grain & Mill Co. v. Ayers*, 581 F.2d 419, 424 (5th Cir. 1978); *Betaseed*, 681 F.2d at 1220.

Tying arrangements are per se unlawful if "(1) the defendant has market power in the tying product market, and (2) the tying arrangement affects a not insubstantial volume of commerce in the tied product market." *Teradata*, 124 F.4th at 572 (citation and quotation omitted); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 85 (D.C. Cir. 2001) (identifying elements of per se tying claim). Both elements are satisfied here. *First*, Google has market power in the tying product market. *See* Compl. ¶ 49 ("Google enjoys an 89.2% share of the market for general search services" measured by query volume). *Second*, Google's coercive reciprocal dealing arrangement affects a not insubstantial amount of commerce: Chegg's own commercial agreements to license its content,

on a non-exclusive basis, generated over $11 million in revenue during the first half of 2025 alone. *Id.* ¶ 179; *see, e.g.*, *Fortner Enterprises, Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 502 (1969) ($200,000 was substantial commerce). The total amount of commerce affected is far greater factoring in the value of content that Google has misappropriated from other publishers. Compl. ¶ 170; *see id.* ¶¶ 98, 179 (alleging that several publishers' commercial agreements with OpenAI were ballparked at "tens of millions" of dollars).

Google suggests that per se treatment should be denied because courts lack experience with coercive reciprocal dealing claims. Mot. 12. But courts have ample experience with tying claims, which Google acknowledges bear significant analytical similarity to coercive reciprocal dealing claims. Moreover, Google does not, and cannot, explain why the coercive use of its illegally maintained monopoly power to force Chegg into providing content for zero compensation could ever be considered procompetitive. *Cf. Teradata*, 124 F.4th at 573 ("'[I]t is far too late in the history of our antitrust jurisprudence to question the proposition that certain tying arrangements'— those in which a seller uses its tying-market power to capture a non-de minimis volume of commerce—'are unreasonable per se.'" (quoting *Jefferson Parish*, 466 U.S. at 9)).

### 2.    Chegg's Allegations Also Satisfy the Rule-of-Reason Standard

The Court need not decide between per se or rule-of-reason analysis now, because Chegg adequately alleges that Google's conduct is unlawful under a rule of reason theory as well. *Fotobom*, 719 F. Supp. 3d at 51; *see also In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1122 (N.D. Cal. 2012) ("more appropriate" to decide between per se standard and rule of reason "on a motion for summary judgment"). Google's arguments otherwise should be rejected.

Under the rule of reason, conduct is unlawful "if it has the 'net effect' of substantially impeding competition." *Fotobom*, 719 F. Supp. 3d at 50 (citation omitted). This question is usually one of fact and "often beyond the scope of a Rule 12(b)(6) inquiry." *Id.* (citation omitted) "[A]t

the motion to dismiss stage," a plaintiff need only "sketch the outline of the injury to competition with allegations of supporting factual detail" and "plead an injury to competition beyond the impact on the plaintiffs themselves." *Id.* (citations omitted). The Complaint meets this standard.

Google's conduct has substantial anticompetitive effects, including imposition of sub-competitive prices in the input market for search and the markets for Republishing Content, GAI Training Content, and RAG Content, Compl. ¶¶ 65, 155, 189; restricted competition in the Online Educational Publishing market, *id.* ¶¶ 169, 190; reduced quality and quantity of output in the Online Educational Publishing market, *id.* ¶¶ 149-51, 169-70, 190; and the elimination of choice among market participants, *id.* ¶ 146. As the Complaint explains, "[t]he effects of the output restriction attributable to Google's reciprocal dealing" "affect billions of dollars of digital publisher investment in content" and "undermines the public's ability to gain access to original content and information." *Id.* ¶ 170.

### B.        Chegg Adequately Alleges the Relevant Markets

Google's market-definition arguments overstate the requirements for defining plausible markets at the pleading stage and mischaracterize Chegg's Complaint. A plaintiff need not plead a market "with specificity," and a proposed market definition will "survive a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect." *Newcal Industries, Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008). No "economically technical recitation of the market boundaries" is required. *Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*, 947 F. Supp. 2d 88, 103 (D.D.C. 2013). Moreover, "[a]ccording to *Brown Shoe* [*Co. v. United States*, 370 U.S. 294, 325 (1962)], the boundaries of a product market may be determined by examining such practical indicia as industry or public recognition, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *FTC v. Sysco Corp.*, 113 F. Supp.

3d 1, 27 (D.D.C. 2015) (cleaned up).[4] The analysis "should be grounded in commercial realities, and involves a pragmatic, factual analysis, not a formal, legalistic one." *United States v. Google LLC* ("*Google Ad Tech*"), 778 F. Supp. 3d 797, 833 (E.D. Va. 2025) (cleaned up). Ultimately, market definition is generally a fact-driven empirical question not amenable to resolution on a motion to dismiss. *Am. President Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209, 222 (D.D.C. 2022). As demonstrated below, the Complaint satisfies the proper legal standards.

### 1. Chegg Adequately Alleges a "Tying" Market for Search Referral Traffic

Google claims that Chegg fails to plausibly allege why other forms of referrals or distribution are not reasonable substitutes for search referral traffic. Mot. 15-16. But at the pleading stage, Chegg need only explain why obvious substitutes are unreasonable; it "is not required to anticipate and refute in its complaint all possible market substitutes." *Jamsports & Ent., LLC. v. Paradama Prods., Inc.*, 2003 WL 1873563, at *6 (N.D. Ill. Apr. 15, 2003). The Complaint meets this requirement.

The Complaint explains why social media and direct navigation are not reasonable substitutes for search referral traffic. *See* Compl. ¶¶ 40, 153. As this Court has explained, "unlike [social media]," general search engines (GSEs) like Google "are a gateway to the World Wide Web." *Google Search*, 747 F. Supp. 3d at 110. "Search on a GSE therefore is not constrained by subject matter, inventory, or query type." *Id.* In contrast, social media sites "are 'walled gardens,'" and "only yield results from profiles on the platform and do not display web links to external site." *Id.* Nor can direct navigation to websites viably substitute for search referral traffic, because "[d]irect navigation requires the user to know both a publisher's specific URL and that the

---

[4] Relevant markets "can exist even if only some of the[] [*Brown Shoe*] factors are present." *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1075 (D.D.C. 1997).

publisher offers relevant content." Compl. ¶ 153.

Even if social media traffic or direct navigation share some commonality with search referral traffic, that would not establish that those referral forms compete in the same market as Google. *See Sysco*, 113 F. Supp. 3d at 30-31. The existence of weak substitutes that may be "functionally interchangeable does not compel a finding that they belong in the same market," *In re Lorazepam & Clorazepate Antitrust Litig.*, 467 F. Supp. 2d 74, 81 (D.D.C. 2006), because the "key question" is whether "substitution to one [product] could constrain any anticompetitive pricing in the other," *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 20 (D.D.C. 2017) (alteration omitted); *see also Staples*, 970 F. Supp. at 1074-75 (distinguishing functional interchangeability from responsiveness of one product's sales to the price changes of another product). Social media and the like could not replace the drastic reduction in traffic to a publisher's website if a publisher opted to only engage with social media or GAI platforms to the exclusion of Google. As Chegg has alleged, it cannot substitute anything for Google's search services, which forces Chegg to provide its content for Google's GAI offerings. *See* Compl. ¶ 83 ("virtually no digital publishers can afford" to opt out of republishing); *id.* ¶ 95 (Google has obtained content for use in GAI products for free, while other technology companies have had to pay publishers for these uses); *id.* ¶ 96 (ChatGPT Head of Product "testified that OpenAI lacks the 'leverage' that Google has 'over the ecosystem' because [ChatGPT] provide[s] less traffic to publishers").

The search referral traffic market is further supported by *Brown Shoe* "practical indicia."

***Peculiar characteristics and uses.*** Search referral traffic serves a particular function: it connects a user with a search query to a web publisher with the information that can answer that query. Compl. ¶ 30. That is why Google early on emphasized that "our goal is to have people leave our website as quickly as possible." *Id.* During the Google Search remedies phase, OpenAI's Head

of Product for Chat GPT recognized the distinct role of search traffic when he explained that Google has "leverage" over the web ecosystem because it provides "traffic" to publishers. *Id.* ¶ 96.

**Industry and public recognition.** The Complaint details numerous examples of industry recognition of search referral traffic as a distinct product. *See id.* ¶ 143 (describing industry analyses of Search Generative Experience's effect on traffic); *id.* ¶¶ 72, 77, 144 (discussing data and studies on click-through rates). Google itself has also recognized search referral traffic as a distinct product. *See id.* ¶ 142 (Google engineer explained how "direct answers" to queries "reduce search referral traffic"); *id.* ¶¶ 125-26 (explaining that AI Overviews eliminate the need for users to click through to websites for answers).

**Distinct customers.** Search referral traffic has distinct customers: web publishers. "Users seeking answers to their search queries click on search results to visit a web publisher's site." *Id.* ¶ 32. This "search referral traffic" allows publishers to reach users interested in their content. *Id.*

**Unique production facilities.** As this Court explained in *Google Search*, "if Google's search quality substantially degraded, whether purposely or through neglect," social media and direct navigation could not simply "shift resources to put out a product that resembles" search referral traffic. *Google Search*, 747 F. Supp. 3d at 113. The Complaint details how, in order to provide search referral traffic, search engines must crawl publisher sites (or publishers must push their information to the search engine) to index the site's information. *See* Compl. ¶¶ 34-37. Unlike other companies' crawlers, Google's web crawlers have been largely free to index the web, likely because of Google's position as the most popular search engine. *Id.* ¶ 111.  In sum, this is "not one of the relatively rare cases of a glaring deficiency in the market-definition pleadings that renders dismissal at the 12(b)(6) stage appropriate." *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 16-17 (D.D.C. 2021) (quotation omitted).

Google argues that there cannot be an antitrust market for search referral traffic because "Google does not sell 'Search Referral Traffic' to publishers." Mot. 14. But there is no "categorical rule that an antitrust market can *never* relate to a product that is not licensed or sold." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 978 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 (2024); *see also Arcell v. Google LLC*, 744 F. Supp. 3d 924, 931-32 (N.D. Cal. 2024) (rejecting "Google's sweeping claim" that plaintiffs "can never suffer antitrust injury" "from the use of products . . . that do not charge a fee"). Crucially, such a rule would "overlook[] that there may be markets where companies offer a product to one side of the market for free but profit in other ways, such as by collecting consumer data or generating ad revenue." *Epic Games*, 67 F.4th at 978. Numerous courts, including this one, have found markets for nominally "free" products. *See, e.g.*, *Google Search*, 747 F. Supp. 3d at 110 ("general search services is a relevant product market" despite fact that "general search is a free product").

Google's cited cases, which were decided after full discovery, are not to the contrary. *See* Mot. 15 (citing *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1486 (9th Cir. 1991) and *Flegel v. Christian Hosp., Ne.-Nw.*, 4 F.3d 682, 688 (8th Cir. 1993)). In *Morgan*, there was a near-total lack of market analysis, with the court lamenting that "[n]one of the parties seems much concerned with what exactly the product is, or who the purchasers are." 924 F.2d at 1489 n.4. The court found no record evidence that referrals were sold, *id.* at 1489, whereas Chegg alleges that Google monetizes search referral traffic through the sale of advertisements, Compl. ¶¶ 31, 173. In *Flegal*, the Court similarly found that "none of the evidence plaintiffs presented support[ed] [their] market definition." 4 F.3d at 691. Neither case supports dismissal here.

### 2.  Chegg Adequately Alleges the Corresponding Input Market

Google is a monopsonist in the corresponding input market for search referral traffic. "At a very basic level, the input market is the supply side of the equation." *Le v. Zuffa, LLC*, 2023 WL

5085064, at *16 (D. Nev. Aug. 9, 2023). In this input market, web publishers contribute their websites' data to Google's search index so that Google can use that content to generate search results. Compl. ¶¶ 32-34, 93, 171. The Complaint refers to data contributed by web publishers to a search engine for search purposes as "Search Index Data." *Id.*

Google claims other buyers should be included in the input market, Mot. 17, but there are no buyers for Search Index Data who are reasonably interchangeable with Google. *See Todd*, 275 F.3d at 202 (in evaluating monopsony power, market "is comprised of buyers who are seen by sellers as being reasonably good substitutes" (quotation omitted)). Google's suggestion that Chegg could sell its content to competitive fringe search platforms is irrelevant. None of those platforms could provide the traffic that Google has historically provided, so they do not exert competitive pressure on prices in the input market. In short, there is no "sufficiently viable . . . alternative[]" "to defeat [Google's] exercise of monopsony power." *Zuffa*, 2023 WL 5085064, at *16 n.25.

Google also challenges the input market definition because Chegg's "sale" of Search Index Data to Google does not preclude Chegg from licensing its content for other purposes. Mot. 16. But products are reasonably interchangeable only if they "can be used for the *same* purpose." *Staples*, 970 F. Supp. at 1074 (emphasis added) (quotation omitted). Content licensed for one purpose is restricted to that use; it is not reasonably interchangeable with products licensed for other purposes. To take Google's example, *see* Mot. 16, the price Chegg Study customers are willing to pay for Chegg's content does not constrain the price Google pays for Search Index Data. *See Todd*, 275 F.3d at 203-06 (possibility that oil and petrochemical industry professionals could obtain employment in other industries did not disprove industry-specific market at pleading stage).

Chegg adequately alleges Google's monopsony power in the input market. Google has "the power to control prices" for Search Index Data, as demonstrated by the fact that it obtains Chegg

and other web publishers' content for a zero access fee. *Microsoft*, 253 F.3d at 51; *see also Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 98 (2d Cir. 1998) (market power "may be proven directly by evidence of the control of prices"). Moreover, Chegg alleges that Google continues to pay the same zero access fee and has reduced the amount of search referral traffic it provides, but receives more benefits: Google receives Search Index Data *and* Republishing Content, GAI Training Content, and RAG Content. Google has in effect driven prices in the input market down even further, by offering fewer click-throughs to publishers and receiving greater benefits. *See* Compl. ¶¶ 72, 77, 93, 95, 97-98, 140-44. This is strong evidence of Google's monopsony power.

### 3.    Chegg Adequately Alleges the "Tied" Markets

Chegg's Complaint properly defines markets for Republishing Content, GAI Training Content, and RAG Content. Compl. ¶¶ 155-163. The allegations supporting these markets are straightforward because the markets' boundaries are easily discernable using the *Brown Shoe* indicia, as described below.

*Peculiar characteristics and uses; pricing.* Republishing, GAI Training, and RAG each refer to specific uses of content by large language models (LLMs). *Id.* ¶ 99. Republishing refers to the copying and publishing of existing content. *Id.* ¶ 156. Training content is used to teach an LLM to take a seed input (e.g., a question or prompt) and iteratively predict the most likely next word based on the patterns it has learned. *Id.* ¶¶ 99-103. RAG Content is used to "ground" an LLM model with external sources of information in order to improve its output quality. *Id.* ¶¶ 105-06. Each of these use cases has independent value and has independent pricing. *Id.* ¶¶ 161-62.

*Industry and public recognition.* Public reporting has recognized the existence of these AI content markets, while noting they are "opaque" because participating companies generally do not disclose details of their content licensing agreements. *Id.* ¶ 160. Courts too have recognized evidence of emerging AI content-licensing markets. *See, e.g., In re Mosaic LLM Litig.*, 2025 WL

2294910, at *4 (N.D. Cal. Aug. 8, 2025) (Cisneros, M.J.) (discussing discovery related to "market for licensing for AI-training purposes").

***Distinct customers.*** The customers for Republishing Content, Training Content, and RAG Content are technology companies that deploy LLMs. *See id.* ¶ 161 (describing Perplexity's licensing program); *id.* ¶ 162 (describing OpenAI's partnership with the *Washington Post*).

Notably, Google insists that Chegg's allegations regarding the markets for Republishing, GAI Training, and RAG Content are insufficient, but it nowhere suggests that Chegg has defined these markets too broadly or narrowly. Mot. 17-18. Instead, Google erroneously argues that the fact that the same content can in some instances be licensed for multiple uses somehow defeats the existence of distinct product markets for Republishing, GAI Training, and RAG Content. Mot. 17-18. But as explained above, products are not interchangeable unless they can be "used for the same purpose." *Staples*, 970 F. Supp. at 1074 (quotation omitted). Content can be licensed for republishing, training, or grounding, a combination of those uses, or none of those uses. *See* Compl. ¶¶ 155-58. Granting permission to use content for one use does not confer the right to use content for other purposes, so these products are not interchangeable.

In any event, even if Republishing, GAI Training, and RAG Content could be considered as a single product market, that would not affect the analysis of Chegg's claim. The competitive harm underlying a coercive reciprocal dealing claims centers on the seller's ability to leverage its economic power in the tying market to exercise buying power in a second, tied, market rather than compete on the merits in the second market. Whether defined as a single GAI content licensing market, or separate markets, Chegg plausibly alleges that Google is using its monopoly power in search to invade a second market and avoid competing on the merits there. That is sufficient to define a market for coercive reciprocal dealing at the pleading stage.

### C.    Chegg Has Antitrust Standing for Its Coercive Reciprocal Dealing Claims

The antitrust standing inquiry "asks whether the plaintiff is a proper party to bring a private antitrust action." *Fotobom*, 719 F. Supp. 3d at 43 (cleaned up). Plaintiffs who are "participant[s] in the relevant market and suffered [] injury in the market where competition is being restrained" have antitrust standing. *Id.* at 44 (same). Chegg alleges that Google's coercive reciprocal dealing results in an underpayment to Chegg for access to its content and reduced search referral traffic leading to fewer subscribers. In response to Chegg's well-pleaded allegations of harm, Google does not identify another plaintiff who is better situated to challenge Google's unlawful conduct. Instead, Google prematurely raises potential factual disputes about the effects of its conduct.

### 1.    Chegg Is Harmed By Google Underpaying For Chegg's Content

Google's coercive reciprocal dealing results in an underpayment to Chegg. Compl. ¶ 65. Google uses its unlawful market power as the monopolist provider of search referral traffic to coerce Chegg into permitting Google to republish Chegg's content in AI Overviews, and to use Chegg's content for training and grounding its AI models. *Id.* ¶ 146. The effect is an underpayment to Chegg: Google continues to pay a zero access price, but uses Chegg's content not just for search indexing, but also for republishing, and training and grounding Google's own AI models. At the same time, this coercive "deal" reduces click-throughs to Chegg. In a market that Google had not unlawfully monopolized, Chegg would earn money from licensing its content for republishing, training, and grounding. Google's exploitation of its market power to depress compensation to Chegg is an antitrust injury. *See Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988-89 (9th Cir. 2000) (where suppliers are paid less than the prices that would prevail in competitive market, they suffer antitrust injury); *United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 24-25 (D.D.C. 2022) ("monopsony" is "a market condition where a buyer with too much

market power can lower prices or otherwise harm sellers").[5]

Google argues that "a legitimate buyer is entitled to use its market power to keep prices down," Mot. 24 (quoting *Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922, 929 (1st Cir. 1984)), but Google is not a legitimate buyer. It has already been found to have unlawfully maintained its monopoly over general search services. *See* Compl. ¶ 177; *Google Search*, 747 F. Supp. 3d at 187-88. The Complaint alleges that Google is engaged in coercive, not legitimate, buying. This distinguishes *Kartell*, 749 F.2d at 929. Unlike Google in this case, the defendant in *Kartell* (which was decided after a 37-day trial), was found to be a "lawful monopolist" engaged in "nonpredatory" pricing. *Id.* at 928, 929; *see also Kartell v. Blue Shield of Massachusetts, Inc.*, 582 F. Supp. 734, 736 (D. Mass.). Also unlike this case, *Kartell* involved no allegations of "the single harm most likely to accompany the existence of market power on the buying side of the market, namely lower seller output." 749 F.2d at 927. In contrast, Chegg alleges that "the output restriction attributable to Google's reciprocal dealing" "affect[s] billions of dollars of digital publisher investment in content," and "undermines the public's ability to gain access to original content and information." Compl. ¶ 170; *see also id.* ¶ 190 (publishers have been forced to lay off staff and reduce output and quality of content).

Contrary to Google's arguments, Chegg need not show that Google excluded other potential buyers of Chegg's content, or that Google prevented Chegg from entering into nonexclusive licensing agreements. Mot. 24. It is sufficient for Chegg to allege that Google has

---

[5] Underpinning this injury is the denial of free choice. Google's "coercive activity" "prevents [Chegg] from making free choices between market alternatives," including to deny Google access to its content, or grant an exclusive republishing, training, or grounding license to another party. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 (1983); *see also Amarel v. Connell*, 102 F.3d 1494, 1510 (9th Cir. 1996), *as amended* (Jan. 15, 1997).

leveraged its unlawful monopoly in general search services and its corresponding monopsony in the input market for general search services in order to degrade the terms on which Google obtains Chegg's content for republishing, training, and grounding. *See FTC v. Meta Platforms, Inc.*, 775 F. Supp. 3d 16, 55 (D.D.C. 2024) ("[A]n anticompetitive effect is anything that 'has a substantial effect in protecting a firm's market power, and does so through a means other than competition on the merits.'" (quoting *Microsoft*, 253 F.3d at 62) (alteration omitted)).

## 2.    Chegg Is Harmed By Reduced Search Referral Traffic and Resulting Lost Subscription Revenue

Chegg has also lost subscription revenues as a result of Google diverting traffic from its website. Compl. ¶¶ 146, 194. This is another antitrust injury.

Google speculates that Chegg's diminished click-throughs and resulting diminished subscription revenues were caused by other GAI products. Mot. 24-25. This is a factual question not amenable to resolution on a motion to dismiss. As Google's own cited case explains, the Court must "liberally construe the complaint in the plaintiff's favor and grant the plaintiff the benefit of all inferences that can be derived from the facts alleged." *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 805 (D.C. Cir. 2001). Google's argument sidesteps this fundamental rule and asks the Court to instead draw inferences in Google's favor.

Google incorrectly suggests that *Andrx* requires Chegg to establish that its injury is not "attributable to other causes." Mot. 23.[6] But Google omits *Andrx*'s very next sentence, which clarifies that "a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury." 256 F.3d at 808 (quoting *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 114 n.9 (1969)). No authority supports Google's argument that antitrust

---

[6] Google also cites *Johnson v. Commission on Presidential Debates*, 869 F.3d 976 (D.C. Cir. 2017) (cited Mot. 23), but that case is inapposite. In *Johnson*, the plaintiff alleged injury to only "a single competitor" and "most important" the injury was political, not economic. *Id.* at 983.

plaintiffs must make a heightened causation showing ruling out all other possible causes of injury, especially at the pleading stage. *See Yellow Pages Cost Consultants, Inc. v. GTE Directories Corp.*, 951 F.2d 1158, 1163 (9th Cir. 1991) (antitrust plaintiffs "need not negative all possible alternative explanations for his decline in profits"). Under controlling precedent, "[i]t is enough that the illegality is shown to be a material cause of the injury." *Zenith Radio*, 395 U.S. at 114 n.9; Areeda *et al.*, Antitrust Law ¶ 338a2 (5th ed. 2022) (violation can be "'substantial' cause" "even if other factors" "aggregate to a more substantial cause"). The Complaint meets that standard.

Google's citations to *City of Oakland v. Oakland Raiders*, 20 F.4th 441 (9th Cir. 2021), and *SEIU Health & Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068 (D.C. Cir. 2001) (cited Mot. 25), only serve to highlight the direct causal chain from Google's conduct to Chegg's injury. Chegg and Google deal directly with each other. In contrast, the plaintiffs in those cases had no dealings at all with the defendants. *See Oakland*, 20 F.4th at 459 ("Nonpurchasers who are priced out of the market . . . present a special problem, due to the speculative nature of the harm."); *In re Lorazepam & Clorazepate Antitrust Litig.*, 295 F. Supp. 2d 30, 42 (D.D.C. 2003) (explaining that plaintiff health trusts in *Philip Morris* sought to recover for injuries to their members, so their claims were "*derivative* of the harm suffered by smokers"). This case does not involve any similarly attenuated causal chains. Chegg's injury is a direct, not derivative, result of its dealings with Google.

Google finally argues that Chegg's lost subscription revenue cannot confer antitrust standing because this injury is supposedly suffered in the market for search referral traffic, not the tied markets for Republishing, GAI Training, or RAG Content. Mot. 25-26. Chegg has antitrust standing based on Google's underpayment for its content, so the Court need not reach this issue. But if the Court elects to engage further on this issue, Google's argument misunderstands how the

"same market" requirement applies to Chegg's reciprocal dealing claim. In this case, Chegg suffers harm in *both* the tying and tied markets. This is because Google leverages its control over search referral traffic to demand publisher content for free, and Google's use of that content in its GAI offerings forecloses Chegg from competing for clicks on the SERP.

### 3. Google's Product Improvement Arguments At Most Raise Fact Disputes

Google's argument that its alleged conduct is not exclusionary and is instead procompetitive product improvement, *see* Mot. 28-29, ignores the core of Chegg's allegations. Contrary to Google's arguments, Chegg is not alleging that Google's GAI products standing alone violate the Sherman Act. Rather, Chegg alleges that Google's use of its monopoly power to coerce Chegg into providing the content needed to power those products is an abuse of Google's monopoly power. *See 2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*, 342 F. Supp. 3d 126, 138 (D.D.C. 2018) ("[T]he use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful."). Google has fundamentally changed the terms of the parties' original bargain. And the only reason Google was able to unilaterally force this change on Chegg was because of its monopoly power in general search services and its corresponding monopsony power as "buyer" of content for search.

Google's argument that product improvement is per se lawful misstates the law. "[C]hanges in product design *are not immune from antitrust scrutiny* and in certain cases may constitute an unlawful means of maintaining a monopoly under Section 2." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998 (9th Cir. 2010) (emphasis added). In *Allied Orthopedic*, the Ninth Circuit expressly acknowledged that an improved product design alone is unlawful if "the monopolist abuses or leverages its monopoly power in some other way when introducing the product." 592 F.3d at 1000. In *U.S. v. Microsoft*, the D.C. Circuit similarly

found that Microsoft's product design choices "constitute[d] exclusionary conduct." 253 F.3d at 67. At most, Google's product-improvement argument raises a fact dispute that is not susceptible to resolution at this stage. *See In re Google Digital Advert. Antitrust Litig.*, 2024 WL 988966, at *6 (S.D.N.Y. Mar. 7, 2024) (rejecting Google's argument that its "transition from Flash to HTML5" "was merely a product redesign that should not give rise to antitrust liability" as "beyond the four corners of the Complaint"); *Tawfilis v. Allergan, Inc.*, 157 F. Supp. 3d 853, 864 (C.D. Cal. 2015) (argument that allegedly anticompetitive licensing agreement was "procompetitive" "at most raised factual issues that are inappropriate to resolve at [12(b)(6)] stage").

### D.  Refusal-To-Deal Doctrine Is Inapplicable

Google distorts Chegg's allegations in an attempt to recast them as "lawful refusal to deal" conduct. Mot. 8-11 (citing *Trinko*, 540 U.S. 398). But Courts are careful to limit *Trinko*'s refusal-to-deal analysis only to true refusals to deal with rivals, and not "more direct interference" with competition, such as tying or abuse of monopoly power. *See Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1173 (10th Cir. 2023) (district court erred by applying refusal-to-deal framework rather than looking to market reality and "practical effect of [monopolist's] conduct"). As Judge Brinkema recently explained in *Google Ad Tech* (rejecting a near-identical argument by Google), even if certain anticompetitive conduct "can be conceptualized as a 'conditional refusal to deal,' that does not mean it should be assessed as a 'simple refusal to deal' with rivals" under *Trinko*. 778 F. Supp. 3d at 867 (alterations omitted) (quoting *Viamedia*, 951 F.3d at 453). "That is why a tying claim 'does not fail as a matter of law simply because it was implemented by refusing to deal with an intermediary.'" *Id.* (quoting *Viamedia*, 951 F.3d at 453). After years of providing Chegg with search referral traffic in exchange for Chegg providing its content for indexing, Google is now using its unlawful monopoly power over search to coerce Chegg to provide its content to

Google for free for all purposes—and then using that content to develop products that reduce traffic to Chegg. That is coercive reciprocal dealing, not a refusal to deal.

*Trinko* is also distinguishable because "[u]nlike in *Trinko*, Google's [search] business has not operated in a highly regulated industry . . . . [T]here is no industry-specific 'regulatory structure designed to deter and remedy anticompetitive harm' or otherwise 'perform the antitrust function.'" *Google Ad Tech*, 778 F. Supp. 3d at 867 (alteration omitted) (quoting *Trinko*, 540 U.S. at 412). Moreover, in this context Chegg is an input provider to Google's search, not a horizontal rival.

Even if Google's conditioning of search referral traffic on Chegg providing its content for all purposes could somehow be characterized as a *Trinko* refusal to deal, Google would still be liable. An "exception" to *Trinko*'s refusal-to-deal doctrine exists where a plaintiff alleges that "before the defendant refused its competitors access the defendant voluntarily engaged in a course of dealing with its rivals." *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 305 (D.C. Cir. 2023) (discussing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)). The Complaint alleges an extended course of dealing in which Google repeatedly solicited web publishers to provide content for search, then unilaterally revised the deal's terms to Google's benefit. *See* Compl. ¶ 42 (quoting Google's description of its deal with web publishers); *id.* ¶ 93 (quoting internal Google documents discussing the "web ecosystem"); *id.* ¶ 96 (quoting ChatGPT Head of Product describing Google's "leverage" "over the ecosystem" because it provides "traffic to publishers"); ¶ 142 (quoting Google engineer discussing the effects of GAI on "web and search ecosystems"). Google's unilateral degradation of the parties' deal is anticompetitive because it forces Chegg to choose between acquiescence and exclusion. Google cannot hide behind *Trinko*'s refusal-to-deal doctrine to escape liability.

II.    **CHEGG ADEQUATELY PLEADS UNLAWFUL MONOPOLY MAINTENANCE**

A.    **The Complaint Alleges the Elements of Monopoly Maintenance**

"The offense of monopoly under § 2 . . . has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992). The second element, anticompetitive conduct, "is the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Id.* at 482-83 (quotation omitted). "*Microsoft* holds that anticompetitive conduct by a monopolist is simply conduct that maintains or expands its monopoly other than through competition on the merits." *FTC v. Meta*, 775 F. Supp. 3d at 54-55. Chegg adequately alleges both elements. *See* Compl. ¶¶ 171-78.

As to market power, Chegg alleges Google's monopoly in search and monopsony in the input market for search.[7] *See supra* at 17-22. As to anticompetitive conduct, Chegg alleges that Google has ratcheted up the abuse of its market power by forcing Chegg to allow its content to be used to generate AI Overviews, including through republishing, training, and RAG. Compl. ¶¶ 171-78. This type of coercion is anticompetitive conduct. *See Google Ad Tech*, 778 F. Supp. 3d at 865 (finding that Google policy was anticompetitive "because it involved Google using its coercive monopoly power to deprive its publisher customers of a choice that they had previously exercised to promote competition"); *FTC v. Meta*, 775 F. Supp. 3d at 54-55.

---

[7] "Monopsony power is market power on the buy side of the market." *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320 (2007). "Although most antitrust law has developed under sell-side theories of harm, i.e., monopoly, monopsony analysis relies on similar principles." *Bertelsmann*, 646 F. Supp. 3d at 22 n.13. For example, in *Bertelsmann*, Judge Pan enjoined a proposed merger between two publishing houses after finding that the merged firm would be able and incentivized to pay smaller advances to authors. The Court treated the authors as sellers to an input market; its monopsony analysis considered whether reduced competition from a merger would harm the authors as sellers, rather than the consumers as buyers. *See id.* at 10-12.

Google argues, incorrectly, that degrading search by eliminating the source of supply (web publisher content) is not anticompetitive "because no one is excluded from competing with Google as a result." Mot. 30-31. Contrary to Google's argument, it is not necessary to show complete exclusion of rivals in order to demonstrate anticompetitive effects. "As *Microsoft* teaches, an anticompetitive effect is anything that 'has a substantial effect in protecting a firm's market power, and does so through a means other than competition on the merits.'" *FTC v. Meta*, 775 F. Supp. 3d at 54 (quoting *Microsoft*, 253 F.3d at 62) (alteration omitted). This may include, for example, "reduced output, increased prices, or decreased quality in the relevant market," *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018). Chegg adequately alleges both reduced output and decreased quality, as explained above. *See supra* at 16, 25.

Google also suggests that Chegg's allegations regarding degraded search output quality are "hyperbole." Mot. 30. But the logical result of Google using publishers' own content to compete against them is that publishers will stop developing new content. Compl. ¶ 176. As Google acknowledges, "Google Search's quality depends on its ability to answer user queries," Mot. 30, which in turn depends on the quality of Search Index Data and data used to power AI Overviews, *see* Compl. ¶¶ 12, 34, 100, 176, 182, 190-91. In short, Chegg's allegations are "based on standard principles of supply and demand." *Osborn v. Visa Inc.*, 797 F.3d 1057, 1065 (D.C. Cir. 2015) (quotation omitted). Such allegations "are routinely credited by courts in a variety of contexts." *Id.*

Google's contention that its "rivals in the GSS market" obtain GAI Training Content and RAG Content for free, Mot. 29-30, is contradicted by Chegg's Complaint, *see* Compl. ¶¶ 162, 179 (examples of content licensing deals). Google's argument to the contrary improperly asks the Court to resolve factual disputes in its favor. Google also improperly construes Chegg's allegation that "some" of Chegg's competitors "must pay a significantly higher price for the same content,"

*id.* ¶ 175, to mean others get that content for free. Mot. 30. That is not a reasonable reading of Chegg's allegation, let alone a reading that draws reasonable inferences in Chegg's favor.

Google's remaining arguments, *see* Mot. 29-30, fail for reasons discussed earlier. *See supra* at 28-29 (responding to Google's argument that its conduct reflects lawful product improvement) and 25 (responding to Google's "legitimate buyer" argument).[8]

## B.    Chegg Has Antitrust Standing to Sue for Unlawful Monopoly Maintenance

Chegg participates in the general search services market as a supplier of content for search. and as a recipient (or purchaser) of search referral traffic. Chegg's Complaint straightforwardly alleges that it suffers antitrust injury as both a content supplier and as a recipient (or purchaser) of search referral traffic. Google's arguments to the contrary rely on misreadings of Chegg's Complaint and a misunderstanding of antitrust standing.

### 1.    Chegg Adequately Alleges Antitrust Injury as a Supplier of Content for Search and as a Purchaser of Search Referral Traffic

Google counterintuitively argues that Chegg's underpayment injury cannot confer antitrust standing on Chegg for its monopoly maintenance claim because this injury occurs in the input market, rather than the output market, for search. Mot. 26-27. This attempt to artificially wall off the search input market for purposes of antitrust standing is at odds with these markets' economic and practical realities and the structure of Google's anticompetitive conduct.

The Complaint describes how Google's monopoly power in general search services affords it corresponding monopsony power in the input market for search. Compl. ¶¶ 52, 93, 171-73. In

---

[8] Google cites *Philadelphia Taxi Association, Inc v. Uber Techs., Inc.*, 886 F.3d 332 (3d Cir. 2018) (Mot. 29), for the exceedingly broad, and incorrect, proposition that "a firm's efforts to lower its costs . . . does not violate the antitrust laws." In *Philadelphia Taxi*, the Court found that defendant's "fail[ure] to comply with statutory requirements and regulations" and "lur[ing] away drivers from Individual Plaintiffs" was not anticompetitive in that factual context. *Id.* at 339. It did not hold that conduct intended to lower a firm's costs is automatically immunized from antitrust scrutiny, or that raising a rival's costs can never be evidence of harm from anticompetitive conduct.

these markets, web publisher content (Search Index Data) is exchanged for search referral traffic. *Id.* ¶ 32. Unlike Google's cited cases, *see* Mot. 27, there is no mismatch between the market where anticompetitive conduct occurred, on the one hand, and the market where injury was suffered, on the other, because Google's anticompetitive conduct (coercive conditioning) has effects in both the input market (underpayment) and output market (reduced search referral traffic), and Chegg participates in both.[9] *Cf. United States v. Live Nation Ent., Inc.*, 2025 WL 835961, at *5 (S.D.N.Y. Mar. 14, 2025) ("putting antitrust legalese to the side," where plaintiffs' complaint carved primary market "into several different markets," plaintiffs had antitrust standing based on "overcharge" they paid due to defendants' anticompetitive conduct).

Said differently, web publishers like Chegg are integral participants in the general search services market as input providers to that market. The Complaint describes how the input market feeds the output market, and how Google's monopoly power in general search services affords it corresponding monopsony power in the input market for search. *See* Compl. ¶¶ 52, 94, 171-173. Publishers like Chegg participate in this interrelated network by providing content; in exchange, Google provides search referral traffic. The input market for general search services and the market for search referral traffic are thus inextricably linked.

---

[9] *See W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 102 (3d Cir. 2010) (mismatch where plaintiff participated *only* by supplying hospital services to insurers, and defendant's anticompetitive conduct was in entirely separate and downstream health insurance market); *PhantomALERT v. Apple, Inc.*, 762 F. Supp. 3d 8, 18 (D.D.C. 2025) (granting unopposed motion to dismiss, in part, due to mismatch between anticompetitive conduct in smartphone market and injury in smartphone app market); *Fotobom*, 719 F. Supp. 3d at 46 (mismatch between anticompetitive conduct in search market and injury in unspecified separate market); *Cal. Crane Sch., Inc. v. Google LLC*, 2023 WL 2769096, at *3 (N.D. Cal. Mar. 31, 2023) (plaintiff alleged "restraint in an inadequately defined 'search market,'" but claimed injury in "undefined" search advertising market). *SigmaPharm, Inc. v. Mutual Pharmaceutical Co.*, 772 F. Supp. 2d 660, 673 (E.D. Pa.), *aff'd*, 454 F. App'x 64 (3d Cir. 2011), is even further afield because the plaintiff's injury was based on the "ancillary or tangential" harm of lost contractual royalty payments.

Google also claims that Chegg's injury as a content supplier is somehow caused by its competitors' decision to permit Google to use their content for republishing, training, and grounding. Mot. 28-29. This argument fails for reasons discussed above. *See supra* at 13.

### 2.    Chegg Also Has Standing Under *McCready*

Chegg alternatively has standing because its injuries are "inextricably intertwined" with the injury that Google seeks to inflict on its competitors in the general search services market. *See Blue Shield v. McCready*, 457 U.S. 465, 484 (1982). *McCready* held that health insurance subscribers had standing to sue their insurer for colluding with physicians and psychiatrists to deny them reimbursement for payments made to psychologists. *Id*. The Court acknowledged that while the psychologists (not the patients) were the conspiracy targets, standing "cannot reasonably be restricted to those competitors whom the conspirators hoped to eliminate from the market." *Id.* at 479. "[S]everal circuits have construed *McCready* as recognizing antitrust injury where the plaintiff was used as a conduit to harm the defendants' actual competitors, such that the plaintiff's harm is an indispensable aspect of the scheme." *Fotobom*, 719 F. Supp. 3d at 47.

Like the subscribers in *McCready*, Chegg has been forced to absorb the underpayment caused by Google's anticompetitive conduct.[10] The harm to Chegg is an essential means by which Google's illegal conduct ultimately injures competition in general search services. Google obtains Chegg's content for republishing, training, and grounding at zero cost. This exploitation effectively increases the relative costs to Google's competitors of obtaining content for these purposes, solidifying the barriers to entry for Google's would-be competitors. *See* Compl. ¶¶ 95-96. Google's coercive abuse of its monopoly power, which harms Chegg directly, is the means by

---

[10] This underpayment is the monopsony equivalent of a monopoly overcharge and an intended purpose of Google's conduct. *Cf. In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 401 (3d Cir. 2000) (party that bears "overcharge[]" caused by anticompetitive conduct has standing because price increase was conspiracy's "aim"); *In re Lorazepam*, 295 F. Supp. 2d at 39-40 (same).

which it limits competition. This is sufficient for standing under *McCready*.

### 3.    The *Associated General Contractors* Factors Support Standing

The Supreme Court in *Associated General Contractors*, 459 U.S. 519, identified certain "additional factors to be considered in determining whether the plaintiff has 'antitrust standing,'" *Andrx*, 256 F.3d at 806. These include "the directness of the injury, whether the claim for damages is 'speculative,' the existence of more direct victims, the potential for duplicative recovery and the complexity of apportioning damages." *Id.* (citing *Assoc. Gen. Contractors*, 459 U.S. at 542-45). All of these factors weigh in favor of Chegg having antitrust standing.

As an initial matter, Google does not argue that duplicative recovery or apportionment of damages poses a problem in this case. *See* Mot. 28-29. Nor could it. Google does not identify any other potential plaintiff that it believes is better situated to sue, and Chegg's damages from Google's anticompetitive conduct cannot be claimed by Google's competitors.[11]

Contrary to Google's arguments, Chegg's injuries are neither "indirect" nor "speculative." Mot. 28. Chegg alleges underpayment for its content and reduced search referral traffic resulting in a demonstrated reduction in subscription revenue. *See supra* at 24-28. There are no intermediate steps between Google's coercion and its failure to pay Chegg for the value of Chegg's content. With respect to lost subscriber revenue, Chegg has alleged a direct causal chain leading from (1) Google's use of Chegg's content for its GAI products to (2) Google's elimination of Chegg from the SERP through AI Overviews to (3) the accompanying lack of search referrals resulting in reduced subscriber conversion. *See* Compl. ¶¶ 139, 146. Courts have found far longer causal chains sufficiently direct for antitrust standing. *See, e.g.*, *Palmyra Park Hosp. Inc. v. Phoebe Putney Memorial Hosp.*, 604 F.3d 1291, 1304, 1306-07 (11th Cir. 2010) (plaintiff's injury was

---

[11] In any event, the existence of another potential plaintiff is not dispositive of the antitrust standing inquiry. *Apple Inc. v. Pepper*, 587 U.S. 273, 287 (2019).

sufficiently direct for standing because it could be expected to "inevitably" follow from the challenged conduct, even though "several steps must occur" first). In contrast to Chegg's allegations of direct and concrete injuries, Google's cited cases involved plaintiffs that were multiple steps removed from the antitrust violator's conduct, or plaintiffs who failed to allege anticompetitive conduct at all. These cases bear no resemblance to Chegg's Complaint.[12]

Nor are Chegg's injuries "speculative." Mot. 28. As Google's own cited case explains, "there is nothing speculative about" "damages for the alleged loss of revenue and profits." *City of Moundridge, KS v. Exxon Mobil Corp.*, 471 F.Supp.2d 20, 32 (D.D.C. 2007) (cited Mot. 38); *see also See IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 68 (2d Cir. 2019) (cited Mot. 28) (damages for "potentially ascertainable business losses" are not speculative).

## III.    CHEGG ADEQUATELY PLEADS MONOPOLY LEVERAGING

### A.    Courts in This Circuit Recognize Monopoly Leveraging as a Viable Claim

Google's assertion that courts have "consistently concluded" that monopoly leveraging is not a viable antitrust claim, Mot. 31, is flatly incorrect. The Second Circuit, the Seventh Circuit, and this district have recognized monopoly leveraging claims. *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979); *Sargent-Welch Sci. Co. v. Ventron Corp.*, 567 F.2d 701 (7th Cir. 1977), *cert. denied*, 439 U.S. 822 (1978) (defendant's refusal to sell monopolized products unless customers bought second product was unlawful, even though defendant had no reasonable possibility of monopolizing second product market); *2301 M Cinema*, 342 F. Supp. 3d at 133 (recognizing illegality of "unlawful monopoly leveraging" (quotation omitted)).

The elements of monopoly leveraging are: the defendant "(1) possessed monopoly power

---

[12] In *Adams v. Pan Am. World Airways, Inc.*, 828 F.2d 24, 29 (D.C. Cir. 1987) (cited Mot. 28), employees of a firm victimized by antitrust violations lacked standing to pursue claims against the violator. And in *Stallard v. Goldman Sachs Grp., Inc.*, 2024 WL 4903783, at *8 (D.D.C. Nov. 27, 2024) (cited Mot. 28), the plaintiff failed to allege anticompetitive conduct at all.

in one market; (2) used that power to gain a competitive advantage over [the plaintiff] in another distinct market; and (3) caused injury by such anticompetitive conduct." *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 272 (2d Cir. 2001). Chegg adequately alleges each element: (1) Google has monopoly power in the general search services market. Compl. ¶¶ 49-50; (2) Google is leveraging its monopoly in general search services to gain an advantage in the market for Online Educational Publishing, *id.* ¶¶ 129-32; and (3) Google's advantages in Online Educational Publishing are not the result of procompetitive efficiencies, as explained above, *see supra* at 15, 28-29.

There are particularly strong justifications for permitting Chegg's monopoly leveraging claim to move forward under the circumstances here. Google does not cite any cases rejecting a monopoly leveraging claim where the defendant was previously adjudicated to have unlawfully maintained its monopoly in the leveraged market. *Cf. Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 548 (9th Cir. 1991) (cited Mot. 31) (distinguishing "between efficient and natural monopolies on the one hand, and unlawful monopolies on the other").

**B.     Chegg Adequately Pleads a Market for Online Educational Publishing**

The Complaint properly defines the Online Educational Publishing market, which is supported by *Brown Shoe* practical indicia. *See* Compl. ¶¶ 54-55 (describing nature of Online Educational Publishing content and "key attributes" students require from such content); *id.* at ¶¶ 56, 60, 62 (describing distinct customers and uses for Online Educational Publishing); *id.* ¶ 57 (describing competitors in the market and specific uses of Online Educational Publishing); *id.* ¶ 58 (describing analyst recognition of market); *id.* ¶ 59 (noting public recognition of the market; *id.* ¶ 60-61 (describing production and format of Online Educational Publishing). Google's arguments to the contrary exaggerate the pleading standard, and ignore Chegg's allegations. *See supra* at 16-17 (describing legal standard for pleading a market at this stage).

38

Google's argument that the Online Educational Publishing market's definition is "vague," Mot. 33-34, focuses solely on Chegg's description of pedagogical content's attributes and ignores the market-defining allegations cited above. Nitpicks about a product being left out or improperly included are not a basis for dismissal. ""[F]uzziness' is inherent in bounding any market," because "[m]arket definition is more art than science." *Bertelsmann*, 646 F. Supp. 3d at 33 (quoting *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 202 (D.D.C. 2018)). Nor is there any "barrier to combining in a single market a number of different products or services where that combination reflects commercial realities." *Sysco*, 113 F. Supp. 3d at 26.

Google's cited cases concern the adequacy of market definition for purposes of assessing market power and the specific problem of plaintiffs drawing markets too narrowly and thus potentially overstating defendants' market power. Mot. 33.[13] This is not a concern with respect to Chegg's alleged Online Educational Publishing market, because Chegg's monopoly leveraging claim does not require Chegg to allege that Google currently has market power in this market.

Finally, Chegg adequately pleads that Google competes in Online Educational Publishing. As an initial matter, Google republishes Chegg's content—an obvious example of Google competing directly with Chegg in this market. Compl. ¶ 76 (example of republishing). The Complaint also alleges in detail how Google competes "directly" with online educational publishers "through Google's AI Overviews" and other AI products. *Id.* ¶¶ 65, 115, 129-32.

Google argues that AI Overviews serve purposes other than providing educational content. *See* Mot. 34. But the fact that AI Overviews may serve educational content *and* other content does

---

[13] *See, e.g.*, *Tundra, Inc. v. Faire Wholesale, Inc.*, 2024 WL 589097, at *1 (N.D. Cal. Feb. 13, 2024) (plaintiff created an "artificial" market using "adjectives that facially pare down the relevant market to attribute a greater share to [defendant]"); *Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963, 971 (W.D. Tenn. 2004) (court was "unable to assess Defendants' market power" because the plaintiff "neglect[ed] to define a relevant market in any meaningful way").

not mean that AI Overviews are excluded from the Online Educational Publishing market. Google invades multiple markets when it republishes content, uses that content to train and ground its AI models, and then provides answers in AI Overviews. This does not mean Google is somehow not participating in the Online Educational Publishing market.

## IV.    CHEGG ADEQUATELY PLEADS ATTEMPTED MONOPOLIZATION

"To establish a § 2 violation for attempted monopolization, a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Fotobom*, 719 F.Supp.3d at 52 (quoting *Microsoft*, 253 F.3d at 80)); *see also Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456 (1993). In evaluating these claims, courts "'must examine the facts of each case'—ultimately, what constitutes an offense is 'a question of proximity and degree.'" *Am. President Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209, 232 (D.D.C. 2022) (quoting *Spectrum Sports*, 506 U.S. at 454-55). Chegg alleges each element of Google's attempted monopolization of the Online Educational Publishing market, as explained below. Google's scattershot arguments for dismissal of this claim mischaracterize the relevant legal standards and ignore numerous allegations in Chegg's Complaint.

***Anticompetitive conduct.*** The same facts supporting Google's coercive reciprocal dealing establish anticompetitive conduct for attempted monopolization. *See supra* at 10-14; *see also, e.g.*, Compl. ¶ 155. Google suggests that diminished click-throughs solely affect the market for search referral traffic, not the Online Educational Publishing market, Mot. 37, but click-throughs are the pivotal means by which users purchase subscriptions in the Online Educational Publishing market. Google cannot simply disregard this harm by cutting off the causal chain at a point of its choosing.

***Specific intent to monopolize.*** Courts can infer specific intent to monopolize from "conduct that has no legitimate business justification but to destroy or damage competition." *City*

*of Moundridge*, 471 F. Supp. 2d at 42-43 (citation omitted); *Aspen Skiing*, 472 U.S. at 608 n.39 (1985) (business conduct unrelated to "any apparent efficiency" can prove specific intent). Google's specific intent to monopolize is shown by its refusal to permit publishers to opt out of their content being used for training and grounding, despite Google's internal recognition that web publishers faced a "forced choice." Compl. ¶ 93. Google understood this false choice was problematic: it specifically sought to avoid drawing attention to its decision not to adopt a publisher opt-out option. *Id.* ¶ 138. Google's acknowledgement of this "forced choice" indicates that it understood that publishers could not afford to opt out of search entirely given Google's dominance. Moreover, Google's desire not to publicize its decision-making is strongly suggestive that Google understood its conduct was suspect. Chegg further alleges that Google is willing to destroy the Online Educational Publishing market so long as it can make its GAI product the most powerful one. *Id.* ¶ 142 (describing Google Research Scientist's admission that "[d]irect answers reduce search referral traffic" and hurt publishers' ability to monetize). Taken together, these facts, coupled with Google's anticompetitive conduct, are sufficient to allege specific intent to monopolize. *See United States v. Apple, Inc.*, 2025 WL 1829127, at *15 (D.N.J. June 30, 2025) ("statements allegedly made by Apple executives regarding the barriers set in place to maintain its monopoly" adequately pleaded specific intent).

Google's contrary argument (Mot. 38) that "all that Chegg's allegations suggest" is that Google "intended to improve its offerings" fails for the same reasons as Google's other product-improvement arguments. *See supra* at 28-29.

**Dangerous probability of monopolization.** A dangerous probability of monopolization is shown where a defendant has the ability to lessen or destroy competition in that market. *Spectrum Sports*, 506 U.S. at 456. To determine whether dangerous probability is alleged, courts "may

consider factors such as significant market share coupled with anticompetitive practices, barriers to entry, the strength of competition, the probable development of the industry, and the elasticity of consumer demand." *Philadelphia Taxi*, 886 F.3d at 342 (cited Mot. 39).

Chegg alleges that Google is destroying competition in Online Educational Publishing by eliminating incentives for content creation. As Google provides "derivative, regurgitated content on its SERP," users stop clicking through to original content. Compl. ¶ 169; *see id.* ¶ 141. "That means less revenue for those original publishers, which in turn undermines their ability to invest in new content," and a "reduc[tion] of output of original content across the entire market." *Id.* ¶ 169. These allegations regarding Google's impact on the industry's "probable development" support a dangerous probability of monopolization. *Philadelphia Taxi*, 886 F.3d at 342.

Google's market share in Online Educational Publishing is significant. "For education queries, AI overview coverage was near-complete as of May 2025." Compl. ¶ 129; *see also id.* ¶ 147 (explaining that Chegg has experienced declines in click-throughs as Google has made AI Overviews broadly available). Further evidence of Google's market share, nearly 90% of queries that trigger AI Overviews are informational. *Id.* ¶ 132. Competition in the Online Educational Publishing industry is rapidly weakening because of Google's misappropriation of publisher content. As Chegg explains, analysis of education related search terms shows that the percentage of searches where the user does not click through to *any* non-Google site increased by 21% year over year. *Id.* ¶ 148. Google has acknowledged reduced click-throughs hurt online educational publishers' ability to monetize their content. *Id.* ¶ 142. As fewer and fewer users click through to these publishers' websites, the economic incentives necessary for the creation and publication of high-quality original content will evaporate. *Id.* ¶ 149.

Google argues that Chegg fails to sufficiently allege barriers to entry in the Online

Educational Publishing market, Mot. 39, but the dangerous-possibility element is satisfied by allegations that a would-be monopolist "would likely erect significant barriers to entry upon acquisition of a dominant market share," even if such barriers do not exist now. *Microsoft*, 253 F.3d at 84. Such barriers would exist here if Google succeeds in monopolizing this market. As the Complaint explains, Online Educational Publishers cannot attract customers unless those potential customers can find the publishers' content. Compl. ¶ 29. But with Google republishing content directly to Google's SERP, those potential customers have no reason to click through to the publishers' websites. *Id.* ¶¶ 75-80, 126-29. The result is a "catch-22" that erects barriers to entry for new competitors. *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 141 F.4th 1075, 1089 (9th Cir. 2025). Moreover, as Google eats up market share, potential competitors will need a full GAI infrastructure in order to compete. Developing this infrastructure requires "vast datasets of written material," and the technology to train and ground large language models. Compl. ¶¶ 99-104. The "high capital costs" and "scale" required to develop this infrastructure "are significant barriers" that will protect Google's market dominance. *Google Search*, 747 F. Supp. 3d at 119. Google's motion to dismiss Chegg's attempted monopolization claim should be denied.

## V.    CHEGG PLEADS A VIABLE UNJUST ENRICHMENT CLAIM

Google's argument for dismissal of Chegg's unjust enrichment claim, Mot. 41-44, relies on outdated caselaw and ignores Chegg's well-pleaded factual allegations. While California's old caselaw "was uncertain and inconsistent," more recent authority has allowed "independent claim[s] for unjust enrichment to proceed." *Bruton v. Gerber Prods. Co.*, 703 F. App'x 468, 470 (9th Cir. 2017) (citing *Hartford Cas. Ins. Co. v. J.R. Mktg., LLC*, 61 Cal. 4th 988, 1000 (2015)). In *Hartford Casualty*, the California Supreme Court held that unjust enrichment claims are not limited to quasi-contractual relationships and privity "is not necessarily required." 61 Cal. 4th at 998. Since *Hartford Casualty* and *Bruton*, standalone unjust enrichment claims under California

law have routinely survived motions to dismiss. *See, e.g.*, *Cherkin v. PowerSchool Holdings, Inc.*, 2025 WL 844378, at *7 (N.D. Cal. Mar. 17, 2025); *Chong v. Nestlé Water N.A., Inc.*, 2021 WL 4938128, at *1 (9th Cir. Oct. 22, 2021); *Deutsch v. Cook*, 2020 WL 977894, at *4 (E.D. Cal. Feb. 28, 2020) (collecting authorities). Google's authorities all pre-date *Hartford Casualty* and *Bruton*.

Chegg sufficiently pleads the elements of unjust enrichment, which require showing "that the defendant received and unjustly retained a benefit at the plaintiff's expense." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1038-39 (9th Cir. 2016) (citation omitted). The Complaint details how Google benefited through the monetization of AI Overviews and through an increase in stock price by unjustly taking and retaining Chegg's "meticulously researched, carefully written, thoroughly edited, and highly accurate" content as "training and grounding" material for its AI systems. Compl. ¶¶ 179-83. Beyond those allegations, Chegg pleads the value of Chegg's content, *id.* ¶¶ 12, 26, 27, that Google has unjustly taken for its benefit, *id.* ¶¶ 8, 63, 138, at great harm to Chegg and other digital publishers, *id.* ¶¶ 146, 150-51.

In the alternative, Chegg sufficiently pleads facts to support a quasi-contract claim for restitution. *See ESG*, 828 F.3d at 1038-39. Google concedes that California law recognizes such claims. Mot. 42. Chegg has sufficiently pleaded facts showing Google's coercion by alleging in detail how Google leverages its monopoly power in the search market to force Chegg to supply content for Google's GAI products. Compl. ¶¶ 5, 9-12, 13, 35-37, 42, 51, 146, 168; *see also supra* at 10-14 (discussing coercion allegations); *Leeper v. Beltrami*, 53 Cal. 2d 195, 204-05 (1959) (rejecting argument that plaintiffs' ability to sell their home at foreclosure sale defeated coercion allegation because foreclosure was not "reasonable alternative" to acquiescing to defendants' demand). This distinguishes *Tremblay v. OpenAI, Inc.*, 716 F. Supp. 3d 772 (N.D. Cal. 2024) (cited Mot. 44), where the plaintiff book authors failed to allege that the benefit to OpenAI—the use of

their works to train ChatGPT—was obtained through "fraud, mistake, coercion, or request." *Id.* at 783. Google's motion to dismiss should be denied as to Chegg's unjust enrichment claim.

## VI.    **DISMISSAL WITH PREJUDICE WOULD BE IMPROPER**

To the extent the Court is inclined to dismiss Chegg's Complaint, Chegg respectfully requests leave to file a second amended complaint. *See* Fed. R. Civ. P. 15(a)(2); *Kurdistan Victims Fund v. Kurdistan Reg'l Gov't*, 2025 WL 1360432, *4-5 (D.D.C. May 9, 2025) (permitting plaintiffs to amend complaint second and third time to cure pleading deficiencies). Google continues to expand its GAI product offerings, including in the education sector.[14] New information regarding the impact of Google's coercive, anticompetitive conduct on publishers and markets is surfacing on a near weekly basis. For example, recent data shows that Google's AI Overviews result in a nearly 50% decrease in users clicking on traditional search results like Chegg's website.[15] In addition, content licensing markets continue to mature as GAI companies like OpenAI, Amazon, and ProRata.ai sign new deals with publishers and new market players like Apple emerge.[16] Chegg should be given the opportunity to cure any pleading deficiencies by incorporating this and other newly available information into a second amended complaint.

## CONCLUSION

For the foregoing reasons, Chegg respectfully requests that the Court deny Google's motion to dismiss the Complaint.

Dated: August 29, 2025                      */s/ Ian Crosby*

---

[14]  Google, Back to School 2025, https://blog.google/outreach-initiatives/education/back-to-school-collection-2025 (Aug. 6, 2025) (offering students free subscriptions to "AI Pro" plans).
[15] *Google users are less likely to click on links when an AI summary appears in the results*, PEW RESEARCH CENTER (Jul. 22, 2025), https://www.pewresearch.org/short-reads/2025/07/22/google-users-are-less-likely-to-click-on-links-when-an-ai-summary-appears-in-the.results.
[16] *Who's suing AI and who's signing*, PRESS GAZETTE (Aug. 12, 2025), https://pressgazette.co.uk/platforms/news-publisher-ai-deals-lawsuits-openai-google.

Ian Crosby (Bar ID: WA0036)
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
icrosby@susmangodfrey.com

Davida Brook (Bar ID: CA00117)
Halley Josephs (Bar ID: CA00217)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
dbrook@susmangodfrey.com
hjosephs@susmangodfrey.com

Y. Gloria Park (Bar ID: NY0615)
Thomas Boardman (Bar ID: NY0617)
Elizabeth Aronson (Bar ID: NY0645)
SUSMAN GODFREY L.L.P.
One Manhattan West, 50th Floor New York, NY
10001 Telephone: (212) 336-8330
Facsimile: (212) 336-8340
gpark@susmangodfrey.com
tboardman@susmangodfrey.com
baronson@susmangodfrey.com

*Attorneys for Plaintiff Chegg, Inc.*

## CERTIFICATE OF SERVICE

On August 29, 2025, I hereby certify that I caused a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification to the attorneys of record.

*/s/ Ian Crosby*
Ian Crosby