**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CHEGG, INC.,

        *Plaintiff*,

   v.

GOOGLE LLC; ALPHABET INC.,

        *Defendants*.

Case No. 1:25-cv-00543-APM

## <u>REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

ARGUMENT ........................................................................................................................3

I.   CHEGG FAILS TO PLEAD A CLAIM FOR RECIPROCAL DEALING ............................................3

    A.   Google's Lawful Refusal to Deal Is Not Reciprocal Dealing...................................3

    B.   Chegg Does Not Allege A Viable Reciprocal Dealing Claim...............................6

        1.   Chegg Fails to Allege Per Se Reciprocal Dealing ......................................6

        2.   Chegg's Reciprocal Dealing Claim Fails Under the Rule Of Reason ...........................................................................................................14

    C.   Chegg Lacks Antitrust Standing for Its Reciprocal Dealing Claim......................15

II.  CHEGG FAILS TO PLEAD UNLAWFUL MONOPOLY MAINTENANCE .....................................15

    A.   Chegg Does Not Allege Exclusionary Conduct In The GSS Market ..................15

    B.   Even If Chegg Had Plausibly Alleged Exclusionary Conduct, It Has Failed To Allege That It Possesses Antitrust Standing...................................................18

III. THERE IS NO CLAIM FOR MONOPOLY LEVERAGING UNDER THE SHERMAN ACT.............19

IV.  CHEGG FAILS TO PLAUSIBLY PLEAD ATTEMPTED MONOPOLIZATION OF THE OEP MARKET ...............................................................................................................20

    A.   Chegg Failed To Define The OEP Market .........................................................20

    B.   Chegg Does Not Plausibly Allege Attempted Monopolization............................22

V.   CHEGG MISSTATES AND FAILS TO MEET THE STANDARD FOR UNJUST ENRICHMENT.........24

VI.  AMENDMENT WOULD BE FUTILE ......................................................................................25

CONCLUSION....................................................................................................................25

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*,
    342 F. Supp. 3d 126 (D.D.C. 2018) ...............................................................20

*A.J. Fistes Corp. v. GDL Best Contractors, Inc.*,
    38 Cal. App. 5th 677 (2019) .........................................................................24

*\*Abuelhawa v. Santa Clara Univ.*,
    529 F. Supp. 3d 1059 (N.D. Cal. 2021) ........................................................24

*Aerotec Int'l, Inc. v. Honeywell Int'l*,
    836 F.3d 1171 (9th Cir. 2016) .........................................................................4

*\*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
    592 F.3d 991 (9th Cir. 2010) ........................................................................16

*\*Andrx Pharms., Inc. v. Biovail Corp. Int'l*,
    256 F.3d 799 (D.C. Cir. 2001) ......................................................................15

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985) ........................................................................................5

*\*Athos Overseas, Ltd. v. YouTube, Inc.*,
    2022 WL 910272 (S.D. Fla. Mar. 29, 2022) .................................................13

*Baiul-Farina v. Lemire*,
    804 F. App'x 533 (9th Cir. 2020) .................................................................24

*Belizan v. Hershon*,
    434 F.3d 579 (D.C. Cir. 2006) ......................................................................25

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ......................................................................................12

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
    603 F.2d 263 (2d Cir. 1979) .........................................................................19

*Blue Shield of Virginia v. McCready*,
    457 U.S. 465 (1982) ......................................................................................19

*\*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
    140 F.3d 494 (3d Cir. 1998) .....................................................................6, 14

*Brown Shoe Co. v. United States,
    370 U.S. 294 (1962)......................................................................................2, 8, 9, 10, 11

Bruton v. Gerber Products Co.,
    703 F. App'x 468 (9th Cir. 2017) ......................................................................................24

Campfield v. State Farm Mut. Auto. Ins. Co.,
    532 F.3d 1111 (10th Cir. 2008) ........................................................................................11

Christy Sports, LLC v. Deer Valley Resort Co.,
    555 F.3d 1188 (10th Cir. 2009) ..........................................................................................4

City of Moundridge v. Exxon Mobil Corp.,
    471 F. Supp. 2d 20 (D.D.C. 2007) ...................................................................................22

Dairy, LLC v. Milk Moovement, Inc.,
    2022 WL 2392622 (E.D. Cal. July 1, 2022) ....................................................................24

De Havilland v. FX Networks, LLC,
    21 Cal. App. 5th 845 (2018) .............................................................................................24

*Dreamstime.com, LLC v. Google LLC,
    54 F.4th 1130 (9th Cir. 2022) .....................................................................................17, 18

Epic Games, Inc. v. Apple, Inc.,
    67 F.4th 946 (9th Cir. 2023) ...............................................................................................7

*Fotobom Media, Inc. v. Google LLC,
    719 F. Supp. 3d 33 (D.D.C. 2024)......................................................................15, 19, 21

Fried v. Snapple Beverage Corp.,
    753 F. Supp. 3d 1145 (S.D. Cal. 2024).............................................................................24

FTC v. Meta Platforms, Inc.,
    775 F. Supp. 3d 16 (D.D.C. 2024) ...................................................................................17

FTC v. Qualcomm Inc.,
    969 F.3d 974 (9th Cir. 2020) ..............................................................................................4

FTC v. Whole Foods Mkt., Inc.,
    548 F.3d 1028 (D.C. Cir. 2008).........................................................................................9

Griffith v. TikTok, Inc.,
    2023 WL 9019035 (C.D. Cal. Dec. 13, 2023) .................................................................24

Hartford Casualty Insurance Co. v. J.R. Marketing, LLC,
    61 Cal. 4th 988 (2015) .....................................................................................................24

*In re Diamond Shamrock Corp.,*
    113 F.T.C. 316 (1990)................................................................................3

*In re Elevator Antitrust Litig.,*
    502 F.3d 47 (2d Cir. 2007)........................................................................4

*In re Google Digital Advert. Antitrust Litig.,*
    721 F. Supp. 3d 230 (S.D.N.Y. 2024).....................................................21

*In re Theos Dark Chocolate Litig.,*
    750 F. Supp. 3d 1069 (N.D. Cal. 2024) ..................................................24

*Intergraph Corp. v. Intel Corp.,*
    195 F.3d 1346 (Fed. Cir. 1999)................................................................6

*\*Kartell v. Blue Shield of Mass., Inc.,*
    749 F.2d 922 (1st Cir. 1984)...................................................................18

*Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.,*
    588 F.3d 908 (6th Cir. 2009) ....................................................................9

*L.A. Land Co. v. Brunswick Corp.,*
    6 F.3d 1422 (9th Cir. 1993) ....................................................................23

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,*
    551 U.S. 877 (2007)..................................................................................6

*Leeper v. Beltrami,*
    53 Cal. 2d 195 (1959) .............................................................................25

*New York ex rel. Schneiderman v. Actavis PLC,*
    787 F.3d 638 (2d Cir. 2015)....................................................................22

*New York v. Facebook, Inc.,*
    549 F. Supp. 3d 6 (D.D.C. 2021), *aff'd*, 66 F.4th 288 (D.C. Cir. 2023)..............................5

*Novell, Inc. v. Microsoft Corp.,*
    731 F.3d 1064 (10th Cir. 2013) ................................................................4

*\*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.,*
    555 U.S. 438 (2009)..................................................................................4

*\*PhantomALERT v. Apple, Inc.,*
    762 F. Supp. 3d 8 (D.D.C. 2025)..............................................................8

*Phila. Taxi Ass'n, Inc v. Uber Techs., Inc.,*
    886 F.3d 332 (3d Cir. 2018)....................................................................23

iv

*Rollins v. Wackenhut Servs., Inc.,*
    703 F.3d 122 (D.C. Cir. 2012) ........................................................................................25

*Sargent-Welch Scientific Co. v. Ventron Corp.,*
    567 F.2d 701 (7th Cir. 1977) ..........................................................................................19

*Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.,*
    947 F. Supp. 2d 88 (D.D.C. 2013) ...................................................................................7

*Spectrum Sports, Inc. v. McQuillan,*
    506 U.S. 447 (1993) ...............................................................................................19, 22

*United States v. Aetna Inc.,*
    240 F. Supp. 3d 1 (D.D.C. 2017) .....................................................................................8

*United States v. Google, LLC,*
    2025 WL 2523010 (D.D.C. Sept. 2, 2025) ..........................................................9, 15, 16

*United States v. Google LLC,*
    747 F. Supp. 3d 1 (D.D.C. 2024) .....................................................................................4

*United States v. Google LLC* (*Google Ad Tech*),
    778 F. Supp. 3d 797 (E.D. Va. 2025) ...............................................................................4

*United States v. Microsoft Corp.,*
    253 F.3d 34 (D.C. Cir. 2001) ...........................................................................7, 12, 23

*Uniwill v. City of L.A.,*
    124 Cal. App. 4th 537 (2004) ........................................................................................25

*Virgin Atl. Airways Ltd. v. Brit. Airways PLC,*
    257 F.3d 256 (2d Cir. 2001).............................................................................................19

# INTRODUCTION

Chegg's opposition seeks to cloak its claims as the natural outgrowth of the DOJ Search case in a transparent bid to avoid the numerous deficiencies that doom its claims. But Chegg—a homework help website that is failing because it admittedly missed the shift to AI and engaged in deceptive cancellation practices that are the subject of a recent FTC consent decree—is neither Google's customer nor competitor in General Search Services (GSS) and has no credible claim of injury in that alleged market or from the conduct at issue in that case. When the flawed reliance on the DOJ Search case is stripped away, Chegg's case fails on virtually every element required for a viable antitrust claim. Chegg attempts to pass off those pleading defects as factual disputes for later resolution, but its opposition confirms that Chegg's core theories are not legally cognizable and must be rejected at this stage.

Chegg's theories rest on the mistaken proposition that because the Court previously held that Google is a *monopolist* in GSS, it must also be a *monopsonist* in any upstream market for GSS inputs. This assumption cannot withstand scrutiny. The mere fact that a company is a monopolist in one market does not inherently mean that it exercises monopsony power over every input that it purchases. Google purchases or uses many inputs—such as electricity for its facilities, food for its cafeterias, or labor from its talented engineers. Yet Google is not a monopsonist in any of these supposed "input markets." Web content used in GSS is no different. Chegg's reliance on this false premise alone dooms its claims.

Undeterred, Chegg invents no fewer than four new "input" markets that are not products, let alone relevant product markets, and a *fifth* market for "Online Educational Publishing" (OEP), that is defined so vaguely and broadly that it encompasses everything (including Google Search and Chegg) and nothing at the same time. Chegg's alleged product markets fail to meet the most

1

fundamental requirement of being defined by reference to reasonable interchangeability. Chegg's reliance on its interpretation of the "practical indicia" discussed in *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962), cannot bring these non-existent "markets" to life. Those indicia are relevant only after a broader product market has been determined based on reasonable interchangeability; they are not a substitute for this threshold requirement or a tool used to create a product market from whole cloth. And *Brown Shoe* fails to help Chegg, even on its terms, as the Amended Complaint (FAC) cannot support any of its indicia with well-pled facts. Chegg's only real response—that if it has failed to allege four valid markets it has alleged one valid one—makes no sense.

And though one would barely know it from Chegg's opposition, most of its theories of unlawful conduct are not those the Court evaluated in the DOJ case. Instead, Chegg's primary gripe is with something it calls reciprocal dealing, which it aims to resuscitate from the dustbin of antitrust history. No court has recognized a reciprocal dealing theory like Chegg's, where there is no "dealing" between the parties. What Chegg really complains about is a refusal to deal on Chegg's preferred terms, which is not cognizable except in limited circumstances not applicable here. And when it is not contesting a refusal to deal, it attacks Google's recent innovation in Search and generative AI—precisely the kind of product improvement that antitrust law encourages. Google continues to index Chegg's content and make it available to users on its search engine. That Chegg's costless benefit from the arrangement may have been reduced over time is not a cognizable antitrust theory.

Fundamentally, the core theories that underlie Chegg's claims do not pass muster—and it is not close—as a matter of law. Chegg has already taken an opportunity to amend to assert a plausible claim and failed. Dismissal should therefore be with prejudice.

## ARGUMENT

### I.    CHEGG FAILS TO PLEAD A CLAIM FOR RECIPROCAL DEALING

#### A.    Google's Lawful Refusal to Deal Is Not Reciprocal Dealing

As Google's motion makes clear (Mot. 9-10), Chegg cannot plead a claim for reciprocal dealing because it has not plausibly alleged an "actual agreement between" Google and Chegg "to make reciprocal purchases." *In re Diamond Shamrock Corp.*, 113 F.T.C. 316 (1990). In response, Chegg argues that "Google threatens to withhold search referral traffic from Chegg and other publishers … unless publishers acquiesce to Google using their content for … republishing, training, and RAG." Opp. 10-11 (citing FAC ¶¶ 152, 155, 166). But the FAC is clear that Google never threatens to *withhold* that traffic, nor could it because Chegg does not and cannot allege that there is any agreement whereby Google is required to deliver such traffic in the first place.

In an implicit admission that it has alleged no evidence of an actual agreement, Chegg's opposition contends that "Google and Chegg had a de facto agreement." Opp. 1. But that is just Latin for "there was no agreement." As explained (Mot. 9), these allegations merely reflect that there is a mutual benefit to the way search engines work—not that Google has entered into any agreement with Chegg or anyone else.

As explained (Mot. 9-10), the implications of Chegg's supposed "implicit and longstanding agreement" are implausible and defy common sense. Opp. 12. If any such agreement did exist, it would mean that Google promises to refer search referral traffic (SRT) to every web publisher whose content was available to be indexed on Google Search—constituting nearly every website in existence. But that is not how a search engine works. If SRT flows to Chegg, that is the result of Google Search *users* clicking on the link to Chegg's website, not any promise made by Google. *See* Mot. 9-10. And if fewer users are clicking on the link to Chegg's website because they are

3

finding their learning needs met elsewhere, that is the result of Chegg's failure to compete with AI or other offerings, not any broken promise by Google.

At bottom, then, what Chegg really alleges is that Google refuses to do business with Chegg on Chegg's preferred terms—namely, that Google has supposedly placed a "condition" on Chegg's inclusion in Google's index and subsequent receipt of referral traffic: use of Chegg's content for republishing on Google's AI-based Search features and training its AI models. *See* FAC ¶ 155. But it is black-letter law that Google "has no duty to deal under the terms and conditions preferred by" Chegg. *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 457 (2009).

Chegg argues that Google mischaracterizes the alleged conduct as a refusal to deal, relying principally on Judge Brinkema's liability decision in *United States v. Google LLC* (*Google Ad Tech*), 778 F. Supp. 3d 797 (E.D. Va. 2025). *See* Opp. 29. Judge Brinkema found that *Trinko* only applied in "highly regulated" industries, *Google Ad Tech*, 778 F.3d at 867, but that is not the law in this Circuit or numerous others where *Trinko* has been applied in cases involving industries and products that are not highly regulated, including Google Search. *See United States v. Google LLC*, 747 F. Supp. 3d 1, 181-184 (D.D.C. 2024).[1] Further, the conduct at issue in *Google Ad Tech* involved "restricting AdX's submission of real-time bids only to DFP, and [] not allowing AdX to provide real time bids to other publisher ad servers." 778 F. Supp. 3d at 861. That conduct is nothing like the alleged conduct here. Chegg complains that Google does not provide it with SRT on its preferred terms—a standard refusal to deal theory. *See e.g., Aerotec Int'l, Inc. v. Honeywell Int'l,* 836 F.3d 1171, 1184 (9th Cir. 2016). Whatever the merits of Judge Brinkema's decision

---

[1] *See also, e.g.*, *FTC v. Qualcomm Inc.*, 969 F.3d 974, 993-995 (9th Cir. 2020) (chips); *Aerotec*, 836 F.3d at 1183-1184 (aircraft repair); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074-1078 (10th Cir. 2013) (operating systems); *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1194-1198 (10th Cir. 2009) (ski resorts); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 53-54 (2d Cir. 2007) (elevators).

evaluating entirely different conduct—a decision with which Google disagrees[2]—it offers Chegg no help.

Chegg also suggests (Opp. 29-30) that *Trinko* can be set aside because this is a monopsony case where Chegg is an input supplier, not a competitor. But Chegg never explains why that matters, and it does not. As Chegg itself argues, Opp. 6, there is no distinction in the relevant legal standard. There is also no refusal to deal exception for monopsony cases, and Chegg does not argue, let alone establish, otherwise.

Chegg's argument that Google's alleged conduct falls within the narrow exception to the refusal to deal doctrine is similarly unavailing. To start, Chegg misstates the exception's requirements, focusing on just one part of a "three-part test." *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 27 (D.D.C. 2021), *aff'd*, 66 F.4th 288 (D.C. Cir. 2023). Chegg fails to address Google's arguments that a valid refusal to deal claim requires "products that the defendant already sells" to "similarly situated customers" and "a willingness to forsake short-term profits to achieve an anti-competitive end." *Id.*; Mot. at 10-11. Chegg likely does not address these requirements because its FAC acknowledges that Google uses content from publishers generally and that Google's opt-out policies apply to all publishers, not just Chegg. *Compare* FAC ¶¶ 166-167, *with Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 610-611 (1985). Chegg also does not allege that Google's refusal to provide Chegg with SRT on Chegg's preferred terms causes Google to forgo short-term profits, nor would such an allegation make sense. Google's conduct reflects a rational decision to use indexed Search data to improve its product.

---

[2] Remedies proceedings in *Google Ad Tech* begin on September 22, 2025. After the court issues its ruling, Google intends to appeal to the Fourth Circuit.

**B.    Chegg Does Not Allege A Viable Reciprocal Dealing Claim**

Chegg's refusal to deal claim fails even if assessed as a claim for reciprocal dealing—under both the *per se* rule and the rule of reason. *See* Mot. 11-23.

**1.    Chegg Fails to Allege *Per Se* Reciprocal Dealing**

**a.    *Per Se* Treatment Is Unwarranted**

Chegg does not dispute that *per se* treatment is rare, reserved for situations where courts have had such "considerable experience" with the restraint that they are confident that "it would be invalidated in all or almost all instances under the rule of reason." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886-887 (2007) (citation omitted); *see* Mot. 12. Chegg has not met that high bar here. Nowhere in its opposition does Chegg explain why coercive reciprocal *selling* (i.e., the arrangement alleged here) has the same economic consequences as coercive reciprocal *buying* (i.e., typical reciprocal dealing). Mot. 12. And critically, Chegg does not deny that the only court to address a similar claim has rejected it. *See* Mot. 13 (citing *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1361-1362 (Fed. Cir. 1999)).

Chegg's only argument is that reciprocal dealing is "analytically similar" to tying, which has in some circumstances received *per se* treatment. Opp. 14. That is plainly insufficient. That tying and reciprocal dealing are "analytically similar" does not mean that courts are equally experienced with each arrangement such that reciprocal dealing can be condemned as *per se* unlawful. Indeed, "reciprocal dealing has not been the subject of extensive case law development." *Brokerage Concepts*, *Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 511-512 (3d Cir. 1998). In any event, even tying is often evaluated under the rule of reason. *See id.* at 513. And "like tying, not all reciprocal dealing arrangements are anticompetitive." *Id.* at 511.

**b.    Chegg Fails to Adequately Plead the Tying and Tied Markets**

Chegg's *per se* reciprocal dealing claim also fails because Chegg has not and cannot plead

legally cognizable tying and tied product markets. *See* Mot. 13-18 (explaining that Chegg must plead that "(1) the tying and tied goods are two separate products" and "(2) the defendant has market power in the tying product market"—both elements of a reciprocal dealing claim, *United States v. Microsoft Corp.*, 253 F.3d 34, 85 (D.C. Cir. 2001)).

*First*, Chegg asserts that Google overstates the requirements for defining a market at the pleading stage. Opp. 16-17. But the very case Chegg cites for the proposition that no "economically technical recitation of the market boundaries" is required, Opp. 16 (quoting *Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*, 947 F. Supp. 2d 88, 103 (D.D.C. 2013)), endorses the exact requirements Google identified (Mot. 14). The "failure to define the market by reference to the reasonable interchangeability—or lack thereof—of services is valid ground for dismissal at the Rule 12(b)(6) stage." *Sky Angel*, 947 F. Supp. 2d at 103 (citation omitted). Chegg's failure to even attempt to satisfy this bedrock requirement is by itself fatal to any reciprocal dealing claim.

*Second*, Chegg's attempt to salvage an alleged "tying" market for SRT fails. Opp. 17-20. For starters, SRT is not a product at all—it is not marketed to counterparties or exchanged for consideration in any sense. Rather, so-called SRT is a consequence of behavior of *users,* who choose to click or not click on links, not anything done by Google. Chegg's citation to *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023), is not to the contrary. There, the Ninth Circuit declined to adopt "a categorical rule that an antitrust market can *never* relate to a product that is not licensed or sold" because it recognized that "there may be markets where companies offer a product to one side of the market for free but profit in other ways, such as by collecting consumer data or generating ad revenue." *Id.* at 978. Critically, in those markets, a *product* is being offered and the other requisites for a relevant market are satisfied. *Epic Games* does not suggest that Chegg's supposed SRT market—involving a non-existent product where no transaction is alleged

to occur—can constitute a relevant market. Any claim based on a market for SRT should be rejected on that basis alone.

Even if SRT were the kind of "product" that would support a market, Chegg fails to identify any factual allegations establishing this supposed market. Chegg "fails to draw the market's boundaries to encompass the product at issue as well as all economic substitutes for the product" and thus "cannot state a claim for relief." *PhantomALERT v. Apple, Inc.*, 762 F. Supp. 3d 8, 22 (D.D.C. 2025) (internal quotations omitted). As explained (Mot. 15), Chegg's acknowledgement that web publishers can obtain referral traffic from other sources such as direct navigation, navigation via links or social media, or paid ads, FAC ¶ 153, is a concession that these other forms of referral traffic *are* reasonable substitutes for SRT.

Chegg attempts to walk that back by arguing that substitution to direct navigation or social media traffic could not "constrain any anticompetitive pricing" for SRT. Opp. 18 (quoting *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 20 (D.D.C. 2017)). But that theory does not work. Chegg claims that these forms of referral traffic could not wholly "replace" Google Search, but they need not wholly "replace" Google Search to constrain "*any*" anticompetitive pricing. Opp. 18 (emphasis added). Indeed, the "key question" is whether "products are sufficiently close substitutes" to "constrain any anticompetitive … pricing." *Aetna,* 240 F. Supp. 3d at 20 (quotation omitted).

Chegg also argues that the purported market for SRT bears some of the "practical indicia" discussed in *Brown Shoe*, 370 U.S. at 325. *See* Opp. 18. Even if this were true, this does not relieve Chegg from needing to first define the "outer boundaries of [the] product market … by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." 370 U.S. at 325. *Brown Shoe* merely states that "*within"* a market that has already been defined by reasonable interchangeability, there may be "submarkets" whose

"boundaries" can be determined by examining certain "practical indicia." *Id.* (emphasis added). As the Sixth Circuit has explained, "these practical indicia come into play only *after* the 'outer boundaries of a product market are determined' by evaluating 'the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.'" *Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 918 (6th Cir. 2009) (emphasis added) (quoting *Brown Shoe*, 370 U.S. at 325)). The "reasonable-interchangeability analysis" is still the "essential test for ascertaining the relevant product market." *Id.* (citation omitted). Instead, Chegg seeks to steal second base without having first gotten a hit or walk.

Furthermore, Chegg's contention that the purported market for SRT bears "practical indicia" of a submarket makes little sense. For example, the supposed "industry recognition" that Chegg cites (Opp. 19) does nothing to establish a market for SRT. This indicium considers whether there is "industry or public recognition of the submarket as a *separate economic entity*." *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1038 (D.C. Cir. 2008) (emphasis added). Chegg's cited allegations establish only that users of Google Search click on links that appear in search results. *See* FAC ¶¶ 72, 77, 125-126, 142-144. That shows, at best, that users want to visit the websites that Google presents to them in its search results, not that there is any recognition of SRT as a commercial product, much less a relevant market in which Google and other firms compete to provide such a product. Similarly, Chegg states that the market for SRT has the "[p]eculiar characteristic[]" of "connect[ing] a user with a search query to a web publisher with the information that can answer that query." Opp. 18. But of course, as this Court knows, AI chatbots that provide links have that same (not so) "peculiar characteristic"—they connect a user with a question to links to web-published material that answers that question (and *also* add value by synthesizing and summarizing the information from multiple publishers). *See United States v.*

*Google, LLC*, 2025 WL 2523010, at *11 (D.D.C. Sept. 2, 2025) ("[C]hatbots perform an information-retrieval function like that performed by GSEs.").

*Third*, Chegg argues that the FAC adequately alleges an "input market" for SRT: the supposed market for "Search Index Data," in which Chegg claims Google is a monopsonist. Opp. 20-21. But as explained (Mot. 16), such a market makes no sense because Google simply indexes content publishers make available and then makes that content available to users. And unlike in typical input markets, a publisher's choice to make its content available to Google for crawling does not limit its ability to license the same content to other search engines or distributors— meaning that Chegg's market definition fatally fails to account for "reasonable interchangeability of use." *Brown Shoe*, 370 U.S. at 325; Mot. 16. Chegg's response is unavailing. It argues that "[c]ontent licensed for one purpose is restricted to that use; it is not reasonably interchangeable with products licensed for other purposes." Opp. 21. But, as Google explained, a publisher's choice to make its content available for crawling by Google does not preclude it from making that same content available to other search engines for the same purpose, nor does it prevent Chegg from licensing (or otherwise making available) its content to OpenAI, Anthropic, Perplexity, and so on. *See* Mot 16.

Chegg also fails to resuscitate its weak assertion that Google is a monopsonist in the purported input market. As Google explained, Chegg asserts only that "Google's monopoly power in search gives it monopsony power in the Input Market for publishing content that drives search results," FAC ¶ 93, but a monopolist in one market downstream is not inherently a monopsonist in an upstream input market. *See* Mot. 17. Thus, the fact that Google may be a monopolist in the downstream market for GSS (a proposition that it continues to vigorously dispute) does not mean that Google can be presumed a monopsonist with respect to its key inputs (or anything). The FAC

alleges nothing to support that presumption.

Indeed, the FAC specifically points to numerous other buyers for its and other publishers' content. *See, e.g.*, FAC ¶¶ 97-98. Chegg asserts that these buyers of "Search Index Data" are not "reasonably interchangeable" with Google because they cannot provide as much search traffic as Google. Opp. 21. But Chegg cites no support for the proposition that only competitors with equal market share constitute "reasonably interchangeable" buyers, and there is none. To wit, "[w]hen there are numerous sources of interchangeable demand, the plaintiff cannot circumscribe the market to a few buyers in an effort to manipulate those buyers' market share." *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1119 (10th Cir. 2008).

*Fourth*, Chegg claims that it has adequately alleged the tied markets for Republishing, GAI Training, and RAG Content. Opp. 22-23. But again, Chegg makes no allegations about "the reasonable interchangeability of use or the cross-elasticity of demand," *Brown Shoe*, 370 U.S. at 325, or any factual allegations that support the existence of these as distinct markets. *See* Mot. 17-18. Moreover, as Google has explained (Mot. 18), Chegg's poorly defined input market (and arguably, its OEP market) seems to involve the use of the same content as the tied markets, directly contradicting Chegg's allegations that these markets are distinct. Chegg responds that, even if these markets involve the same content, they are distinct because "[g]ranting permission to use content for one use does not confer the right to use content for other purposes." Opp. 23. But that just restates Chegg's claim that Google has "misappropriated" its content, which fails under both antitrust and unjust enrichment law. *See* Mot. 3, 41-44.[3] And it is not always true. Content can be blanket-licensed for all purposes. And in all events, Chegg does not explain why the content is

---

[3] In its original complaint, Chegg raised a claim of "misappropriation" under the Sherman Act but dropped that claim after amendment. *See* Compl. ¶¶ 171-177.

being used for such different "purposes" in each of its alleged markets to render them distinct.

Chegg is also wrong that "even if Republishing, GAI Training, and RAG Content could be considered as a single product market, that would not affect the analysis of Chegg's claim." Opp. 23. Chegg must plausibly plead any tied market with reference to reasonable interchangeability of demand, and Chegg has not even attempted to do so for this alternative, composite market. That is, one poorly defined market leaves Chegg no better off than if it has three poorly defined markets.

*Finally*, Chegg once again resorts to the "practical indicia" discussed in *Brown Shoe*. *See* Opp. 22-23. But as explained, that is not an alternative to defining the market based on the reasonable interchangeability of use, *see supra* pp. 8-9, which Chegg has failed to do. Regardless, none of Chegg's assertions of distinct "indicia" are supported by factual allegations. Chegg merely (1) asserts that each of these supposed types of content has "independent value," (2) claims that "[p]ublic reporting" and courts have recognized the existence of these markets without pointing to any reports or cases that actually recognize these three markets, and (3) asserts that the customers for these markets are "technology companies that deploy LLMs" without explaining how that distinguishes these purported markets from each other or any others. Opp. 22-23. This mere recitation of *Brown Shoe*'s indicia "stops short of the line between possibility and plausibility," and is therefore inadequately pleaded. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 546 (2007).

### c.     Chegg Fails to Allege Coercion

Chegg has also failed to plausibly allege coercion, the third element of a *per se* reciprocal dealing claim. *See* Mot. 19-21; *Microsoft*, 253 F.3d at 85. As already explained, Google cannot have "threaten[ed] to withhold" (Opp. 10) referral traffic from Chegg, because Chegg does not and cannot plausibly allege that Google promised to deliver any amount of referral traffic (or any traffic at all) in exchange for Chegg allowing Google to index Chegg. *See supra* pp. 3-4. All Google has done is index publicly available content that publishers such as Chegg make available

for indexing and place that content on its search engine, as it has long done. This longstanding practice has not somehow become coercive simply because Google now presents information differently. Google has merely enhanced its Search product to more efficiently provide users with the information they seek, including by synthesizing Search results with generative AI. That does not reflect a change in the parties' relationship to the extent they have any to begin with. Chegg may feel (though it fails to show) that AI Overviews lessens its search traffic from Google, but Chegg does not and cannot allege that it was Google's supposed coercion, as opposed to the introduction of AI Overviews itself (with or without Chegg content) that is responsible for the decline.

Chegg's allegations fail to establish coercion for other reasons, too. For one, Google does not charge publishers to index their websites, and courts have uniformly held that there can be no coercion for acceptance of a free service. *See*, *e.g.*, *Athos Overseas, Ltd. v. YouTube, Inc.*, 2022 WL 910272, at *3 (S.D. Fla. Mar. 29, 2022); *see also* Mot. 19. Chegg claims that the plaintiff there "failed to allege coercion" because it was not "forced" to buy the free service. Opp. 12. But Chegg too has the option to block Google from indexing its content, in part or in whole. *See* FAC ¶ 36.

Chegg also entirely fails to address the fact that Chegg's own FAC undermines its allegation that Google "coerc[es] publishers to supply content to be used for other purposes as a condition of being included in its search index *at all*." FAC ¶ 152 (emphasis added). For example, publishers can use the "nosnippets" metatag to prevent snippets of their content but still appear in Search results. *Id.* ¶¶ 81-82. This means that publishers do not need to supply "Republishing Content." Nevertheless, Chegg continues to argue that if it "refuses to permit Google to use its content *for all purposes*, Chegg risks never being discovered by consumers and cedes that competitive ground to Chegg's publishing rivals." Opp. 12-13 (emphasis added). Even putting

aside that error, those effects do not stem from any coercive conduct *by Google*. Google is offering a non-coercive choice, and to the extent that Chegg feels coerced, that is because Google has the highest-quality search engine that billions of people choose to use. That is not unlawful behavior.

### 2.    Chegg's Reciprocal Dealing Claim Fails Under the Rule Of Reason

Because Chegg fails to plausibly allege *per se* reciprocal dealing, its claim must be analyzed under the rule of reason, under which Chegg must plausibly allege that the alleged conduct harmed competition in the market for the tied product. *See Brokerage Concepts*, 140 F.3d at 510-512. As Google has explained (Mot. 21-23), the FAC fails to do so for several reasons. *First*, because the allegedly tied markets are not adequately alleged, Chegg necessarily fails to plead anticompetitive harm within such markets. Mot. 21. *Second*, Chegg fails to sufficiently allege harm to *competition* in any market; it merely provides speculative, generalized allegations of reduced output. Mot. 21-22. But a reduction in output, like charging a monopoly price, is not itself unlawful. *Third*, the alleged harms in the markets for GSS (*see* FAC ¶¶ 189, 202) and OEP (*see* FAC ¶¶ 190, 203) are irrelevant because they do not reflect harm to competition in the allegedly tied markets for Republishing, GAI, and RAG content. Mot. 22-23. And to the extent Chegg claims harm to competition in the alleged Republishing, GAI Training, and RAG content markets because it was paid less for content, Chegg has not plausibly alleged that harm was caused by Google's alleged reciprocal dealing, as discussed below. Mot. 23; *see infra* p.15.

Chegg does not answer *any* of these points. Instead, it merely asserts that "Google's conduct has substantial anticompetitive effects" and provides a laundry list of citations to its FAC. Opp. 16. But Chegg does not explain why any of its cited paragraphs specifically allege harm *to competition*—that output was reduced below what would be expected in a competitive market or that it was caused by Google's alleged reciprocal dealing. Nor does it explain why alleged effects "in the Online Educational Publishing market," Opp. 16, are relevant given that it is not the

allegedly tied market. To be sure, at this stage, Chegg need not conclusively prove anticompetitive effects, but as Chegg admits, it needs to "*plead* an injury *to competition*," Opp. 16 (quoting *Fotobom Media, Inc. v. Google LLC*, 719 F. Supp. 3d 33, 50 (D.D.C. 2024)). Chegg fails to do so.

### C.    Chegg Lacks Antitrust Standing for Its Reciprocal Dealing Claim

Chegg's alleged injuries for its reciprocal dealing claim are insufficient to support antitrust standing. To adequately plead antitrust standing, Chegg must plausibly allege "that the defendant's illegal conduct caused its injury" and that the "injury . . . reflect[s] the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 806, 812 (D.C. Cir. 2001) (citation omitted).

For starters, Chegg's allegations that it is being underpaid for Republishing, GAI, and RAG Content make no sense. Chegg insists that "Google . . . pay[s] a zero access price," Opp. 24, but Google's decision to not pay for Chegg's content is, as already discussed, a lawful refusal to deal, and thus is not an "injury of the type the antitrust laws were intended to prevent." *Andrx*, 256 F.3d at 812 (citation omitted). And Chegg has offered no allegations whatsoever that Google's nonpayment to Chegg is resulting in reduced prices from other companies. Mot. 23.

Nor do Chegg's claimed "diminished click-throughs and resulting diminished subscription revenues," Opp. 26, suffice for standing. Chegg has not plausibly alleged that these harms occurred because of Google's conduct, rather than other, more obvious causes, like the rise of GenAI more broadly. Mot. 24-25. *Cf. Google*, 2025 WL 2523010, at *12 (recognizing that "homework help" is a "use case[] for which people typically choose chatbots over search").

## II.    CHEGG FAILS TO PLEAD UNLAWFUL MONOPOLY MAINTENANCE

### A.    Chegg Does Not Allege Exclusionary Conduct In The GSS Market

Chegg's opposition fails to identify any anticompetitive conduct by Google (that it challenges) in the GSS market. *First*, as Google noted before (Mot. 29), Chegg's allegations

amount to an argument that Google Search has become too efficient, but "product improvement by itself does not violate Section 2, even if it is performed by a monopolist and harms competitors as a result." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 999-1000 (9th Cir. 2010). Chegg accuses Google of misstating the law, Opp. 28, but that is because Chegg wrongly conflates "product improvement" with "changes in product design." *Allied Orthopedic*, 592 F.3d at 998-999. The former is always immune; the second is not. *See id.* at 1000 ("There is no room . . . for balancing the benefits or worth of a product improvement against its anticompetitive effects."). As Google has thoroughly explained, there is no question that the AI features that Chegg challenges were adopted to better serve its Search users. This Court has recognized that AI Overviews "has had a generally positive effect on Search—Google has seen an increase in both consumer satisfaction and volume of queries." *Google*, 2025 WL 2523010, at *10. Chegg nonetheless insists that "Google's product-improvement argument raises a fact dispute that is not susceptible to resolution at this stage," Opp. 29, but it is Chegg's burden to adequately plead its claims. Here, Chegg itself alleges that these features improve users' ability to find answers to their queries. *See, e.g.*, FAC ¶¶ 6-7, 75, 77, 126. That is a clear product improvement. Chegg claims that product design changes can be illegal when "the monopolist abuses or leverages its monopoly power in some other way when introducing the product." Opp. 28 (quoting *Allied Orthopedic*, 592 F.3d at 1000). Here, however, Chegg has offered no allegations suggesting that Google leveraged its monopoly power in rolling out its AI features, and indeed such features are also offered by Bing and other Google rivals who are not alleged to have any market power. *See Google,* 2025 WL 2523010, at *10.

   *Second*, Chegg argues that Google's alleged "coercion [of Chegg] is anticompetitive conduct." Opp. 31. But this purported conduct is not exclusionary in the GSS market: It relates to

how Google allegedly obtains content from Chegg, not how Google excludes rivals from obtaining content from Chegg, or how Google's conduct prevents Chegg from dealing with Google's rivals. Chegg's allegations thus boil down to an argument that Google "mistreated" Chegg, because Chegg would have preferred a different arrangement, not that "this mistreatment harmed competition in [the relevant market.]" *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1141 (9th Cir. 2022) That is not exclusionary conduct. *Id.* ("Google harming one of its own online search advertising customers does not exclude its competitors in the online search advertising market, *i.e.*, Yahoo! and Bing.").

*Third*, Chegg points to alleged harms of "reduced output and decreased quality" as anticompetitive. Opp. 32. But neither reduced output nor decreased quality are inherently anticompetitive; in fact, such alleged results can make it *easier* for rivals to compete with the alleged monopolist. *See* Mot. 30-31. Chegg misinterprets the cases that it cites on this point. For example, Chegg cites *FTC v. Meta Platforms, Inc.*, 775 F. Supp. 3d 16 (D.D.C. 2024), but that opinion explains that, while these kinds of alleged harms may constitute evidence of anticompetitive conduct, they are "downstream from the anticompetitive effect itself." *Id.* at 54. Instead, "[i]n identifying the anticompetitive effects," the focus is on "whether the actions foreclosed competition on the merits, not whether they led to price or output changes." *Id.* Chegg's reliance on these downstream effects is therefore insufficient.

*Finally*, Chegg argues that it alleged that Google's rivals in the GSS market cannot obtain the relevant content in the same way as Google. Opp. 32 (citing FAC ¶¶ 162, 179). But Chegg's cited allegations do not involve GSS providers, like Bing or Yahoo; instead, they involve OpenAI, a generative AI company that Chegg does not allege provides GSS. As Google demonstrated, Mot. 28-30, Chegg alleges only that "some," but not all, "competitor search platforms" must pay a

higher price for the same content. FAC ¶ 175. Chegg points to no allegations that GSS competitors like Bing or Yahoo do not or cannot use similar policies. Even accepting Chegg's framing, the allegations amount to arguing that Google, by virtue of its size, can obtain better pricing, which Chegg analogizes to "charging supracompetitive prices." FAC ¶ 177; *see* Opp. 35 n.10. But supracompetitive pricing, even by a supposed monopsonist, is not itself anticompetitive. *See Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922, 929 (1st Cir. 1984) (Breyer, J.) ("A legitimate buyer is entitled to use its market power to keep prices down."); *see also Dreamstime.com*, 54 F.4th at 1141 ("[Monopoly pricing] is a feature, not a bug, of the free market system").

**B.    Even If Chegg Had Plausibly Alleged Exclusionary Conduct, It Has Failed To Allege That It Possesses Antitrust Standing.**

Even if Chegg had plausibly alleged exclusionary conduct in the GSS market, it does not plausibly allege that it suffered its injury in that market from the alleged exclusionary conduct or that it has "proper-plaintiff status." Mot. 26-29. Chegg effectively concedes that it does not offer GSS and is not a consumer of GSS. Chegg instead seeks to rely on atypical theories of antitrust standing to bring its claim based on alleged anticompetitive conduct in the GSS market. It fails.

Chegg begins by arguing that it has antitrust standing because it is involved in both "the input market" and "output market" for search, and Google's conduct in the GSS market has effects in both. Opp. 33-34. But Chegg has failed to sufficiently allege either of these markets. *Supra* pp. 6-10; Mot. 13-18. Even if it had, it would still not have standing, because not every "input" supplier to a monopolist is thereby a victim of monopsony. The existence of monopsonistic market power in the input market, along with a properly pleaded anticompetitive act that created or maintained that monopsony (as opposed to a mere monopoly in an adjacent market), is required, and Chegg has failed to plead either, instead choosing to improperly rely on this Court's previous findings with respect to a completely separate GSS market in *Google Search*. Mot. 27.

18

Chegg then alternatively asserts that it has standing based on the rarely applied principle from *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982) that harms that are "inextricably intertwined" with the alleged competitive harm inflicted on competitors are sufficient to support antitrust standing. Opp. 35-36. But as this Court has recognized, a plaintiff must "clear[ a] high bar" to establish standing under *McCready*. *Fotobom*, 719 F. Supp. 3d at 47. To do so, Chegg must allege that it is being "used as a conduit" to inflict harm on Google's competitors. *Id.* (alteration omitted). Nothing in the FAC supports that notion.

Chegg is also not a "proper plaintiff" for this type of action, as its injuries are too indirect and speculative. Mot. 27-29. Chegg's claims depend on a number of contingencies that go beyond Chegg's allegations or a direct causal chain. While Chegg argues that "underpayment" is a direct injury, Chegg fails to plausibly allege that Google's allegedly non-monopolist competitors would have paid for the same content. Mot. 28.

## III.    THERE IS NO CLAIM FOR MONOPOLY LEVERAGING UNDER THE SHERMAN ACT

As previously explained, there is no independent "monopoly leveraging" claim under Section 2 of the Sherman Act. Mot. 31-32. In response, Chegg points to two out-of-circuit cases from the 1970s—*Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) and *Sargent-Welch Scientific Co. v. Ventron Corp.*, 567 F.2d 701 (7th Cir. 1977)—that supposedly demonstrate the existence of such a claim. *See* Opp. 37. Far from it. Both cases precede the Supreme Court's decision in *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993), which clarified that Section 2 "makes the conduct of a single firm unlawful *only* when it actually monopolizes or dangerously threatens to do so." *Id.* at 459 (emphasis added). Indeed, the Second Circuit has since revisited its *Berkey Photo* decision and stated that "uncertainty exists as to the continued scope of a monopoly leveraging claim as an independent cause of action." *Virgin Atl. Airways Ltd. v. Brit. Airways PLC*, 257 F.3d 256, 272 (2d Cir. 2001). As noted (Mot. 31-32), to

the extent that courts in this Circuit have addressed monopoly leveraging as an independent Section 2 claim, they have been skeptical of or expressly rejected it.

Chegg also cites *2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*, 342 F. Supp. 3d 126 (D.D.C. 2018), as an example of a case in this district that recognized an independent monopoly leveraging claim under Section 2 of the Sherman Act. Opp. 37-38. But in *M Cinema*, "leveraging conduct" was referenced only as a component of a Section 1 claim for circuit dealing, 342 F. Supp. 3d at 132-135, and as conduct to support an overall monopolization or attempted monopolization claim under Section 2, *id.* at 138-139. The case does not support Chegg's argument that an independent cause of action for monopoly leveraging exists.

## IV.  CHEGG FAILS TO PLAUSIBLY PLEAD ATTEMPTED MONOPOLIZATION OF THE OEP MARKET

### A.    Chegg Failed To Define The OEP Market

Despite several different tries, Chegg fails to show an OEP market. *First*, Chegg's argument that Google "focuses solely on Chegg's description of pedagogical content's attributes and ignores the market-defining allegations" in the FAC misses the mark. Opp. 39. It is Chegg, not Google, that used "pedagogical content" to define the market. FAC ¶ 54 ("Other forms of online informational content … fail to combine key attributes … [including pedagogical focus"), ¶ 60 ("The primary purpose of Online Educational Publishing is pedagogical."). Although market definitions may tolerate some "fuzziness," Opp. 39, Chegg's allegations are not merely fuzzy but indecipherable. For example, Chegg points to its allegations as to the "format of" OEP, Opp. 38, but the allegation says only that format "*can* vary" and "*may* include" certain characteristics—it adds no clarity whatsoever to the market definition. FAC ¶ 61 (emphasis added).

*Second*, Chegg seeks to distinguish the cases that Google cites because they concern "the specific problem of plaintiffs drawing markets too narrowly and thus potentially overstating

defendants' market power," and argues that this is not an issue because "Chegg's monopoly leveraging claim does not require Chegg to allege that Google currently has market power in this market." Opp. 39. Chegg cites nothing to support this argument, and many of the cases that Google cites are not specifically about the problem of drawing markets too narrowly. *See, e.g.*, *In re Google Digital Advert. Antitrust Litig.*, 721 F. Supp. 3d 230, 254 (S.D.N.Y. 2024). But even if an independent monopoly leveraging claim were possible (it is not), Chegg also relies on this alleged OEP market for its attempted monopolization claim, a claim which *does* depend on establishing market share. *See infra* Section IV.B; *Fotobom*, 719 F. Supp. 3d at 52.

*Finally*, Chegg misunderstands Google's argument regarding whether Google competes in the OEP market. Opp. 39-40. As Google explained, Chegg's inadequate allegations for why Google competes in the OEP market demonstrate that the alleged market is fatally overbroad and vague. Mot. 34. Chegg's opposition demonstrates this problem yet again: Chegg argues that "the fact that AI Overviews may serve educational content *and* other content does not mean that AI Overviews are excluded from the Online Educational Publishing market." Opp. 39-40. But Chegg's market definition requires that the "*primary* purpose" be pedagogical, such that if another purpose is "primary," it does not qualify for the market. FAC ¶ 60 (emphasis added). Because AI Overviews serves content that is not always pedagogical, Google is excluded from Chegg's alleged market. Yet Chegg also notes that "nearly 90% of queries that trigger AI Overviews are informational," Opp. 42, again suggesting that *any* informational content fits in its alleged OEP market, despite other allegations attempting to distinguish educational from general informational content. Ultimately, Chegg's OEP market definition is based on vague and self-contradicting allegations. Chegg's attempted monopolization claim fails on this basis.

### B.    Chegg Does Not Plausibly Allege Attempted Monopolization

Even if Chegg has sufficiently alleged an OEP market, it has not plausibly pleaded the three elements of its attempted monopolization claim. *See Spectrum Sports*, 506 U.S. at 456. *First*, Chegg has not plausibly alleged harm to competition in the OEP market, and Chegg again confuses alleged price-related harm with anticompetitive conduct. Chegg bases its argument on the same facts supporting its alleged reciprocal dealing claim, but none of these facts show harm to *competition* within the OEP market. As Google has explained, Mot. 37; *supra* Section I.B.1.b, Google's conduct does not exclude publishers or prevent publishers from licensing content, and even accepting Chegg's allegations, Google's conduct does not affect publishers that rely on other means by which individuals access their websites, like direct navigation. *See* Mot. 22. To the extent that Chegg alleges that losing clicks constitutes anticompetitive conduct, this harm occurs in its purported SRT market, not in the alleged OEP market.

*Second*, Chegg fails to allege specific intent to monopolize. As Google explained, Mot. 38, sufficiently pleading specific intent to monopolize requires that the alleged conduct has "no legitimate business justification but to destroy or damage competition." *City of Moundridge v. Exxon Mobil Corp.*, 471 F. Supp. 2d 20, 43 (D.D.C. 2007). But Chegg's argument and allegations come nowhere close. Chegg argues that it alleged that Google knew it was putting web publishers into a challenging position, Opp. 40-41, but even accepting that description of the allegations, Google's alleged conduct clearly had a "legitimate business justification": making its results even more responsive to user queries. Chegg never addresses this point and instead cites a prior discussion of Google's product-improvement arguments. Chegg ignores that the standard for specific intent to monopolize is distinct and higher. *See New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 651 (2d Cir. 2015) ("Attempted monopolization, unlike monopolization, requires a finding of specific intent.").

*Third*, Chegg's opposition confirms that it lacks sufficient allegations to support a dangerous probability of monopolization. For one, Chegg's allegations do not show—nor does its opposition meaningfully rebut—that the purported OEP market can be monopolized. In particular, Chegg does not plausibly allege entry barriers that protect the alleged market. None of Chegg's arguments indicate that new entrants would incur costs "not incurred by incumbent firms." *L.A. Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1427 (9th Cir. 1993). To the contrary, one of Chegg's primary arguments is that existing online publishers suffer harm from Google's conduct. Chegg also invokes dicta in *United States v. Microsoft Corp.* to argue that this element can be satisfied if a party "would likely erect significant barriers to entry upon acquisition of a dominant market share," Opp. 43 (quoting 253 F.3d at 84), but that opinion indicated only that the plaintiff did not make such an argument, not that such evidence would necessarily be sufficient. Regardless, as Google has explained (Mot. 39), it is difficult to imagine a category with *fewer* barriers to entry than online textual content, and this basic inference warrants dismissal.

Further, Chegg's opposition does not show that it plausibly alleged that Google has a dangerous probability of monopolizing this alleged market. Chegg fails to analyze Google's alleged conduct against Chegg's actual definition of its relevant market, which includes that the "primary purpose" be pedagogical and that the content be "curated" and "verified," none of which Chegg suggests are true of Google's AI features. Mot. 40-41. Chegg's other allegations also fall short. For example, Chegg claims to have made allegations regarding Google's share of the OEP market, but none of the referenced allegations do so. Opp. 42 (allegations related to AI Overview's coverage of information or education questions, *not* market share); *see Phila. Taxi Ass'n, Inc v. Uber Techs., Inc.*, 886 F.3d 332, 342 (3d Cir. 2018) (dismissing where "allegation falls short of indicating Uber's market share in the context of *all* the competitors in the . . . market").

## V. CHEGG MISSTATES AND FAILS TO MEET THE STANDARD FOR UNJUST ENRICHMENT

Count VI fails because California does not recognize a cause of action for unjust enrichment and Chegg does not sufficiently allege a claim for restitution that California permits.

"California law is clear: 'Unjust enrichment is not a cause of action.'" *Abuelhawa v. Santa Clara Univ.*, 529 F. Supp. 3d 1059, 1070 (N.D. Cal. 2021). Chegg's argument to the contrary relies on a misreading of *Hartford Casualty Insurance Co. v. J.R. Marketing, LLC*, 61 Cal. 4th 988 (2015), and an application of *Bruton v. Gerber Products Co.*, 703 F. App'x 468 (9th Cir. 2017), an unpublished Ninth Circuit decision that has since been repudiated. *See* Opp. 43-44. As one California district court has noted, "*Hartford* 'raised a narrow question' limited to 'the facts of th[at] case.'" *Abuelhawa*, 529 F. Supp. 3d at 1071 (citation omitted). "[P]ublished post-*Hartford* decisions by California Courts of Appeal have confirmed that '[u]njust enrichment is not a cause of action.'" *Id.* (collecting cases) (quoting *De Havilland v. FX Networks, LLC*, 21 Cal. App. 5th 845, 870 (2018)). The Ninth Circuit's suggestion to the contrary in its unpublished 2017 *Bruton* decision is not binding on this Court and has been repudiated by the Ninth Circuit itself, by California Courts of Appeal, and by every federal district court in California.[4]

Chegg argues in the alternative that it has sufficiently pleaded a quasi-contract claim for restitution because it alleges that "Google leverages its monopoly power in the search market to force Chegg to supply content for Google's GAI products." Opp. 44. But as Google has explained, Chegg's theory of coercion is legally defective because the antitrust laws do not require Google to deal with Chegg on Chegg's preferred terms. *Supra* pp. 4, 12-13. Even if Chegg's theory was

---

[4] *See, e.g.*, *Baiul-Farina v. Lemire*, 804 F. App'x 533, 537 (9th Cir. 2020); *A.J. Fistes Corp. v. GDL Best Contractors, Inc.*, 38 Cal. App. 5th 677, 697 (2019); *Griffith v. TikTok, Inc.*, 2023 WL 9019035, at *6 (C.D. Cal. Dec. 13, 2023); *Dairy, LLC v. Milk Moovement, Inc.*, 2022 WL 2392622, at *8 (E.D. Cal. July 1, 2022); *In re Theos Dark Chocolate Litig.*, 750 F. Supp. 3d 1069, 1091-1092 (N.D. Cal. 2024); *Fried v. Snapple Beverage Corp.*, 753 F. Supp. 3d 1145, 1154 (S.D. Cal. 2024).

somehow tenable under the antitrust laws, Chegg would still fall far short of plausibly alleging coercion for purposes of its quasi-contract claim because it has not alleged that it has "no reasonable alternative but to succumb" because its "only other alternative is bankruptcy or financial ruin." *Uniwill v. City of L.A.*, 124 Cal. App. 4th 537, 545 (2004). Chegg's claim that it deals with Google on "penalty of financial harm" is insufficient to clear this high bar. Opp. 13. Indeed, Chegg's cited case, *Leeper v. Beltrami*, 53 Cal. 2d 195 (1959), concerning foreclosure of the plaintiff's home, involved precisely the kind of ruinous harm that is sufficient to plead duress.

## VI.   AMENDMENT WOULD BE FUTILE

Perhaps conceding the insufficiency of its factual allegations, Chegg requests leave to amend its FAC again, this time with usage data, content licensing deals, and unspecified "newly available information" about Google's "GAI product[s]." Opp. 45. But Chegg does not explain why these allegations would salvage its legally flawed theories. *See Belizan v. Hershon*, 434 F.3d 579, 583 (D.C. Cir. 2006) (dismissal with prejudice is appropriate when "the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency"). Chegg's suggestion that it may wish to amend with other, as-of-yet unidentified information is far too speculative to give Chegg a third bite at the apple and require Google to continue litigating this matter, which at its core runs contrary to the purpose of the antitrust laws. *See Rollins v. Wackenhut Servs., Inc.,* 703 F.3d 122, 131 (D.C. Cir. 2012) (upholding dismissal with prejudice because plaintiff did not "indicate[] that she will be able to plead sufficient facts to state a claim for relief," even in the absence of a finding that plaintiff "could not" do so). If Chegg had facts that it believed could salvage its claims, it surely would have offered them in its earlier amendment or, at a minimum, with its opposition. Its failure to do so confirms the futility of any putative amendment.

## CONCLUSION

For the reasons above, Chegg's FAC should be dismissed with prejudice.

Dated: September 19, 2025                    Respectfully submitted,

By: _/s/ Sonal N. Mehta_
Sonal N. Mehta*
Chris Johnstone*
WILMER CUTLER PICKERING HALE
AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA  94306
Telephone: (650) 858-6000
Facsimile: (650) 858-6100
sonal.mehta@wilmerhale.com
chris.johnstone@wilmerhale.com
*Admitted Pro Hac Vice*

David Gringer (Bar No. 1001200)
WILMER CUTLER PICKERING HALE
AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888
david.gringer@wilmerhale.com

*Counsel for Defendants Google LLC &*
*Alphabet Inc.*